No. 1:08cv720

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

_____

GUSTAVO JULIAN GARCIA,

*Petitioner,*

v.

NATHANIEL QUARTERMAN,
            Director, Texas Department of Criminal Justice,
            Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
366th District Court of Collin County, Texas

_____

## PETITION FOR WRIT OF HABEAS CORPUS

_____

**JAMES W. VOLBERDING**       **JOHN E. WRIGHT**
SBN: 00786313                 SBN: 20048500

Plaza Tower                   Law Office of John E. Wright, P. C.
110 North College Avenue      P. O. Box 6547
Suite 1850                    Huntsville, Texas 77342-6547
Tyler, Texas 75702

(903) 597-6622 (Office)       (936) 291-2211 (Office)
(903) 597-5522 (fax)          (832) 201-0463 (fax)
*e-mail: volberding@attglobal.net  e-mail: wright49@swbell.net*

Court-Appointed Attorneys for the Petitioner

No. 1:08cv720

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

_____

GUSTAVO JULIAN GARCIA,

*Petitioner,*

v.

NATHANIEL QUARTERMAN,
            Director, Texas Department of Criminal Justice,
            Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
366th District Court of Collin County, Texas

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, GUSTAVO JULIAN GARCIA, the Petitioner, and respectfully submits his

Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the

Institutional Division of the Texas Department of Criminal Justice.  This application follows his

conviction and death sentence in the 366th District Court of Collin County, Texas, cause number

366-80185-91, styled *State v. Gustavo Julian Garcia.*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, GUSTAVO JULIAN GARCIA, certifies

that the following listed persons have an interest in the outcome of this case.  These representations

are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Gustavo J. Garcia | Polunsky Unit | Petitioner |
| Mr. James W. Volberding | 110 North College Avenue Suite 1850, Plaza Tower Tyler, TX 75702 (903) 597-6622 | Appointed attorney for current federal habeas and 1999 federal habeas |
| Mr. John C. Wright | P. O. Box 6547 Huntsville, Texas 77342-6547 (936) 291-2211 | Appointed attorney for current federal habeas |
| Mr. Steven R. Miears | P.O. Box 736 Bonham, TX 75418 | Attorney for Garcia in second trial, second direct appeal, and petition to Supreme Court |
| Mr. William C. Meili | Dallas | Appointed attorney for 1999 federal habeas |
| Mr. Michael L. Strasser | Wylie, Texas | Represented Garcia at first trial and first state direct appeal. |
| Mr. Ronald T. Wilson | Dallas | Represented Garcia at first trial. |
| Mr. Richard Anderson | Dallas | Represented Garcia in first state habeas action |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |

iii

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Ms. Fredericka Sargent | Office of the Attorney General *Counsel for the State* Capital Litigation Division P.O. Box 12548, Capitol Station Austin, TX 78711-2548 (512) 936-1600 (voice) (512) 320-8132 (fax) | Asst. Attorney General |
| Mr. Tommy Skaggs | Austin | Asst. Attorney General |
| Mr. John Cornyn | | Former Attorney General, now U.S. Senator |
| Collin County District Attorney's Office | McKinney | Prosecuted trials of Petitioner |
| Mr. John R. Roach | McKinney | Collin County District Attorney |
| Mr. John Rolater | McKinney | Assistant Collin County District Attorney, appellate section |
| Mr. Tim O'Connell | McKinney | Former Collin County District Attorney |
| Mr. Randall A. Blake | McKinney | Asst. Collin County District Attorney |
| Mr. Mark J. Rusch | McKinney | Asst. Collin County District Attorney |
| Mr. David Waddell | McKinney | Asst. Collin County District Attorney |
| Mr. Robert Huttash | McKinney | Asst. Collin County District Attorney |
| *Judges* | | |
| Hon. Nathan E. White, Jr. | 366th District Court McKinney, Texas | Collin County 366th District Judge who presided over first and second trials |

iv

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Hon. Webb Biard | Paris, Texas | Visiting judge assigned 2008 to decide Garcia's habeas petition. |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

INDEX OF PETITIONER'S RECORD EXCERPTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxi

DESIGNATION OF ABBREVIATIONS and
    EXPLANATION OF THE TRIAL RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    The Beverage Warehouse Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    The Texaco Station Robbery and Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Gustavo Garcia's Education and Juvenile Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Conduct in County Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Escape Attempt From Ellis Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Defense Mitigation Presentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    State Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW  IN TEXAS . . . . . . . . . . . . 36

GARCIA HAS MET ALL PROCEDURAL REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . 43
    ALL CLAIMS HAVE BEEN EXHAUSTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED . . . . . . . . . . . . . . . . . 46

    A.    Explanation of Default Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    B.    Garcia's Response to the Trial Court's and CCA's Findings That Garcia Procedurally
            Defaulted Most of his Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    C.    There is no impediment to review of Garcia's liability phase claims from his 1991
            trial following his 2001 re-sentencing hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    CHALLENGES TO CONFESSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    Claim Number One: Plano Police Interrogated Garcia and Obtained a Confession in
            Violation of Miranda v. Arizona and the Guarantee Against Self-Incrimination
            Afforded by the Fifth Amendment to the United States Constitution. . . . . . . . . 55

Claim Number Two:  Plano Police Interrogated Garcia and Obtained a Confession in Violation of his Sixth Amendment Right to Effective Assistance of Counsel. . . 55

Claim Number Three: Plano Police Interrogated Garcia and Obtained a Confession in Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    A.    The Issues Have Been Properly Preserved for Review and Exhausted in the State Forum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    B.    Texas Denied These Claims, although it is unclear whether the CCA reached the Federal Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        1.    In 1992, the CCA Granted Relief, Finding State Law Violation.  57

        2.    In 1996, With the Addition of Judge Mansfield, the CCA Reversed its Decision and Denied Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        3.    The CCA and Trial Addressed the State Law Claims, but Less Clear is Whether it Addressed the Federal Claims. . . . . . . . . . . . . . . . 62

    C.    The Federal Constitutional Claims Were Not Procedurally Defaulted. Alternatively, Garcia can be Excused for Any Default Because Of Ineffective Assistance of Direct Appeal and Habeas Counsel. . . . . . . . . . . . . . . . . . 65

    D.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    E.    Garcia Was Interrogated and Signed Two Confessions . . . . . . . . . . . . . 68

    F.    Garcia's Trial Counsel Sought to Suppress the Confessions, but the Trial Court Ruled that the Statements Were Voluntary and Admissible and that Garcia Implicitly Waived His Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    G.    The Failure to Obtain Written Waivers of His Right to Remain Silent Violated Garcia's Fifth Amendment Right to Remain Silent . . . . . . . . . 75

        1.    The Right to Remain Silent is an Important Personal Right . . . . 75

        2.    Garcia Was Effectively "De-Mirandized" by Police. . . . . . . . . . 77

        3.    The Written Statements Were Clearly Flawed in the Absence of the Written Waivers of Garcia's Fifth Amendment Rights . . . . . . . . 80

    H.    Without the Written Waiver of Rights Required by Article 38.22, the Obtaining and Introduction of the Statements Violated the Due Process Clause of the Fifth And Fourteenth Amendments . . . . . . . . . . . . . . . . . . 81

    I.    Without the Written Waiver of Rights Required by Article 38.22,  the Fifth Amendment and the Due Process Clause, the Obtaining and Introduction of the Statements Violated Garcia's Sixth Amendment Right to Counsel  . 83

    J.    The Requirement that a Defendant Make a Knowing and Intelligent Waiver is Not a New Rule Under *Teague* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    K.    Garcia suffered considerable harm as a result of the confessions.  The *Chapman* Harmless Error Test Applies, Although Garcia Clearly Satisfies Both the *Chapman* and *Brecht* Standards. . . . . . . . . . . . . . . . . . . . . . . . 84

JURY ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

CHALLENGES TO STRIKE OF TWO JURORS
        BASED ON RACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

JUROR HAZEL HOLMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Claim Number 4: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to
        Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating
        the Due Process Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . 88

Claim Number 5: In the 1991 Trial, the State Improperly Used a Peremptory Cha1llenge to
        Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating
        the Equal Protection Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . . 88

Claim Number 6: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to
        Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating
        the Right to a Fair and Impartial Jury Clause of the Sixth Amendment. . . . . . . . 88

Claim Number 7: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to
        Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating
        the Cruel and Unusual Punishment Clause of the Eighth Amendment. . . . . . . . 88

Claim Number 8: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to
        Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating
        the Due Process Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . 88

        A.      The claim was fully preserved. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
        B.      Analysis of the Batson hearing findings. . . . . . . . . . . . . . . . . . . . . . . . 90
        C.      Testimony by Mrs. Holmes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
                1.      She proved she was qualified and the court agreed. . . . . . . . . . 91
                2.      Improper Nazi holocaust analogy – used only once and against an
                        African American. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
                3.      Religious pressure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
                4.      Violating public oath pressure. . . . . . . . . . . . . . . . . . . . . . . . . . 93
        D.      The Explanation of Prosecutors for Their Strikes. . . . . . . . . . . . . . . . . . 95
        E.      Equal Protection Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

JUROR ALBERT R. DIAZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Claim Number 9: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to
        Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating
        the Due Process Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . 110

Claim Number 10: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Equal Protection Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . 110

Claim Number 11: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Right to a Fair and Impartial Jury Clause of the Sixth Amendment. . . . . . . 110

Claim Number 12: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Cruel and Unusual Punishment Clause of the Eighth Amendment.  . . . . . . 110

Claim Number 13: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Robert Rea Phillips, Violating the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution. . 121

Claim Number 14: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Robert Rea Phillips, Violating the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Claim Number 15: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Robert Rea Phillips, Violating the Effective Assistance of Counsel Clause of the Sixth Amendment to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

    A.    These Claims Were Exhausted in State Court and Not Procedurally Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    B.    Resolution by the Texas Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    C.    Juror Robert Rea Phillips Was Removed for Cause  . . . . . . . . . . . . . . 123
    D.    A Juror May Not Be Excused for Cause Merely Because He or She Expresses General Opposition or Discomfort With the Death Penalty  . . . . . . . . 123
    E.    Mr. Phillips Was Amply Qualified and Improperly Removed for Cause Merely Because He Felt Youth Was a Mitigating Factor In Favor of a Life Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
    F.    Removal of Mr. Phillips Violated the Equal Protection Clause of the Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
        1.    The Strict Scrutiny Test Should Apply  . . . . . . . . . . . . . . . . . . . 127
        2.    Alternatively, the Traditional Equal Protection Test Should Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
    G.    Removal of Mr. Phillips Violated the Cruel and Unusual Punishment Clause of the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

H.      Garcia is Not Required to Demonstrate Prejudice for a Wither spoon Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
I.      The Fifth Circuit Has Reviewed State Decisions to Excuse Jurors With an Incorrect Degree of Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Claim Number 16: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Ernestine Ovida Whitehorn Kieke, Violating the Effective Assistance of Counsel Clause of the Sixth Amendment to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Claim Number 17: In the 1991 Trial, the Trial Court Improperly Denied Defense Counsel the Opportunity to Question Venireman Ernestine Ovida Whitehorn Kieke, Violating the Effective Assistance of Counsel Clause of the Sixth Amendment to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

A.      The Issues Are Properly Preserved and Exhausted.  . . . . . . . . . . . . . . 133
B.      Alternatively, The Court of Criminal Appeals Has Adopted an Unconstitutional Practice of Waiving Federal Claims, Particularly in Capital Cases.  The Court Should Therefore Treat These Issues as Exhausted.  133
C.      Alternatively, Any Procedural Default On This Issue is Excused as a Result of Ineffective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . . . . . 139
D.      Mrs. Kieke Was Qualified and Successfully Rehabilitated by Defense Counsel Four Times . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Claim Number 18: In the 1991 Trial, the Trial Judge Excused Juror, Cornelius John Collins, Jr., Who Was Opposed Generally to the Death Penalty, Thereby Violating Witherspoon v. Illinois.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Claim Number 19: In the 1991 Trial, the Trial Court Improperly Excused Venireman General A. Adam Gallo on Grounds that he Would Always Find a Mitigating Circumstance When Answering Special Issue Number Four, Thereby Violating Witherspoon v. Illinois. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

Claim Number 20: In the 1991 Trial, the Trial Court Improperly Excused Venireman Richard Eugene Wycoff on Grounds that he Would Always Find a Mitigating Circumstance When Answering Special Issue Number Four, Thereby Violating Witherspoon v. Illinois. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

CHALLENGES TO THE PROCEDURES USE TO SELECT JURY . . . . . . . . . . . . . 153

Claim Number 21: The Grand Jurors Who Indicted Garcia Were Selected in a Racially Discriminatory Manner, Violating the Equal Protection Clause of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Claim Number 22: The Trial Court Conducted Voir Dire Examination of Eleven Jurors Without the Presence of Garcia or his Attorney, Violating the Due Process Clause of the United States Constitution.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

Claim Number 23: The Trial Court Conducted Voir Dire Examination of Eleven Jurors Without the Presence of Garcia or his Attorney, Violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. . . . . . 158

Claim Number 24: The Trial Court Conducted Voir Dire Examination of Eleven Jurors Without the Presence of Garcia or his Attorney, Violating the Confrontation Clause of the Sixth Amendment to the United States Constitution. . . . . . . . . . . . . . . 158

SENTENCING ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

PERIPATETIC PRISON SPECIALIST ROYCE SMITHEY . . . . . . . . . . . . . . . . . . . . 161

Claim Number 25: State Prosecutors Introduced Evidence That Texas Does Not Provide Adequate Prison Guard Staffing, Which Therefor Leads to More Violence in Prison. The State Used This Evidence to Argue That Because of its Lack of Staffing, Mr. Garcia Should Be Executed. This Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Claim Number 26: State Prosecutors Introduced Evidence That Texas Does Not Provide Adequate Prison Guard Staffing, Which Therefor Leads to More Violence in Prison. The State Used This Evidence to Argue That Because of its Lack of Staffing, Mr. Garcia Should Be Executed.  This Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. . . . . . . . . . . . . . . . . . . . . . . . 161

Claim Number 27: State Prosecutors Introduced Evidence That Texas Does Not Provide Adequate Prison Guard Staffing, Which Leads to More Violence in Prison.  The State Used This Evidence to Argue That Because of its Lack of Staffing, Mr. Garcia Should Be Executed. This Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution.  . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Claim Number 28: If the Court Determines that These Issues Have Been Procedurally Defaulted by Trial or Direct Appeal Counsel, then Mr. Garcia Asserts a Claim for Ineffective Assistance of Counsel For Trial and Appeal In Violation of the Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

A.      Introduction to Royce Smithey, State Expert Who Told Jurors That TDCJ-ID is Understaffed and Underfunded, and Guards Do Not Follow the Rules, Therefore Mr. Garcia Will Be More Violent. . . . . . . . . . . . . . . . . . . . . 162

B.     The Prosecutor Played on Jurors' Fears By Emphasizing that TDCJ-ID Lacked Sufficient Staffing to Secure Mr. Garcia. . . . . . . . . . . . . . . . . . 169
C.     Discussion of Due Process Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . 171
D.     Discussion of Equal Protection Analysis . . . . . . . . . . . . . . . . . . . . . . . 175
E.     Discussion of Cruel and Unusual Punishment Analysis  . . . . . . . . . . . 178

Claim Number 29: The Testimony of Royce Smithey Did Not Satisfy the Reliability Requirements of *Daubert v. Merrill Dow* or *Nenno v. State*, and its Introduction in a Death Penalty Sentencing Hearing Violated the Due Process Clause of the Fourteenth Amendment.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Claim Number 30: The Testimony of Royce Smithey Did Not Satisfy the Reliability Requirements of *Daubert v. Merrill Dow* or *Nenno v. State*, and its Introduction in a Death Penalty Sentencing Hearing Violated the Equal Protection Clause of the Fourteenth Amendment.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Claim Number 31: The Testimony of Royce Smithey Did Not Satisfy the Reliability Requirements of *Daubert v. Merrill Dow* or *Nenno v. State*, and its Introduction in a Death Penalty Sentencing Hearing Violated the Cruel & Unusual Punishment Clause of the Eighth and Fourteenth Amendments.  . . . . . . . . . . . . . . . . . . . . . 181

Claim Number 32: If the Court Determines that These Issues Have Been Procedurally Defaulted by Trial or Direct Appeal Counsel, then Mr. Garcia Asserts a Claim for Ineffective Assistance of Counsel For Trial and Appeal In Violation of the Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

A.     The Trial Court and the State Failed to Prove that Mr. Smithey's Methods and Opinions Were Reliable Under *Daubert v. Merrill Dow* or *Kelly v. State* or *Nenno v. State*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
B.     The Supreme Court and the Court of Criminal Appeals Insists that Expert Witnesses Be Genuinely Qualified, and Not Merely Reporters of Unsubstantiated Speculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182
C.     Dr. Mark Cunningham, a Real TDCJ Expert, Has Demonstrated that Mr. Smithey's Testimony was Completely Misleading and Inaccurate.  . . . 188
D.     Introduction of Mr. Smithey's testimony violated the requirement that the sentencing process in a capital case be individualized, and thereby violated the need for heightened reliability in the sentencing process under Woodson. His testimony was not related to Mr. Garcia. . . . . . . . . . . . . . . . . . . . . . 189
E.     Less Than One Year Before Trial, Mr. Smithey Confessed in Another Capital Trial That He was Unqualified to Testify as an Expert.  . . . . . . . . . . . . 190
F.     Mr. Garcia Was Severely Prejudiced as a Result of Mr. Smithey's Destructive Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

Claim Number 33: In Violation of <u>Brady v. Maryland</u> and <u>Kyles v. Whitley,</u> The State Withheld Critical Evidence in its Possession Which was Both Mitigating and Capable of Impeachment of One of Its Star Witnesses, Thereby Violating the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.   . . 195

Claim Number 34: If the Court Determines that This Issue Has Been Procedurally Defaulted by Trial or Direct Appeal Counsel, then Mr. Garcia Asserts a Claim for Ineffective Assistance of Counsel For Trial and Appeal In Violation of the Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

    A.    Mr. Smithey Revealed in Another 2000 Trial, *State v. Danielle Simpson*, That He had Internal TDCJ Statistics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

    B.    The State Failed to Reveal to Mr. Garcia's Attorneys That Mr. Smithey Had Earlier Denied Being a Classification Expert. . . . . . . . . . . . . . . . . . . . . . 198

    C.    Mr. Smithey Initially Tried to Hide His Earlier Disqualification, And Later Finally Admitted That He Did Not Qualify as a Classification or Security Expert, But Claimed That He Was a "Lay Expert."  . . . . . . . . . . . . . . . 200

    D.    The Supreme Court and Court of Criminal Appeals Has Held that Material Impeachment Evidence Must Be Turned Over to Defense Attorneys Before Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

    E.    Mr. Garcia Made Specific Requests Before Trial For All Impeachment, Mitigating and Exculpatory Evidence, and Therefore the Strict Standard of *Agurs*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

Claim Number 35: Testimony by The State's Psychologist That Mr. Garcia Was a Future Danger Lacked Scientific Reliability Required by <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.,</u> and <u>Kumho Tire Co., Ltd. v. Carmichael</u>. . . . . . . . . . . 219

Claim Number 36: The State's Psychologist Who Testified That Mr. Garcia Was a Future Danger Lacked Sufficient Qualifications as Required by <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.,</u> and <u>Kumho Tire Co., Ltd. v. Carmichael</u>. . . . . . . . . . . 219

Claim Number 37:  Testimony by the State's Psychologist That Mr. Garcia Was a Future Danger Lacked Scientific Reliability, and Thereby Violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. . . . . . . . . . . . . . . . . . . 219

    A.    Psychiatric predictions of future dangerousness. . . . . . . . . . . . . . . . . . . 221

CHALLENGES TO JURY INSTRUCTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Claim Number 38: In Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Mitigating Evidence Which Would Have Permitted Jurors to Apply a Reasoned Moral Response to Mr. Garcia's Crime.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Claim Number 39: In Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Mitigating Evidence Which Would Have Permitted Jurors to Apply a Reasoned Moral Response to Mr. Garcia's Crime.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Claim Number 40: In Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Mitigating Evidence Which Would Have Permitted Jurors to Apply a Reasoned Moral Response to Mr. Garcia's Crime.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

REASONABLE DOUBT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Claim Number 41: In Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Claim Number 42: In Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Claim Number 43: In Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Claim Number 44: In Violation of the Constitutional Guarantee Against Ex Post Facto Laws, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof.  . . . . . . . . . . . 237

   A.   When the Crimes Occurred in 1990 and 1991, A Defendant Was Entitled to Definition of Reasonable Doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237
   B.   The law and procedures in effect of the defendant's offense determine what procedures are applied at trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

C.      It is a Violation of Ex Post Facto Principles to Apply the Later Decision of *Paulson v. State* Retroactively and Deny Mr. Garcia the Definition of a Critical Jury Instruction Which Jurors in His 1991 Liability Trial Received and to Which Mr. Garcia Was Entitled. . . . . . . . . . . . . . . . . . . . . . . . . . 238

D.      Mr. Garcia Was Clearly Harmed as a Result of the Denial of This Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

Claim Number 45:  Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction of the Death Penalty Were Violated Because the Statute under Which Applicant Was Sentenced to Death  Allows the Jury Too Much Discretion to Determine Who Should Live and Who Should Die and Because it Lacks the Minimal Standards and Guidance Necessary for the Jury to Avoid the Arbitrary and Capricious Imposition of the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

Claim Number 46: Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Rights as Interpreted in <u>Penry v. Johnson</u> Were Violated Because the Mitigation Special Issue Set Forth in the Texas Death Penalty Statute Sends Mixed Signals to the Jury Thereby Rendering Any Verdict Reached in Response to That Special Issue Intolerably Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Claim Number 47: The Mitigation Inquiry Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Does Not Provide  Adequate Guidance for Jurors to Consider and Give Effect to Mr. Garcia's Mitigating Circumstances.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Claim Number 48: The Mitigation Inquiry Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Does Not Provide  Adequate Guidance for Jurors to Consider and Give Effect to Mr. Garcia's Mitigating Circumstances.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Claim Number 49:  The Mitigation Inquiry Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Fails to Assign the Burden of Proof to Either Party to Prove Whether or not  Mr. Garcia's  Mitigating Circumstances are Sufficient to Warrant a Life Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Claim Number 50:  The Mitigation Inquiry Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Fails to Assign the Burden of Proof to  Either Party to Prove Whether or not Mr. Garcia's Mitigating Circumstances are Sufficient to Warrant a Life Sentence.  . . . . . . . . . . . . . . . . . . . . . . 247

Claim Number 51:  The Mitigation Inquiry Violates the Due Process Clause of the
          Fourteenth Amendment to the U.S. Constitution Because It Fails to Assign the
          Burden of Proof to the Prosecution to Prove the Truth of the Facts it Offered in
          Rebuttal of  Mr. Garcia's  Mitigation Case Beyond a Reasonable Doubt.  . . . . 247

Claim Number 52:  The Mitigation Inquiry Violates the Cruel and Unusual Punishment
Clause of the Eighth Amendment to the U.S. Constitution Because It Fails to Assign the
Burden of Proof to the Prosecution to Prove the Truth of the Facts it Offered in Rebuttal of
Mr. Garcia's  Capital Defendant's Mitigation Case Beyond a Reasonable Doubt. . . . . 248

Claim Number 53: The Trial Court Violated the Eighth and Fourteenth Amendments to the
          United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a
          Single Jury Member Would Result in a Life Sentence Instead of Death Despite the
          Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or
          for a "Yes" Vote to Article 37.071 § 2(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

Claim Number 54: Garcia's right to a fair trial was fundamentally compromised because
          jurors were instructed that they may infer intent to commit murder generally, rather
          than find intent specifically, in violation of the Due Process Clause of the 14th
          Amendment and the heightened reliability of the 8th Amendment.  . . . . . . . . . 262

          A.       The Claim was Exhausted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262
          B.       Applicable Constitutional Principles on Instruction Error, Unconstitutional
                   Presumptions and Harmless Error.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
                   (1)      Instructions Must Be Accurate and Comprehensible . . . . . . . . . 265
                   (2)      An Instruction Will Be Error Only if There is a "Reasonable
                            Likelihood" of Juror Misunderstanding . . . . . . . . . . . . . . . . . . 268
                   (3)      The Error Must Be Harmful and Uncorrected . . . . . . . . . . . . . 274
          C.       Application to Garcia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

Claim Number 55. The refusal of the Texas courts to properly define the terms and phrases
          in the future dangerousness special issue was a decision contrary to, and an
          unreasonable application of clearly established constitutional law in that Mr. Garcia
          was 1) deemed eligible for the imposition of death as a penalty by the use of an
          unconstitutionally vague aggravator, and 2) Mr. Garcia was selected for the death
          penalty without giving full consideration and effect to record evidence of his
          mitigating circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

Claim Number 56:  Article 37.071 § 2(e) Is Unconstitutional Under the Eighth and
          Fourteenth Amendments to the United States Constitution Because Appellate Review
          of the Second Special Issue Is Impossible.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

Claim Number 58: Social Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Define Key Terms "Deliberately," "Criminal Acts of Violence," "Probability," "Continuing Threat," "Society," Thereby Violating Mr. Garcia's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

    A.    Overview of Constitutional Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290
    B.    Social Science Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292
    C.    Application to Mr. Garcia's Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . 295
    D.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

Claim Number 59:  The Texas Capital Punishment Scheme and Texas Code of Criminal Procedure Article 37.071 Violate the Cruel and Unusual Punishment Clause of the Eighth and Fourteenth Amendments to the Federal Constitution Because They Fail to Provide for Life Without Parole. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Claim Number 61: Execution of a Man Who was Only 18 Years of Age at the Time of His Offense Would Violate the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

CHALLENGES TO THE EFFECTIVENESS OF TRIAL COUNSEL . . . . . . . . . . . . . 312

Claim Number 62: Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Object at Trial to Garcia's Confession On the Basis That He is Legally Blind and Could Not Read the Miranda Warnings or the Statement?  . 313

Claim Number 63:  Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Explain to Garcia that Garcia had the Right to Testify in his Suppression Hearing for the Limited Purpose of Challenging the Admissibility of his Statement? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Claim Number 64: Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Investigate and Call an Eyewitness Who Could Not Identify Garcia, But Instead Described the Assailant as African-American? . . . . . . . . . 315

Claim Number 65:  Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Raise the Issue of Collateral Estoppel in Response to the State's Conflicting Positions as to Who Was the Shooter? . . . . . . . . . . . . . . . . . . . . . . 317

    A.    The State Argued In the Punishment Phase of Garcia's Trial that Garcia was the Triggerman Behind the Texaco Murder and Killed Mr. Gregory Martin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

B.    The State Argued Earlier at Mr. Chris Vargas' Trial that Vargas was the Triggerman at the Texaco Murder, and That it Was Vargas Who Killed Mr. Gregory Martin  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320

C.    Garcia Contends That in the Sentencing Phase of a Capital Case, The Sixth Amendment is Violated When a State Introduces Evidence and Argues That the First Co-Defendant is the Triggerman, and in a Later Trial Argues Inconsistently That the Second Co-Defendant is the Triggerman  . . . . 321

1.    The Doctrine of Collateral Estoppel Applies in Criminal Cases as a Component of the Double Jeopardy Clause to Prevent Relitigation of Critical Issues Found In Favor of the Defendant . . . . . . . . . . . 321

2.    The Federal Constitution Should Be Interpreted to Bar a State Prosecutor in a Capital Case From Asserting That A Defendant is The Actual Triggerman, After the Prosecutor Has Previously Argued and Convicted Another as the Triggerman  . . . . . . . . . . . . . . . . . . 325

3.    The Non-Mutual Collateral Estoppel Doctrine Does not Apply in This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

D.    Garcia Does Not Seek to Create a New Rule Barred by Teague.   The Principles Here Are Well-Established.  . . . . . . . . . . . . . . . . . . . . . . . . . 331

Claim Number 66: Mr. Garcia Did Not Receive Effective Assistance of Counsel in his 2001 Trial In Violation of the Sixth and Fourteenth Amendments to the Federal Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

A.    Trial Counsel Introduced Mr. Garcia's Juvenile Criminal Record and Permitted Other Aspects Without Challenge. . . . . . . . . . . . . . . . . . . . . 333

B.    Trial Counsel Allowed Introduction of Extraneous Offenses in Through Mrs. Knox.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

C.    Trial Counsel Failed to Object to Hearsay Statements of SWIFT, Without Requiring SWIFT to Prove Firearm Ballistics Similarity. . . . . . . . . . . . 335

D.    Trial Counsel Failed to Object to Hearsay of SWIFT on Fingerprint Issues, Without Requiring SWIFT to Prove the Fingerprints on the Texaco Cigarettes and Containers were Garcia's.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

E.    Trial Counsel Failed to Object to First Confession.   . . . . . . . . . . . . . . 335

F.    Trial Counsel Failed to Object to Hearsay Information in the Reports From Faubion Middle School.  These contain many hearsay reports of improper behavior. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

G.      Trial Counsel Failed to Object to Mr. Garcia's Juvenile Confession. . . 337

H.      Trial Counsel Failed to Challenge the Juvenile Confession which Contained Reference to Four Other Burglaries Which Could not be Corroborated. Corroboration is required for a Confession. . . . . . . . . . . . . . . . . . . . . . . 338

I.      Trial Counsel Failed to Challenge the Uncorroborated Hearsay Testimony of Co-Conspirators Admitted Through Det. Heaton, In Violation of the Accomplice-Witness Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

J.      Trial Counsel Failed to Seek and Include a Jury Instruction on Corroboration of a Confession. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

K.      Trial Counsel Failed to Challenge Testimony of Mr. Heaton as Entirely Hearsay.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344

L.      Trial Counsel Failed to Seek a Limiting Instruction Requiring Jurors to Disregard Uncorroborated Testimony of Accomplices.  . . . . . . . . . . . 346

M.      Trial Counsel Failed to Obtain the Written Statements and Offense Reports from Mr. Heaton. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

N.      The Trial Counsel Failed Seek a Pre-Trial *Franks* Hearing on the Admissibility of All of Mr. Heaton's Hearsay, Confession by Mr. Garcia, and Accusations by Co-Conspirators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

O.      Trial Counsel Elicited Extraneous Offense from Mr. Heaton.  . . . . . . . 347

P.      Trial Counsel Failed to Challenge Photographic Lineup and Entirely Hearsay Testimony by a Police Officer That Co-Conspirators Picked out the Right Suspect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

Q.      Trial Counsel Failed to Object to In-Custody Interrogation and Oral Statements of Mr. Garcia as a Juvenile.  . . . . . . . . . . . . . . . . . . . . . . . 348

R.      Trial Counsel Failed to Object to Hearsay of Owner of a Car Dealership Regarding Recovery of Cars Allegedly Stolen by Mr. Garcia as a Juvenile. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

S.      Trial Counsel Failed to Object to the Hearsay Statements of Dep. Mehman, Dept. Blackburn, and Dept. Ponder.  . . . . . . . . . . . . . . . . . . . . . . . . . 349

xix

T.      Trial Counsel Failed to Challenge the Signature on the Note Signed by Mr. Gustavo in the Dail Demanding a Match. . . . . . . . . . . . . . . . . . . . . . . . 349

U.      Trial Counsel Failed to Challenge Royce Smithey's Qualifications in a 702 Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 349

V.      Trial Counsel Failed to Request Instruction of Definition in Charge of Key Term "Reasonable Doubt" or Make Proper Objections to its Omission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 349

W.      Trial Counsel Failed to Object to Interview of Mr. Garcia by the State's Psychologist and Forced Waiver of his Fifth Amendment Right to Silence or to Challenge Constitutionality of *Lagrone v. State.* . . . . . . . . . . . . . . . . 351

X.      Trial Counsel Failed to Put Mr. Garcia on the Stand Outside the Jury's Presence to Create a Record of What He Would Have Explained Really Occurred During His Interview and Confession. . . . . . . . . . . . . . . . . . . . 352

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

## INDEX OF PETITIONER'S RECORD EXCERPTS

Supporting this application is the state trial record, including Garcia's direct appeal pleadings filed in 1992 and 2002, and his 1998 habeas application.

Garcia's 2003 state WHC was accompanied by a three-volume set of excerpts from the trial record and other supporting evidence. The supporting documents and evidence are therefore part of the state appellate record. These documents were not refiled with this federal WHC but are incorporated by reference.

There are two new exhibits attached to this application.

| *Description* | *Location in Record* | *Tab* |
|---|---|---|
| Order dated February 10, 1999 by the Texas Court of Criminal Appeals Denying State article 11.071 petition for writ of habeas corpus | Habeas Corpus Application Transcript File, Texas Court of Criminal Appeals | **1** |
| 1994 and 1996 Published Opinion by Texas Court of Criminal Appeals reversing, then affirming Mr. Garcia's conviction and sentence | *Garcia v. State,* 919 S.W.2d 370 (Tex. Crim. App. 1996) | **2** |
| First hand-written confession by Mr. Garcia | S.F. vol. 75; St. MTS Exh. 2; St. Trial Exh. 3 | **3** |
| Typed copy of Mr. Garcia's first confession | S.F. vol. 75; Def. Exh. 2, at p. 10. | **4** |
| Second hand-written confession by Mr. Garcia | S.F. vol. 75; Def. Exh. 3 at p. 11 | **5** |
| Typed copy of Mr. Garcia second confession | S.F. vol. 75; Def. Exh. 3, at p. 11; St. Exh. 3 at 4 | **6** |

| *Description* | *Location in Record* | *Tab* |
|---|---|---|
| Final state judgment of conviction and sentence of death by 366th District Court of Collin County | C.R. vol. 6 at 1098-1104 | **7** |
| Guilt - Innocence Jury Charge | C.R. vol. 6 at 1048-59 | **8** |
| Punishment Jury Charge | C.R. vol. 6 at 1090-97 | **9** |
| List of Members of Mr. Garcia's Petit Jury | C.R. vol. 6 at 1045 | **10** |
| Mr. Garcia's Direct Appeal Brief to the Texas Court of Criminal Appeals | Not located in the trial record. Filed with the Texas Court of Criminal Appeals. | **11** |
| Mr. Garcia's Article 11.071 Application for State Writ of Habeas Corpus filed July 24, 1997 | Habeas Corpus Application Transcript File, Texas Court of Criminal Appeals | **12** |
| Findings of Fact and Conclusions of Law Rendered by 366th District Court of Collin County on Mr. Garcia's Article 11.071 Application for Writ of Habeas Corpus | Habeas Corpus Application Transcript File, Texas Court of Criminal Appeals | **13** |
| Closing Arguments from Punishment Phase of Mr. Garcia's trial. | S.F. vol. 73 | **14** |

| _Description_ | _Location in Record_ | **_Tab_** |
|---|---|---|
| August 7, 1991 Examination of Several Jurors in Advance of August 12, 1991 General Voir Dire | S.F. vol. 13 | **15** |
| August 12, 1991 Challenge to the Array | S.F. vol. 14 | **16** |
| August 29, 1991 Transcript of Motion to Quash Jury Array | S.F. vol. 18 | **17** |
| November 22, 1991 _Batson_ Hearing | S.F. vol. 61 | **18** |
| December 2, 1991 Trial Cross-Examination of Det. David Wilson, Officer Who Obtained Confessions | S.F. vol. 62 | **19** |
| October 14, 1991 Interview of Venire Juror Hazel Holmes | S.F. vol. 36 | **20** |
| October 17, 1991 Interview of Venire Juror Albert R. Diaz | S.F. vol. 39 | **21** |
| November 8, 1991 Interview of Venire Juror Robert Rea Phillips | S.F. vol. 53 at 6828 | **22** |

| *Description* | *Location in Record* | *Tab* |
| --- | --- | --- |
| September 20, 1991 Interview of Venire Juror Ernestine Ouida Whitehorn Kieke | S.F. vol. 27 at 1980 and vol. 28 at 2132 | **23** |
| October 16, 1991 Interview of A. Adam Gallo | S.F. vol. 38 at 4250 | 24 |
| October 31, 1991 Interview of Richard Eugene Wycoff | S.F. vol. 47 at 5878 | **25** |
| October 28, 1991 Interview of Cornelius John Collins, Jr. | S.F. vol. 44 at 5523 | **26** |
| Affidavit of Richard Weaver, Trial Counsel for Chris Vargas | n/a | **27** |
| Plano Police Dept. Statement Form, Containing Waiver Paragraphs | S.F. vol. 77 at 104, *Def. Ex. 1* | **28** |

## DESIGNATION OF ABBREVIATIONS and
## EXPLANATION OF THE TRIAL RECORD

"Petitioner's Record Excerpts" are referred to in this brief with the abbreviation "PRE." References to the trial record statement of facts are abbreviated as "SF." References to the transcript are abbreviated as "CR" for the clerk's record.

The 1991 trial record consists of seventy-seven volumes, while the 2001 trial record consists of about 50 volumes. For purposes of this application, each volume of the trial statement of facts will be referred to by the year and the volume number assigned by the court reporter and printed on the cover of the volume. For ease, we have used Arabic numbering rather than the court reporter's Roman numbering.

The numbering of the statement of facts is somewhat confusing. In our 1991 set, there are about fourteen pre-trial volumes. Some of these appear to be numbered as part of the 1991 seventy-seven volumes. Others are not. In some instances, we have referred to pre-trial volumes by date to identify the volumes precisely. (*e.g.,* "Hearing on Pre-Trial Motions, Aug. 21, 1991").

The 1991 clerk's transcript or record consists of six volumes. Additional volumes were added in the 2001 retrial.

1

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five (due process clause), eight (cruel and unusual punishment clause), and fourteen (due process and equal protection clauses), of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## PROCEDURAL HISTORY

### A.   *Procedural History in State Court.*

Gustavo Julian Garcia was convicted of capital murder in Collin County in 1991 and sentenced to death. *See State v. Gustavo J. Garcia*, No. 366-80185-91 (366th Dist. Crt. 1991).

On December 21, 1994, the Texas Court of Criminal Appeals reversed his conviction. *See Garcia v. State,* 919 S.W.2d 370 (Tex. Crim. App. 1994), *rev'd on reh'g*, 919 S.W.2d 370 (Tex. Crim. App. 1996).   Following a change of judges as a result of elections, the court vacated its opinion March 27, 1996 and affirmed his conviction. *See Garcia v. State,* 919 S.W.2d 370 (Tex. Crim. App. 1996).  Garcia did not appeal to the U.S. Supreme Court.

Garcia's first application for writ of habeas corpus was filed in the 366th District Court of Collin County April 20, 1997, and supplemented July 24, 1997.  (*See* State PRE at tab 12.)  On December 31, 1998, the application was denied by the trial court which issued findings of fact and conclusions of law.  (*See* State PRE at tab 13.)  The file and report of the state district judge were transferred to the Court of Criminal Appeals.

On February 10, 1999, the Court of Criminal Appeals denied Garcia's state application for writ of habeas corpus. *Ex Parte Garcia*, No. 40,214-01 (Tex. Crim. App. 1999) (unpublished) (*See* State PRE at tab 1).  The trial court set his execution date for March 31, 1999.

2

Garcia entered federal court and, as discussed below, the U.S. District Court vacated Garcia's death sentence by agreement and remanded for a new state punishment hearing.

Upon federal remand, a new punishment hearing was conducted February and March 2001 in the 366th District Court. On March 10, 2001 the jury answered special issues favoring execution. The court sentenced Garcia to death March 23, 2001. Garcia's sentence was affirmed by the CCA November 12, 2003. *See Garcia v. State*, AP-71,417, 2003 WL 22669744 (Tex. Crim. App. Nov. 12, 2003) (unpublished), *cert. denied*, 543 U.S. 855 (2004). The CCA denied Garcia's motion for rehearing and issued mandate February 18, 2004.

Garcia filed a petition for writ of *certiorari* with the U.S. Supreme Court, which denied *certiorari* October 4, 2004. *Garcia v. Texas*, No. 03-10873, 543 U.S. 855 (Oct. 4, 2004). His motion for rehearing was denied November 15, 2004. *Id.* at 995.

Garcia filed a timely state application for writ of habeas corpus April 15, 2003. A visiting judge assigned in 2008 recommended denial of the application and signed findings of fact and conclusions of law February 12, 2008. The CCA adopted the trial court's F&Cs October 15, 2008 and denied relief. *See Ex parte Garcia,* No. WR-40,214-02 (Tex. Crim. App. Oct. 15, 2008).

**B.     Procedural History in Federal Court.**

As mentioned, after the CCA denied relief in 1999, new lawyers for Garcia filed in the Tyler Division of the Eastern District of Texas a motion March 15, 1999 for appointment as counsel and a motion to stay the execution. The case was assigned to the Beaumont Division in accordance with the rotating assignment procedure of death penalty appeals in the Eastern District. *Gustav Garcia v. Johnson*, No. 1:99cv134 (E.D. Tex. 1999). Judge Schell granted the appointment of counsel and

stay of execution March 18, 1999.  Garcia filed a timely petition for writ of habeas corpus August 21, 1999.

While the Director's motion for summary judgment was pending in 2000, the Texas Attorney General, John Cornyn, confessed error in nine death cases, including Garcia's.  By agreement, Garcia filed August 10, 2000 a supplemental claim to his habeas application.  The claim consisted of an argument that his equal protection rights were violated by use during sentencing of a state sponsored psychologist who argued that Garcia's Hispanic ethnicity increased his risk of future dangerousness.  On September 7, 2000, Judge Heartfield issued a writ of habeas corpus and ordered a new sentencing hearing.  The court dismissed Garcia's remaining claims without prejudice to refiling.

After the October 15, 2008 denial of his state habeas action by the CCA, Garcia filed for appointment of lawyers in this Court.  His motion was granted December 2, 2008.

Since 1991 Garcia has been confined in the Polunsky Unit, and previously the Ellis One Unit, by the Director of the Texas Department of Criminal Justice, and by the warden of the Polunsky Unit.

## **STATEMENT OF FACTS**

This tragic case involves two robberies which resulted in two murders.  The first offense is known as the Beverage Warehouse robbery and murder.  The second is referred to as the Texaco robbery and murder.

The following is a summary of the testimony during Mr. Garcia's second trial, the sentencing hearing for conviction of the Beverage Warehouse murder.  The trial began February 26, 2001.  Garcia also references testimony from the 1991 suppression hearing.

4

### *The Beverage Warehouse Offense*

The State's first witness was **Donna Delozier Sawtelle**.  (2001 RR vol. 25 at 15.)  Mr. Sawtelle was one of the first witnesses to discover the robbery of the Beverage Warehouse in Plano. Early evening on December 9, 1990, she pulled in.  When she opened the door to the store, she looked around and saw several aspects out of order.  The cash drawers were open, she did not see the clerk, and the only one she saw was someone standing in an office area.  (2001 RR vol. 25 at 17-18, 20-23.)  Uneasy, she turned and returned to her car.  There was only one car in the parking lot. (2001 RR vol. 25 at 24-26.)  Her initial impression was that the driver was African-American.  (2001 RR vol. 25 at 24-25.)

She drove the five minutes home and mentioned what she saw to her fiancé.  (2001 RR vol. 25 at 25-27.)  They returned to the store to see if things were alright.  (2001 RR vol. 25 at 27-28.) When they entered the store this time, it was in complete disarray.  (2001 RR vol. 25 at 27-29.) Displays were down and there was blood.  They found the clerk laying behind the counter.  (2001 RR vol. 25 at 28.)  She ran next door and dialed 911.  (2001 RR vol. 25 at 29.)

The State's next witness was **Charles Sawtelle**, Mrs. Sawtelle's husband.  (2001 RR vol. 25 at 33.)  He confirmed that he and his wife, then fiancé, returned to the liquor store, and found the clerk on the floor, blood splattered, and the store ravaged.  (2001 RR vol. 25 at 35-37.)  Mr. Chris Turski, the clerk, was still alive.  Mr. Sawtelle listened as Mr. Turski sucked for air through the hole in his chest.  (2001 RR vol. 25 at 36.)  Mr. Sawtelle did what he could to comfort Mr. Turski.  (2001 RR vol. 25 at 37-39.)

The State next called **Terry Collins**, a Plano police officer.  (2001 RR vol. 25 at 42-43.)  He was one of the first officers to respond.  Officer Collins explained briefly how he arrived and found

5

Mr. Turski on the floor and Mr. Sawtelle next to him, with a trail of blood leading back into the store.  (2001 RR vol. 25 at 43-44.)

The next officer to testify was **Steven VanNote**.  (2001 RR vol. 25 at 44.)  He and other officers searched the store for the robbers but found no one.  (2001 RR vol. 25 at 46.)  He stayed with Mr. Turski as he was loaded into the ambulance.  (2001 RR vol. 25 at 47-48.)  Suspecting that the robber was African-American, based on Mrs. Satelle's impression, Officer VanNote tried to ask Mr. Turski, who was conscious and in pain throughout his nightmare.  (2001 RR vol. 25 at 48-49.)  Officer VanNote described the half-dollar size shotgun hole blown in Mr. Turski's side, and a second to back of his head.  (2001 RR vol. 25 at 48-49, 50-51.)  Mr. Turski stopped breathing on the way to the hospital, but the paramedics managed to revive him.  (2001 RR vol. 25 at 49-50.)

Next, Detective **Billy Joe Meeks**, of the Plano Police department, testified.  (2001 RR vol. 25 at 52.)  He arrived as Mr. Turski was departing by ambulance.  Then he drove to the hospital.  (2001 RR vol. 25 at 56-57.)  He attempted to communicate with Mr. Turski as he struggled for life, and asked him to blink twice for "yes" and once for "no."  (2001 RR vol. 25 at 57-58.)  A doctor told Mr. Turski that he was dying.  (2001 RR vol. 25 at 60.)  Det. Meeks questioned Mr. Turski initially about whether the attacker was black.  (2001 RR vol. 25 at 59-60.)  Det. Meeks described that in a certain manner Mr. Turski thrashed around and would blink frequently.  (2001 RR vol. 25 at 60-61.)  Although at first he assumed seizure, after Mr. Turski's death, Det. Meeks surmised that the reason Mr. Turski reacted vigorously was because Mr. Turski was trying to correct the officer's misunderstanding about the assailant's description.  (2001 RR vol. 25 at 60-61.)  Mr. Turski died before Det. Meeks could learn more.  (2001 RR vol. 25 at 61-62.)

Det. Meeks returned to the store.  (2001 RR vol. 25 at 63.)  Through diagrams and photographs, Det. Meeks explained to jurors that a trail of blood led from the counter to a fence outside and then doubled back to where Mr. Turski finally fell.  (2001 RR vol. 25 at 63-77.)  He found a shotgun shell.  (2001 RR vol. 25 at 74-77.)  Det. Meeks testified at length that the robbery was planned, although poorly, and ineptly executed.  He explained that the robber likely chased Mr. Turski done as he attempted to flee over a fence, shot him a second time, and followed him back into the store where he struggled to stay alive.  (2001 RR vol. 25 at 77-131.)

The next witness was **Andrew Rohde**, a Plano paramedic, who attempted to save Mr. Turski. (2001 RR vol. 25 at 132.)  Mr. Rohde described Mr. Turski's wounds, which were serious and fatal. Mr. Turski's liver was destroyed and much of it was blown out onto the floor, where he lay gasping. (2001 RR vol. 25 at 133-37.)

Next, **Dr. John Launius**, the treating emergency physician, explained to jurors that Mr. Turski suffered a phenomenal amount of pain and was conscious through most of his ordeal.  (2001 RR vol. 25 at 141-48.)  There was very little that could be done for him.

The State next called **Pete Spiros**, the owner of the liquor store.  (2001 RR vol. 25 at 152.) He was at home when he heard that Mr. Turski had been shot.  He called Mr. Turski's wife and then drove her to the hospital.  After a few minutes, they were told that he had died.  Everyone broke down and cried when they saw his body.  (2001 RR vol. 25 at 158.)  After checking, Mr. Spiros determined that $700 had been stolen from the cash register.  (2001 RR vol. 25 at 160.)  Mr. Spiros and friends and family worked all night to clean up the store and wash away the blood.  (2001 RR vol. 25 at 161-63.)

7

The next witness was **<u>Shawn Robinson</u>**, 27.  (2001 RR vol. 25 at 164.)  Mr. Robinson was a TDC inmate serving a 25-year sentence for aggravated assault.  Before his sentence, he was a high school friend of Chris Vargas and knew Gustavo Garcia to a lesser degree.  On the day of the murder, he was at Chris' house drinking beer when Gustavo arrived.  They stayed for a while, and then Chris and Gustavo left in a small car.  (2001 RR vol. 25 at 170.)  Chris has a .20 gauge shotgun. (2001 RR vol. 25 at 171.)  The pair returned later and parked the car in the garage, which was not their usual practice.  (2001 RR vol. 25 at 172.)  Chris had some cash, a few hundred.  They also hauled in several cases of beer.  Chris told Mr. Robinson that they had killed someone.  (2001 RR vol. 25 at 174-76.)  Gustavo did not say much.  (2001 RR vol. 25 at 176.)  Mr. Robinson wrote a statement in 1991 in which Gustavo said at the time that he shot the clerk in the chest and a second time in the back of the head as he was crawling away.  (2001 RR vol. 25 at 177.)  The purpose for the murder was to make sure that the clerk would not live to identify him.

Several weeks later, in January 1991, Mr. Robinson tagged along with Chris and Gustavo as they drove from Plano to Dallas.  (2001 RR vol. 25 at 180-82.)  One of the men, possibly Gustavo, said that they were looking for places to rob.  Finding no suitable target, they returned home in Plano.  Although Mr. Robinson was vague and equivocal, it seems that on another night sometime later, they drove around once again and identified a Texaco station in Plano that Mr. Garcia said he wanted to rob.  (2001 RR vol. 25 at 183.)

The next witness was **Bobby Flores** (2001 RR vol. 25 at 190.)  Bobby had a fair number of criminal convictions.  He was a friend of Chris Vargas.  He was an acquaintance of Gustavo Garcia. He said that on the day of the murder, he was at a house hanging out with Gustavo, Chris, and Shawn.  They planned to get some beer.  Chris and Gustavo left in a small car at some point.  When

8

the pair returned, Mr. Garcia was driving.  He pulled the car into the garage and closed the door.
This was not their usual practice because Chris lived in the garage.  Usually, they parked on the
street.  Mr. Garcia told him that they had robbed a store and shot someone.  They had a couple cases
of beer and some cigarettes.  They also had around $500 in cash.

The State next called **Mrs. Phane Knox**.  (2001 RR vol. 26 at 1.)  She lived near Dallas.  Her
daughter, Shiela, 17, at one time dated Mr. Garcia when she was a teenager.  (2001 RR vol. 26 at 2.)
Shiela and Mr. Garcia were not married.  Gustavo worked for a fast food restaurant and also for Mrs.
Knox' ex-husband doing painting and roofing.  (2001 RR vol. 26 at 18-19.)  Gustavo was a very
talented painter.

On the morning after the murder, Shiela, who was upset, called Mrs. Knox and asked her to
come to the home of Mrs. Knox' ex-husband, where Shiela was staying.  (2001 RR vol. 26 at 3, 5.)
Shiela told her mother that Gustavo had taken her car.  (2001 RR vol. 26 at 3-4.)  Gustavo was also
at the home of Mrs. Knox's ex-husband.  He watched television while Shiela talked with her mother.
(2001 RR vol. 26 at 5.)  Shiela told her mother that Gustavo had driven home the night before.  He
was drunk and told her that he and Chris Vargas had robbed a liquor store and killed a man.  (2001
RR vol. 26 at 5-6.)  Mrs. Knox did not believe her daughter, who had a habit of exaggerating.  (2001
RR vol. 26 at 5-6.)  Moreover, Gustavo acted normally.

Mrs. Knox identified the car Shiela was driving as one she gave to Shiela.  (2001 RR vol. 26
at 4.)  One of the two, Gustavo or Shiela, gave Mrs. Knox $10 for gas.  (2001 RR vol. 26 at 10.)  The
young couple planned to go Christmas shopping later in the day with money Gustavo said he had
won shooting pool.

On the positive side, Mrs. Knox described Gustavo as a very talented painter and artist. (2001 RR vol. 26 at 30-31.)  He painted an oil portrait of a lighthouse which is still hung at her house.

### The Texaco Station Robbery and Murder

The State next turned to Mr. Garcia's involvement in a murder the following month, on January 5, 1991, at a Texaco station in Plano.

The next witness for the state was **Mrs. Kelly Flesher**.  (2001 RR vol. 26 at 39-40.)  Ten years earlier, Mrs. Fisher was single and dating a man named Greg Martin.  Although unmarried, she was eight months pregnant with his child when he was murdered.  Mr. Martin was a clerk at a Texaco station in Plano.  He worked the night shift as a second job for extra money to prepare for the baby.  (2001 RR vol. 26 at 42.)  During one late evening in January 1991, Mr. Martin called Kelly.  They chatted, and then he told her that a suspicious car had driven through the parking lot. He read a license number to her.  Someone came in at about midnight and asked to purchase alcohol. She could hear the man arguing in Spanish.  Greg said he was not going to sell the man alcohol.  The man left.  (*See also Testimony of Kelly Martin*, 1991 trial SF vol. 2 at 151 (July 22, 1991 suppression hearing).)

About one minute later, Greg told her to hold on.  She heard a voice on the other end tell him to give him everything he had.  (*See also Testimony of Kelly Martin*, 1991 trial SF vol. 2 at 152, 169-74 (July 22, 1991 suppression hearing).) She heard a loud pop, and then nothing else.  She called police.  She initially reported two black males in the car Greg identified.  Only later did she learn that Greg had been murdered.

10

As an aside, although Kelly Martin was Greg Martin's fiancee before he died, she later changed her surname to Martin after his death and designated herself common law married.  They had lived together for eighteen months and had one child together.  (*See Testimony of Kelly Martin*, 1991 SF vol. 2 at 161-63 (July 22, 1991 suppression hearing).)  She needed to declare herself married in order to qualify for victim compensation payments.  (*See Testimony of Kelly Martin*, 1991 SF vol. 2 at 151, 182-83 (July 22, 1991 suppression hearing).)

Prosecutors then called **Kent Perlich**, a Plano police officer.  (2001 RR vol. 26 at 47.)  He was the first officer on the scene of the Texaco robbery.  Parked out front was Mrs. Knox' car with Shiela Knox nervously sitting in the driver's seat.  Bypassing her, Officer Perlich entered the store to investigate.  He saw the clerk laying on the floor in the back and Chris Vargas standing over him.  He ordered Chris away.   Other officers arrested Chris.  Police found two unexpended shotgun cartridges in Chris' pocket and one spent round.  (2001 RR vol. 26 at 68-69.)  Chris also had nylon hose in his pocket.  Meanwhile, another officer found Gustavo hiding in the cooler storage room.  On Gustavo, police found rolls of cash and coins.  The clerk was dead.

Officer Perlich then read *Miranda* rights to Gustavo and Chris at the scene as they sat in the patrol cars.  (2001 RR vol. 26 at 73-74.)  He saw no indication that either had been drinking.

Prosecutors next called **Officer James Brunson**, the second Plano police officer on the scene.  (2001 RR vol. 26 at 102-03.)  Finding the clerk on the floor, he handcuffed Chris Vargas and put him in the patrol car.  (2001 RR vol. 26 at 107-08.)  After putting Chris in the car, he talked with Shiela Knox, who had begun using Gustavo's surname.  Shiela was nearly hysterical.  She told Officer Brunson that her husband was still in the store.  A few minutes later, Officer McDonald, another patrolman, brought Gustavo out.  (2001 RR vol. 26 at 111-13.)  Officer Brunson searched

11

Gustavo and found blue panty hose in one pocket, and cash and coins stuffed in others.  The officer saw no indication that Gustavo was drunk.  (2001 RR vol. 26 at 117-18, 120-21.)

Searching Shiela's car, Officer Brunson found several cartons of cigarettes.  (2001 RR vol. 26 at 118-19.)  He drove Gustavo to jail and booked him in.

The State's next witness was **Officer Harry Manning**, a senior Plano police officer.  (2001 RR vol. 26 at 124-25.)  Officer Manning explained that as he and other officers searched the cooler, they found a unspent shotgun cartridge and the shotgun.

**Officer Rick McDonald**, another Plano police officer, testified next.  (2001 RR vol. 26 at 140.)  Officer McDonald dragged Mr. Garcia out of the station.  He later searched the Texaco station with his police dog, Blitz.  Finally, the officers determined that no one else was hiding in the station.

**Det. Billy Joe Meeks** the same detective who investigated the Beverage Warehouse robbery, also described for jurors his investigation of the Texaco station robbery and murder.  (2001 RR vol. 26 at 149-50.)  Gustavo's and Chris' fingerprints were found on cigarette cartons and a plastic storage box found in Shiela's car, indicating that they had hauled the goods from the store to the car.  (2001 RR vol. 26 at 154-55.)  Officers also found an illegal .20 gauge single shot, short barrel shotgun in the cooler.  (2001 RR vol. 26 at 165-67.)  The gun was in poor condition and was not capable of reliably ejecting a cartridge.  The hammer had to be operated manually.  Detective Meeks said that a Dallas laboratory had tested the gun and concluded that the gun produced a similar strike point on the primer of a cartridge as that used in the Beverage Warehouse crime.  (2001 RR vol. 26 at 170.)

Det. Meeks felt that the Texaco robbery revealed a higher degree of planning than the Beverage Warehouse crime because they now used masks.  (2001 RR vol. 26 at 172.)  This fit his

12

theory that criminals follow a learning curve and continue to improve their methods as they commit crimes.  Det. Meeks acknowledged that Chris, who was 15 at the time of both crimes, was certified to stand trial as an adult and was prosecuted for murder of Mr. Martin.  Det. Meeks confirmed that the State's theory in Chris' prosecution was that Chris was the one who shot Mr. Martin, not Gustavo.  (2001 RR vol. 26 at 174-75.)  Chris received a life sentence.

### 1991 Suppression Hearing.

Most of the officers involved in the arrest, search, and interrogation testified during the suppression hearing or trial.  The following summarizes the key points:

Officers drove Garcia to the Plano Police Department.  The officer who booked in Garcia wrote on the medical screening form that Garcia appeared to be under the influence of alcohol or drugs, circling the word "alcohol."  *(See* 1991 SF vol. 8 at 426-27; vol. 75 at 2.)  During the interview, Garcia told the officers that he was drunk during both murders.  (1991 SF vol. 9 at 491.)

*Michael McCreary.*  Officer McCreary is the Plano PD officer who pulled up shortly after the first car.  His testimony is contained in volume 2 of the 1991 statement of facts, during the suppression hearing.

- He frisked Garcia upon first contact and found no weapons.  P. 216.  Garcia was hiding in the storage cooler.

- In the cooler, he and other officers found a shotgun shell and a sawed-off shotgun between some of the boxes.  P. 217.

- Another officer found money on Garcia, so he and the other officer researched Garcia outside the station.  P. 221.  They found no weapon.

- He instructed Officer Perlich to read Garcia his Miranda rights.  P. 222.

- He did not believe Garcia to be intoxicated.  P. 226.

13

- There were certain offense reports available which he did not review. The trial court denied request by the Defense for their production, but did order these offense reports sealed for appellate review. Pp. 236-42, 246-50.

***Sealed Offense Reports.*** In the 1991 suppression hearing, from page 226 onward, the transcript describe the reports that Officer McCreary compiled from other officers and adopted as his own. Officer McCreary testified from his memory of those reports and referred during testimony to matters discussed in them. The documents were sealed for appellate review. (1991 SF vol. 2 at 241.) There is no indication that these documents were ever examined on appeal.

Garcia's motions to suppress were overruled and his confessions were admitted.

***2001 Sentencing Trial.***

The next witness in the 2001 sentencing trial was **Det. David Wilson**, a Plano police officer who interrogated Mr. Garcia and Shiela Knox (or Shiela Lowe) after their arrest. (2001 RR vol. 26 at 177.) The interviews were recorded, but the equipment malfunctioned and the recording quality was low. Det. Wilson read Gustavo his *Miranda* rights. (2001 RR vol. 26 at 181-82; St. Exh. N.) According to Det. Wilson, Mr. Garcia waived his rights and talked. (2001 RR vol. 26 at 196-97.) The interview began at 5 a.m. at the jail, about four or five hours after his arrest. He was asleep and tired when Det. Wilson summoned him. (2001 RR vol. 26 at 192, 195, 199.) Mr. Garcia signed a confession written by Det. Wilson. (St. Exh. I.) Gustavo speaks English fluently.

Det. Wilson interviewed Mr. Garcia a second time at around 8:15 a.m., three hours after the first interview, and seven or eight hours after his arrest. (2001 RR vol. 26 at 184-85; St. Exh. 3.) This time the topic was the Beverage Warehouse robbery. Det. Wilson again read his *Miranda* rights. Mr. Garcia confessed his role. (2001 RR vol. 26 at 185-86; St. Exh. 3.)

The State introduced the videotapes of his confession.  (St. Exh. 327, 328.)  The defense lawyer failed to object to the videotapes of the interviews.  (2001 RR vol. 26 at 194-95.)

The State next called **John Naylor**, a forensic technician with the Plano Police Department.  (2001 RR vol. 27 at 1.)  He examined the Beverage Warehouse after the robbery.  No prints could be obtained from the shotgun shell found on the floor the Beverage Warehouse.  No other prints at the warehouse matched those of Mr. Garcia or Chris Vargas.  (2001 RR vol. 27 at 8.)

Mr. Naylor also examined the Texaco station crime scene.  No prints could be matched to the shotgun cartridge found in the cooler.  (2001 RR vol. 27 at 13.)  Nor from the beer cases found in the store which had been moved.  Mr. Naylor said that a print on the handle to the cooler door matched Chris Vargas.  (2001 RR vol. 27 at 19-20.)  The prints on the cigarette cartons in Shiela's car matched Chris Vargas.  (2001 RR vol. 27 at 20.)  The prints on the cigarette cartons found next to Mr. Martin's body matched Chris Vargas.  No prints could be obtained from the shotgun.

The prints lifted from the tote handles of three cases of beer found on the counter of the convenience store matched Gustavo Garcia.  (2001 RR vol. 27 at 21-22.)

The State next called **Dr. William Rohr**, the pathologist who conducted the autopsy on Mr. Turski and Mr. Martin.  (2001 RR vol. 27 at 25.)  He described the fatal injuries in detail.  Both men were shot a close range.  The gun was placed against or very near Mr. Martin's head when fired.

The next witness by the State was **Frank Smith**.  (2001 RR vol. 27 at 64-65.)  Mr. Smith owns a gun store and has considerable firearm experience.  He explained to the jury that the shotgun is a Harrington & Richards single shot .20 gauge shotgun made in Garner, Massachusetts.  The weapon was in poor condition and had been altered.  The trigger guard was broken.  The sear did not work (which holds the hammer back in a cocked position).  The stock had been sawed to create a

crude pistol grip.  The barrel had been sawed below the legal limit.  The firing mechanism is damage

and the gun will no longer cock.  The firing receiver had been crudely modified with aluminum foil

to contact the firing pin.

In order to insert a cartridge, one must hold the hammer back with the other hand with a

sufficient degree of force.  (2001 RR vol. 27 at 69-70.)  Because of the recoil, the shooter must hold

the gun with both hands and fire from a short distance because of the poor accuracy.

The next witness was **Lanny Emanuel**, a firearm and toolmark examiner with the

Southwestern Institute of Forensic Sciences in Dallas (SWIFS).  (2001 RR vol. 27 at 80.)  He

concluded that the shotgun fired the cartridge which killed Mr. Turski.  (2001 RR vol. 27 at 85-86.)

### *Gustavo Garcia's Education and Juvenile Record*

The State then called  **Jim Chandler**, the principal of the McKinney Learning Center, an

alternative learning program for students in the McKinney Independent School District.  (2001 RR

vol. 27 at 89.)  In 1987 and 1988, he was an assistant principal at the Faubion Junior High School

in Collin County where Gustavo Garcia attended at one time.  He made the following comments

regarding Gustavo's performance in eighth grade:

- Gustavo was chronically truant while at Faubion Junior High School during his eighth grade (2001 RR vol. 27 at 91-92);

- Generally, he was a capable student (2001 RR vol. 27 at 92-93);

- He had the ability and intelligence to succeed in school (2001 RR vol. 27 at 93);

- Mr. Chandler talked with Gustavo and tried to convince him to stay in school and apply himself (2001 RR vol. 27 at 94-95);

- Gustavo's mother was very supportive of Mr. Chandler's efforts to keep him in school (2001 RR vol. 27 at 96-97);

16

- Gustavo was cooperative with Mr. Chandler when Mr. Chandler spoke with him, although Gustavo continued to repeat his behavior (2001 RR vol. 27 at 97-99);

- Gustavo maintained his appearance well (2001 RR vol. 27 at 99);

- Gustavo's missed so much school that it began to interfere with his ability to learn sufficient material to graduate (2001 RR vol. 27 at 99);

- Gustavo had a package of discipline reports, including insubordination, one fight, and class disruption (2001 RR vol. 27 at 100; St. Exh. 366);

- Mr. Chandler saw no indication of drug or alcohol use (2001 RR vol. 27 at 101);

- Nor did Mr. Chandler see indication of physical abuse (2001 RR vol. 27 at 101);

- Gustavo had artistic talent (2001 RR vol. 27 at 111);

- He was not involved in extracurricular activities (2001 RR vol. 27 at 111-18).

The State called **Mrs. Pat Rodgers**, an educational consultant, but who in 1988 was an assistant principal at Faubion Middle School where Gustavo attended seventh and eighth grade. (2001 RR vol. 27 at 119.)   She made the following comments regarding his eighth grade performance:

- Gustavo was seriously truant (2001 RR vol. 27 at 123-24);

- He repeated the eighth grade (2001 RR vol. 27 at 135-36);

- Gustavo was involved in insubordination and disruptive behavior (2001 RR vol. 27 at 123-30);

- Gustavo had two friends who were also discipline problems (2001 RR vol. 27 at 130);

- She counseled him often, and cared a great deal for this young man who was so much at risk (2001 RR vol. 27 at 137-38);

- There was no indication of physical abuse (2001 RR vol. 27 at 132);

17

- Gustavo dropped out of school at the beginning of his ninth grade (2001 RR vol. 27 at 140-41).

The State then called **Richard S. Smotherman**.  (2001 RR vol. 27 at 142.)  Currently the principal of Crowell High School in Crowell, Texas, he is formerly the principal of the Faubion Junior High School in 1988 when Gustavo attended eighth grade.  According to Mr. Smotherman:

- One of Gus' friends broke a window of an opposing team's bus at a school basketball game, while Gus was present.  (2001 RR vol. 27 at 145, 147);

- Gus was always relatively polite and courteous to him, although not always to some of his teachers.  (2001 RR vol. 27 at 146);

- Gus was involved in a fight in the cafeteria and Mr. Smotherman talked with him afterward.  (2001 RR vol. 27 at 147-48);

- Gus was one of his more disruptive students.  (2001 RR vol. 27 at 148; education records, Def. Exh. 25).

The next witness was **Pamela Ann Huffman**, a Collin County juvenile probation officer. (2001 RR vol. 27 at 150).  She explained to the jurors:

- She began supervising Gustavo when he was 16 in December 1988 after he was arrested for burglary.  He was adjudicated as a juvenile for burglary of a habitation and burglary of a building.  (2001 RR vol. 27 at 154.);

- During probation, Gustavo did not attend school regularly.  (2001 RR vol. 27 at 161; vol. 31 at 20-28.);

- Gustavo repeated the first grade (2001 RR vol. 31 at 22-23);

- Nor did he work consistently;

- Nor did he pay much of his probation or restitution fees (2001 RR vol. 31 at 29-31);

- Gustavo was always respectful and cordial.  (2001 RR vol. 27 at 171.);

- He and his mother lived in a neat, well-kept frame home in McKinney.  (2001 RR vol. 27 at 174.);

18

- Gus was abusing alcohol (2001 RR vol. 27 at 161-62);

- In September 1989, six months after probation began, and nine months after supervision began, Gustavo broke into a liquor store in Plano.  He was caught and placed in the juvenile detention center.  (2001 RR vol. 27 at 162.);

- She worked the phones and arranged for Gustavo to go through a 30-day inpatient alcohol treatment program in September 1989 in Dallas. (2001 RR vol. 27 at 162-67; vol. 31 at 50-60);

- He was then transferred to a residential treatment facility with Buckner's Children's Home in Dallas where he stayed for five months, until his release in March 1990;

- Adelina, the mother, showed up in her office once with a black eye Rene Magana had given her (2001 RR vol. 31 at 57-58.);

- His probation ended when he turned 18 on September 27, 1990.

The next witness was **Jack Tulley**, a former McKinney police officer.  (2001 RR vol. 27 at 179).  He investigated the two burglaries Gustavo committed in 1988 when he was a juvenile. Gustavo confessed to both crimes.  (2001 RR vol. 27 at 182-85; St. Exh. B.)  There was no objection by the defense attorney.  (2001 RR vol. 27 at 185.)

The home Gustavo burglarized was located in McKinney, about two blocks from his house. He and another friend broke in one morning and stole Christmas presents from the family under the tree.

In his confession, Gustavo also admitted burglarizing four other houses in Plano, with the help of four buddies.  (2001 RR vol. 27 at 1986.)

The State then called **Joel Christopher Heaton**, the director of the Texas Municipal Police Association.  (2001 RR vol. 27 at 187-88.)  In 1988, Mr. Heaton was a Plano police officer.  He told jurors that Gustavo was responsible for several Plano home burglaries.  A juvenile named Rene Guajardo confessed to several burglaries and implicated Gustavo as an associate.  Mr. Heaton also

19

interviewed other people and recovered some of the stolen property from a Plano apartment complex. Some of the people who were found with the stolen property said that they had obtained it from Gustavo and other people. Mr. Heaton assumed that the apartment complex residents with the stolen property were fencing the property from Gustavo and others. (2001 RR vol. 27 at 188-96.)

Mr. Garcia's lawyer did not object to any of this hearsay testimony.

Mr. Heaton also told jurors that he interviewed a couple called the Jacksons. The Jacksons were two people he believed were fencing stolen property. He explained to jurors that he arranged for these co-conspirators to review a photographic lineup. The Jacksons, according to Mr. Heaton, looked at a lineup of photographs and identified Gus Garcia as one of the young men who sold stolen property to them. (2001 RR vol. 27 at 205-06.) There was no objection to this hearsay by the defense counsel or effort to obtain the lineup photographs for review, or copies of the interview reports with the Jacksons.

Without objection by defense, Mr. Heaton also told jurors that he arrested Gustavo based on the evidence he obtained, and that Gustavo lied to him about his name. (2001 RR vol. 27 at 207-08.) The defense did not object to these custodial interrogation oral statements. (2001 RR vol. 27 at 207.)

The next witness was **Todd D. Koons**, another Plano police officer. (2001 RR vol. 28 at 1.) He responded to the burglary of a liquor store called the Beverage Center in Plano on September 10, 1989, the one allegedly burglarized by Gustavo when he was 16. (This is not the same store as the Beverage Warehouse.) Officer Koons testified that at 4 a.m. one morning he responded to an alarm call at the store. Beer and cigarettes had been stolen. Some kids were arrested with the goods at a nearby school.

20

The next witness was another Plano police officer, **Rick Mills**.  (2001 RR vol. 28 at 8-9.)  With another officer, within a few minutes after the burglary he corralled the kids at the nearby school found with cold beer.  Among them were Chris Vargas and Gustavo Garcia.  (2001 RR vol. 28 at 11.)  Gustavo was drunk and could hardly stand up, suggesting that he was not capable of the work necessary to burglarize a store and haul away goods.  (2001 RR vol. 28 at 13.)  Nonetheless, he was arrested as one of the burglars.  (2001 RR vol. 28 at 12-13.)  The defense lawyer did not cross-examine the officer.

The State next called **Eddie W. Bradley**, a manager at a Plano car dealership.  (2001 RR vol. 28 at 14-15.)  He reported that in November 21, 1988, someone broke into the building, stole all of the car keys from the lock box, and took two cars from the lot.  The thieves drove through the cable barrier crossing the driveway.  The cars were found several weeks later driven by someone near the Plano High School.  (2001 RR vol. 28 at 18.)

The State next called **Kathleen Kripaitis**, a McKinney resident.  (2001 RR vol. 28 at 19.)  Her home was burglarized in 1988.  All of the Christmas presents under the family's tree had been ripped open and many of the presents stolen.  The thieves ransacked the entire house and stole the VCR and cameras.  Even her daughter's Bible had been rummaged and personal notes and letters had been ripped up and tossed.  Her son's electronic keyboard was stolen along with his drafting paper and marking pens which he used for art work.  Even some clothing was taken.  (2001 RR vol. 28 at 22-23.)

The next witness was **Sandra Klein**.  (2001 RR vol. 28 at 24.)  Her home was burglarized in December 1988.  The home had been completely ransacked.  The family's  Christmas presents were torn open and many stolen, the rest destroyed.  A computer was stolen, along with guns, a

knife, jewelry, clothing, and a small amount of money.  Even some savings bonds were taken.  None of their property was recovered.

The next witness was **Rodney Marks**, another Plano resident.  (2001 RR vol. 28 at 28.)  He explained that his home had been burglarized in December 28, 1988.  Stolen was a jewelry box, watches, a camera, and credit cards.  The thieves damaged a water spigot climbing into the house which poured a large amount of water into the back yard.

### Conduct in County Jail

The State then called **James Blackburn**.  (2001 RR vol. 28 at 31-32.)  In 1991, he was a supervisor at the Collin County jail.  Mr. Garcia spent several months in the jail.  (Although jurors were not told, this was while he was awaiting his first trial on capital murder.)  There were two incidents in which Mr. Garcia did not follow the jail rules.  In the first, he refused to follow several orders of a guard to get up from a table in the day room while officers were clearing inmates to another room.  (2001 RR vol. 28 at 39.)  Finally, he got up and followed the order and moved to his cell.  Mr. Garcia made some loud remarks to the guard as he passed.  The guard ordered him placed in a separate room.  Dep. Blackburn told jurors that Mr. Garcia did not seem to be intimidated by him although Mr. Garcia was only 18.

In the second incident, he struck a surveillance camera to get the guards' attention.  Dep. Blackburn wrote a report on the second incident, but not the first.  (2001 RR vol. 28 at 44.)

The State then called **Jerry Mehman**, deputy with the Collin County Sheriff's Department.  (2001 RR vol. 28 at 74-75.)  In 1991, he was a jail officer.  He reported three infractions by Mr. Garcia.  The first was the same incident described by Dep. Blackburn in which Mr. Garcia did not respond to initial orders to get up from a table and move out of the day room tank.  Mr. Garcia finally

22

got up from the table and walked toward Dep. Blackburn.  Mr. Garcia spoke to Dep. Blackburn in a loud voice.

The second incident occurred a few weeks later.  Mr. Garcia struck one of the surveillance cameras and was moved to a single cell.  (2001 RR vol. 28 at 79.)  Once he was in the single cell, Mr. Garcia began beating on the door.  Mr. Garcia was angry.  The officers reopened the cell and told Mr. Garcia to step back.  Dep. Mehman asked Mr. Garcia whether he would still beat on the cameras if brought into the group cell.  Mr. Garcia said that he would.  Mr. Garcia then charged Dep. Mehman and jerked his clip on tie off.  Several guards helped restrain Mr. Garcia on the floor.

About two months later, another inmate told guards that he and Mr. Garcia wanted a match so they could smoke.  The pair signed a note to guards stating that if they could not have a match then they would rather die.  (2001 RR vol. 28 at 87; St. Exh. L.)  The other inmate began banging his head against the cell door.  Guards asked the two inmates to open the door but they refused.  The two inmates, one of whom was Mr. Garcia, had jammed a roll of toilet paper between the wall and the door and a ballpoint pen was stuck into the door track.  Consequently, the door would not open.  Guards finally pried open the door and a shake down revealed cigarettes in one of the mattresses.

Dep. Mehman said that there were a number of disciplinary reports written on Mr. Garcia.  (2001 RR vol. 28 at 89.)

The next witness was **Kim Roper**.  (2001 RR vol. 28 at 101.)  In 1988, she worked as a secretary for Mr. Rodgers at Fabion Middle School.  She explained that on February 19, 1988, she wrote Gustavo up for being slightly belligerent and generally disrespectful.

The State then called **William D. Ponder**, another Collin County guard in 1991.  (2001 RR vol. 28 at 106-07.)  Lt. Ponder described Mr. Garcia as "more or less rebellious" and someone who

did not like to follow the rules of the jail.  Mr. Garcia, although only 18, did not seem to be afraid of anyone.  Lt. Ponder described the incident in which Dep. Mehman's tie was pulled off by Gustavo.

Lt. Ponder said that there were incident reports available for examination.  (2001 RR vol. 28 at 112.-15.)

### *Escape Attempt From Ellis Unit*

The State then introduced a series of witnesses to describe Mr. Garcia's attempted escape from the Ellis Unit with several other inmates in 1998.  The first witness was an officer with the Ellis Unit, **Michael O'Dwyer**.  (2001 RR vol. 29 at 11-12.)  Capt. O'Dwyer in 1998 was a lieutenant at the Ellis Unit.  He lived in a house just outside the perimeter fence, 150 yards from the fence.  On evening in November 1998, he and family were relaxing on the back porch of his home when they saw inmates crossing the fence to escape.  (2001 RR vol. 29 at 20-21.)  Capt. O'Dwyer ran toward the fence and yelled for guards to open fire.  Then he alerted his family to lock the house and arm themselves.  Capt. O'Dwyer's brother brought him a pistol.  One of the inmates crossed the second fence and succeeded in escaping.  The others crossed the first fence, but failed to cross the second. Fog shrouded the river and land outside the prison.  Capt. O'Dwyer approached the fence and ordered the inmates trapped between the fences to remain on the ground.  (2001 RR vol. 29 at 21-30.)

The inmates had dyed white thermal underwear into gray for camouflage.  They wore gloves. Some of the inmates had wrapped cardboard around their arms and legs so they could cross the concertina wires.  He recognized Garcia among them.  (2001 RR vol. 29 at 29-30.)  Mr. Garcia and another inmate were laughing when Capt. O'Dwyer approached.  (2001 RR vol. 29 at 124-25.)  To

24

escape, the inmates fashioned dummies and hid them under their bed sheets to fool guards into believing they were asleep.  (2001 RR vol. 29 at 47.)  The inmates started at the recreation room, climbed a retaining wall, and then got to the roof by cutting through the chain link fence which protected access to the roof.  Then they crossed the roof of a cell block, and crossed the roof of the main portion of the prison building.  Finally, they scaled down the side of the chapel and reached the ground where they ran for the first fence.

Capt. Dwyer told jurors that Mr. Garcia had a few disciplinary violations for possessing contraband, including unauthorized jewelry, radio, some clothing, tattooing paraphernalia, and some shirts.  (2001 RR vol. 29 at 70-71.)

The State next called **Guy R. Cabeen**, a sergeant at the Ellis Unit.  (2001 RR vol. 29 at 147-48.)  He was at home asleep when his wife woke him and told him that inmates had tried to escape.  Living on the Ellis Unit property a short distance from the perimeter, he threw on clothes and raced to the unit.  The inmates were still on the ground between the two fences when he arrived.  He determined that none of the inmates were injured.  He and other guards secured the inmates with leg irons.  The inmates were marched back into the building and lined up.  The inmates were strip searched.  Their clothing and property was inventoried.

Mr. Garcia wore clothing died light gray.  He wore rubber bands for holding newspaper and padding in place.  He carried some toiletries.  He had a certain type of razor blade used for craft work.  (2001 RR vol. 29 at 155-56.)

At this point, the State rested.  (2001 RR vol. 29 at 168.)

25

### *Defense Mitigation Presentation*

The Defense called **Janie Alisondo**, Gustavo's aunt.  (2001 RR vol. 30 at 10.)  She lives in Balch Springs, near Mesquite.  Her sister, Adelina, gave birth to Gustavo when she was 19 or 20 in Houston.  Adelina was first married at 18.  Gustavo's father was Gustavo Garcia, Sr.  Adelina and Gustavo, Sr. struggled through a series of low-wage jobs.  Gustavo, Sr. joined the Army.  The couple divorced when Gustavo was four.  (2001 RR vol. 31 at 5.)  Adelina began living with Manuel Guajardo and she moved to Austin.  (2001 RR vol. 31 at 5-7.)  Adelina had three more children, from other men.  (2001 RR vol. 31 at 10.)  The family moved to a number of houses and apartments in the Dallas area.

Adelina separated from Manuel and took up with Rene Magana.  (2001 RR vol. 31 at 18.)  Adelina worked many menial jobs and long hours to support the family.

The Defense next called **Dr. Walter Quijano,** a psychologist.  (2001 RR vol. 30 at 21-22.)  Dr. Quijano was the psychologist who testified for the State in punishment at Mr. Garcia's first punishment trial in 1991.  It was his testimony, which mentioned race as a factor increasing the possibility of future dangerousness, which led to the reversal of Mr. Garcia's sentence and retrial.

Dr. Quijano has considerable experience with Texas inmates from within and without the system.  His most senior position was that of chief psychologist and director of the psychiatric services of TDCJ-ID, a position he held from 1984 to 1989.  In that position, he developed classification standards and was a member of the classification committee.  Regarding Mr. Garcia, Dr. Quijano told jurors:

• 	Security at TDCJ-ID has improved since Ruiz;

26

- By considering a number of factors involving an inmate's history, personality, and the nature of his crime, one can make general assessments of his probable future violence or passivity;

- The rates of violence in prison are actually lower than in public because of controls;

- Drugs, alcohol and home made weapons can be obtained in prison, but controls are used to find them;

- Inmates are carefully classified among units of increasing restrictiveness in relation to the inmate's dangerousness, which reduces violence;

- Given Gustavo's history, he would most likely be placed in a high security unit in TDCJ-ID if assigned a life sentence, and probably placed in the most restrictive category: administrative segregation.  (2001 RR vol. 30 at 50-57.)

Dr. Quijano presented a videotape of a maximum security unit which walked jurors through administrative segregation.  (2001 RR vol. 30 at 58-65; Def. Exh. 4.)

The Defense then called **Michelle Guajardo**, Gustavo's younger sister.  (2001 RR vol. 31 at 29-30.)  Her father was Manuel.  She did not keep in touch with her father and did not know where he was.  In the years when his mother worked long hours, Gustavo took care of his sisters. younger sisters.  Gustavo is as close a father figure as she had.

The next witness was **Rachel Villereal**, 30, one of Gustavo's aunts.  (2001 RR vol. 31 at 33.)  There was a lot of alcohol consumed in the family.  The children, including Gustavo, began drinking and using drugs at a young age.  The other sisters, Janie and Adelina, shoplifted to obtain supplies for the family.  The children began stealing as well.  (2001 RR vol. 31 at 38.)  As young as his early teens, Gustavo acted as a surrogate father for his younger sisters, providing their food and making sure they go to school and back.  He never struck the other children.  Adelina drank on the weekends, but not during the week.  Rachel recalled abuse and violence between Adelina and Manuel when she was young.  (2001 RR vol. 31 at 49.)

27

The Defense then called **Gracie Lynn Armejo**, 28, a cousin.  (2001 RR vol. 31 at 52-53.)  She offered nothing substantial.  She painted a picture of a normal and typical American family.

The Defense called Gustavo's mother, **Adelina Garcia Guajardo**.  (2001 RR vol. 31 at 61-62.)  She married Gustavo's father when she was 16.  Gustavo, Sr. was also 16.  Gustavo was born within the year.  It was a normal pregnancy and delivery with no complications.  After five years of a dysfunctional marriage, she divorced Gustavo, Sr., who refused to let go of alcohol, drugs and other women.  (2001 RR vol. 31 at 73-76.)

Gustavo had splendid grandparents who raised him well and spent time.  Her father, a family man, finally ordered Adelina to leave because she would not leave the night life.  (2001 RR vol. 31 at 86.)  She moved to Austin, and the grandparents continued to take care of Gustavo.  She moved in with a man named Manuel.  The grandmother died shortly thereafter of a stroke.  Gustavo was five.  Her father was shot and killed in a bar the next year.

Her relationship with Manuel disintegrated quickly because he dominated and beat her severely or raped her.  (2001 RR vol. 31 at 99, 163-64, 167-69.)  For three years, from age five to eight, Gustavo witnessed it all.  She stayed with Manuel and the beatings and alcohol for five years.  Gustavo lived in and out of women's shelters.  Manuel once dragged her out a women's shelter.  (2001 RR vol. 31 at 162-63.)  He put into the hospital several times.  (2001 RR vol. 31 at 171-72.)  When she was five months pregnant with twins, Manuel beat her so severely that she miscarried.  (2001 RR vol. 31 at 176-77.)  Manuel chased her from home to home, and shelter to shelter, and forced her to return when she fled, stalking her when necessary to find her.  Gustavo moved through several schools with interruptions.  (2001 RR vol. 31 at 199-200.)  Adelina was desperate for money and shoplifted to get what she needed for the family, clothes and food, and one time hose for

28

Gustavo's baptism.  She was convicted or arrested six times for shoplifting.  (2001 RR vol. 31 at 209.)

After years of abuse, she managed to break free of Manuel and get an apartment in another city.  Welfare and minimum wage jobs supported her and the three children.  She worked long hours and things started to improve.  They were around family.  Gustavo handled meals and school for his younger sisters.  Two years later, when Gus was twelve, Manuel returned and kidnaped the two younger sisters.  (2001 RR vol. 31 at 190.)  She borrowed a shotgun and got one of the children back Manuel by force.  She took the child to and FBI agent to report what occurred.  (2001 RR vol. 31 at 193-94.)

Adelina moved in with another man, Rene Magaña.  She had another daughter and son through him.  She lived with Rene for eighteen years.  By the time Gustavo reached Faubion Middle School, he was fourteen and fifteen.  He played sports for one year and then began hanging out with bad influences.  She was unaware that Gustavo was skipping school.  He began drinking when he was fifteen when he connected with Shiela and spent more time in Plano.  (2001 RR vol. 31 at 207-08.)  At age 16, Gustavo moved Shiela into his mother's house and his mother permitted it.  (2001 RR vol. 31 at 219-20.)  Gustavo's behavior deteriorated.  She was unaware of any other burglaries he committed, other than the one which put him on juvenile probation at 15.  (2001 RR vol. 31 at 223-24.)  She did not know the extent of his alcoholism until he went on juvenile probation and Gustavo told her needed considerable rehabilitation help.  (2001 RR vol. 31 at 227-30.)  She learned more during group counseling.

At some point in 1989, when Gustavo was about 16, Adelina was involved in a shooting at a club during a wedding party.  (2001 RR vol. 31 at 214-16.)  A group of boys, gangsters, were piled

on Gustavo, beating him up.  Adelina got a pistol from Rene's car and fired into the air.  She was arrested along with more than a dozen of the juveniles.  Gustavo was not arrested.

The next witness was **Jonathan E. Walker**, a physician, and very experienced neurologist. (2001 RR vol. 31 at 106-09.)  An electroencephalogram records electrical activity of a brain.  An electroencephalogram is more commonly referred to as an EEG.  The purpose of an EEG is to measure electrical activity of a brain to determine if there is abnormal functioning.  Another type of test is called a quantitative EEG, also known as a QEEG.  A QEEG is a method of using computerized modeling which analyses EEG data.  The purpose of a QEEG is also to determine if one's brain is functioning abnormally.

Dr. Walker conducted both an EEG and QEEG on Mr. Garcia.  (Def. Exh. 22.)  He made the following observations:

- Mr. Garcia displayed an abnormal EEG level of activity.  This was due to a relative lack of alpha activity.  Alpha activity refers to a certain level of brain wave activity. Mr. Garcia does not have the proper level of brain wave activity.  (2001 RR vol. 31 at 117-18, 122-23.);

- Mr. Garcia has a higher than normal level of what is called delta brain wave activity. This too indicates that he does not have the proper level of brain wave activity. (2001 RR vol. 31 at 122-23.)  "Excessive delta activity is typically associated with a head injury or stroke, something which has damaged the brain."  (2001 RR vol. 31 at 122.);

- The EEG demonstrated that there is some level of organic brain damage to Mr. Garcia's brain.  Dr. Walker concluded that there had been at some point in time some damage to Mr. Garcia's brain which caused some degree of dysfunction.  (2001 RR vol. 31 at 118.);

- Because Mr. Garcia has been in prison for the last 10 years, and therefore without drugs or alcohol, Dr. Walker surmised that his brain dysfunction has existed for a long time, during the time when Mr. Garcia was in society.  (2001 RR vol. 31 at 119-20.);

- The degree and type of brain wave abnormality is consistent with someone who has abused alcohol.  (2001 RR vol. 31 at 122-23.);

- Similarly, the degree and type of brain wave abnormality is consistent with someone who has abused drugs.  (2001 RR vol. 31 at 122-23.);

- The degree and type of brain wave abnormality is consistent with someone who has been diagnosed with an antisocial personality disorder. (2001 RR vol. 31 at 123-24.);

- Mr. Garcia's brain dysfunction can be treated.  One means is by EEG biofeedback, in which electricity is fed into the brain to train the brain how to conduct normal wave activity.  (2001 RR vol. 31 at 123-24.)  Another is with use of certain powerful and specialized medication.  (2001 RR vol. 31 at 124-25.);

- A person, such as Mr. Garcia, with his level of brain abnormal functioning is more likely to commit crimes in the future, and therefore, more likely to be dangerous in the future.  (2001 RR vol. 31 at 129-30.).

The defense then called **Alyssa Cleveland**, a nurse on contract with the Collin County jail. (2001 RR vol. 31 at 205.)  She explained to jurors that during his 2001 incarceration in the jail, Mr. Garcia had not received any medication.

The next defense witness was **Gilda Kessner**, a psychologist with juvenile experience. (2001 RR vol. 31 at 83-84.)  She examined Mr. Garcia's school records, offense and juvenile reports, interviewed him, interviewed his mother, and evaluated his background.  She did not address whether Mr. Garcia would be a future danger to society.  (2001 RR vol. 31 at 98.)  She explained to jurors:

- Gustavo's family had a significant history of crime, drug abuse, domestic violence, and instability;

- The substance abuse in Gustavo's family spans several generations;

- His parents were inadequate to the task of raising him;

- He had no proper male role models;

31

- He was terrorized and sometimes abused by his mother's men;

- Consequently, a child suffering exposure to so many dysfunctional problems for so long so early, could expect depression, behavior disorders, school disorder, loss of control, shame, fear, and insecurity (2001 RR vol. 31 at 165-67);

- These traumatic circumstances would have adversely affected Gustavo's emotional development, his cognitive abilities, his decision making skills, and his ability to deal with stress, desire for achievement, and self-image;

- Gustavo is impulsive (2001 RR vol. 31 at 113-15.);

- Dr. Kessner explained at length the statements made to her by Gustavo during her interview in which he admitted guilt, his reaction to arrest and interrogations, and his feelings about the murders;

- Gustavo's mother was far too dependent on Gustavo for her own emotional and living support during Gustavo's childhood.  Adelina carried so much emotional baggage that her severe problems compounded Gustavo's own;

- Gustavo posed a continuing danger (2001 RR vol. 31 at 148-51.);

- Gustavo expressed considerable remorse and guilt over what he had done.

The Defense attorney asked Dr. Kessner whether in her opinion there was sufficient mitigating evidence in Gustavo's circumstances to warrant a life sentence over death.  The State objected and the Court refused to permit Dr. Kessner's opinion, which was that there was in fact sufficient mitigating evidence to warrant a life sentence.  (2001 RR vol. 31 at 108-09, 175-77, 185-86.)  In an offer of proof, she testified that there was sufficient mitigating evidence to warrant a life sentence.  (2001 RR vol. 31 at 209-11, 217-21.)

### State Rebuttal

In rebuttal, the State called **Dr. Lisa K. Clayton**, a psychologist.  (2001 RR vol. 33 at 7-8.) She interviewed Mr. Garcia and conducted various tests on him.  She told jurors:

- Mr. Garcia suffers from an Axis II diagnosis, termed "anti-social personality disorder."  (2001 RR vol. 33 at 15-16.);

- She did not detect any meaningful remorse;

- He is a future danger to society (2001 RR vol. 33 at 31-32; 55-56.).

The Defense objected to Dr. Clayton's testimony that Mr. Garcia was a future danger to society as improper rebuttal testimony.  (2001 RR vol. 33 at 1-6.)  The Defense did not offer testimony that Mr. Garcia was <u>not</u> a future danger to society.  The Defense called two expert witnesses, Dr. Kessner and Dr. Quijano.  Dr. Kessner only described mitigating circumstances in Mr. Garcia's life which might warrant a life sentence.  It was only in response to State cross-examination, she that she discussed future dangerousness at all, and she in fact conceded that all evidence pointed that he would remain a future danger.  Dr. Quijano did not interview Mr. Garcia at all.  He merely described the state penitentiary and the layers of control which would secure Mr. Garcia.  He did not testify at all whether Mr. Garcia would constitute a future danger.

The State responded that the videotape displaying security conditions at TDCJ-ID somehow constituted evidence suggesting that Mr. Garcia would not be a future danger because he would be locked up.  Moreover, the State argued that it was the *mitigating* evidence offered by the Defense which opened the door in rebuttal to State expert testimony that Mr. Garcia was a future danger.  The trial court allowed the testimony in full.  (2001 RR vol. 33 at 5-6.)

The State concluded by calling in <u>rebuttal</u> **Connie Turski**, the mother of Craig Turski.  (2001 RR vol. 33 at 56-57, 76-77.)  She described his life.  Her son was born in Chicago.  She showed jurors family photographs.  (2001 RR vol. 33 at 78-80.)  She described Craig at artistic, helpful, very talented at making arts and crafts, and a good guitar player.  He loved children.  He was married 20

33

years, but had no children.  He was an exterminator, but not a very good one because he loved animals and brought many of them home or let them go.  As a young man, Craig turned down appointment at the Naval Academy, and enlisted in the Army where he was deployed to West Germany.  He was a high school wrestling champion in the middle weight division.  (2001 RR vol. 33 at 83.)

On the night of the murder, she was called at home.  The entire family rushed to the hospital. He died while the family waited.  She described how the murder devastated the family.  (2001 RR vol. 33 at 86-88.)  The funeral was packed.  His wife, Peggy, was traumatized.  Peggy returned to Chicago and although in only her 50's, was soon placed in a nursing home because her mind decayed.  The nieces and nephews of Mr. Craig Turski were torn apart.  (2001 RR vol. 33 at 87-89.) One of the nephews, Matthew, cried for a long time and expected his uncle Craig to return.  She did not tell him about Gustavo's retrial.  There would never be a day that she did not think about her loss.

The trial judge commented that he was allowing the State witnesses' rebuttal testimony on the theory that the testimony and videotape offered by the Defense of the security conditions at TDCJ-ID opened the door to rebuttal by a state psychologist (Dr. Kessner) and state prison investigator (Royce Smithey).  (2001 RR vol. 34 at 16-17.)

The State concluded its case by presenting an official from TDCJ-ID, **Royce Smithey**, a TDCJ-ID prison investigator who now testifies in almost every Texas capital trial.  (2001 RR vol. 34 at 17-18, 57-58.)  His job is to investigate and help prosecute inmates who commit crimes in prison.  Mr. Smithey reviewed the videotape sponsored by Defense expert witness, Dr. Walter Quijano.  Recall that the tape showed the movement and control of prisoners in the administrative

segregation section, and emphasized the tight control over inmates by TDCJ-ID.  The thrust of Mr. Smithey's testimony was that under the right conditions a capital murder inmate with one escape attempt could be relocated from administrative segregation to general population in a medium security unit.  The Defense objected that Mr. Smithey did not satisfy Rules 701 or 702 or *Daubert* standards.  (2001 RR vol. 34 at 52-53, 67, 69, 75, 76.)  Moreover, Mr. Smithey's testimony repeated Dr. Quijano's who candidly told jurors at length that TDCJ-ID is full of dangerous people who commit crimes.  (2001 RR vol. 34 at 53-54.)

Mr. Smithey, oddly enough, told jurors that TDCJ-ID often does not comply with its internal procedures.  Therefore, the control is not as tight as one would hope.  (Rule 701 hearing: 2001 RR vol. 34 at 21-23.)  He said that TDCJ-ID often fails to follow its policies and guidelines.  Therefore, it cannot control its inmates, allowing them the opportunity to hurt guards or other inmates.

With that, the evidence closed and the trial court instructed jurors.  After arguments, on March 12, 2001, the jury answered "yes" to the first two special issues, and "no" to the mitigation question.  (2001 RR vol. 34 at 212-13.)  Mr. Garcia was later sentenced to death on March 23, 2001.  (2001 RR vol. 35 at 1-3.)  The court appointed article 11.071 counsel.  (2001 RR vol. 35 at 3-4.)

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW  IN TEXAS

The following is an overview of capital punishment law in Texas.  This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty.  To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder.  For instance, kidnaping and then killing a person is a capital offense.  So is killing two people, rather than one.  Killing a police officer in his line of duty is a capital offense.  Garcia was convicted of killing a person while robbing him.  A murder during a robbery is a capital offense.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys.  One of the lawyers is the lead attorney.  The other is the second chair attorney.  The attorneys are charged with investigating the case, filing motions, selecting the jury and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions.  The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge.  Death penalty jurisprudence is thick with constitutional and statutory issues.  All unsettled challenges to death penalty procedures must be raised.  Failure to do so means that the issues are waived for direct appeal.  Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the

36

failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense.  The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts.  Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors.  Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700.  Many jurors exercise certain allowable rights not to serve.  Others cannot be found.  On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel.  Either side may ask for the jury to be shuffled at this point.  Jurors will be seated randomly in numerical order.  Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.  The judge may excuse some jurors but not others.  At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.  After the juror leaves, each side is permitted to challenge for cause.  If granted, the juror is finally excused and deleted from the pool.  If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges.  For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied.  This is sometimes called the sequential method of selecting the jury.  The State goes first.  If the State strikes the juror, the juror is gone.  If the State declines to strike the juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.  Garcia's jury was selected using the sequential method.

The second method can be referred to as the pool method.  The goal is to create a pool of forty-eight death penalty qualified jurors.  Each juror is questioned by the parties individually.  The court rules upon any challenges for cause by the State or Defense.  If the juror is not disqualified, then the juror is added to the pool in consecutive number.  When forty-eight are reached, the court designates a day for strikes.  Beginning with the first juror qualified, the State announces whether

38

it will accept the juror or exercise one of its peremptory challenges.  If not, the Court turns to the

Defense, which announces whether it will accept the juror or use a strike.  If the juror is not struck

by either, then the juror joins the petit jury.  The process ceases when twelve jurors and two

alternates are seated.  *See recognition Rousseau v. State*, 824 S.W.2d 579, 582 n.4 (Tex. Crim. App.

1992), *aff'd*, 855 S.W.2d 666, *cert. denied*, 510 U.S. 919 (1993).

Both prosecutors and defense attorneys generally prefer the pool method.  Both sides can

exercise their strikes intelligently, eliminating the jurors at the extremes based on their death penalty

views.  This method benefits the defense by allowing identification of each of the *Morgan v. Illinois*

jurors who managed to escape a cause challenge, before using any strikes.  (In *Morgan v. Illinois*,

the Supreme Court held that a juror who would automatically impose the death penalty for a capital

murder regardless of the mitigating circumstances may be removed for cause.  *See* 112 S. Ct. 2222

(1992).)

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is

found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's

insistence that the jury decision-making process be guided, Texas has constructed three questions,

called special issues.  The questions have varied over the years.  In Garcia's 2001 re-sentencing,

there were three special issues:

### Special Issue Number 1

*Do you find beyond a reasonable doubt that the conduct of the defendant,
Gustavo Julian Garcia, that caused the death of the deceased, Craig Turski,
was committed deliberately and with the reasonable expectation that the
death of Craig Turski or another would result?*

*You may not answer this Special Issue "yes" unless you agree unanimously, and you may not answer this Special Issue "no" unless 10 or more jurors agree.*

Answer "Yes" or "No"

<u>Answer</u>        *Yes*

### Special Issue Number 2

*Do you find beyond a reasonable doubt that there is a probability that the defendant, Gustavo Julian Garcia, would commit criminal acts of violence that would constitute a continuing threat to society?*

*You may not answer this Special Issue "yes" unless you agree unanimously, and you may not answer this Special Issue "no" unless 10 or more jurors agree.*

Answer "Yes" or "No"

<u>Answer</u>        *Yes*

### Special Issue Number 3

*Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?*

*You may not answer this Special Issue "no" unless you agree unanimously, and you may not answer this Special Issue "yes" unless 10 or more jurors agree.*
*The jury, however, need not agree on what particular evidence supports an affirmative finding on this Special Issue.*
*You shall consider mitigating evidence to be evidence that you might regard as reducing the defendant's moral blameworthiness.*

Answer "Yes" or "No"

<u>Answer</u>        *No*

40

2001 Clerk Record at 502-06 (filed Mar. 21, 2001).

The method of answering the special issues is complicated. If the jurors unanimously answer all three questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically. If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes. It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue. If this occurs, then the defendant is sentenced automatically to life in prison. There is no retrial. Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case. The result is always either a life sentence or a death sentence. Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence. Unanimity is required for a death sentence. A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor. Again, the answer is that the defendant receives an automatic life sentence.

In a non-capital case, jurors are informed of the effects of parole. In 1990, Texans amended the state constitution to require juries to be informed when a defendant becomes eligible for parole. In the 1970s and 1980s, there was concern that defendants served only a fraction of their sentence.

41

Those supporting accurate sentencing wanted jurors to know when the defendant would be eligible for parole so that this could be taken into consideration when deciding the sentence.

In sharp contrast, in a death penalty case jurors are not permitted to know this information. A defendant who is tried for the death penalty, but who receives a life sentence, is eligible for parole only after he has served forty years.  It was thirty-five years when Garcia was tried.  Therefore, Garcia would have been 53 before becoming eligible for parole.  An older defendant, say around 30, would be 65 before becoming eligible.  Defense lawyers and psychologists have argued that jurors are entitled to know about the 35-year (or later 40-year, and now life without parole) parole eligibility rule during sentencing because aging has a significant reduction on the likelihood that an inmate will display violence upon release.  Garcia's jurors were not informed that he would serve a minimum of 35 years on a life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## **GARCIA HAS MET ALL PROCEDURAL REQUIREMENTS**

## **ALL CLAIMS HAVE BEEN EXHAUSTED**[1]

There are procedural hurdles which must be crossed before a petitioner may ask a federal court to review a claim entitling him to federal habeas relief.  *See generally Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999).

A petitioner seeking a writ of habeas corpus in federal court must show that he has exhausted all avenues of relief in state court.  A federal district court may decline to address the merits of a claim that was inexcusably "defaulted" by the petitioner in state court proceedings.

A federal "default" question generally involves an evaluation of whether and how a claim for relief was presented to and considered by a state court.  A default question arises in several ways.  First, a default question can arise if a claim in a habeas corpus petition was not presented, or not fully presented, to the state court.  Presenting a claim to the state courts is called "exhausting" the claim.  *See Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1720 (1992) (the exhaustion requirement is grounded in "comity concerns." "The purpose of exhaustion is . . . [to] afford the State a full and fair opportunity to address and resolve the [federal] claim on the merits.")

"In order for a claim to have been 'fairly presented' to a state court to fulfill the exhaustion requirement, the applicant 'need not spell out each syllable of the claim before the state court.' Instead, a federal claim must only be the 'substantial equivalent' of one presented to the state courts."  *Fisher*, 169 F.3d at 303 (citations omitted).

---

[1]Portions of this and the following section on exhaustion and procedural default were abstracted from a 1995 paper written entitled *Pleading Prejudice in Capital Habeas Corpus Proceedings*, by John H. Blume and Mark E. Olive.

Second, a default question may arise if the claim was presented to the state court, but not in the manner that the state court normally and regularly requires that it be presented, such as when the claim is presented untimely, and the state court invoked its state rule to bar consideration of the inmate's claim.  This is called a "procedural default."  *See Wainwright v. Sykes*, 433 U.S. 72 (1977). This is discussed below.

**_Demonstrating Cause and Prejudice._**    A federal district court is required to give considerable analysis and receive evidence when called upon to determine whether there has been a default, and if so, whether the default will be excused so that the federal court can reach the constitutional merits of a claim.  Whether there exists an independent and adequate state court basis for barring a claim is decided by the district court, and "[w]hether a petitioner's actions have created a state law procedural bar is a mixed question of law and fact." *Hansbrough v. Latta*, 11 F.3d 143, 145 (11th Cir. 1994).  Even when a state court decides there has been default, the federal district court must make an independent inquiry. *Macklin v. Singletary*, 24 F.3d 1307 (11th Cir. 1994), *cert. denied*, 513 U.S. 1160 (1995).

Even if there has been an enforceable default, the federal district court may still proceed to the merit's of the petitioner's claim if the petitioner can demonstrate "cause" for and "prejudice" from the default.  Cause and prejudice are federal questions requiring *de novo* review by the federal district court. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("cause and prejudice" is a mixed question of law and fact which the federal court must decide).  If the state alleges and the federal court finds that a procedural default is applicable, a petitioner is entitled to an evidentiary hearing on the matter of cause and prejudice.  *See Tamayo-Reyes*, 112 S. Ct. at 1721 ("a remand to the District Court is appropriate in order to afford respondent the opportunity to bring forward evidence

44

establishing cause and prejudice"); *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977); *Murray v. Carrier*, 477 U.S. 478, 487 (1986); *Walker v. Davis*, 840 F.2d 834, 839 (11th Cir. 1988); *Harich v. Dugger*, 813 F.2d 1082 (11th Cir. 1987).

Examples of cases applying these principles include:  *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (new factual allegations supporting claim in federal court do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts); *Beauchamp v. Murphy*, 37 F.3d 700, 704 (1st Cir. 1994) (discussing the fair presentation doctrine, recognizing here that state court would not have viewed the claim differently had the word "federal" appeared in the heading to the issue), *cert. denied*, 115 S. Ct. 1365 (1995).

*Scarpa v. DuBouis*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 940 (1995), includes a good discussion of the fair presentation doctrine, discussing ways in which a petitioner can fairly present claims to state courts.  These include citing a specific provision of the Constitution, alerting the state court to the claim's federal nature through the substance of the claim, relying on federal constitutional precedents, claiming a particular right guaranteed by the Constitution, and asserting a state law claim that is "functionally identical" to a federal claim.

Other examples include *Laswell v. Frey*, 45 F.3d 1011, 1013-14 (6th Cir.) (Court held that petitioner's pre-state-court trial double jeopardy claim was exhausted), *cert. denied*, 116 S. Ct. 199 (1995); *Williams v. Washington*, 59 F.3d 673, 677-78 (7th Cir. 1995) (Petitioner fairly presented her ineffective assistance of counsel claim; in applying this rule courts should "avoid hypertechnicality"), *cert. denied*, 516 U.S. 1179 (1996); *Shute v. Texas*, 117 F.3d 233, 237 (5th Cir. 1997) (court construed § 2254(b)(2) to allow only for the denial of an entire mixed petition, as opposed to selective denial of meritless unexhausted claims).

*Application to Garcia*.  Each of the claims presented by Garcia in this application have been exhausted.  Each claim was presented at least once to the state trial court and the CCA in (1) Garcia's 1991 trial, (2) his 1992 CCA appeal brief, (3) his 1997 state writ of habeas corpus, (4) his 2002 CCA appeal brief, and (5) his 2003 state writ of habeas corpus.

## NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED

### A.     *Explanation of Default Principles*

As mentioned, a requirement of a state death row petitioner seeking a federal writ of habeas corpus is to show that she has not procedurally defaulted any of the grounds for relief presented.  In order for a claim to have been procedurally defaulted, the state court's ruling must *not* be based upon the federal constitution.  In other words, the state ruling must be on grounds independent of the federal constitution.  In addition, the state court's ruling *must be* based upon an adequate state ground.  *See Ford v. Georgia*, 498 U.S. 411, 423 (1991) (discussing what is meant by "adequate" state ground).

For example, *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995), held that ineffective assistance at guilt phase issue was adequately presented to state courts. Even though the issue was not "precisely articulated" in state post-conviction proceedings, the "necessary arguable factual commonality" existed between claims presented in state court and in the federal petition.

*Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995), held that a petitioner's claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds."

In *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998), the court held that a petitioner's failure to object at trial to the admission of a snitch's out-of-court statements did not prevent the federal habeas court from considering the petitioner's confrontation clause claim where the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims.  The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review.

"A federal court reviewing a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law." *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977).  "The rule is quite simple: 'a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Williams*, 125 F.3d at 275 (*quoting Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989) (internal quotation marks and citation omitted)).

"In *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S. Ct. 2546, 2559, 115 L.Ed.2d 640 (1991), the Court explained that the 'clear and express' statement requirement applies to cases where the state court's judgment fairly appears to rest primarily upon federal law, or to be interwoven with federal law, and not to cases where there is no reason to question whether the decision was based upon independent and adequate state law grounds." *Williams*, 125 F.3d at 275 n.3.

Of course, if there has been no adjudication on the merits in state court, and the claim is exhausted, then the statute by its terms requires no deference to the state decision.  In that situation,

47

the general rule that federal courts review questions of law *de novo* would apply.  See *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997)  (Where the state appellate court erroneously applied a state procedural default rule to bar review, there was no adjudication on the merits and § 2254(d) did not apply.)

**B.      *Garcia's Response to the Trial Court's and CCA's Findings That Garcia Procedurally Defaulted Most of his Claims.***

As mentioned, each of the claims presented by Garcia in this application have been exhausted.  Each claim was presented at least once to the state trial court and the CCA in (1) Garcia's 1991 trial, (2) his 1992 CCA appeal brief, (3) his 1997 state writ of habeas corpus, (4) his 2002 CCA appeal brief, and (5) his 2003 state writ of habeas corpus.

The State (before the state trial court and CCA) takes the position that when a death row inmate presents a claim *twice* to the state courts he procedurally defaults that claim.  This position is illogical and contradicted by federal law.

In February 2008 a Collin County Assistant District Attorney submitted proposed findings of fact and conclusions of law which he had written for the trial judge.  The trial judge signed them without a single change.  The F&Cs state that Garcia procedurally defaulted most of his claims.

The CCA denied Garica's habeas application, and wrote likewise that Garica had procedurally defaulted most of his claims.

What has occurred is that Texas prosecutors have adopted a tactic of asking state court judges to sign decisions finding *federal* procedural default has occurred, then asking federal judges to defer to state court findings that an inmate's federal claim was defaulted.  This is not permitted by federal

48

law.  Procedural default is a federal concept, not a state one.  It is not appropriate for state courts to declare whether an inmate's federal claim has been procedurally defaulted for federal court purposes.

Here, all claims have been exhausted and none procedurally defaulted.  Under each ground for relief, Garcia identifies the point at which the issue was preserved at trial, and later presented on direct appeal or in his state habeas petition.  Issues need only be presented once to the state courts.  It is not required that an issue presented to the state courts on direct appeal, and later again in the state habeas action.

Moreover, presenting a federal claim *twice* to a state court does not create federal procedural default.  Here, Garcia presented many of his federal claims, which were properly preserved, exhausted and not defaulted when he filed his 1999 federal habeas writ application, to the Texas district court and CCA in his 2002 state direct appeal and 2003 state habeas application.  A federal claim previously denied by a state court might be moot when submitted a second time, but subsequent submission of a previously preserve claim does not trigger federal procedural default.

In *Cone v. Bell*, 556 U.S. ___, slip op. at 1 (2009), Tennessee similarly argued that federal courts could not review Cone's *Brady* claim because it was presented twice to state courts, and was thus procedurally defaulted.  *Id.* at 16-17.

*Cone* held that state court procedural rules cannot automatically deny federal review of federal claims.  It is the prerogative of federal court to decide whether a federal claim was appropriately presented to state courts.  *Cone*, 556 U.S. ___ at slip op. 16.  "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."  *Cone*, 556 U.S. ___ at slip op. 17.  "When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's

49

decision does not indicate that the claim has been procedurally defaulted.  To the contrary, it provide strong evidence that the claim has already been given full consideration by the state courts and is thus *ripe* for federal adjudication." *Cone*, 556 U.S. ___ at slip op. 17-18.  "A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once." *Id.* at 18.

In *Jimenez v. Quarterman*, 555 U.S. ___, No. 07-6984 (U.S. Jan. 13, 2009), the Court rejected Texas arguments that an inmate's federal habeas petition was untimely because it was filed more than one year after the date his state conviction became final, notwithstanding that the state permitted an out-of-time direct appeal.  The inmate argued that by permitting additional state review of his conviction by granting out-of-time direct appeal, the one-year AEDPA period did not begin until the completion of his direct appeal.  The Justices unanimously agreed.

The Court identified the one-year AEDPA limitations period as "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Jimenez*, 555 U.S. ___, slip op. at 5 (quoting 28 U.S.C. § 2244(d)(1)(A)).  A state court judgement is final upon the conclusion of direct review or the expiration of the time for seeking such review. *Id.* at 6.

Therefore, "once the Texas Court of Criminal Appeals reopened direct review of petitioner's conviction on September 25, 2002, petitioner's conviction was no longer final for purposes of § 2244(d)(1)(A).  Rather, the order granting an out-of-time appeal restored the pendency of the direct appeal, and petitioner's conviction was again capable of modification through direct appeal to the state courts and to this Court on certiorari review." *Jimenez*, 555 U.S. ___, slip op. at 7 (citation, quotations and internal brackets omitted).

50

Consequently, when the Garcia's case was remanded in 2000 to the 366th District Court in Collin County for re-sentencing, and that court began proceedings, Garcia's conviction and sentence in the original cause were no longer final.  When the 366th District Court, and later, the CCA, reopened and reconsidered Garcia's sentencing, his conviction was no longer final, and did not become final until the Supreme Court denied Garcia's motion for rehearing of its *certiorari* denial November 15, 2004.  *See Garcia v. Texas*, No. 03-10873, 543 U.S. 855, 995 (Oct. 4, 2004 and Nov. 15, 2004).  As Garcia had filed a timely state application for writ of habeas corpus April 15, 2003, and it remained pending until the CCA denied relief October 15, 2008, Garcia's one-year AEDPA limitations period was tolled from November 14, 2004 and did not begin until October 15, 2008.  *See Ex parte Garcia,* No. WR-40,214-02 (Tex. Crim. App. Oct. 15, 2008).  Consequently, this federal habeas corpus application is timely filed.

It does not matter that the CCA's decision to permit additional review in *Jimenez* was voluntary while its 2003 and 2008 review of Garcia's case was involuntary.  It is not the state court's intent or desire which matters, but its actions – whether it in fact reopened review.  The Court made this clear, stating, "[W]e merely hold that, where a state court *has in fact reopened direct review*, the conviction is rendered non-final for purposes of § 2244(d)(1)(A) during the pendency of the reopened appeal."  *Jimenez*, 555 U.S. ___, slip op. at 7 n.4 (emphasis added).

In *Burton v. Stewart*, 549 U.S. ___, slip op. at 8 (2007), the Supreme Court explained that "when a 'first' petition is dismissed because it contains unexhausted claims, a prison returning later with a fully exhausted petition would not confront the 'second or successive' bar." (Citing and quoting *Slack v. Daniels*, 529 U.S. ___ at 485-86).  *Slack* commented that "a habeas petition which is filed after an initial petition was dismissed *without adjudication on the merits* for failure to

51

exhaust state remedies is not a 'second or successive' petition" (emphasis added by *Burton*, 549 U.S. ___ slip op. at 8.

In Garcia's case, the federal district court dismissed without prejudice Garcia's 1999 federal petition in 2000 at the agreement of the parties so the parties could relitigate Garcia's death sentence. In essence, the federal court dismissed Garcia's claims without adjudication on the merits because Garcia and Texas agreed that Garcia had unexhausted claims, that is, his those pertaining to his sentence of death.  Consequently, upon return to federal court Garcia occupies the position *status quo ante* and proceeds on his first federal habeas petition.

Further, the Supreme Court explains that in the context of AEDPA limitations requirements, the statute itself demands that the one-year limitations period "applicable to 'a person in custody pursuant to the judgment of a State court' shall run from, as relevant here, 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" *Burton*, 549 U.S. ___, slip op. at 9 (*quoting* AEDPA, § 2244(d)(1)(A)).  "Final judgment in a criminal case means sentence.  The sentence is the judgment." *Burton*, slip op. at 9 (quoting *Berman v. United States*, 302 U.S. 211, 212 (1937).  Consequently, a state inmate's AEDPA limitations period does "not begin until both his conviction *and* sentence 'became final by the conclusion of direct review or the expiration of the time for seeking such review.'" *Burton*, slip op. at 9 (quoting AEDPA, *supra*).

For these reasons, therefore, Garcia occupies precisely the *status quo ante* position he occupied in 2000 before remand, with the caveat that he is now permitted to replace exhausted claims pertaining his 1991 death sentence with those pertaining to his 2001 death sentence.  He is

permitted to proceed on his first federal petition, and the fact that he presented some claims twice to the CCA in no way triggers procedural default.

In the event, however, that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Garcia respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. ___, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.' *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)."

"Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

> ### C.   *There is no impediment to review of Garcia's liability phase claims from his 1991 trial following his 2001 re-sentencing hearing.*

Garcia presents claims arising from his 1991 trial on liability (guilt/innocence), and his 2001 retrial on sentencing. There is no impediment to doing so. The Fifth Circuit has explained that the

preferred procedure in sentencing retrial situation is for the state habeas counsel to *refile* all claims pertaining to the original liability trial in the later state habeas petition raising new claims from re-sentencing, precisely what Garcia has done  *Hatten v. Quarterman,* 570 F.3d 595, 599-601 (5th Cir. Tex. 2009) (explaining how to handle guilt phase claims after a retrial on punishment only).  In *Hatten*, the Fifth Circuit discussed a situation in which Hatten's first state habeas attorney raised claims from the original 1996 liability trial, but when Hatten received a new sentencing hearing, his second state habeas attorney failed to reassert those claims in the revised state habeas application. Fortunately for Hatten, the CCA declined to address the 1996 liability claims, allowing the federal courts to do so on their merits.  However, the CCA could easily have ruled that the claims were procedurally defaulted by the failure to reassert them.  Garcia avoided this error by reasserting all federal claims from his 1991 liability trial in his 2003 state habeas application following his 2001 sentencing retrial.  His claims, therefore, are fully preserved.

## ARGUMENT AND AUTHORITIES

## CHALLENGES TO CONFESSIONS

*Claim Number One: Plano Police Interrogated Garcia and Obtained a Confession in Violation of Miranda v. Arizona and the Guarantee Against Self-Incrimination Afforded by the Fifth Amendment to the United States Constitution.*

*Claim Number Two: Plano Police Interrogated Garcia and Obtained a Confession in Violation of his Sixth Amendment Right to Effective Assistance of Counsel.*

*Claim Number Three: Plano Police Interrogated Garcia and Obtained a Confession in Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.*

| | Presentation to State Trial Court | Presentation to CCA | Presentation to U.S. District Court |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 62 at 64-68, 71-72; vol. 75 at 37; 1991 C.R. vol. 2 at 243, 354 (motions to suppress; federal issues raised) | *Garcia v. State,* 919 S.W.2d 370 (Tex. Crim. App. 1994), *rev'd on reh'g,* 919 S.W.2d 370 (Tex. Crim. App. 1996)*; Appellant's Bf.* at 56-57. | |
| **1997 WHC** | | *Application for Writ of Habeas Corpus filed Jul 24, 1997,* p. 2 (claim A) | Claims 1, 2, 3 |
| **2001 Trial** | | | |
| **2003 WHC** | Garcia AWHC, Claims 12-14 (Apr. 15, 2003) | | |
| | | | |

In these issues, Garcia challenges the two written confessions obtained from him and introduced at his 1991 and 2003 trials. The Plano Police Department did not comply with the long-standing requirements of *Miranda* and the Fifth and Fourteenth Amendments. The Texas Court of Criminal Appeals, which first agreed on state grounds, later rejected these arguments. The CCA's

opinion is unclear and it is not certain whether the court addressed Garcia's federal constitutional claims, although it did deny them.

### A.     The Issues Have Been Properly Preserved for Review and Exhausted in the State Forum.

These issues were properly preserved for federal review. Garcia raised the violation of his federal constitutional rights at his 1991 trial. *(See* 1991 S.F. vol. 62 at 64-68, 71-72; vol. 75 at 37; 1991 C.R. vol. 2 at 243, 354 (motions to suppress; federal issues raised).

He also raised it in his 1991 direct appeal. *See Garcia v. State,* 919 S.W.2d 370 (Tex. Crim. App. 1994), *rev'd on reh'g*, 919 S.W.2d 370 (Tex. Crim. App. 1996); *see also Appellant's Bf.* at 56-57, P.R.E. at tab 11). He also raised it in his state application for habeas relief. *See Application for Writ of Habeas Corpus*, p. 2; P.R.E. at tab 12 (Claim A).

Garcia raised it again in his 2003 state habeas action. *See* Garcia AWHC, Claims 12 - 15 (Apr. 15, 2003). In 2008 the state trial judge signed F&Cs that Garcia's *Miranda* claims were "procedurally barred" from subsequent review under state law because they had been previously rejected by the CCA. State Court F&Cs (Feb. 12, 2008) at 2-3. The CCA agreed.

As discussed above, however, the state court's determination that these federal claims have been procedurally defaulted is erroneous because the Supreme Court has held that claims are not procedurally defaulted, a federal rule, not state, merely by presenting the claim twice, as Garcia has done.

**B.      Texas Denied These Claims, although it is unclear whether the CCA reached the Federal Merits.**

The state courts denied these claims, although it is unclear whether the state court's addressed the federal claims.  If not, then a federal district court is required to review the federal claims *de novo*.

**1.      In 1992, the CCA Granted Relief, Finding State Law Violation.**

In 1992, the CCA found that Garcia's statements had been obtained in violation of state law. The court held that police failed to comply with Texas Code of Criminal Procedure 38.22 which required clear a written waiver of a suspect's fifth amendment right to silence. *Garcia v. State*, 919 S.W.2d 370 (Tex. Crim. App. 1994).  Texas Code of Criminal Procedure article 38.22, § 2(a) and 2(b) in their entirety are as follows:

> Sec. 2. No written statement made by the accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding *unless it is shown on the face of the statement* that:
>
> (a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:
>
>> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>> (2) any statement he makes may be used as evidence against him in court;
>> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning;  and
>> (5) he has the right to terminate the interview at any time;  and
>
> (b) the accused, prior to and during the making of the statement, knowingly, intelligently and voluntarily *waived the rights* set out in the warning prescribed by Subsection (a) of this section.

Tex. Code Crim. Proc. Ann. Art. 38.22 (Vernon 1991) (emphasis added).

Garcia signed the warning supplied by Plano police but did not waive his right to silence. In a 5-4 *per curium* opinion, the CCA wrote, "We hold that appellant [Garcia], by initially each warning reflected on the written statement form, did not affirmatively *waive* the rights contained within the warnings.  At best, appellant's initials only indicated he read and understood those warnings."  *Id.* at 379 (emphasis in original).

While reversing on a violation of a state statute, the CCA recognized that the statute was codification of federal constitutional fifth and sixth amendment guarantees, writing, "This [explicit waiver requirement] is a mandatory requirement enacted by our Legislature to address the defendant's Fifth and Sixth Amendment protections recognized by the Supreme Court of the United States."  *Id.* at 379-80.  This statement, however, is not declaration that the CCA adjudicated Garcia's fifth and sixth amendment claims on their merits.

The CCA was troubled that Plano police officers, who questioned 18-year-old Garcia several times, asked Garcia to sign a confession lacking silence waivers, but had conveniently on hand other forms which contained the required written waivers, one of which was in the appellate record. *Garcia*, 919 S.W.2d at 381.  "This unsigned statement makes it clear that the Plano Police Department was aware of the [statutory waiver] requirements . . . ."  *Id.*  Ignoring the deficiencies, the prosecutor offered, and the trial judge admitted, appellant's signed written statement. Consequently, we believe declaring the error harmless would encourage the State to repeat the error with impunity."  *Id.*   The CCA therefore reversed Garcia's conviction and ordered a new trial.

## 2. In 1996, With the Addition of Judge Mansfield, the CCA Reversed its Decision and Denied Relief.

The November 1994 elections, however, produced a man named Steven Mansfield, a lawyer whose tenure on the court was cut short by poor judgment and misconduct.[2] When Judge Mansfield

---

[2]It is worth a moment to consider Judge Mansfield.  The *Houston Press* had this to say:

Mansfield was a two-bit insurance company lawyer in Houston when he was elected to the court in 1994, despite lying during his campaign that he had substantial criminal-law experience and was a Texas native.  The State Bar of Texas slapped him with a reprimand for his dishonesty. Then, just when it seemed like Mansfield maybe wasn't the dolt his 1994 campaign exposed him to be, he was arrested last year for scalping University of Texas football tickets outside the stadium before a game. The state's Commission on Judicial Conduct reprimanded him.  An Austin-based judge last month accepted his no-contest plea to trespassing, sentencing him to six months' probation, a $300 fine and 30 hours of community service.  His criminal record will be wiped clean if he successfully completes his sentence.  Eskenazi, Stuart, *Houston Press*, "Strong Convictions" (Nov. 18, 1999) (http://www.houstonpress.com/1999-11-18/news/strong-convictions/).

*The New York Times* wrote:

The system has allowed unprepared candidates to serve on the court. In 1994 a tax lawyer, Stephen W. Mansfield, won election despite admitting during the campaign that he had lied about his legal experience and biography. While a judge, he was arrested for scalping complimentary college football tickets (he pleaded no contest to trespassing) and was accused of animal abuse for locking his dogs in his car while he sat on the bench. He did not seek re-election in 2000 but ran again in 2002 and lost.  Liptak, Adam & Ralph Blumenthal, *The New York Times*, "Death Sentences in Texas Cases Try Supreme Court's Patience" (Dec. 5, 2004) (http://www.nytimes.com/2004/12/05/national/05texas.html?oref=login&pagewanted=print)

*The Austin Chronicle* reported Mansfield's ignominious demise:

Former Court of Criminal Appeals Judge Stephen Mansfield "may now be the most overqualified security guard in Houston history," reports Tim Fleck of the Houston Press. Although Fleck could not reach Mansfield directly, Houston Republicans told him Mansfield is complaining he's having to make ends meet as a uniformed security guard at the Texas Medical Center. According to Fleck, "A county source says he got a call from a dumbfounded security company official trying to verify that a guard

was sworn in January, he formed a majority vote in favor of granting the State's motion for rehearing.

On rehearing, now Judge Mansfield and his fellow judges overturned long-standing precedent and held that confessions obtained by police would be upheld if they *substantially* complied with state law. *Garcia*, 919 S.W.2d at 385-86. Although conceding "that appellant's statement . . . is by no means a model of clarity," *ibid* at 386, Judge Mansfield dismissed concerns that an intoxicated 18-year-old man who had not slept "or was induced to confess by promises of leniency made by the officer who took his statement." *Id.* at 386. "The record does not support his claim he was intoxicated at the time he confessed." *Garcia*, 919 S.W.2d at 387. Although "appellant had been drinking, . . [t]he court found he was not under the influence of alcohol to such an extent so as to render his confession involuntary." *Id.*

Judge Mansfield also set aside Garcia's complaint that at least four times the officer promised favorable treatment of his case if he cooperated. "Detective Wilson did *not* promise appellant he would not be charged with capital murder if Chris Vargas, not appellant pulled the trigger, only that it was a possibility." *Garcia*, 919 S.W.2d at 388.

It is worth considering the text of the admonishments contained in the statement signed by Garcia because that is the basis on which Judge Mansfield and other CCA judges decided that he

_____

applicant was indeed a former appeals judge." Mansfield won a seat on the CCA in 1994 despite admitting that he lied to reporters about his background and during his tenure was busted for scalping complimentary UT football tickets on university property. He did not seek re-election in 2000, and was defeated last year in the GOP primary. He had worked for a while as a visiting judge in Angleton, but told friends that since that program is up for renewal at the Lege, he was jettisoned as an embarrassment. M.K. & Clark-Madison, Mike, *The Austin Chronicle,* "Naked City: Beyond City Limits" (Dec. 20, 2002) (http://www.austinchronicle.com/gyrobase/Issue/story?oid=oid:115317).

voluntarily and knowingly waived his right to remain silent.  The face of the form signed by Garcia

contained these words:

> I have been duly warned and advised by [the Detective], a person who has identified
> himself as an officer of the Plano Police Department, that:
>
>> (1) I have the right to remain silent and not make any statement at all and any
>> statement I make will be used against me at my trial;
>>
>> (2) Any statement I make will be used as evidence against me in court;
>>
>> (3) I have the right to have a lawyer present to advise me prior to and during
>> the questioning;
>>
>> (4) If I am unable to employ a lawyer, I have the right to have a lawyer
>> appointed (without cost to me) to advise me prior to and during my questioning; and
>>
>> (4) [sic] I have the right to terminate the interview at any time.
>
> . . .
>
> I have read each page of this statement consisting of [# omitted] page(s), each
> page of which bears my signature, and corrections, if any bear my initials, and I
> certify that the facts contained herein are true and correct.  I further certify that I have
> made no request for the advice or presence of a lawyer before or during any part of
> this statement, nor at any time before it was finished did I request that this statement
> be stopped.  I also declare that I was not told or prompted what to say in this
> statement.

*Garcia*, 919 S.W.2d at 378-79.

Nothing in this admonition contained an explicit waiver of the right to remain silent, which

to the 1994 CCA rendered it fatally flawed.  Judge Mansfield saw things differently.

He wrote, "appellant initialed, in the appropriate spaces on each page (a total of fifteen times) that

he was informed as to his rights and it can be inferred that he understood each of his rights, the rights

provided him under § 2(a).  Second, appellant signed each page, his signature being adjacent to

additional language which reinforces the inescapable conclusion that he knew and understood his

§ 2(a) rights." *Garcia*, 919 S.W.2d at 386.  According to Judge Mansfield, "The appearance of his initials before each of the five warnings is evidence that he received them and that he read and understood them; . . . ." *Id.*  Moreover, "prior to the making of his statement, appellant was informed as to his rights under *Miranda v. Arizona*," 384 U.S. 436 (1966).  *Id.*  Consequently, Judge Mansfield overruled Garcia's challenge to the admission of his statements.

### 3. *The CCA and Trial Addressed the State Law Claims, but Less Clear is Whether it Addressed the Federal Claims.*

It is clear that the Texas Court of Criminal Appeals based its decision to reverse on state law, but if it addressed the federal claims it was obliquely.  Although the court devoted most of its analysis to state law interpretation of article 38.22, it only made passing references to federal constitutional requirements.

Explaining how article 38.22 came to be, the court commented, "This is a mandatory requirement enacted by our Legislature to address the defendant's Fifth and Sixth Amendment protections recognized by the Supreme Court of the United States.  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and, *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)."  *Garcia*, 919 S.W.2d at 379-80.  This statement acknowledges the federal implications at stake, but does not resolve them.

In explaining its reversal, the court distinguished *Penry v. State,* 691 S.W.2d 636 (Tex. Crim. App. 1985) on page 379 of its decision.  *Penry* involved, in part, a challenge under *Miranda* to the wording of the warnings contained in a written statement.  In *Penry*, the court considered whether the warnings given complied with federal constitutional law, quoting from the Supreme Court's then recent decision of *California v. Prysock,* 453 U.S. 355 (1981).  *Penry*, 691 S.W.2d at 634-44.  It is

may be that by citing *Penry v. State* in Garcia's case, the Court of Criminal Appeals was trying to contrast a case advanced by the State in order to show that *Penry*'s analysis strengthened the justification for rejecting Garcia's confessions.  Penry was unsuccessful because *Miranda* did not affect mere technical wording of the warnings.  The court found by contrast that the omission of waiver portion of the warnings complained of by Garcia were not mere technical wording, but "clearly more than "technical non-compliance with the statute." *Garcia*, 919 S.W.2d at 379.  The CCA, therefore, was entirely consumed with vindicating application of the state statute governing written statements, and did not address, directly at least, *Penry*'s federal constitutional analysis for disposing of Garcia's federal claims.

In reaching its decision, it is clear that the court based its decision on state legal grounds, but less clear that it adjudicated Garcia's federal claims.  Judge Mansfield relied upon the officer's *Miranda* warnings as support that Garcia's implicit waiver: "Third, prior to the making of his statement, appellant was informed as to his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." *Garcia*, 919 S.W.2d at 386.  The court also said, "Appellant fails to show any coercive conduct on the part of the police and, absent such evidence, his confession cannot be said to have been taken in such a manner so as to violate his federal due process rights. *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); . . ." *Garcia*, 919 S.W.2d at 387.  This statement is a recognition that Garcia has federal due process rights and asserts that Garcia cannot show how they were violated.  This is as close as the CCA gets to addressing Garcia's federal due process claim, but does not address his fifth and sixth amendment federal claims.

The CCA recognized that Garcia was presenting federal claims, commenting, "Appellant also asserts appellant's written confession was taken in violation of his right to effective assistance of counsel under both the Texas and United States Constitutions, in violation of his right against self-incrimination under both constitutions and in violation of his due process rights under the United States Constitution." *Garcia*, 919 S.W.2d at 385.  The court said it would look at all claims together: "We will address these points of error collectively."  *Garcia*, 919 S.W.2d at 385.

There can be no question that Garcia fairly presented his federal constitutional claims to the state courts, although it remains unclear whether the CCA addressed their merits.  *Scarpa v. DuBouis*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 940 (1995), includes a good discussion of the fair presentation doctrine, discussing ways in which a petitioner can fairly present claims to state courts.  These include citing a specific provision of the Constitution, alerting the state court to the claim's federal nature through the substance of the claim, relying on federal constitutional precedents, claiming a particular right guaranteed by the Constitution, and asserting a state law claim that is "functionally identical" to a federal claim.

Garcia, therefore, takes the position that he fully exhausted his federal claims pertaining to his police statement, which the CCA acknowledged receiving, but that the state courts did not resolve the federal claims on their merits, although the state courts did deny them flatly, requiring this U.S. District Court to address Garcia's federal claims *de novo*, not under the deferential AEDPA standard of review.

**C.     The Federal Constitutional Claims Were Not Procedurally Defaulted. Alternatively, Garcia can be Excused for Any Default Because Of Ineffective Assistance of Direct Appeal and Habeas Counsel.**

On direct appeal rehearing in 1996, the Court of Criminal Appeals made the following comment: "Finally, appellant fails to brief separately his contentions that he is entitled to relief under both the Texas and the United States constitutions. Any point of error contending a violation of the Texas Constitution and not separately setting forth supporting arguments and authorities is inadequately briefed and will not be addressed. . . . . Appellant's points of error numbers forty-four through fifty-one are overruled."  *Garcia*, 919 S.W.2d at 388-89 (citations and footnote omitted).

Several observations are appropriate.  First, it is clear that the court determined Garcia's state constitutional claims to have been procedurally defaulted under state law -- not federal law -- because they were not separately briefed.  Second, the court *did not* say that his *federal* constitutional claims were defaulted, merely that he had not supplied authorities in support of his state constitutional claim.  As discussed above, however, the fair presentation doctrine does not require extensive briefing, only that the petitioner make the basis of his federal claims known to the state court.  Therefore, it is clear that the federal constitutional claims were not procedurally defaulted.

Third, the Court of Criminal Appeals has long held that the state constitutional rights to remain silent and to be afforded counsel are co-extensive with their Fifth and Sixth Amendment counterparts.  *See Thomas v. State,* 723 S.W.2d 696 (Tex. Crim. App. 1986).  The Texas constitution does not afford much independent protection of its citizens.

The 1996 second opinion by the Texas Court of Criminal Appeals can also be read that the court failed to address Garcia's federal claims on the merits, despite his requests, and therefore the *de novo* standard of review is appropriate, rather than the deferential standards of either *Chapman*

65

or *Brecht*.  (See discussion *infra*.)  In the absence of a state court adjudication on the merits of a petitioner's claim, to which AEDPA requires deference under 28 U.S.C. § 2254(d), the federal district court reviews the claim *de novo*.  *Hatten v. Quarterman,* 570 F.3d 595, 599-600 (5th Cir. Tex. 2009).  The pre-AEDPA standard of review applies.  *See Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997).

Alternatively, if this Court takes the position that the federal *Miranda* claims were procedurally defaulted under state law, then Garcia requests a hearing to demonstrate cause and prejudice.  He will argue that the cause of the default lay not at his feet, but at those of his 1992 court appointed appellate lawyer, who rendered ineffective assistance of counsel by failing to brief adequately the federal claims so that they survived state procedural default rules.  If the Court is of the position that the federal claims were procedurally defaulted under state law, then the Court of Criminal Appeal's statement proves ineffective counsel per se because no effective appellate lawyer would allow the most important federal claim to be procedurally defaulted by failing to supply sufficient briefing.

In any event, the federal constitutional claims pertaining to the *Miranda* issues were presented a second time to the Texas courts in Garcia's 1997 article 11.071 state habeas writ application.  (See 2003 P.R.E. at tab 12 (claim A).)  If the Court determines that Garcia's 1996 state article 11.071 habeas counsel did not properly present ineffective assistance of direct appeal counsel to demonstrate cause and prejudice for default, then Garcia argues here that he can demonstrate sufficient cause and prejudice in that his appointed article 11.071 counsel was ineffective for failing to raise this issue.

66

### D.      Standard of Review.

The voluntariness of a confession is ultimately a legal determination.  *See Miller v. Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 450- 51 (1985); *Muniz v. Johnson*, 132 F.3d 214, 219 (5th Cir.), *cert. denied*, --- U.S. ----, 118 S. Ct. 1793 (1998).  However, the determination may also involve subsidiary factual determinations and mixed issues of law and fact.  *Muniz*, 132 F.3d at 219.

Garcia asks the U.S. District Court to review his claims *de novo*.  In the absence of a state court adjudication on the merits of a petitioner's claim, to which AEDPA requires deference under 28 U.S.C. § 2254(d), the federal district court reviews the claim *de novo*.  *Hatten v. Quarterman,* 570 F.3d 595, 599-600 (5th Cir. Tex. 2009).  The pre-AEDPA standard of review applies.  *See Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997).

Alternatively, if the deferential standards of the AEDPA applies, Garcia contends that he prevails.  Under AEDPA standards, for the issues that are purely legal or mixed law and facts, a reviewing federal court must respect a state court's determination of voluntariness so long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1); *Drinkard v. Johnson,* 97 F.3d 751, 767-68 (5th Cir.1996), *cert. denied*,  --- U.S. ----, 117 S. Ct. 1114, 137 L. Ed.2d 315 (1997); *see also Mata v. Johnson*, 99 F.3d 1261, 1267 (5th Cir.1996) (equating this form of review with the "clearly erroneous" standard).  Purely factual subsidiary determinations are presumed to be correct and are overturned only if they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998). When challenging a state court's factual

determinations, a petitioner must rebut this presumption of correctness by "clear and convincing evidence." 28 U.S.C.A. S 2254(e)(1); *Barnes*, 160 F.3d at 222.

### E.    Garcia Was Interrogated and Signed Two Confessions

As mentioned, Garcia signed two written statements drafted by Plano police. The first concerned the Beverage Warehouse offense. It was introduced during the guilt phase of his 1991 trial. (*See* 1991 S.F. vol. 62 at 64 and 75 at 37; 1991 St. Exh. 3; P.R.E. at tab 5.) This was a hand-written statement introduced as State's Exhibit 3. The same statement was introduced in his 2001 sentencing retrial. *See* 2001 Master Exhibit List.

The second written statement concerned the Texaco offense. It was introduced during the punishment phase of both his 1991 and 2002 trials. (*See* 1991 S.F. vol. 69 at 746; vol. 77 at 204; 1991 St. Exh. N; P.R.E. at tab 3; *See* 2001 Master Exhibit List.) This hand-written statement was introduced as State's Exhibit N in the 1991 trial and in the 2002 trial. *See* 2001 Master Exhibit List.

Both of these statements were hand-written by a Plano detective, and signed by Garcia. Someone in the police department retyped the statements within the next forty-eight hours. (*See* P.R.E. at tabs 4 and 6.)

Years before Garcia's offense, the Texas Legislature created a statutory right requiring that law enforcement officers obtain and prove that a suspect voluntarily and knowingly waived his federal right to remain silent. Texas Code of Criminal Procedure article 38.22 provided that "no written statement . . . is admissible . . . unless it is shown on the face of the statement that:  (b) the accused prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section." Tex. Code Crim. Proc. Ann. Art. 38.22 (Vernon 1991).

68

Evidently, Plano detectives had a form for the taking of statements from a suspect.  The form contained explicit waiver warnings and acknowledgments.   This form complied with article 38.22. An example is submitted with this petition as *Attachment 28,* attached to this Petition.  There are two critical waiver warnings:

> I do not want to talk to a lawyer, and I hereby knowingly and purposely waive my right to the advice and presence of a lawyer before and during any questioning or at any time before or while I voluntarily make the following statement to the aforesaid person, knowing that anything I say can and will be used against me in court or courts of law.

> I declare that the following voluntary statement is made to the aforesaid person of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whomsoever.

> *Plano Police Department Form PPD-2005, Attachment 28* (*see also* 1991 S.F. vol. 77 at 104, *Def. Ex. 1*).

This, however, is *not* the form that Plano Police asked Garcia to sign.  The forms he was asked to sign did not include these waiver warnings.  The form Garcia was asked to sign bears the appearance of having been created by cut-and-paste.  Also significant is that the first three lines of the Beverage Warehouse confession (State's Exhibit 3) are darker than the rest of the document, and indented slightly, suggesting that the document had been altered by cutting and rephotocopying.  (*See* 1991 S.F. vol. 75 at 3, 1991 St. Exh. 3; P.R.E. at tabs 4, 6).  These lines contain Garcia's name and the time of the interview.  (*Note:* It is hard to see this in the copies contained in the Petitioner's Record Excerpts, but easier in the copy contained in the trial record.)

Detective David Wilson of the Plano Police Department took Garcia's confessions.  He explained the following:

69

- The Plano Police Department had two forms: the form which Garcia signed and the alternative form with the two waiver paragraphs. (1991 S.F. vol. 62 at 106.)

- The type-written version of Garcia's confession to the Beverage Warehouse robbery (Defendant's Exhibit 1) was typed within forty-eight hours after Garcia signed the hand-written confession to the same offense (1991 State's Exhibit 3). (1991 S.F. vol. 62 at 100-01.)

- Blank statement forms, containing the article 38.22 waiver paragraphs, existed in the Plano Police Department before and after Garcia's arrest. The proper forms also predated the State Exhibit 3 form which Garcia signed, the one lacking the waiver paragraphs. (1991 S.F. vol. 62 at 107.)

- He did not know who instructed the printing of the form which Garcia signed. (1991 S.F. vol. 62 at 108.)

- He confirmed that the two additional paragraphs in the alternative form complied with article 38.22, which requires written proof that the suspect waived his rights. (1991 S.F. vol. 62 at 103.)

- That it was possible that the first three lines of the hand-written Beverage Warehouse confession (1991 State's Exhibit 3) had been added after the two additional, missing waiver paragraphs had been excised. He also agreed that it appeared that the first three lines were darker than the remaining text and slightly misaligned in relationship to the rest of the text. (1991 S.F. vol. 62 at 103-05.)

- Det. Wilson explained that the reason that the hand-written Beverage Warehouse confession form signed by Garcia (1991 State's Exhibit 3) was edited to remove the two waiver paragraphs was because they were deemed to be superfluous. He conceded, however, that the proper form, containing the waivers, was still being used by the Plano Police Department. (1991 S.F. vol. 62 at 125-27.)

*See Testimony of Det. Wilson,* 1991 S.F. vol. LXII at 57, 100-08, 125-27.

### F.     Garcia's Trial Counsel Sought to Suppress the Confessions, but the Trial Court Ruled that the Statements Were Voluntary and Admissible and that Garcia Implicitly Waived His Rights

Garcia's attorneys challenged the written statements vigorously at trial, starting with two

motions to suppress. (1991 C.R. at 243-47, 354-56.) The trial judge conducted a hearing, and

ultimately denied the motions, supported by findings of facts and conclusions of law. (1991 S.F.

70

vol. 12 at 1074-76; 1991 C.R. at 709-14, 715-24.)  It is worth a moment to consider the trial judge's conclusions, which were extensive:

- Garcia was lawfully arrested without a warrant at the crime scene.

- Police at the scene read his *Miranda* rights.

- Garcia did not invoke his right to remain silent or to counsel at any point.

- "Prior to the statement, but during the recording, the Defendant was given the warnings, or their substantial equivalent, required by Art. 38.22(2)(A), Texas Code of Criminal Procedure.  Detective Wilson, Immediately [sic] after reading the Defendant his rights, asked Defendant if he wished to speak with Detective Wilson.  The audio quality of State's Exhibit 5 is poor, but it is clear from Detective Wilson's testimony In court as well as the Defendant's demeanor on the videotape, that the Defendant answered affirmatively.  The Court finds that the Defendant orally waived the rights afforded him under the Constitution and laws of the United States and the State of Texas prior to the making of the statement.  The Court further finds that the Defendant evidenced his understanding of his rights and waiver thereof by placing his initials by each of the warnings that appear on the face of his written confession, State's Exhibit 3.  The Court therefore finds that the written confession, State's Exhibit 3, shows on its face a waiver of defendant's rights under Art. 38.22(2)(a), Texas Code of Criminal Procedure."

- "The defendant knowingly, Intelllgently [sic] and voluntarily waived his aforesaid rights and freely and voluntarily confessed orally and in writing.  The Defendant's confessions were not the result of compulsion or persuasion."

- "Each [written statement] reflects on its face that the Defendant knowingly, intelligently and voluntarily waived his rights prescribed by Art. 38.22(2)(a)."

(1991 C.R. vol. 4 at 709-14.)

- "The evidence shows that Detective Wilson expressly stated to the Defendant that 'I can't promise you anything.'  The evidence shows that Detective Wilson advised the Defendant that Capital Murder was the only offense in Texas that carried the death penalty.  The evidence shows that Detective Wilson advised the Defendant that he was presently suspected of the offense of Capital Murder.  The evidence shows that Detective Wilson advised the Defendant that 'you're already in a world of trouble.'  The evidence shows

71

that Detective Wilson told Defendant that he intended to try to get Defendant's friend, Christopher Vargas, certified as an adult to stand trial for the alleged Capital Murder of Gregory Martin.  The evidence shows that Detective Wilson told the Defendant that if Sheila Loe did not know that Christopher Vargas and Defendant herein were going to kill Gregory Martin during the robbery, that 'she would be an accessory to robbery.  I would not charge her with murder.'  The Court finds that these statements were accurate statements of fact and assessments of possibilities based upon Detective Wilson's state of knowledge at the time.  The evidence shows that Detective Wilson told Defendant immediately before beginning the written statement that the Defendant did not have to give a written statement and that the written statement meant nothing if he did not sign it.  The evidence further shows that, after the written statement, State's Exhibit 2, was made, Detective Wilson asked the Defendant if he was going to sign it.  The Court finds that Detective Wilson repeatedly gave the Defendant numerous opportunities to refuse to give a written statement.  The Court finds that the Defendant never indicated in any way that he did not desire to give a written statement.  The Court finds that there is no evidence of trickery or deceit on the part of Detective Wilson or any other police or law enforcement officer."

- "Immediately prior to the actual reduction of the Defendant's oral statement to writing, and after the defendant had read the warnings that appear on the face of State's Exhibit 2, Defendant expressed a concern about implicating his friend, Christopher Vargas.  The evidence shows that Detective Wilson expressed the opinion that Christopher Vargas was a 'cold blooded murderer'.  The Court finds that at this time Detective Wilson told Defendant that 'you don't have to do this' and that he was referring to the Defendant's giving of a written statement.  Prior to this time the Defendant had orally stated on videotape that Christopher Vargas had, in fact, shot and killed Gregory Martin and that the Defendant did not know at the time that Christopher Vargas would do so.  The evidence shows that, in this context, Detective Wilson stated to the Defendant that 'he [Detective Wilson] could not promise him [Defendant] anything but there is a possibility' that he could be charged with Aggravated Robbery rather than Capital Murder.  The Court finds that this was an accurate statement of possibilities based upon Detective Wilson's knowledge at the time.  The Court finds that this was not a statement made for the purpose of plea negotiations.  The Court finds that the Defendant could not reasonably have considered the statement to be made for the purpose of plea bargain negotiation.  The Court finds that there is no evidence that the statement made by Detective Wilson did, in fact, motivate or induce the defendant to confess then or later."

- "The evidence shows that, while the Defendant's statement was being reduced to writing and while Detective Wilson was questioning the Defendant about the role of Sheila Loe in the alleged Capital Murder of Gregory Martin herein, the Defendant expressed a concern about what would happen to her.  The Defendant had previously informed Detective Wilson that Sheila Loe did not know that the Defendant and Christopher Vargas intended to commit the robbery herein until very shortly before the robbery actually occurred.  The Defendant had also previously informed Detective Wilson that Sheila Loe did not know that the clerk, Gregory Martin, would be killed.  The evidence shows that, in this context, Detective Wilson told the Defendant that 'she [Sheila Loe] would be an accessory to robbery.  I wouldn't charge her with murder.'  The court finds that this statement by Detective Wilson was not a promise to the Defendant.  The Court finds that this was an accurate statement of possibilities based on the knowledge of Detective Wilson at the time.  The Court finds that there is no evidence that this comment by Detective Wilson motivated or induced the Defendant to confess then or later."

- The evidence shows that Detective Wilson was unaware of Defendant's involvement in the alleged Capital Murder of Craig Turski at the time of his interview of Defendant regarding the alleged Capital Murder of Gregory Martin.  Detective Wilson told the Defendant that he suspected that co-defendant Christopher Vargas was involved in other similar robberies or shootings because of the apparent execution style killing of Gregory Martin.  After the Defendant had signed his written confession labeled State's Exhibit 2 herein, Detective Wilson encouraged the Defendant to reveal any information he had regarding other robberies or shootings committed by Christopher Vargas.  Detective Wilson told Defendant that the Defendant should 'think about it' and 'call me and ask for me and I'll talk to you and I'd talk to the "DA" and see if we could work something out'.  The evidence also shows that Detective Wilson told the Defendant that 'if you know anything else, I'll do my best to help you out.'  The court finds that these statements were too vague or ambiguous to constitute a promise.  The court finds that if a promise was made that it was contingent on the Defendant initiating an interview with the police regarding other killings or shootings by Christopher Vargas.  The Court finds that the Defendant did not initiate any interview with Detective Wilson or other police officers regarding other shootings or killings by Christopher Vargas.  The Court finds that, if a promise was made, it was not positive or certain nor was it of such a nature as was likely to cause the Defendant to falsely confess to a crime he had not committed.  The Court finds that these statements by Detective Wilson were not made for the purpose of plea bargain negotiation.  The Court finds that the Defendant could not have reasonably believed these statements to be made for the

73

purpose of plea negotiation.  The Court finds that there is no evidence that these statements motivated or induced the Defendant to confess then or later."

• "There is no evidence that the Defendant was motivated or induced to confess by any act of the police or law enforcement authorities.  There is no evidence that the Defendant's confessions were anything other than freely and voluntarily made."

(1991 C.R. vol. 4 at 719-21.)

The trial judge added comments about the missing videotape of the interview:

Defendant herein was not provided with a copy of State's Exhibit 8, MTS prior to the hearing on the Defendant's Motion to Suppress.  Detective Wilson testified in his examination that he had twice videotaped the Defendant in interviews conducted on January 5, 1991.  The first videotape was that discussed above, State's Exhibit 8, MTS.  The second videotape recorded an interview that was conducted with the Defendant approximately 1 to 1 ½ hours later by Detective Wilson regarding a Capital Murder of Craig Turski that had allegedly occurred on December 9, 1990 and which was admitted into evidence in the hearing on the Motion to Suppress as State's Exhibit 5, MTS.  Detective Wilson testified that he gave the videotape of the interview with the Defendant, along with the two written statements that he had taken from the Defendant during the video interview process, to Detective Billy Meeks.  He further testified that he also interviewed Sheila Loe or Sheila Garcia [hereafter Sheila Loe], a co-defendant herein, and gave the video recording of that statement and the written statement taken contemporaneously therewith to Detective Billy Meeks.  Detective Meeks was the Investigator charged with overall responsibility in the investigation of this case.  Detective Meeks testified that he received two videotapes from Detective Wilson, one of which he believed to be a videotaped interview of Sheila Loe and one of which was State's Exhibit 5 which he believed contained both of the interviews of the Defendant conducted by Detective Wilson.  State's Exhibit 5, MTS does not contain the videotaped recording of Detective Wilson's first interview with the Defendant regarding the alleged Capital Murder herein.  During the Motion to Suppress, there was a renewed search for the videotape of Detective Wilson's interview with Defendant herein regarding the alleged Capital Murder of Gregory Martin.  State's Exhibit 8, was discovered in the possession of Detective Keith Grisham, also with the Plano Police Department.  Detective Grisham participated in the crime scene investigation.  Detective Grisham testified that he was unaware that he had possessed the videotape labeled State's Exhibit 8, MTS and that he did not recall seeing it before he searched the locked file cabinet in his office at the request of Detective Meeks on Friday, July 26, 1991. Detective Grisham testified that he believes that the videotape must have been placed on his desk at some time in the past with copies of videotapes dealing with an unrelated rape/kidnaping of a

74

mother and daughter which had occurred 3 days prior to the alleged Capital Murder of Gregory Martin.   Detective Grisham testified that he was charged with investigating this rape/kidnaping.   He surmised that when he placed the rape/kidnaping videotapes in his locked file cabinet the missing State's Exhibit 8 was included therewith.   The Court concludes that the temporary absence of State's Exhibit 8 was inadvertent.   The Court concludes that there is no evidence of any intent of any person to hide, conceal, or suppress State's Exhibit 8.

(1991 C.R. vol. 4 at 717-18.)

## G.     The Failure to Obtain Written Waivers of His Right to Remain Silent Violated Garcia's Fifth Amendment Right to Remain Silent

### 1.     The Right to Remain Silent is an Important Personal Right

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   The Fifth Amendment privilege against self-incrimination is "protected by the Fourteenth Amendment against abridgment by the States." *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492 (1964); *Dickerson v. United States*, 530 U.S. 428, 433-34 (2000).

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966), the Supreme Court held that "the right to have counsel present . . . [during custodial] interrogation is indispensable to the protection of the Fifth Amendment privilege."   *Id.* at 469, 86 S. Ct. at 1625.   To safeguard the privilege, the Court held that, "[i]f the individual [under interrogation] states that he wants an attorney, the interrogation must cease until an attorney is present."   *Id.* at 474, 86 S.Ct. at 1628.

A confession taken when a person is in custody without the provision (or waiver) of *Miranda* warnings violates the Fifth, and perhaps the Sixth, Amendment.   *See Thompson v. Keohane*, 1995 WL 698869 (U.S. Nov. 29, 1995).   "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness.   Is the

confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has

willed to confess, it may be used against him.  If it is not, if his will has been overborne and his

capacity for self-determination critically impaired, the use of his confession offends due process."

*Columbe v. Connecticut*, 367 U.S. 568, 602 (1961).

In order to assess the voluntariness of a defendant's confession, a court must consider the

totality of the circumstances.  There is no talismatic test or mechanical formula for determining

whether a defendant's statement to police was voluntary.  *Schneckloth v. Bustamonte*, 412 U.S. 218,

224 (1973); *Fikes v. Alabama*, 352 U.S. 191, 197 (1957).  "The voluntariness of a confession is

ultimately a legal determination."  *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998), *cert.*

*denied,* 119 S. Ct. 1768 (1999) (*citing Miller v. Fenton,* 474 U.S. 104, 112, 106 S. Ct. 445, 450- 51

(1985)); *see also Muniz v. Johnson,* 132 F.3d 214, 219 (5th Cir.), *cert. denied,* 118 S. Ct. 1793

(1998.  However, the determination may also involve subsidiary factual determinations and mixed

issues of law and fact.  *Muniz,* 132 F.3d at 219.

"A suspect's waiver of *Miranda* rights is not invalid merely because police interrogators did

not advise him of the subject matter of the upcoming interrogation."  *Barnes*, 160 F.3d at 223; *see*

*Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857 (1987).  "Similarly, the waiver is not

invalid simply because the suspect did not have 'a full and complete appreciation of all the

consequences flowing from the nature and quality of the evidence in the case.'" *Barnes*, 160 F.3d

at 223 (*citing Oregon v. Elstad,* 470 U.S. 298, 317, 105 S.Ct. 1285, 1297 (1985)).  "There is no

Supreme Court law requiring that a suspect be informed that he is suspected of an offense that could

result in the death penalty.  Indeed, the Supreme Court's decisions in *Colorado v. Spring,* 479 U.S.

at 574, 107 S.Ct. at 857, and *Oregon v. Elstad,* 470 U.S. at 317, 105 S. Ct. at 1297, indicate just the

opposite -- a suspect need not be told that a statement or confession may expose him to the death penalty." *Barnes*, 160 F.3d at 223.

Supporting cases include *Washington v. DeMorales*, 1997 WL 547990 (9th Cir. Aug. 28, 1997) (unpublished), *cert. denied sub nom., Blount v. Washington*, 118 S. Ct. 853 (1998). Here, the Ninth Circuit reversed the district court's judgment in this rape-murder case and remanded with instructions to grant the writ. The state conceded that the petitioner invoked his right to remain silent during interrogation by the police, and the court observed that the state appellate court had found that "the police utterly failed to 'scrupulously honor' petitioner's *Miranda* rights. The court concluded that the confession, which "was by far the most influential proof before the jury[,] . . . inevitably had a substantial and injurious effect on the jury's verdict."

In *Arnett v. Lewis*, 870 F. Supp. 1514, 1537 (D. Ariz. 1994), the police failed to honor petitioner's right to remain silent. Moreover, the petitioner's confession was involuntary under the totality of the circumstances.

Other supporting cases include *Zappulla v. People of the State of New York,* 391 F.3d 462 (2d Cir. 2004), *cert. denied*, 126 S. Ct. 472 (2005); *Taylor v. Maddox,* 366 F.3d 992 (9th Cir. 2004), *cert. denied*, 543 U.S. 1038 (2004); *Hart v. Attorney General for State of Florida*, 323 F.3d 884 (11th Cir. 2003), *cert. denied sub nom. Crist v. Hart*, 540 U.S. 1069 (2003).

### 2.    Garcia Was Effectively "De-Mirandized" by Police.

In *Doody v. Schriro*, 548 F.3d 847 (9th. Cir. 2008), 17-year-old Doody was interrogated for murder by police overnight for twelve hours straight. When he fell asleep, officers prodded him awake and probed him with questions, demanding answers. As the interview began, the officers provided Doody with a water-down version of *Miranda* rights designed to lull him from invoking

his right to silence or counsel.  P. 15618-19.  Many of the officers' questions were framed as ones

he had to answer.  In the early morning hours, Doody stopped answering altogether, but officers

lobbed one question after another at the silent young man.  Finally, at 4 a.m., Doody began to

describe the murders.

The 9th Circuit concluded that the state court determination that Doody was subjected to a

friendly interview was unsupported by the facts.  "In short, Doody paints an overall picture of

downplayed warnings, a softly induced waiver of rights, and conduct conveying the message that

Doody would not be left alone until he confessed, all targeted at an unsavvy, increasingly sleep-

deprived teenager."  *Doody*, 548 F.3d at _____.  The 9th Circuit upheld the *Miranda* warnings, but

found Doody's confession involuntary and granted his petition for a new trial.

In *Thompkins v. Berghuis*, ___F.3d___, 2008 WL 4923016, No. 06-2435 (6th Cir. Nov. 19,

2008), the Sixth Circuit granted relief in a murder and assault case.  The court held that Thompkins'

Fifth Amendment rights were violated when the trial court refused to suppress his statements to

police, and that the Michigan Court of Appeals' affirmation was an unreasonable determination of

the fact and unreasonable application of federal law.  The investigating officer (Helgert) questioned

Thompkins for nearly three hours, and that, until an arguably inculpatory remark at the end, the

interview had been "'very, very one-sided,' 'nearly a monologue,' and that Thompkins was

'uncommunicative,' and 'not verbally communicative[.]'"  *Thompkins,* slip op. at 3.  Helgert also

confirmed three times that "Thompkins remained silent during the first two-plus hours of the

interrogation . . . ."  *Id.* (internal citations omitted).  The federal district court found Thompkins

waived his right to silence and participated in the interview.  *Thompkins*, slip op. at 7.  The Michigan

Court of Appeals found no Fifth Amendment assertion because Thompkins "continued to talk with

the officer albeit sporadically," and "never said he did not want to talk or that he was not going to say anything." *Id.* 9-10.

The Sixth Circuit quickly realized that the state court's "finding that Thompkins 'talked] with the officer, albeit sporadically" misrepresented the record."  The court explained:

> Contrary to the state court's statement, the evidence demonstrate that Thompkins was silent for two hours and forty-five minutes.  Indeed, the only evidence of Thompkins' participation consists of his declining a peppermint, complaining about his chair, and occasionally nodding his head or responding "I don't know" to *unidentified* questions, and these actions do not amount even to "sporadic" conversation with the officers.  To disregard a state court's factual determination, "the state court's factual determination must be 'objectively unreasonable' in light of the evidence presented during the state proceedings," and this is such a case.  *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003).

*Thompkins*, slip op. at 10-11 (internal citation omitted).

In *Woods v. Clusen*, 794 F.2d 293 (7th Cir. 1986), 16-year-old Woods was read *Miranda* warnings, then interrogated for two sessions of 20 minutes each.  Police told him things would go easier for him if he answered.  *Id.* at 295.  Another officer lied to Woods that police found his fingerprints on the victim's wallet.  Wood remained silent during these questions before capitulating and confessing.  *Id.* at 295-296.  The 7th Circuit found the confession involuntary.

Additionally, in light of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *North Carolina v. Butler*, 441 U.S. 369 (1979), the Michigan Court of Appeals "unreasonably applied clearly established federal law insofar as the court viewed such scant evidence of Thompkins's participation during the interrogation as demonstrating that Thompkins voluntarily waived his right to remain silent . . . ." *Thompkins*, slip op. at 11.  Criticizing the absence of context of the "occasional eye contact or head nods" described by Helgert, the Sixth Circuit summarized, "The state failed to satisfy its 'heavy burden' of showing that Thompkins's 'course of conduct indicated] waiver.'  Indeed,

Thompkins's persistent silence for nearly three hours in response to questioning and repeated invitations to tell his side of the story offered a clear and unequivocal message to the officers: Thompkins did not wish to waive his rights." *Thompkins*, slip op. at 12.

### 3. The Written Statements Were Clearly Flawed in the Absence of the Written Waivers of Garcia's Fifth Amendment Rights

Garcia's written statements were extracted involuntarily.  Garcia was only four months past 18, with moderate education, interrogated by experienced police.  He was exhausted, hungover, lacking his glasses, and unable to read adequately the statements written for him.

What appears to have occurred is that a few of the detectives in the Plano Police Department decided to modify the existing PPD-2005 standardized suspect statement form by deleting the two waiver paragraphs.  The form which detectives required Garcia to sign is a photocopy, and the face of the form reveals that it was constructed by cut-and-paste.  The three additional lines of text at the top of Garcia's statements were drawn in by hand to fill in the blank created after deleting the two waiver paragraphs.

The Respondent may argue that State's Exhibits 3 and N, the two statements signed by Garcia, substantially complied with article 38.22, section 2(b) and the federal constitution.  The Respondent may point to Garcia's initials of lines 1 through 44 at the top of page one, and to the certificate paragraph immediately preceding the signature lines on both pages.

What is clearly missing from Garcia's two statements, however, is what is required by article 38.22, a statement, certificate, or some other acknowledgment that *prior to* making the statement, Garcia knowingly, intelligently, and voluntarily waived the rights contained in section 2 of article 38.22.

In *Galloway v. Quarterman*, 2008 WL 5091748 (N.D. Tex. 2008), the court agreed with petitioner that his challenge that trial counsel was ineffective at the penalty phase for failing to present available mitigating evidence and adequately investigate did not present a new claim where in state court petitioner argued more generally that counsel was ineffective for failing to present available mitigating evidence. The court noted that "[t]he way the Fifth Circuit has applied th[e rule of *Picard* and *Vasquez*] suggests that, so long as the petitioner presents evidence to the state court in some form, he can present it to the federal court in a more fleshed out form." 2008 WL 5091748 at *3-5.

### H.   Without the Written Waiver of Rights Required by Article 38.22, the Obtaining and Introduction of the Statements Violated the Due Process Clause of the Fifth And Fourteenth Amendments

A confession given involuntarily as the result of police actions violates the Fourteenth Amendment Due Process Clause. *See Colorado v. Connelly*, 479 U.S. 157, 163 (1986). There is a two-step analysis applied to procedural due process challenges. First, one "must determine whether a protected liberty or property interest exists." *Ex parte Montgomery*, 894 S.W.2d 324, 327 (Tex. Crim. App. 1995). Second, one must "decide whether sufficient procedural safeguards are employed to assure the deprivation of that interest is not arbitrary." *Id.; citing Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593 (1972); *Hewitt v. Helms*, 459 U.S. 460, 103 S. Ct. 864 (1983).

Garcia has three interests at stake. First, his life. Second, he has an interest in his liberty. He is currently restrained. Additionally, Garcia has an interest created by state statute which guarantees that any written statements obtained from him must be preceded with his written waiver of rights. The Supreme Court has recognized that States are free to create entitlements not required by the federal constitution. *See Hewitt v. Helms*, 459 U.S. at 468, 103 S. Ct. at 869; *Greenholtz v.*

*Nebraska Penal Inmates*, 442 U.S. 1, 99 S. Ct. 2100 (1979) (although the Due Process Clause contains no right to parole, a state statute could create such an entitlement).  "A statute will create an expectation or entitlement if it places 'substantive limitations on official discretion' to deny the particular interest."  *Ex parte Montgomery*, 894 S.W.2d 324, 327 (Tex. Crim. App. 1995) (*citing Kentucky Department of Corrections v. Thompson,* 490 U.S. at 462, 109 S. Ct. at 1909, 104 L. Ed. 2d at 516 *and quoting Olim v. Wakinekona*, 461 U.S. 238, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983)).

One aspect is clear: the Texas Legislature decided to create a statutory entitlement to Texas citizens, by requiring police to obtain from any citizens being questioned about a criminal offense an unequivocal written waiver of their federal constitutional rights.  Having granted that statutory entitlement which creates a liberty interest, neither the Plano Police Department nor the Texas courts can terminate that interest without providing sufficient procedural due process that comports with federal constitutional due process requirements.

Here, Texas has not provided sufficient procedural due process.  First, Garcia was not provided notice during his police interview that he had a statutory right to have his *Miranda* waivers placed in writing.  Second, he was not provided an attorney prior to signing the statements who could have advised him that he had a statutory right to insist that police obtain written waivers.  Third, he was not provided an attorney who could have advised him that he had a right not to sign defective statements, or who could have insisted on a judicial hearing as to whether the written statement, as is, substantially complied with article 38.22 or federal constitutional demands.  Fourth, the Texas court retroactively decided that a Texas citizen could be denied the Texas Legislature's statutory entitlement grant, by inventing and applying a "substantial compliance" doctrine to Garcia, one which all agree did not exist when he signed the statements.  Fifth, there was no discretion left to the

82

Plano Police whether to grant or deny this right.  Article 38.22 plainly was mandatory, applying to *all* interrogations of any individual within the borders of the Lone Star State, as the initial opinion by the Texas Court of Criminal Appeals makes clear.

> **I.** **Without the Written Waiver of Rights Required by Article 38.22,  the Fifth Amendment and the Due Process Clause, the Obtaining and Introduction of the Statements Violated Garcia's Sixth Amendment Right to Counsel**

A confession taken after the right to counsel has attached, and without a knowing, intelligent, and voluntary waiver of the right to counsel, violates the Sixth Amendment.  *See Brewer v. Williams*, 430 U.S. 387 (1977).  The chief problem here is that the denial of Garcia's statutory entitlement right to written waivers led to the denial of his due process and anti-self-incrimination rights, which in turn led to the denial of his right to counsel under the Sixth Amendment.  Had he been provided with due process and notified that he had the right not to waive the rights described to him, then it is possible that Garcia would have sought the advice of counsel, who would have advised him not to give a written confession that would lead to his execution.

> **J.** **The Requirement that a Defendant Make a Knowing and Intelligent Waiver is Not a New Rule Under *Teague***

An example of this principle is *Snook v. Wood*, 89 F.3d 605, 613 (9th Cir. 1996), which held that the requirement that defendant make a knowing and intelligent waiver of right to counsel on the record was not a new rule as applied to the petitioner's case where the petitioner's conviction became final in 1979 because the standard had been set forth by the Supreme Court in *Faretta* in 1975.  The district court's grant of relief was therefore not in violation of *Teague*'s nonretroactivity principle.

**K.**      **Garcia suffered considerable harm as a result of the confessions.  The *Chapman* Harmless Error Test Applies, Although Garcia Clearly Satisfies Both the *Chapman* and *Brecht* Standards.**

"A confession is like no other evidence."  *Arizona v. Fulminante,* 499 U.S. 279, 296 , 111 S. Ct. 1246, 1257 (1991).  It "is probably the most probative and damaging evidence that can be admitted against [a criminal defendant]."  *Bruton v. United States,* 391 U.S. 123, 139, 88 S. Ct. 1620, 1629 (1968) (White, J., dissenting).  "While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision."  *Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1257; *see, e.g., Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1998) (finding harmful error for 5th amendment violation and ordering evidentiary hearing).

Involuntary and *Miranda* impure confessions are subject to the harmless error analysis.  *See Arizona .v. Fulminante*, 111 S. Ct. 1246 (1991).  In *Brecht v. Abrahamson*, 113 S. Ct. 1710 (1993), the Court ruled that a new harmless error test would apply in federal habeas corpus proceedings with respect to claims for relief theretofore subject to the *Chapman v. California* standard.  The Court held that "the standard for determining whether habeas relief must be granted is whether . . . the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 113 S. Ct. at 1713-14 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The *Brecht* standard of review is substantially more rigorous than the *Chapman* standard. "In *Chapman v. California,* the Supreme Court held that in a direct appeal 'before a federal constitutional error can be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'"  *Barber v. Johnson*, 145 F.3d 234, 235-36 (5th Cir. 1998) (*quoting*

84

*Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967) (footnote omitted), *cert. denied*, 119 S. Ct. 518 (1998)).

Garcia argues that although this is a habeas proceeding, this Court should apply the *Chapman* standard of review rather than that of *Brecht*.  The reason is that the Texas Court of Criminal Appeals failed to perform the proper harmless error analysis on rehearing.  In fact, on rehearing, the Court of Criminal Appeals, although finding severe shortcomings in the process of obtaining a statement, refused to conduct any harmless error analysis at all.  Additionally, as mentioned earlier, the Texas Court of Criminal Appeals never said that Garcia's federal claims were procedurally defaulted under State law.  Therefore, it is not proper to grant the State the deferential treatment of *Chapman* or *Brecht*, both of which presume that the State has made some attempt to address the federal claims.

In *Hogue v. Johnson*, a panel of the Fifth Circuit appears to have foreclosed review of a habeas claim under *Chapman* when the state courts failed to conduct an improper or insufficient harmless error review.  131 F.3d 466 (5th Cir. 1997), *cert. denied,* 118 S. Ct. 1297 (1998).  This panel decision has been somewhat criticized by another Fifth Circuit panel as inconsistent with *Brecht*.  *See Barber v. Johnson*, 145 F.3d 234, 236-37 (5th Cir. 1998).  In *Barber v. Johnson*, the Fifth Circuit reluctantly denied relief, finding itself compelled to follow the previous panel's decision in *Hogue*.  But *Barber* contrasted the extensive *Chapman* review in Hogue's case with Barber's and commented that "In this capital case, unlike in *Brecht* which reached the Supreme Court after two state appellate courts, a federal district court, and a federal court of appeals had reviewed the error under *Chapman,* no court, at the state or federal level, has reviewed Barber's constitutional error under the *Chapman* standard."  *Barber*, 145 F.3d at 237.  Garcia advances the arguments of Judge

85

Dennis, who concurred in *Barber*, lamenting that "Barber will be executed with no state court ever having demanded that the State prove beyond a reasonable doubt that the constitutional error did not contribute to the verdict obtained."  *Barber*, 145 F.3d at 238 (Dennis, J., concurring).

Thus, if the state court has determined beyond a reasonable doubt that an error had no effect a federal court will "defer" to that finding unless the federal court determines that the error in fact had a substantial effect.  *Brecht* applies to "trial" errors, not "structural" errors.  "In sum, we hold that pursuant to *Brecht v. Abrahamson,* a federal habeas court must conduct a harmless error analysis of all trial errors, including those occasioned by the sentencer's weighing of an invalid aggravating circumstance, before granting habeas relief."  *Billiot v. Puckett*, 135 F.3d 311, 320 (5th Cir. 1998).

However, if the state court performed no harmless error analysis with respect to a claim, the usual federalism comity concerns between the state and federal government should not attach and the federal court may apply the *Chapman* standard to constitutional violations.  *See Starr v. Lockhart*, 23 F.3d 1280, 1291-92 (8th Cir. 1993); *Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir. 1993), *cert. denied*, 114 S.Ct. 1631 (1994).  The Eighth Circuit has said that the *Brecht* prejudice analysis is not appropriate unless the state court have conducted a *Chapman v. California* harmless error analysis.  *Seiler v. Thacker*, 101 F.3d 536, 539 (8th Cir. 1996), *cert. denied*, 117 S. Ct. 1447 (1997); *but see Billiot v. Puckett*, 135 F.3d 311, 318, 318 n.9 (5th Cir. 1998) (disagreeing with 8th Circuit, and holding "that before a federal habeas court can grant relief on a trial error, including an error occasioned by the sentencer's weighing of a vague aggravating circumstance, the habeas court must review the alleged error for harmlessness.").

The Supreme Court has held that "trial error" -- that is, error that "'occur[s] during the presentation of the case to the jury'" -- "is amenable to harmless-error analysis because it 'may . .

86

. be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'"  *See Brecht,* 507 U.S. at 629, 113 S. Ct. at 1716 (*quoting Arizona v. Fulminante,* 499 U.S. 279, 307-08, 111 S. Ct. 1246, 1263-64 (1991)) (alterations in original); *see Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1998); *cf. United States v. Cannon,* 981 F.2d 785, 789 n. 3 (5th Cir.1993) ("A harmless-error analysis may be performed to examine the effect of an *Edwards* violation.").

The Court does not have to guess at harm.  The Texas Court of Appeals, in its initial decision, found ample evidence of harm, establishing that issue as fact.  The court wrote:  "The Plano Police Department and the prosecutors are clearly the sources of the error."  *Garcia,* 919 S.W.2d at 380.  "Further, more than half of the State's argument was consumed by direct references to appellant's written statement, or details provided by the statement.  Clearly, the statement was emphasized by the State." *Id.*  "Clearly, under these circumstances, it is very probable the jury relied upon appellant's written statement in their deliberations and verdict." *Garcia*, 919 S.W.2d at 380-81. "[W]e cannot determine beyond a reasonable doubt the admission of the statement made no contribution appellant's conviction or punishment." *Garcia*, 919 S.W.2d at 381.

For these reasons, therefore, Garcia is entitled to relief on his *Miranda* claims.

### *JURY ISSUES*
### *CHALLENGES TO STRIKE OF TWO JURORS*
### *BASED ON RACE*

### *JUROR HAZEL HOLMES*

***Claim Number 4: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating the Due Process Clause of the Fourteenth Amendment.***

***Claim Number 5: In the 1991 Trial, the State Improperly Used a Peremptory Cha1llenge to Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating the Equal Protection Clause of the Fourteenth Amendment.***

***Claim Number 6: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating the Right to a Fair and Impartial Jury Clause of the Sixth Amendment.***

***Claim Number 7: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating the Cruel and Unusual Punishment Clause of the Eighth Amendment.***

***Claim Number 8: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Hazel Holmes on the Basis of Her Race, Thereby Violating the Due Process Clause of the Fourteenth Amendment.***

|  | **Presentation to State Trial Court** | **Presentation to CCA** | **Presentation to U.S. District Court** |
|---|---|---|---|
| **1991 Trial** | 1991 SF vol. 36:3757-67; 1991 S.F. vol. 61 at 1; C.R. at 1030-32*;* 1991 S.F. vol. 61 at 94-96. | *Garcia v. State,* 919 S.W.2d 370, 394-95 (Tex. Crim. App. 1996)***;*** *Appellant's 1992 CCA Bf.* at pp. \_\_\_\_, claim 25-30. |  |
| **1999 WHC** |  |  | Claim 15-19 |
| **2002 Trial** |  |  |  |

88

|  | **Presentation to State Trial Court** | **Presentation to CCA** | **Presentation to U.S. District Court** |
|---|---|---|---|
| **2003 WHC** | Garcia AWHC, Claim 53-57 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). |  |
|  |  |  |  |

In these grounds, Garcia challenges the strike by the State in his 1991 trial of a certain African-American juror as a violation of *Batson v. Kentucky*, the landmark case forbidding the use of peremptory challenges on the basis of race.  Mrs. Holmes' interview appears in P.R.E. at tab 20.

A.      *The Claims Are Preserved and Exhausted.*

These issues were preserved at trial and presented on direct appeal.  (1991 S.F. vol. 61 at 1; C.R. at 1030-32.)  After Mrs. Holmes was questioned individually, the State moved to exercise a peremptory challenge against her.  Garcia objected.  (1991 S.F. vol. 36 at 3765.)  The trial court overruled.  (1991 S.F. vol. 36 at 3767.)  Following selection of the twelve petit jurors and two alternates, and prior to their being sworn (*see* 1991 S.F. vol. 61 at 67-68), Garcia's attorney filed a motion to dismiss the array on the basis of a *Batson* violation (*see* 1991 C.R. at 1030-32).  The trial judge conducted a *Batson* hearing.  Both State prosecutors testified.  (1991 S.F. vol. 61 at 1-2.)  The trial judge found that Garcia had established a prima facie showing of racial discrimination by the State by use of their strikes.  The trial court, however, also concluded that the State had provided sufficiently race neutral reasons for their strikes.  (1991 S.F. vol. 61 at 94-95.)  The trial court overruled Garcia's constitutional and statutory objections.  (1991 S.F. vol. 61 at 96.)  Although

89

Garcia requested written findings of fact and conclusions of law, the trial court failed to write them. (*See* 1991 S.F. vol. 61 at 96.)

In his 1992 direct appeal brief, Garcia specifically argued a violation of *Batson*, which rests upon due process and equal protection rights.  *(See Appellant's 1992 Bf.* at 42-45, 50.) The CCA wrote that Garcia did not assert an equal protection claim, *Garcia*, 919 S.W.2d at 394, which is untrue; he based his arguments on *Batson*, the lead Supreme Court decision on equal protection violations. The constitutional claims were therefore fully exhausted.

**B.**    ***Analysis of the Batson hearing findings.***

At the *Batson* hearing, the court established the following facts.  The transcript of the *Batson* hearing appears at P.R.E. at tab 18:

- All twelve jurors, as well as the two alternates, were white. (1991 S.F. vol. 61 at 67-68);

- Garcia was a member of a racially identifiable group, Hispanic, or Mexican-American.  (1991 S.F. vol. 61 at 68; vol. 36 at 3762);

- Venirewoman Hazel Holmes was a black female.  (1991 S.F. vol. 61 at 77; vol. 36 at 3760);

- She was the first African American struck by the State.  1991 SF vol. 36:3761.

- Venireman Albert R. Diaz was an Hispanic or Mexican-American male.  (1991 S.F. vol. 61 at 77 and 28);

- Mrs. Holmes and Mr. Diaz were the only two qualified prospective jurors of a racial minority on the entire panel of 107 prospective jurors subject to individual voir dire against whom the State exercised peremptory challenges.  (1991 S.F. vol. 61 at 78-80, and 32-34.)

Garcia therefore established his prima facie case for discrimination in the use of peremptory challenges by the State.  *See Batson v. Kentucky*, 476 U.S. 79, 96 (1986).  The burden then shifted to the State to offer racially neutral reasons for its strike of the minorities.

**C.    Testimony by Mrs. Holmes.**

**1.    She proved she was qualified and the court agreed.**

Questioned by the State, Mrs. Holmes showed she was qualified:

- She said she generally opposed the death penalty and could not impose a death sentence.  1991 SF vol. 36:3676.  However, once the process was explained, she could find a defendant guilty of capital murder if proven by facts.  1991 SF vol. 36:3679.

- She would not find a defendant not guilty merely to avoid a death sentence. 1991 SF vol. 36:3681.

- She would approach the case with an open mind, and allow her decisions to be determined by the evidence, without committing in advance to supporting a death sentence or life sentence.  1991 SF vol. 36:3686-87.

- She said that if the State presented evidence justifying a death sentence, she could support it.  1991 SF vol. 36:3688.

- She said that deciding whom to believe is difficult and she prefers not to be in that position, 1991 SF vol. 36:3694-96. but she was going to try to follow the law, 1991 SF vol. 36:3700.

- She would answer the first, second and third special issues "yes" if proved beyond a reasonable doubt. 1991 SF vol. 36:3701-02.

- She would answer fourth issue, on mitigation, based on the evidence, "According to whatever I hear."  1991 SF vol. 36:3709.

- When asked whether she would answer the questions in a way to support execution if required by her oath, she said flatly that she would. 1991 SF vol. 36:3710.

- She would not require any additional evidence to obtain a "yes" answer on the second special issue (future danger) than the crime itself.  1991 SF vol. 36:3752-53.

2.    *Improper Nazi holocaust analogy – used only once and against an African American.*

The prosecutor then used a Nazi holocaust illustration on Mrs. Holmes – the only juror during the trial on whom he did – to compare her mind to that of a Nazi death camp soldier.

> [Prosecutor]:  It's kind of like – think maybe back in during World War II, and you've got a German soldier that's gathering up all the Jewish prisoners and he's loading them on to a train and he knows where they're going, he knows they're going to go and get gassed, and he's doing it and, . . . ." [objection overruled.] "It might be easy for that soldier to say, well, you know, I didn't gas them, I didn't punch the button, I didn't pull the lever, I didn't push them into that gas chamber so it's not my responsibility, I didn't do it, and yet many people might say, huh-uh, you knew what was going on, you knew what was going to happen and you could have or should have done something about it and you didn't.   And, you know, the fear I have is somebody sitting over here and say, I can't pronounce the words, but – and I can do everything else that would be required.   Okay?   But you get back in the jury room and it's really happening.   Now we're not talking theory.   This is, you know, way down the road, and you're sitting there saying, this is it.   I'm putting this person on the train and even though I'm not saying the words, it's going to happen because in my mind the State's proven that [prosecutor pointing at the chart listing the special issues], the State's proven that, the State's proven that, and there isn't sufficient mitigating circumstances.   This guy is a coldblooded killer." [objection finally sustained.] 1991 SF vol. 36:3683-84.

Although the court's sustained objection to the Nazi analogy, the prosecutor continued unabated:

> [Prosecutor to Mrs. Holmes]: Do you see what concerns me is somebody saying as long as I don't have to say the works, that's okay.   That's fine.   And it seems to me like an attempt to avoid the real issue, which is can you do what you're being asked to do.   And that's really what we get down to.   Can you do it?   Can you sit there and answer the questions based upon the law and the evidence or will you allow your opposition to the death penalty to change your view of things and change your answers to those questions."

> [Mrs. Holmes]: I couldn't answer it either way. . . . I don't know what is going on.   I wasn't there.   I see what you're saying, could I do this based on this or base my opinion.   I don't know what took place.   I don't know whether you could present a case to make me see this way or whether somebody else could present it to make me see it the other way because I feel I did not see it, I was not there, I have no

92

knowledge of it.  So I don't know whether I could go either way." . . . I couldn't say
it was true; I couldn't say it was false."
1991 SF vol. 36:3685-86.

Here, unlike with any other juror in the trial, the prosecutor tried to place Mrs. Holmes in the

mind and position of a Nazi death train guard, seeking to evoke from her through one of the vilest

episodes in history the maximum emotional response that she would never allow herself to become

a Nazi guard by participating in an operation intended to kill someone, whom the prosecutor

analogized for the moment as an innocent Jewish victim.  His analogy certainly rattled her; she

struggled meekly to explain that she merely would listen to the evidence and decide from there.

The Nazi analogy was particularly offensive because it constituted the deliberate use of race

– German extermination of Jews – to eliminate from trial an African American juror sensitive to

those sort of injustices.

### 3. *Religious pressure.*

The court rejected the State's challenge for cause but provided another chance to question

Mrs. Holmes.  1991 SF vol. 36:3711.  To push her off the panel, the State began by pressing whether

her religious views would conflict with her duties as a juror. 1991 SF vol. 36:3712.  Mrs. Holmes,

however, explained the separation of church and state, indicating she would comply with her civic

duties, despite distaste.  1991 SF vol. 36:3712-13.

### 4. *Violating public oath pressure*.

Switching gears, the State tried to pin her with her civic oath, first asking whether she would

be "intentionally breaking the law?"  1991 SF vol. 36:3713.  She said no.  *Id.*  Second, he asked

whether she would violate her oath.  She said no.  *Id.*  The prosecutor then implied to Mrs. Holmes

that she *currently* was not violating the law, "but right now you're not violating any oaths or not breaking any laws."  1991 SF vol. 36:3713-14.

Then he applied pressure on Mrs. Holmes' honesty, "When you're sitting there as a member of the jury, you will then take an oath and you will be required to follow the law and that could put you in this dilemma . . . . Are you the kind of person who wants to violate your own personal beliefs?"  1991 SF vol. 36:3714.  She said no.  *Id.*

He persisted with the attack, "If your beliefs are that you don't believe in the death penalty and you're not going to participate in it, that's fine.  You're not violating any oath.  You're being true to your own principles, which is fine.  But if you got on the jury and you didn't tell us all that if you got put on the jury then you'd have to do one of two things, you'd have to violate the law or what the Court told you to do or you would have to violate your own personal feelings.  Okay?  We don't want to put you in that position."  1991 SF vol. 36:3714-15.  Mrs. Holmes said she would not want to take an oath which conflicted with her personal feelings.  1991 SF vol. 36:3715.

The prosecutor persisted, suggesting that asking her personal feelings were going to collide with her oath as a juror and trying to pin down that she would never support a death sentence.  1991 SF vol. 36:3715-16.  She simply responded that she did not believe in the death penalty.  *Id.* at 3716.

He tried again, pressuring her integrity hard, "My question is are you that kind of person or are you going to – are you, if your sitting on the jury, stay true to what you believe in and find that the defendant does not – should not receive the death penalty and answer those questions accordingly?  1991 SF vol. 36:3716-17.  She repeated that she did not believe in the death penalty.  *Id.* at 3717.  The prosecutor asked directly whether she would nullify her answers to prevent execution.  She said she did not know.  1991 SF vol. 36:3717.

94

Sensing victory, the prosecutor tried to move on, but Mrs. Holmes explained, logically, that she could not commit to any answer without first hearing the evidence.  1991 SF vol. 36:3717.  She distilled her response, "Well, I believe in my belief, but if I get in that position then, and take an oath, I would have to follow my oath."  1991 SF vol. 36:3719.

After a long series of objections, the prosecutor asked Mrs. Holmes whether she could answer a special issue "no" if it meant execution.  Worn down by two hours of grilling, Mrs. Holmes said "I don't feel like I can."  1991 SF vol. 36:3734.  But then she countered by explaining, "But I would be follow the oath the way I feel about it." . . . "Based upon the evidence, . . . ."  1991 SF vol. 36:3738.  "True answers to those questions based upon my feeling." . . . "How I feel about the evidence."  1991 SF vol. 36:3741-42.  She told the court that she would comply with the oath and follow the law and answer the questions "yes" or "no."  1991 SF vol. 36:3743, 44.  She concluded by explaining that she could support a death sentence if based on the evidence, although it would require soul searching.  1991 SF vol. 36:3747.

### D.      The Explanation of Prosecutors for Their Strikes.

Both state prosecutors denied that race played any role in their decision to strike these two jurors.  They testified that neither in cases arising before or after *Batson v. Kentucky* had they ever struck a juror solely for racial reasons.  (S.F. vol. 61 at 18-25, 73-75).  During individual voir dire, the prosecutors provided the following reasons for striking Mrs. Holmes.  (*See* S.F. vol. 36 at 3763-64.)

*First Reason: Opposition to death penalty*.   ". . . because of this panel member's stated opposition to the death penalty.  I will note in the questionnaire that it was an unequivocal opposition to the death penalty."

*Second Reason: Opposition to the death penalty.* ". . . the prior reasons that we requested that this juror be stricken for cause . . ."

*Third Reason: Son prosecuted.* ". . . this juror has had a son who has been subjected apparently to multiple prosecutions, some of which occurred in Collin County."

*Fourth Reason: Son unfairly treated.* "She has expressed . . . that her son was not fairly treated either by the police officers or the criminal justice system."

The questions about Mrs. Holmes son were asked by the prosecutor after 2 ½ hours of interrogation after the court denied the State's challenge for cause. Clearly the State was digging for justification for the *Batson* challenge it knew would arrive shortly. Mrs. Holmes explained that her son served time in the county jail for burglary, but there was nothing about her son's case which would affect her from serving in Garcia's. 1991 SF vol. 36:3749-50. She explained that her son won his case. She did not believe he was unjustly prosecuted. 1991 SF vol. 36:3750. She said he was not treated fairly, but evidently by local police, not the court system. 1991 SF vol. 36:3750-51.

*Fifth Reason: Would answer "No" to Special Issue Four on mitigation.* ". . . the change in her answer at the very end of my examination of her. I asked her if she could answer Special Issue Number Two no and she responded huh-uh, which I . . . interpreted to be a no." "When she was finally coerced into answering . . . she said that her huh, uh had, in fact, meant yes . . ."

At the *Batson* hearing, the prosecutors found additional justifications for their strike:

*First Reason: General Opposition to the Death Penalty.* (*See* S.F. vol. 61 at 36 (Blake), 82, 86-87 (Rusch).)

*Second Reason: Concern for incredible testimony.* "She apparently made some comment during examination that in many cases evidence was presented which should be believed by the jury,

but later they find out that it should not have been believed.  So apparently she was expressing some concern about whether or not she could reach a verdict be favorable to the State, even if she believed the evidence."  (*See* S.F. vol. 61 at 36-37.)

*Third Reason: Inability to judge.*  "With respect to her questionnaire, 'on page five.  Question number six, judge not, lest ye be judged.  In a death penalty case would cause a prosecutor some concern."  (S.F. vol. 61 at 36-37, 87.)

*Fourth Reason: Son had been prosecuted.*  The prosecutors argued that Mrs. Holmes' son had been previously prosecuted by the Collin County District Attorney's Office.  (S.F. vol. 61 at 37, 82.)

*Fifth Reason: She was a vacillating juror.*  "Mrs. Holmes should have been struck for cause.  She was a classic vacillating juror.  Three times she told Mr. Blake that she could not assess a death penalty." . . . "Three times she told the Defense she could.  Three times she told the prosecution she couldn't.  Later in the jury selection process vacillating jurors were excused for cause."  (S.F. vol. 61 at 82.)

### B.    *Disposition by the State Courts.*

The state trial court found the prosecutors' strike of Mrs. Holmes to be race neutral. 1991 SF vol. 36:3764-65; *See Garcia*, 919 S.W.2d at 394.  The Court of Criminal Appeals resolved the federal claims on their merits on page 394-95 of its decision.  The CCA cited Mrs. Holmes checked the block on her juror questionnaire that she would never impose a death sentence, and that she said she was personally opposed to the death penalty, and that she would never answer the special issues to favor a death sentence.  *Id.* at 394.  The CCA held that the trial judge was within its discretion to permit the state's strikes.  *Id.* at 395.

97

### E.      Equal Protection Analysis.

"The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner.  First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race.  Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges.  Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination." *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993).

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 128 S.Ct. 1203, 1208 (2008) (internal quotation marks and alteration omitted); *Reed v. Quarterman,* --- F.3d ---, 2009 WL 58903, at *16 n.12 (5th Cir. Jan. 12, 2009).

In *Batson v. Kentucky,* 476 U.S. 79, 93 n.17 (1986), the Court held that a defendant may establish a prima facie violation of the Equal Protection Clause by showing:

•      he is a member of a cognizable racial group;

•      the group's members have been excluded from the defendant's jury;

•      the circumstances raise an inference that the exclusion was based on race.

In *Powers v. Ohio*, 111 S. Ct. 1364 (1991), the Court expanded *Batson* to permit a white defendant, and presumably a defendant of any race, to raise an equal protection challenge based on the discriminatory use of peremptory challenges against a minority juror.  *Id.* at 1373.

"The prosecutor must give 'clear and reasonably specific' explanations of 'legitimate reasons' for his use of peremptory challenges.  *Batson*, 106 S. Ct. at 1722-24 & n.20.  "As for law, the rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror,

and it *requires* the judge to assess the plausibility of that reason *in light of all evidence* with a bearing on it." *Miller-El v. Dretke,* 545 U.S. 231, 251-52 (2005) ("*Miller-El II*") (emphasis added).

In *Batson*, the Court held that a defendant could rely on "all relevant circumstances" to establish a prima facie case of purposeful discrimination. *Miller-El* (II) clarified that "all relevant circumstances" included evidence outside "the four corners of the case." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El* (II)).   Specifically, the Court allowed statistical analysis of the venire, *ibid* at 240-41, side-by-side comparison of struck and empaneled jurors, *ibid* at 241, disparate questioning, *ibid* at 255, and evidence of historical discrimination, *ibid* at 263.

"[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El* (II), 545 U.S. at ___.

In *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008), a 7-2 decision written by Justice Alito, the Supreme Court reaffirmed its determination to root out racial discrimination in jury selection, holding that when the state proffers several justifications for striking a minority, a *Batson* violation may occur if any one of them demonstrate purposeful discrimination.  In *Snyder*, the state claimed it struck a black juror because he was nervous and because he held a student teaching job.  The trial court did not pass comment on the nervousness allegation.  The Supreme Court sifted the record, compared treatment of the black juror with non-black jurors, and concluded that the state trial judge's decision to reject the *Batson* claim was clear error because it was clear that the student teaching justification for the strike was pretexual.

In *Haynes v. Quarterman*, No. 07-70004 (5th Cir. Mar. 10, 2009), the Fifth Circuit ordered a new trial after finding a *Batson* violation because the state courts were unable to conduct the required factual based inquiry into Haynes' demeanor-based *Batson* claim.  Therefore, as Haynes was able to build a prima facie case for discrimination, the state was unable to rebut it.

The *Haynes* court reasoned as follows (quotations and citations omitted for convenience):

The Supreme Court demands that the trial court especially scrutinize explanations based purely on demeanor. *See Snyder,* 128 S.Ct. at 1208; see also (citations to Texas cases.)  This demand is logically derived from the underlying rationale for delegating the *Batson* determination to a *trial* court and according it substantial deference – namely, that the trial court is better able to make determinations of demeanor.  *See Snyder*, 128 S.Ct. at 1208 ("We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province.") (internal quotations and citations omitted); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *see also Thompson v. Keohane,* 516 U.S. 99, 111 (1995). Therefore, we accord the trial court the primary role in adjudicating demeanor- based *Batson* challenges because the trial court is in a better position to evaluate those challenges and is not relying, as the appellate court does, solely on the paper record. *See Moody v. Quarterman,* 476 F.3d 260, 272 (5th Cir. 2007) (noting that, according to the Supreme Court, the state court's credibility and demeanor determinations based solely on the paper record are not accorded a presumption of correctness, i.e., AEDPA deference) (citing *Cabana v. Bullock*, 474 U.S. 376, 388 n.5 (1986), *overruled in part on other grounds*, *Pope v. Illinois*, 481 U.S. 497 (1987)); *see also Mann v. Scott,* 41 F.3d 968, 982 (5th Cir. 1994).

For demeanor-based challenges especially, appellate review is necessarily dependent on the trial court's inquiry into the prosecutor's reasons and his personal observations of the juror's

100

demeanor that is the basis for those reasons.  *See Snyder,* 128 S.Ct. at 1208; *United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir. 1988)*; Bentley-Smith,* 2 F.3d at 1375; *United States v. Cobb,* 975 F.2d 152, 155-56 (5th Cir. 1992).  Such an inquiry is derivative of the trial court's clearly established obligation to "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (citation omitted and emphasis added)); *id.* at 95 ("[T]he trial court *must* undertake a '*factual inquiry*' that 'takes into account *all possible explanatory factors'* in the particular case." (emphasis added)); *Miller-El v. Dretke,* 545 U.S. 231, 251-52 (2005) ("*Miller-El II*") ("As for law, the rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it *requires* the judge to assess the plausibility of that reason *in light of all evidence* with a bearing on it." (emphasis added)).  For example, in *Jones v. Butler*, we read *Batson* to require the application of the trial court's observations of individual jurors if relevant to the prosecutor's explanation:

> The trial judge then evaluates, 'consider[ing] all relevant circumstances,' whether the prosecutor's explanation is race-neutral or a pretext for excluding potential jurors based on race. In making this determination the trial judge has available not only the prosecutor's explanation, but also the judge's observations of the demeanor of the prosecutor *and the veniremen*.  As the Supreme Court noted in *Batson*, the finding of intentional discrimination in use of peremptory challenges is a finding of fact that 'largely will turn on evaluation of credibility.' Years after trial, the prosecutor cannot adequately reconstruct his reasons for striking a venireman. Nor can the judge recall whether he believed a potential juror's statement that any alleged biases would not prevent him from being a fair and impartial juror.

864 F.2d 348, 369-70 (5th Cir. 1988) (emphasis added); *see also Wilkerson v. Collins,*  950 F.2d 1054, 1063 (5th Cir. 1992) (quoting *Mayo v. Lynaugh*, 893 F.2d 683, 689 (5th Cir.), *modified*, 920 F.2d 251 (5th Cir. 1990)).  Texas courts have also read *Batson* in this way:

101

> *Batson* requires the trial judge to embrace a participatory role in *voir dire*, noting the subtle nuance of both verbal and nonverbal communication from each member of the venire. . . . The trial judge is present during *voir dire* and is best able to observe the demeanor and tenor of voice of the venireperson. . . . Accordingly, although a prosecutor gives a race-neutral explanation, the trial judge, based upon all the evidence and his observations and experience, may determine whether or not the explanation is artificial or pretextual.

*Smith v. State,* 814 S.W.2d 858, 861-62 (Tex. Ct. App.-Amarillo 1991); *accord Ingram v. State,* 978 S.W.2d 627, 630 (Tex. Ct. App.-Amarillo 1998); *Gaines v.State,* 811 S.W.2d 245, 250 (Tex. Ct. App.-Dallas 1991).  Taking these principles together, trial courts are accorded the primary role in adjudicating *Batson* challenges because they can apply the relevant circumstances, which include their presumed observations of the juror and the entire *venire* as part of their role to oversee the trial. *See, e.g., Rice v. Collins,* 546 U.S. 333, 336 (2006); *Miller-El II,* 545 U.S. at 240; *United States v. Armstrong,* 517 U.S. 456, 467-68 (1996).

In a recent case, the Fifth Circuit has mandated *Batson* relief on facts substantially the same as here. *Price v. Cain*, 2009 WL 376785, (5th. Cir. 2009), decided February 17, 2009. The *Price v. Cain* court first observed the now familiar AEDPA rule, that a state court's decision is deemed 'contrary to' clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts, citing  *Murphy v. Dretke*, 416 F.3d 427, 431-32 (5th Cir.2005) (quoting *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir.2004) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000))).  The *Price v. Cain* court  acknowledged that a state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable. Id. (quoting *Pondexter v. Dretke*, 346 F.3d 142, 146 (5th Cir.2003) (citing *Williams*, 529 U.S. at 409, 120 S.Ct. 1495)).

The *Price v. Cain* court noted that the Supreme Court recently stressed in *Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), that *Batson* "spoke of methods by which prima facie cases could be proved in permissive terms." Id. at 169 n. 5, 125 S.Ct. 2410 (emphasis added).

In *Johnson*, the Supreme Court held that California courts could not require a defendant to show at step one that "it is more likely than not" that peremptory challenges, if unexplained, were based on impermissible group bias. Id. at 171-72, 125 S.Ct. 2410. The Supreme Court explained:

> We did not intend the first step to be so onerous that a defendant would have to persuade the judge-on the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of Batson 's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

Id. at 170, 125 S.Ct. 2410.

In other words, reasoned the Fifth Circuit, in *Price v. Cain*, *Batson* intended for a prima facie case to be simple and without frills. The *Batson* opinion was "designed to produce actual answers to suspicions and inferences." Id. at 172, 125 S.Ct. 2410. Actual answers are preferable to "needless and imperfect speculation when a direct answer can be obtained by asking a simple question." Id. (citations omitted). *Batson* thus seeks to promote " 'prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process.' " Id. (quoting *Hernandez v. New York*, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

To make a prima facie case, the Fifth Circuit held that Price needed to show only that the facts and circumstances of his case gave rise to an inference that the State exercised peremptory challenges on the basis of race. The *Price v. Cain* court found that this was a light burden, and that

103

Price carried it. Price, an African-American man, was tried for the rape of a Chinese-American woman. The State used six of its twelve peremptory challenges to strike African-Americans from the venire, and the resulting jury was all-white. Under *Batson*'s "permissive terms," reasoned the *Price v. Cain* court, these facts and circumstances were "sufficient to permit the trial judge to draw an inference that discrimination has occurred," citing *Johnson*, 545 U.S. at 170, 125 S.Ct. 2410.

In a very recent case, the Eleventh Circuit has granted *Batson* relief where similar explanations were proffered by prosecutors. *McGahee v. Ala. Dept. of Corr.*, 2009 WL 530771 (11th. Cir. 2009), Slip Op. No. 07-15602, decided March 04, 2009.

The *McGahee* court held that the evaluation of a prosecutor's race-neutral explanations under Batson is a "pure issue of fact . . . peculiarly within a trial judge's province," citing *McNair v. Campbell*, 416 F.3d 1291, 1310 (11th Cir. 2005). The *McGahee* court noted that at habeas, a *Batson* claim is often analyzed under AEDPA § 2254(d)(2), and is only granted "if it was unreasonable to credit the prosecutor's race-neutral explanations," citing *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969, 974 (2006) (applying AEDPA, 28 U.S.C. § 2254(d)(2), to a *Batson* claim). See also *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (analyzing Miller-El's *Batson* claim under § 2254(d)(2)).

The court in *McGahee* faced facts similar to the case at bar. In response to McGahee's *Batson* motion to the trial court, made just months after that Supreme Court decision, the State initially gave only an affirmation of good faith and general explanations, other than the specific explanation given for the strike of a Dr. Willis Wright. Furthermore, as here, before jury selection was finalized, the defense had made its *Batson* objection to the striking of all the blacks from the jury. With all of this before it, and without responding to the offer of the State to put its

individualized reasons on the record, the Alabama trial court stated simply "[y]our motion is denied." *McGahee*, supra., slip. op. at p. 12.

The Eleventh Circuit found the Alabama trial court's ruling at this point of the proceedings an unreasonable application of clearly established federal law because, as in the case at bar, it was based only upon the State's proffer of general explanations and protestations of good faith.  The Eleventh Circuit noted that  when the State asked for time to get its notes in order to proffer specific reasons for the peremptory strikes, the court ignored that offer and ruled with only the State's general assertions before it. Citing *Batson*, 476 U.S. at 98, 106 S. Ct. at 1723-24,  the *McGahee* Court rejected the state's vague assertions, and stated that the State must be "clear and reasonably specific" in explaining the "legitimate  reasons" for exercising the peremptory challenges, again citing *Batson*, 476 U.S. at 98 n.20, 106 S. Ct. at 1724 n.20 and Eleventh Circuit precedent, *United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir. 1989)

Examining the late-proffered explanations for striking all the blacks from *McGahee*'s jury, the Eleventh Circuit found the State's claim that several African-Americans were of  "low intelligence" is a particularly suspicious explanation given the role that the claim of "low intelligence" has played in the history of racial discrimination from juries. *McGahee*,  Slip Op., P. 26.

The *McGahee* court explained why it felt that it was not required to defer to the Alabama ruling, and why McGahee had met his burden of showing purposeful discrimination. The Eleventh Circuit noted that the  ability of a subjective rationale such as intelligence to serve as a pretext to cover discriminatory strikes is why the intelligence explanation has been found suspect by other courts, citing  *Turner v. Fouche*, 396 U.S. 346, 359-60, 90 S. Ct. 532 (1970) (finding a prima facie

case of discrimination where 171 of the 178 citizens excluded from a jury venire for "lack of 'intelligence' or 'moral uprightness'" were African-American); *Hillery v. Pulley*, 563 F. Supp. 1228, 1248 (E.D. Cal. 1983) ("Intelligence, moral 'uprightness,' 'better types,' and 'proper' jurors provide no standards at all, but inevitably are merely the subjective judgment of the selector."); *State v. Washington*, 375 So. 2d 1162, 1164 (La. 1979) ("[I]t is not unfair to characterize the prosecutor's basis for an almost automatic peremptory challenge to blacks to an assumption that many of them might not possess the intelligence and education requisite to sit on the case.").

The *McGahee* court concluded that the petitioner, also a black man on trial for capital murder, had presented a strong prima facie case of intentional discrimination where all the blacks were struck from the panel, resulting in an all white jury.

Also supportive of Garcia's claims is *Ali v. Hickman*, ___ F.3d ____, 2009 WL 1924792 (9th Cir. July 7, 2009), in which the Ninth Circuit granted relief in a non-capital murder case for *Batson* violation of two jurors, eliminated by the state with pretextual reasons similar to those offered in Garcia's trial.

The state tried to eliminate Mrs. Holmes for cause, but failed. Notwithstanding its failure, the state's effort casts light on its motive. If the state seeks to exclude a venire member because of bias, the state must show that the potential juror lacks impartiality. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985) (*citing Reynolds v. United States*, 98 U.S. (8 Otto) 145, 157, 25 L.Ed. 244 (1878)). "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S. Ct. 844. Opposition to capital punishment,

in itself, is not sufficient cause to exclude a juror.  "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases;  those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S. Ct. 1758, 1766 (1986).

Where the court finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is "'so basic to a fair trial that [its] infraction can never be treated as harmless error.'" *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057 (1987) (plurality opinion); *see also Davis v. Georgia*, 429 U.S. 122, 123, 97 S. Ct. 399, 400 (1976) (per curium) (remanding capital case for reconsideration where a single juror was erroneously removed for bias).

*Analysis.*   The explanations pertaining to Mrs. Holmes views on the death penalty are redundant.  In his first reason, the prosecutor claimed that Mrs. Holmes was opposed to the death penalty.  In his second reason, the prosecutor was referring to his earlier first unsuccessful challenge of Mrs. Holmes for cause, asserting that she was generally opposed to the death penalty.  (*See* 1991 S.F. vol. 36 at 3690, 3710-11; P.R.E. at 20.)

In the prosecutor's second challenge for cause, he complained that she was having difficulty providing him a favorable answer to the special issue on mitigation.  (1991 S.F. vol. 36 at 3733-35.)

In the prosecutor's third challenge of Mrs. Holmes for cause, he argued that the "witness is obviously not qualified."  "[She] can't set aside her strong feelings with regard to the death penalty . . . ."  The prosecutor again argued that she could not provide a favorable answer on the mitigation special issue.  (S.F. vol. 36 at 3757-58.)

The prosecutor's claim that Mrs. Holmes was a vacillating juror was a belated attempt to bolster his strike.  Her testimony is clear, and where she hesitated, it was because she was wrestling to explain her complex views on the death penalty, not because she was unsure of them.   The prosecutor conceded as much, commenting, "I never got the impression she lied to us."  (S.F. vol. 61 at 41.)

The only two justifications by the prosecutors which are consistent were her general opposition to the death penalty, and the prosecution of her son.  These were the explanations provided during individual voir dire and are far more credible than two weeks later when the prosecutors had time to scour for additional ones.  The prosecutor had Mrs. Holmes' questionnaire in his hand during her individual voir dire examination; if there were additional legitimate reasons, he would have said so at this point.

Regarding the prosecutor for her son, she explained that he had been charged with burglary. Belying their later professed concern, the prosecutors spent only a few minutes questioning her about it.  The prosecutor asked only whether the prosecution of her son would prevent her from being a fair and impartial juror in Garcia's case, and she said, "No."  (S.F. vol. 36 at 3750.)  The noticeable absence of probing questioning is a factor suggesting that the State's reason for its strike is pretexual. *See Whitsey v. State*, 796 S.W.2d 707, 713-14 (Tex. Crim. App. 1989).

At the *Batson* hearing, prosecutor proffered new reasons not suggested when they struck Mrs. Holmes when their memories were freshest.  Clearly, they had prepared for the hearing by trying to list as many neutral reasons as possible to justify their actions.

108

Garcia contends that the explanations provided by both prosecutors at the *Batson* hearing which were not presented when they initially struck Mrs. Holmes were pretextual.  The real reason for striking her was because they could ill afford the risks of a minority juror.

*Prejudice Analysis.*  There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  Claims of racial under representation fall into this category.  If racial discrimination occurs in the selection process of the grand or petit jury, the conviction must be reversed notwithstanding "overwhelming" evidence of guilt.  *Vasquez v. Hillary*, 106 S. Ct. 617, 622 (1986).

### *JUROR ALBERT R. DIAZ*

*Claim Number 9: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Due Process Clause of the Fourteenth Amendment.*

*Claim Number 10: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Equal Protection Clause of the Fourteenth Amendment.*

*Claim Number 11: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Right to a Fair and Impartial Jury Clause of the Sixth Amendment.*

*Claim Number 12: In the 1991 Trial, the State Improperly Used a Peremptory Challenge to Strike Prospective Juror Albert R. Diaz on the Basis of His Race, Thereby Violating the Cruel and Unusual Punishment Clause of the Eighth Amendment.*

| | Presentation to State Trial Court | Presentation to CCA | Presentation to U.S. District Court |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 39 at 4358 et seq.*;* 1991 S.F. vol. 39 at 4365-66 | *Garcia v. State*, 919 S.W.2d 370, 394-95 (Tex. Crim. App. 1996)*; Appellant's 1992 CCA Bf.* at pp. ____, claim 31-36. | |
| **1999 WHC** | | | Claims 20 - 24. |
| **2002 Trial** | | | |
| **2003 WHC** | Garcia AWHC, Claim 58-62 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). | |
| | | | |

110

*Preservation of Error and Exhaustion of Remedies.*  These issues were preserved at trial and presented on direct appeal.  A full discussion appears with the previous issues pertaining to Juror Mrs. Holmes.  For Mr. Diaz, see also: 1991 S.F. vol. 39 at 4282, 4365 (individual voir dire objection); and for his transcript, see P.R.E. at tab 21.  After Mr. Diaz was questioned individually, the State moved to exercise a peremptory challenge against him.  Garcia objected.  (1991 S.F. vol. 36 at 4365.)  The trial court overruled.  (1991 S.F. vol. 36 at 4366.)  The Court of Criminal Appeals resolved the federal claims on their merits on page 394-95 of its decision.  As with Mrs. Holmes, the CCA held that the state trial court was within its discretion permitting the state's strike of Mr. Diaz.

*Testimony of Albert Diaz.*  Mr. Diaz' testimony shows him to be a thoughtful capable juror who supported the death penalty, and was willing to impose it in robbery / murders by young offenders:

- He once worked for Touche Ross, then one of the Big-8 international accounting firms.  1991 SF 39:4284.  He was currently attending University of Texas at Dallas to obtain an MBA.  1991 SF 39:4340-41.  He has an BBA in petroleum land management. 1991 SF 39:4341.  He attended the High School of Foreign Visual Arts in Houston. 1991 SF 39:4347.  He plays three instruments. 1991 SF 39:4347.

- His wife attended the University of Houston.  1991 SF 39:4340. His brother is an IRS agent, now in law school in Houston.  1991 SF 39:4298, 4299.

- He indicated on his form that while not in favor of the death penalty, he could vote for it if called for by facts and law.  1991 SF 39:4285.

- His specific answers, however, indicate that he completely supports the death penalty.  He said, "I think it's necessary," although not every murder case requires execution, precisely the position of Texas law.  1991 SF 39:4285.  When asked whether he had ethical or moral objections to the death penalty, he said flatly and unequivocally, "No.  I do not."  1991 SF 39:4285.

- He believes the death penalty is necessary, "I think if a crime is such that it warrants that, I think that the death penalty is necessary to have in our law.  I'm not for everyone dying and I would be much more prone to give someone life as opposed to

death, but I realize there are circumstances where the death penalty is probably a fair verdict for somebody." 1991 SF 39:4286. With this statement, Diaz precisely expressed Texas law, which does not mandate execution for all murders, but is selective and assigns a life sentence as the default decision unless the State carries its proof burdens.

• The prosecutor asked Diaz forcefully to set aside theoretical constructs of the death penalty and determine whether Diaz could answer "those questions in such a way, that you could really seriously lead to the execution of another person." Diaz declared unequivocally, "Yes, sir." 1991 SF 39:4287.

• Switching gears, the prosecutor narrowed his questions of Diaz' beliefs to the robbery / murder for which Garcia was on trial, Diaz provided a thoughtful answer which favored prosecutors, commenting, "I think with your example being a murder situation that was so random, I would be inclined to say that I wouldn't have any problem saying that someone should die. But if it was a murder that was a robbery, it was considered a capital murder, it was the same type example as the 7-Eleven store, again I would be either way. Just depends on the facts that I – that I gather. . . . I would be less inclined to sentence someone to death unless it was really, in my opinion, a person who I felt was of extreme danger from the acts." 1991 SF 39:4288.

• Asked whether he had a bias or prejudice against Texas law which permits execution for murder during a robbery, Diaz said flatly, "No. I do not." 1991 SF 39:4280.

In this paragraph, Diaz again demonstrates willingness to apply Texas death penalty law guided by facts. He believes random murders – like Garcia's charge – deserve the death penalty. Store robberies also deserve the death penalty, but he could choose life or death, influenced by the future dangerousness of the defendants – precisely the requirements of the future danger special issue, which was constructed to guide jurors away from executions for all felony murders and direct them to those in which the defendant will likely be violent in the future, exactly matching Garcia's feelings.

Diaz would execute a young murder if dangerous:

• When asked whether he could support execution of someone age 17 or older guilty of capital murder, Diaz responded, "I'd be strongly opposed to giving someone the death penalty and more prone to giving them life if that's the law under the facts, but

112

I also have to say that I'm not one that feels much sympathy for hardship of upbringing or environment. I'm sensitive to it. . . Somebody very youthful, I would have a real hard time sentencing him to death, but if that person was so dangerous and the crime was such that it was so terrible, I would not have a problem doing it. 1991 SF 39:4290.

- Diaz further explains that he had his own difficult upbringing which he overcame, and has many relatives who struggled with environment and upbringing. Some of his relatives remain poor. But he rejects claims that environment produces crime, "because I think people have a choice." 1991 SF 39:4290-91.

- Asked whether he had a bias or prejudice against executing a young murderer, Diaz responded flatly, "No. I do not." 1991 SF 39:4291. And, "If necessary," he would do so. 1991 SF 39:4291.

In these remarkable statements, Diaz hands the prosecutor all he could wish. While he is not inclined to execute a youthful murderer, given one who was "so dangerous" and a "terrible" crime, he would. The prosecutor intended to show Garica met both requirements. Better yet, Diaz announced his opposition to Garcia's defense – to show poor upbringing and environment. Diaz was a conservative, thoughtful juror.

Diaz' responses to punishment are conservative:

- He is completely utilitarian, indicating that prisons need to invest in rehabilitation, not for humanity's sake, but simply to reduce recidivism and increase productivity. 1991 SF 39:4292.

- He believes the offender's desire chiefly determines rehabilitation. Some are willing to work, and some are so violent they are beyond help. Some should never return to society. 1991 SF 39:4293.

- He would not consider the possibility of parole in his deliberations. 1991 SF 39:4294-95.

- Prison should be a form of punishment. 1991 SF 39:4295-96.

- He viewed the death penalty and prison as deterrence two-fold, "one deterring society, from seeing what the potential is for punishment of such crimes and, second, deterrence of keeping dangerous people out of society." 1991 SF 39:4296.

113

Diaz' other views reflect a conservative, thoughtful approach:

•     Overall, the criminal justice system is sound.  1991 SF 39:4299.

•     He viewed law enforcement favorably.  1991 SF 39:4299-01.

•     He understood the burden of proof and would not require the State to eliminate all doubt.  1991 SF 39:4309-17.

•     He rejected voluntary intoxication as a defense. 1991 SF 39:4318, 4320-21.  "No. I would not allow any type of altered mental state that was self-induced to get in my way in deciding intent."  1991 SF 39:4321.

•     He accepted without qualification that the State could prove mental intent inferentially.  1991 SF 39:4318.

•     He accepted that the State is not required to prove motive. 1991 SF 39:4319.

•     He understood the difference between the deliberateness and intentional requirements and would apply them.  1991 SF 39:4322-23.

•     He was willing to consider liability evidence in punishment.  1991 SF 39:4323.

•     He would not automatically find death answers if Garcia were guilty.  1991 SF 39:4323-24.

•     He would not require "probability" in the future dangerous question to require certainty.  1991 SF 39:4325-26.

•     He would not require proof that Garcia would kill again to support a death sentence. 1991 SF 39:4326, 27.

•     Diaz understood the future dangerousness question perfectly: "I would be looking for a set of facts that makes me feel beyond a reasonable doubt that their conduct and their crime is so severe that they would at this present time be an ongoing threat to all society." 1991 SF 39:4326.

•     He believed a non-trigger man could be guilty of capital murder and executed. 1991 SF 39:4330-31.  "If the law provided that someone being proven beyond a reasonable doubt was guilty of participating and was not the trigger man, I would not have a problem with that."  1991 SF 39:4331.

114

- He would consider lesser offenses and punishment if instructed.  1991 SF 39:4335-36.

Diaz is obviously an intelligent and confident man, who asked for an explanation of a concept overlooked by the prosecutor, the meaning of provocation in one of the special issues.  1991 SF 39:4302.  He felt strongly that a person had the right to defend himself from attack - precisely the view a prosecutor would want.  1991 SF 39:4302-03.  He had no difficulty envisioning answering the third special issue on provocation "no" in favor of execution.  1991 SF 39:4308.

Mr. Diaz also understood the special issue on mitigation and agreed to apply it properly:

- He would not use the mitigation question to nullify a valid death sentence.  1991 SF 39:4329-30.

- The quantity of mitigating circumstances do not add to a life sentence.  1991 SF 39:4331-32.

- The prosecutor asked Diaz to promise to consider youth as a mitigating circumstance. 1991 SF 39:4333.

- Diaz said flatly he foresaw a real world possibility of answering "no" to the special issue on mitigation and requiring execution if justified by the facts. 1991 SF 39:4334-35.

**The Justifications for the Strike.**   The prosecutors attempted to justify their strike of Mr. Diaz on racially neutral reasons:

*First Reason: Empathy for youthful offender.*  Mr. Diaz "expressed a real concern with youth and participation in a capital murder case with a youthful defendant."  (1991 S.F. vol. 39 at 4359.) This is untrue.  Mr. Diaz said he was perfectly willing to convict and, if justified, support execution of a young offender.

*Second Reason: Hesitation on death penalty.*  "[H]e . . . states a real concern about a death penalty in a 7-Eleven hold up."  (1991 S.F. vol. 39 at 4360.)  This is also untrue.  He showed no

hesitation for the death penalty in a random murder.  The prosecutor substituted his own words for

Diaz.  The prosecutor said to Diaz, "Given your general feelings about the sanctity of human life,

. . . ."  1991 SF 39:4334. But Diaz never said the words "sanctity of human life," merely that taking

a life required careful consideration.

*Third Reason: Would impose a high burden of proof on special issues.*  ". . . one of my

biggest concerns, however, dealt with his answers to me in response to the State's burden of proof

on the Special Issues." . . . "I could read it in his eyes."  ". . . I am convinced that my burden of proof

will increase in the punishment phase of a trial versus a guilty-innocence phase."  ". . . his standard

of beyond a reasonable doubt is a very extreme standard."  (1991 S.F. vol. 39 at 4360.)  This is

untrue.  Whatever the prosecutor thought Diaz's eyes showed, Diaz flatly declared many times that

he understood and would apply the standard of proof.

*Fourth Reason: The Defense likes the juror.*  ". . . defense counsel obviously likes this juror."

(1991 S.F. vol. 39 at 4362.)  There is impossible to judge and is not a race neutral reason.  If the

reason the defense liked Diaz was because he shared the same race as Garcia, or could appreciate

Garcia's family experiences, then liking the juror is confirmation that race motivated the State's

strike.

*Fifth Reason: Juror would require history of violence.*  The prosecutor contended that Mr.

Diaz would require a "significant track history of violence" before answering the punishment issues

in favor of the State.  (1991 S.F. vol. 39 at 4361.)  This is untrue.  Mr. Diaz said just the opposite,

clear that some violence justified a death sentence.

Later, at the *Batson* hearing, the State provided another list of justifications, some new, some

old:

*First Reason: Hesitation on death penalty on these facts.*   "I believe he testified that he thought the death penalty was okay with respect to random killing, but he wasn't so sure if it was appropriate for a 7-Eleven convenience store type killing."  (1991 S.F. vol. 61 at 55.)  This is not true.  Diaz said, "But if it was a murder that was a robbery, it was considered a capital murder, it was the same type example as the 7-Eleven store, *again I would be either way.  Just depends on the facts that I – that I gather*. . . . I would be less inclined to sentence someone to death unless it was really, in my opinion, a person who I felt was of extreme danger from the acts."  *See supra* (emphasis added).  Diaz was comfortable with the death penalty for a convenience store robbery, if the facts supported, precisely the requirements of Texas law.  He would be less inclined toward death for someone less dangerous, and by implication, more inclined toward death for someone more dangerous, a perfectly reasonable position.

*Second Reason: Empathy for youthful offender.*   "I believe he stated that he had a strong difficulty with the death penalty when dealing with a youthful defendant."  (1991 S.F. vol. 61 at 55, 92.)  This is not true.  He did not say he had difficulty with the death penalty for a young offender, just that it was harder, but still if the offender was dangerous and the facts warranted, he would do so.  The prosecutor, in fact, asked Diaz to promise that *he would* consider youth as a mitigating circumstance.  1991 SF 39:4333.

*Third Reason: Juror would require history of violence*.   "I believe he stated that if a person had a track history of tremendous violence in the past then he would find the defendant not rehabilitable and at the very least would require that he be incarcerated."  (1991 S.F. vol. 61 at 56.)  This is flatly untrue.

117

*Fourth Reason: Juror would impose high burden of proof in sentencing phase.* "I believe he testified that he would require not perfect, but extreme certainty. I presume that's with respect to our burden of proof. I believe he testified that our burden of proof would increase in the punishment phase of the trial." (1991 S.F. vol. 61 at 56, *see also* 88, 89, 92.) Diaz did not say he would increase the burden of proof beyond that required by law. He agreed that absolute certainty was not required. He said that he wanted a high degree of certainly, a subjective assessment.

*Fifth Reason: Burden on State to prove absence of mitigation.* "I believe he testified that he would require the State to bear the burden of the sufficiency or lack there of mitigating evidence with respect to the fourth special issue." (1991 S.F. vol. 61 at 56.) Diaz did not say this.

*Sixth Reason: The Defense liked the juror.* ". . . the defense liked the prospective juror." (1991 S.F. vol. 61 at 56, *see also* 90.) As mentioned, this is probably a racial justification for the strike.

*Seventh Reason: Opposition to the death penalty.* Citing the questionnaire, the prosecutors contended that Mr. Diaz "indicated he was not in favor of the death penalty." (1991 S.F. vol. 61 at 56.) "He was also opposed to the death penalty . . . ." (1991 S.F. vol. 61 at 92.) This answer ignores what Diaz actually said.

*Eighth Reason: Juror feels there are insufficient efforts to rehabilitate.* "Also, I've got a note on page four that he blames the system as not applying sufficient resources as the reason that the prison system is not successful rehabilitating." (1991 S.F. vol. 61 at 57.) This is not true. He said that he respects the legal and law enforcement system and feels good about its operation.

*Ninth Reason: Juror feels prisons should be capable of incarcerating all.* "I've got a note that prison should be able to house whatever kind of people they get, apparently including also the

sociopathic types that otherwise might well receive the death penalty."  (1991 S.F. vol. 61 at 57.)

This is untrue; Diaz did not say this.

    *Tenth Reason: Juror feels innocent people are hurt by criminal justice system.*  "Page ten,

question 43, my notes besides that, so it must have come from some response of his.  Often innocent

people are hurt by the system.  (1991 S.F. vol. 61 at 57.)  This is untrue.  Diaz never said innocent

people are often hurt.

    *Eleventh Reason: Juror once had unpleasant experience with law.*  "Page twelve, question

52, my notation on that question indicates he had an unpleasant experience with police officers in

Houston in the seventies."  (1991 S.F. vol. 61 at 57.)  This may be true but it is also a racial reason

for the strike because even the prosecutor acknowledged that Houston police had problems in the

1970s, implying that every minority had unpleasant experiences with Houston police.

    Striking about this litany at the *Batson* hearing is how many reasons were presented which

were not suggested during the initial questioning of Mr. Diaz when the defense first objected on

*Batson*.  At the *Batson* hearing, the prosecutors argued for the first time that they struck Mr. Diaz

because he would impose a higher burden of proof with regard to the mitigation issue, was opposed

to the death penalty generally, and had qualified feelings for the criminal justice system.

    **Trial court's response**.  The trial judge found the state's explanations racially neutral, 1991

SF 39:4365, and ruled that there were "ample reasons for either side to have exercised a peremptory

strike," and "either side could have legitimately and from a racially neutral standpoint exercised a

peremptory strike with respect to this particular juror, and so any objections to the State's being able

to exercise its peremptory strike are overruled."  1991 SF 39:4364.

***Prejudice Analysis.***  There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  Claims of racial under representation fall into this category.  If racial discrimination occurs in the selection process of the grand or petit jury, the conviction must be reversed notwithstanding "overwhelming" evidence of guilt.  *Vasquez v. Hillary*, 106 S. Ct. 617, 622 (1986).

***Claim Number 13: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Robert Rea Phillips, Violating the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution.***

***Claim Number 14: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Robert Rea Phillips, Violating the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Federal Constitution.***

***Claim Number 15: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Robert Rea Phillips, Violating the Effective Assistance of Counsel Clause of the Sixth Amendment to the Federal Constitution.***

|  | **Presentation to State Trial Court** | **Presentation to CCA** | **Presentation to U.S. District Court** |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 53 at 6854-56 | *Garcia v. State,* 919 S.W.2d 370, 389-90 (Tex. Crim. App. 1996)*; Appellant's Bf.* at 15, claims 1-4. | |
| **1999 WHC** | | | Claims 7, 8, 9 |
| **2002 Trial** | | | |
| **2003 WHC** | Garcia AWHC, Claims 45 - 47 (Phillips) (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). | |
| | | | |

In these issues, Garcia challenges the release for cause of a juror merely because he voiced general objections to the death penalty, thereby violating *Witherspoon v. Illinois.* Phillips' interview appears in 2003 State WHC P.R.E. at tab 22.

121

### A.     These Claims Were Exhausted in State Court and Not Procedurally Defaulted.

These federal claims were exhausted in the state forum.  They were timely raised and overruled at trial.  (1991 S.F. vol. 53 at 6854-56.)  They were timely presented on direct appeal as Appellant's Points of Error One through Four.  (*Appellant's Brf. at 15, 2003 State WHC P.R.E. at tab 11*.).  The Court of Criminal Appeals was presented with the merits of these federal merits of these claims and held that the trial court did not abuse its discretion.  *Garcia*, 919 S.W.2d at 389; 2003 State WHC P.R.E at 2.

### B.     Resolution by the Texas Courts.

Judge Mansfield deliberately misconstrued Phillips testimony and cast him as having "testified he would never vote so as to impose the death penalty."  *Garcia* 919 S.W.2d at 389.  As discuss below, this assertion is tenable only by a judge intent on ignoring the transcript and imposing a death sentence.  Judge Mansfield summarily dismissed Phillips: "A prospective juror who is unable to consider the full range of punishment may be challenged for cause under the standards established by *Wainwright v. Witt* 469 U.S. 412 (1985), and *Morgan v. Illinois, supra*."  *Garcia*, 919 S.W.2d at 389.

In 2008, the state trial court signed F&Cs denying these Phillips claims because they had been decided adversely before and no new evidence was presented.  *See* 2008 F&Cs at 2-3.  On October 15, 2008, the CCA denied these claims without analysis as a subsequent state habeas application.  *See Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished).   As discussed above, that Garcia presented these claims twice does not create procedural default.

### C.      Juror Robert Rea Phillips Was Removed for Cause

The State challenged prospective juror Robert Rea Phillips for cause on grounds that he would always find a defendant's youth to be a sufficient mitigating circumstance in answering special issue number four in the sentencing phase.  (1991 S.F. vol. 53 at 6837, and 6835-37, 6841-42.)  The trial court granted the challenge and dismissed Mr. Phillips.  (1991 S.F. vol. 53 at 6853.)  The trial judge commented, "I don't believe that he has got a bias or prejudice against the law.  He has a bias or prejudice in this particular fact situation . . ."  (1991 S.F. vol. 53 at 6843.)

### D.      A Juror May Not Be Excused for Cause Merely Because He or She Expresses General Opposition or Discomfort With the Death Penalty

"The jury is given broad discretion to decide whether or not death is 'the proper penalty' in a given case, and a juror's general views about capital punishment play an inevitable role in any such decision."  *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty, or expressed conscientious or religious scruples against its infliction.  *Id.* at 522.  The Court concluded that "Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment."  *Id.* at 522.   "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright*

*v. Witt*, 469 U.S. 412, 424 (1985) (*quoting Adams v. Texas,* 448 U.S. 38, 45, 100 S. Ct. 2521, 2526 (1980)).

"*Witt* set the applicable constitutional rule: '[T]he quest is for jurors who will conscientiously find the facts and apply the law.  That is what an "impartial" jury consists of. . . .'" *McFadden v. Johnson*, 166 F.3d 757, 760 (5th Cir. 1999), (*quoting Witt,* 469 U.S. at 423, 105 S. Ct. 844).

"[W]e have rejected the suggestion that *Witt* requires that veniremen be explicitly asked if they could answer the sentencing questions despite their other reservations." *McFadden*, 166 F.3d at 760 (*citing Fuller v. Johnson,* 114 F.3d 491, 500 (5th Cir.), *cert. denied,* 118 S. Ct. 399 (1997)).

"Where a party seeks to exclude a venire member because of bias, that party must demonstrate through questioning that the potential juror lacks impartiality." *Fuller v. Johnson,* 114 F.3d at 499-500 (*citing Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. At 852, which in turn cited *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 157, 25 L.Ed. 244 (1878)).  "Opposition to capital punishment, in itself, is not sufficient cause for a judge to exclude a member of the jury pool." *Fuller*, 114 F.3d at 500.  "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S. Ct. 1758, 1766 (1986).  *See generally* Mike Alen et al., *Impact of Juror Attitudes About the Death Penalty on Juror Evaluations of Guilt and Punishment: A Meta-Analysis,* 23 Law & Hum. Behav. 715 (1998).

124

**E.      *Mr. Phillips Was Amply Qualified and Improperly Removed for Cause Merely Because He Felt Youth Was a Mitigating Factor In Favor of a Life Sentence***

Mr. Phillips was a qualified juror who was only challenged because he found a defendant's youth to be a mitigating circumstance in a death penalty case, something perfectly permitted by existing law. This produces several problems.

First, the decision to remove Mr. Phillips resulted in a more death prone jury. Mr. Phillips never said that he was going to vote for a life sentence and a life sentence only. He was merely asked whether Garcia's age would be a mitigating circumstance. Lacking Mr. Phillips, the remaining jurors, who presumably did ***not*** consider youth to be mitigating, more quickly decided in favor of a death sentence.

Second, Mr. Phillips never said that his views toward youthful offenders would automatically *outweigh* all other aggravating circumstances he found. The trial judge and prosecutor merely presumed so.

Third, Garcia lost his chance to have a fair cross section of the population as his jurors. A large number of death penalty supporters believe that youth is a mitigating circumstance which should be weighed against aggravating ones.

Fourth, by explaining that he would weigh certain mitigating circumstances along with aggravating ones, and assign weight according to his conscience and values, Mr. Phillips was agreeing to perform precisely the role dictated by the Supreme Court and the Texas Legislature which fashioned the mitigating special issue. The purpose of the fourth special issue is to provide a channel for twelve impartial strangers to express their "reasoned moral response" to whether death or life is warranted in the particular case as hand. The State challenged Mr. Phillps, not because he

was unqualified for this role, but because he revealed himself empathetic to a mitigating circumstance favorable to Garcia.

Fifth, if exclusion of jurors who are always willing to consider youth as a mitigating circumstance is acceptable, then the conclusion must be that a juror who places a high value on *any* mitigating or aggravating circumstance must be unfit.  There were jurors who said they would *not* consider youth to be a mitigating circumstance.  By this logic, they are equally unfit to serve as the juror who would.  The juror who would not consider youth to be mitigating has made a firm value judgment, and consciously chosen to discount one mitigating factor, effectively raising the relative weight of aggravating factors.

### F.   Removal of Mr. Phillips Violated the Equal Protection Clause of the Fourteenth Amendment

"The equal protection clause of the Fourteenth Amendment requires that states treat similarly situated persons alike."  *Ex parte Montgomery*, 894 S.W.2d at 329 (*citing Plyler v. Doe*, 457 U.S. 202, 102 S. Ct. 2382 (1982)).  The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "If a fundamental right is abridged or the differential treatment is based on a suspect classification, such as race, it will be subject to strict scrutiny; otherwise, it need only bear 'some fair relationship to a legitimate public purpose.'" *Ex parte Montgomery*, 894 S.W.2d at 329 (*quoting Plyler*, 102 S. Ct. at 2394-95.)

Here, the State has imposed a classification system on jurors.  Jurors who view youth as a mitigating circumstance are classified and excluded.  Jurors who do not view youth as a mitigating circumstance are classified and included.

126

### 1.     *The Strict Scrutiny Test Should Apply*

Garcia has a fundamental right to his life and liberty. Therefore the Court should apply the strict scrutiny standard of review. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973). Under this standard, a regulation discriminating against a suspect class, or in this case a fundamental interest, will be held to violate equal protection unless found to be necessary to promote a compelling state interest. A classification is necessary when it is narrowly drawn so that no alternative, less burdensome means is available to accomplish the state interest. *See, e.g., Hernandez v. Texas*, 347 U.S. 475 (1954) (discrimination against Mexican-American jury service).

"If a classification disadvantages a 'suspect class' or impinges upon a 'fundamental right,' the ordinance is subject to strict scrutiny. Under the strict scrutiny standard, we accord the classification no presumption of constitutionality. Instead, we ask whether the classification promotes a compelling governmental interest and, if so, whether the ordinance is narrowly tailored such that there are no less restrictive means available to effectuate the desired end." *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993), *cert. denied,* 114 S. Ct. 2134 (1994). Rights are fundamental if they find their source, explicitly or implicitly, in the Constitution. *Ball v. Rapides Parish Police Jury,* 746 F.2d 1049, 1059 (5th Cir. 1984).

Under this standard, in an attack on the facial validity of the statute, Garcia is required to show intentional discrimination. *See, e.g., Washington v. Davis*, 426 U.S. 229 (1976). Here, of course, the State was obviously targeting him for a capital murder conviction followed by a death sentence, based in part on eliminating jurors who viewed youth as a mitigating circumstance and might hesitate on voting for death. The State's role in challenging the juror was not passive, but entirely active. The juror was removed only because the State requested and only because the State

judge ordered.  *Cf. Louisiana v. United States*, 380 U.S. 145 (1965) (literacy test for voting invalid

on face).  Having made a showing of intentional discrimination, the burden now shifts to the state

to show that the impact of its classification of capital murder defendants is constitutionally

permissible.  *See, e.g. McCleskey v. Kemp*, 481 U.S. 279 (1987) (attempt to show by statistics that

the death sentence was unevenly imposed on blacks); *Castaneda v. Partida*, 430 U.S. 482 (1977);

*Williams v. Rhodes*, 393 U.S. 23 (1968) (barriers to new political parties against placing candidates

on ballot without compelling state interest).

Here, there is no compelling reason for imposing capital murder liability for a defendant by

excluding jurors who are willing to consider a certain mitigating circumstance possessed by the

defendant and may weight that special issue more heavily than others.  This weighing process is

precisely what the fourth special issue requires.

### 2.    *Alternatively, the Traditional Equal Protection Test Should Apply*

Alternatively, the classification imposed by the State's exclusion of jurors empathetic to a

defendant's youth fails the traditional equal protection test.  Under this test, a classification is

presumed valid and will be upheld unless the person challenging it proves that it fails to bear some

fair relationship to a legitimate public purpose.  *Royster Guano Co. v. Virginia*, 253 U.S. 412 (1920).

Here, the conspiracy law does not.  There can be no legitimate public purpose for convicting a man,

when the only punishments are death or life without parole for thirty-five years, by excluding

qualified jurors who view youthful defendants empathetically.  In fact, the presence of such jurors

ensures the "reasoned moral response" to the death penalty called for by the Supreme Court.  *See*

*generally United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) (application of

traditional equal protection in economic case).

128

### G.   Removal of Mr. Phillips Violated the Cruel and Unusual Punishment Clause of the Eighth Amendment

The Eighth Amendment, which applies to the States through the Fourteenth Amendment, *see Robinson v. California,* 370 U.S. 660, 82 S. Ct. 1417 (1962), provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend VIII.  "[T]he Eighth Amendment's prohibition of cruel and unusual punishments "'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society,'" and so admits of few absolute limitations."  *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 1000 (1992) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S. Ct. 2392, 2399 (1981) and *Trop v. Dulles,* 356 U.S. 86, 101, 78 S. Ct. 590, 598 (1958) (plurality opinion)).  The Cruel and Unusual Punishments Clause extends beyond merely the severity of a prisoner's punishment.  *Wilson v. Seiter,* 501 U.S. 294, 296-98, 111 S. Ct. 2321, 2322-24 (1991) (extending Eighth Amendment claims to claims about conditions of confinement).  "[T]he Cruel and Unusual Punishments Clause circumscribes the criminal process . . . [in that] it imposes substantive limits on what can be made criminal and punished as such."  *Ingram v. Wright*, 430 U.S. 651, 667, 97 S. Ct. 1401, 1410 (1977) (citations omitted).

"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.  It is unique in its total irrevocability.  It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.  And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity."  *Furman v. Georgia*, 408 U.S. 238, 306, 92 S. Ct. at 2760 (1972) (Stewart, J., concurring).

Imposition of death by eliminating jurors who would have favorably considered Garcia's few mitigating circumstances violates the Cruel and Unusual Punishment Clause.  Evolving standards of decency require us to apply the most severe penalties only to those who are the most culpable. This decision must be made by a fair range of jurors who can weigh aggravating and mitigating circumstances, allowing some to place more weight on a particular mitigating circumstance like youth, and others less, as called for by their values and conscience as they struggle to find their own individual "reasoned moral response" to the crime.

### H.     Garcia is Not Required to Demonstrate Prejudice for a Witherspoon Error

There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  A violation of *Witherspoon* requires automatic reversal of the death sentence.  "Where the court finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is ' "so basic to a fair trial that [its] infraction can never be treated as harmless error.'"  *Fuller v. Johnson,* 114 F.3d 491, 500 (5th Cir.), *cert. denied,* 118 S. Ct. 399, (1997) (*quoting Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 2057 (1987) (plurality opinion)); *see also Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400 (1976) (per curiam) (remanding capital case for reconsideration where a single juror was erroneously removed for bias); *but see Ross v. Oklahoma*, 487 U.S. 81 (1988).

### I.     The Fifth Circuit Has Reviewed State Decisions to Excuse Jurors With an Incorrect Degree of Deference

"A trial judge's finding of bias during voir dire is a determination of fact, subject to a presumption of correctness on collateral review, either under the old 28 U.S.C. § 2254(d), *Witt,* 469

130

U.S. at 426- 27, 105 S.Ct. at 853-54, or under the amended provisions of the AEDPA." *Fuller v. Johnson*, 114 F.3d at 500-01.  The Fifth Circuit has treated state trial court decisions to excuse a juror with deference.  *McFadden v. Johnson*, 166 F.3d 757, 758 (5th Cir. 1999).  Garcia contends that the *McFadden* level of deference does not survive the reversals of such deference to state jury selection decisions such as *Miller-El v. Dretke,* 545 U.S. 231, 251-52 (2005) ("*Miller-El II*").  And as discussed at length in previous claims above, Garcia argues that the AEDPA does not require such deference when reviewing the decision to excuse a juror in violation of *Wither spoon.*

***Claim Number 16: In the 1991 Trial, the Trial Court Improperly Granted the State's Challenge for Cause of Venireman Ernestine Ovida Whitehorn Kieke, Violating the Effective Assistance of Counsel Clause of the Sixth Amendment to the Federal Constitution.***

***Claim Number 17: In the 1991 Trial, the Trial Court Improperly Denied Defense Counsel the Opportunity to Question Venireman Ernestine Ovida Whitehorn Kieke, Violating the Effective Assistance of Counsel Clause of the Sixth Amendment to the Federal Constitution.***

|  | **Presentation to State Trial Court** | **Presentation to CCA** | **Presentation to U.S. District Court** |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 28 at 2157-60. | *Garcia v. State,* 919 S.W.2d 370, 389-90 (Tex. Crim. App. 1996)***;*** *Appellant's 1992 CCA Bf.* at pp. 18-19, claims 5-7. |  |
| **1999 WHC** |  |  | Claims 10, 11. |
| **2002 Trial** |  |  |  |
| **2003 WHC** | Garcia AWHC, Claims 48 - 49 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). |  |
|  |  |  |  |

In these two issues, Garcia challenges the 1991 trial court's removal upon the State's challenge for cause of juror Ernestine Ovida Whitehorn Kieke.  The State made four successive challenges for cause of Mrs. Kieke.  (1991 S.F. vol. 27 at 1980, 2044, 2057, 2071, and 2148.)  The trial court denied the first three, but granted the fourth.  The reason for finally excusing the juror was her perceived inability to consider fairly special issue number three.  (1991 S.F. vol. 27 at 2156-57.)  The transcript of her interview appears in the 2003 State WHC PRE at tab 23.  Garcia adopts by reference the arguments above pertaining to Mr. Phillips.

132

A.    **The Issues Are Properly Preserved and Exhausted.**

These issues were preserved at trial and presented on direct appeal.  (1991 S.F. vol. 28 at 2157-60; *See Appellant's 1992 CCA Brief,* P.R.E. at tab 11 at 18-19.)

B.    **Alternatively, The Court of Criminal Appeals Has Adopted an Unconstitutional Practice of Waiving Federal Claims, Particularly in Capital Cases.  The Court Should Therefore Treat These Issues as Exhausted.**

The Court of Criminal Appeals, on page 390 of its 1996 decision, stated that Garcia's federal claims were inadequately briefed and the court would not consider them.  Garcia, on pages 18 and 19 of his direct appeal brief, specifically asked the court to rule on his federal constitutional claims under the Sixth Amendment and additionally cited the leading Supreme Court opinion, *Wainwright v. Witt*.  As discussed earlier in this brief, all that is required to preserve an issue for federal review is to make known the federal constitutional provision or principle upon relief is sought.

Moreover, it is plain that the CCA had before it a thick brief by Garcia's attorney which explained the rules for deciding federal juror claims under *Witt* and *Morgan,* cited by the CCA during its disposition of the Juror Phillips claims.  Only by closing its collective eyes to his briefing was the CCA able to claim straightlaced that Garcia had failed to provide federal law supporting his complaint that Kieke was improperly removed.  The Court should decide these claims *de novo.*  In the absence of a state court adjudication on the merits of a petitioner's claim, to which AEDPA requires deference under 28 U.S.C. § 2254(d), the federal district court reviews the claim *de novo*. *Hatten v. Quarterman,* 570 F.3d 595, 599-600 (5th Cir. Tex. 2009).

Respectfully, the Court of Criminal Appeals has adopted a practice which the Appellate Defense Bar believes violates the Due Process Clause of the Fourteenth Amendment.  Specifically, the Court, with ever increasing frequency, is refusing to review appellate claims, holding that the

133

appellate lawyer inadequately briefed the contention.  If this Court agrees, then Garcia respectfully requests the Court to permit review on the merits of federal issues raised satisfactorily on direct state appeal for federal exhaustion purposes, but ignored by the Texas Court of Criminal Appeals.

To illustrate, in *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998), the record and issues were complicated.  The record consisted of sixty volumes and over 12,000 pages.  Mosley was represented pro bono by a well-regarded San Antonio appellate attorney.  The appellate counsel sought and obtained two extensions of time totaling six months.  When she sought a third extension, the Court held her in contempt.  The appellate counsel was conscientious, raising every legitimate issue, as she was required to do.  She drafted 173 points of error.  The Court, however, rejected 64 of these points as "inadequately briefed."

*See, e.g., ibid* at 256; *accord ibid* at 267-68 & 268 n.1 (Overstreet, J., dissenting).

What Garcia tactfully contends, is that the CCA, at least during the 1990s, was more frequently using its discretion as a tool for accelerating its docket, and sidestepping the research required to evaluate an appellant's claim and the delay that might accompany rebriefing, with the unfortunate consequence of procedurally defaulting federal claims.  If this is true, then the court's action would constitute an impermissible reason for denying an appellate's claim, especially in a capital case where heightened review is required.

A 1998 Westlaw search of opinions by the Court of Criminal Appeals containing the words "inadequately briefed" listed forty-eight cases.  Forty-two of these cases were direct appeals from **death sentences** in which the Court found claims waived for inadequate briefing.  *See, e.g., Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) (capital), *rehearing ordered* June 3, 1998; *Tuttle v. State,* 1997 WL 685979, *19 nn.10, 12 (Tex. Crim. App. Nov. 5, 1997) (en banc) (capital) (Texas

134

constitution claims); *Dunn v. State*, 951 S.W.2d 478, 480 (Tex. Crim. App. 1997) (capital) (federal and state constitutional claims); *Cantu v. State*, 939 S.W.2d 627, 643 (Tex. Crim. App.) (en banc) (capital) (vague terms in special issue), *cert. denied*, 118 S. Ct. 557 (1997); *McDuff v. State*, 939 S.W.2d 607, 621 (Tex. Crim. App.) (en banc) (capital) (interpretation of capital murder statute), *cert. denied*, 118 S. Ct. 125 (1997); *Williams v. State*, 937 S.W.2d 479, 485 (Tex. Crim. App. 1996) (capital) (juror challenges), *cert. denied*, 118 S. Ct. 631 (1997); *Jones v. State*, 944 S.W.2d 642, 656 nn.25, 28 (Tex. Crim. App. 1996) (capital) (state cruel or unusual punishment clause; disparate racial application of death penalty), *cert. denied*, 118 S. Ct. 100 (1997); *Shannon v. State*, 942 S.W.2d 591, 600 (Tex. Crim. App. 1996) (en banc) (capital) (state cruel or unusual punishment clause); *Janecka v. State,* 937 S.W.2d 456, 466 (Tex. Crim. App. 1996) (en banc) (capital) (state due process claim), *cert. denied,* 118 S. Ct. 86 (1997); *Knox v. State*, 934 S.W.2d 678, 680 n.2 (Tex. Crim. App. 1996) (capital) (greater protection of state constitution); *Matchett v. State*, 941 S.W.2d 922, 934 (Tex. Crim. App. 1996) (en banc) (capital) (greater protection of state constitution), *cert. denied*, 117 S. Ct. 2487 (1997); *Massey v. State*, 933 S.W.2d 141, 148-49 (Tex. Crim. App. 1996) (capital) (invalid portions of search warrant); *Moore v. State*, 935 S.W.2d 124, 128 (Tex. Crim. App. 1996) (en banc) (capital) (greater protection of state constitution), *cert. denied*, 117 S. Ct. 1711 (1997); *Rhoades v. State*, 934 S.W.2d 113, 119, 120 (Tex. Crim. App. 1996) (en banc) (capital) (Sixth Amendment claim; greater protection of state constitution); *Anderson v. State*, 932 S.W.2d 502 *WL p. 31 (Tex. Crim. App. 1996) (en banc) (capital) (due process) (portion unpublished), *cert. denied*, 117 S. Ct. 2517 (1997); *Aldrich v. State*, 928 S.W.2d 558, 559 n.1, 560, 561 n.2 (Tex. Crim. App. 1996) (en banc) (capital) (federal and state constitutional claims; record citations).

135

One of the forty-eight opinions followed a death penalty habeas corpus application, *Ex Parte Granger*, 850 S.W.2d 513, 515 n.6 (Tex. Crim. App. 1993) (en banc), and also found inadequate briefing.  In another, the Court found two issues by the State to be inadequately briefed.  *Thomas v. State*, 837 S.W.2d 106, 112 (Tex. Crim. App. 1992) (en banc).  One case was not on point.  The remaining ***three*** cases in which the Court found inadequately briefed points were non-capital. *See Castillo v. State*, 810 S.W.2d 180 (Tex. Crim. App. 1990) (en banc) (drug case) (finding one issue by State and one issue by Appellant inadequately briefed); *Morehead v. State*, 807 S.W.2d 577, 579 n.1 (Tex. Crim. App. 1991) (en banc) (free speech); *Long v. State*, 931 S.W.2d 285, 287 n.3 (Tex. Crim. App. 1996) (en banc) (non-capital) (finding first amendment claim adequately briefed, where Austin Court of Appeals did not).

These cases indicate that beginning in 1990, the Court dismissed far more claims on this basis.  Appellant's search found no such cases prior to 1990.

| Year | Number of Cases in Which Appellant Claims Dismissed |
|------|------------------------------------------------------|
| 1990 | 3 |
| 1991 | 2 |
| 1992 | 2 |
| 1993 | 4 |
| 1994 | 4 |
| 1995 | 10 |
| 1996 | 16 |
| 1997 | 4 |
| 1998 | 1 |
| Total | 46 |

A similar search of Fifth Circuit opinions in 1999 uncovered only five cases, ***none*** of which were criminal.  *See L & A Contracting Co. v. Southern Concrete Srvs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994); *Dardar v. Lafourche Realty Co., Inc.*, 985 F.2d 824, 831 (5th Cir. 1993); *Netto v.*

136

*Amtrack*, 863 F.2d 1210, 1215 (1989); *Elizarraras v. Bank of El Paso*, 631 F.2d 366, 372 n.14 (5th Cir. 1980); *Ramsey v. Georgia-Pacific Corp.*, 597 F.2d 890, 893 (5th Cir. 1979) (inadequately briefed claim reviewed on the merits anyway).

    ***The Due Process Clause.***  The state court's practice may violate due process.  "'Due Process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated." *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S. Ct. 2437, 2443 (1974).  The State of Texas has considerable authority to regulate how appeals will be conducted, or whether to permit appeals at all. *See McKane v. Durston*, 153 U.S. 684, 14 S. Ct. 913 (1894) (holding that the constitution does not require a State to provide appellate review). However, "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution--and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S. Ct. 830, 838 (1984).

    A Texas citizen sentenced to death has the right of automatic appeal to the Texas Court of Criminal Appeals.  This, therefore, is an appeal as of right, not discretion.  In appeals as of right, the Due Process Clause requires States to provide defendants effective appellate counsel. *Lucey*, 469 U.S. at 402, 105 S. Ct. at 839; *Douglas v. California*, 372 U.S. 353 (1963).  Even the most effective lawyer, however, is ineffective if the appellate court refuses to consider his claims on appeal.  At stake is access to the Court of Criminal Appeals and the right of every Texan to have this Court decide his legitimate claims on the merits.  The Due Process and Equal Protection Clauses undergird the right of access to the courts. *See Procunier v. Martinez,* 416 U.S. 396, 419, 94 S. Ct. 1800, 1814 (1974); *Pennsylvania v. Finley,* 481 U.S. 551, 557, 107 S. Ct. 1990, 1994 (1987).  For this reason,

the Supreme Court, in *Bounds v. Smith,* held that a prisoner's right of access to the courts required States to furnish access to adequate law libraries.  430 U.S. 817, 97 S. Ct. 1491 (1977).

The appellate court shares responsibility for assuring that an appellant receives effective review.  *Entsminger v. Iowa,* 386 U.S. 748, 752, 87 S.Ct. 1402 (1967).  There is no rational basis, for due process purposes, for denying an appellate claim for reasons completely independent of the merits of an appellant's claim, or the needs of justice in his particular case.  Denying appellate claims merely to speed cases is an arbitrary and unpredictable procedure for assuring that the constitutional and statutory rights of a litigant are fairly protected.  What is missing is an acceptable legal standard, one which satisfies due process, for distinguishing those situations which warrant rebriefing of appellate claims, from those which merit dismissal, and from those which deserve review by the Court which may have to research applicable case law on its own.  Moreover, such a standard must account that "the penalty of death is qualitatively different from a sentence of imprisonment, however long."  *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991 (1976) (plurality opinion).  "The unique nature of the death penalty not only necessitates additional protections during pretrial, guilt, and sentencing phases, but also enhances the importance of the appellate process." *Murray v. Giarratano*, 492 U.S. 1, 23, 109 S. Ct. 2765, 2777 (Stevens, J., dissenting).  "[M]eaningful appellate review" in capital cases, however, "serves as a check against the random or arbitrary imposition of the death penalty."  *Id.* (*quoting Gregg v. Georgia*, 428 U.S. 153, 195, 206, 96 S.Ct. 2909, 2935, 2940 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).  "It is therefore an integral component of a State's 'constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.'" *Murray*, 492

U.S. at 23, 109 S. Ct. at 2777 (Stevens, J., dissenting) (*quoting Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S. Ct. 1759, 1764 (1980)).

C. **Alternatively, Any Procedural Default On This Issue is Excused as a Result of Ineffective Assistance of Appellate Counsel**

Alternatively, Garcia argues that any procedural default should be excused on the basis that he had ineffective court-appointed appellate counsel who did not adequately brief the federal claims so that they met state appellate procedural requirements sufficient to avoid default.  He requests a hearing to present evidence and arguments in support of this contention.

D. **Mrs. Kieke Was Qualified and Successfully Rehabilitated by Defense Counsel Four Times**

Mrs. Kieke was questioned by both sides for over four hours.  *(See* 1991 S.F. vol. 27 at 2129-30; P.R.E. at tab 23.)  She was rehabilitated four times by the defense counsel as the prosecutor sought some reason to remove her.

The problem with the prosecutor's questions regarding special issue number three is that he did not ask Mrs. Kieke whether, in the appropriate case where the evidence proved beyond a reasonable doubt that the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.  Instead, the prosecutor's questions were framed under limited fact scenarios in which the venireman *would not have* found it reasonable to kill, without reference to provocation on the part of the deceased.

In order to inquire properly, the prosecutor should have been required to present her with a set of facts in which evidence failed to prove that the defendant's conduct in killing the deceased was unreasonable in response to provocation by the deceased.  If Mrs. Kieke could not follow the sentencing law under that proper hypothetical, then she would have been properly excused for cause.

139

When Mrs. Kieke was rehabilitated to the extent that she was willing to follow the law given to her by the trial judge, then all challenges should have been denied.  The sentencing scheme in a death penalty case is complex, and any initial confusion by a veniremember should not result in a challenge for cause.  The defendant must be afforded the chance to rehabilitate the venireman who appears to be a *Witt* excludable juror.  The trial judge's refusal to allow Garcia's attorney the opportunity to voir dire Mrs. Kieke after four successful rehabilitations resulted in the denial of effective assistance of counsel under the Sixth Amendment.

**Prejudice Analysis.**  There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  A violation of *Witherspoon* requires automatic reversal of the death sentence.  *Davis v. Georgia*, 429 U.S. 122 (1976); *but see Ross v. Oklahoma*, 487 U.S. 81 (1988).

140

**Claim Number 18: In the 1991 Trial, the Trial Judge Excused Juror, Cornelius John Collins, Jr., Who Was Opposed Generally to the Death Penalty, Thereby Violating <u>Witherspoon v. Illinois</u>.**

|  | Presentation to State Trial Court | Presentation to CCA | Presentation to U.S. District Court |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 44 at 5548-49 | *Garcia v. State,* 919 S.W.2d 370, 390 (Tex. Crim. App. 1996)*; Appellant's 1992 CCA Bf.* at pp. 19-21, claim 8. |  |
| **1999 WHC** |  |  | Claim 12. |
| **2002 Trial** |  |  |  |
| **2003 WHC** | Garcia AWHC, Claim 50 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). |  |
|  |  |  |  |

In this issue, Garcia challenges the removal for cause of venireman Cornelius John Collins, Jr. The trial court removed Mr. Collins after the State challenged him for cause because he expressed objection to the death penalty in general. (1991 S.F. vol. 44 at 5529, 5538, *see also* 5528, 5529, 5538.) The transcript of Mr. Collins' interview appears at P.R.E. at tab 26. Garcia adopts the arguments presented above pertaining to Mr. Phillips.

**Preservation of Error and Exhaustion of Remedies.** This issue was preserved at trial and presented on direct appeal. (1991 S.F. vol. 44 at 5548-49; *Appellant's Bf.* at 19-21, P.R.E. at tab 11.) Garcia specifically cited *Witherspoon v. Illinois* in his direct appeal brief. The Court of Criminal Appeals ruled on the merits of his federal claim, specifically citing *Wainwright v. Witt.* The CCA

disposed of the claim with one sentence, "Collins was properly subject to the State's challenge for cause *not because* of his views on capital punishment but because he clearly stated he would answer the special issues so as to prevent its imposition. *Garcia*, 919 S.W.2d at 390 (emphasis in original).

**Discussion.** Upon questioning by Garcia's counsel, Mr. Collins agreed that he could base is decision upon the evidence, and could determine any factual issues. He could return a verdict of guilty if supported by the evidence. He could answer "yes" to the first, second, and third sentencing special issues if supported by the evidence. (1991 S.F. vol. 75 at 27-28; vol. 44 at 5531-34.)

The difficulty began with special issue number four, the mitigation special issue. Mr. Collins was asked whether he could answer "no" to this question "if there are no sufficient mitigating circumstances." *E.g.* 1991 vol. 44 at 5535. While he could answer the first three issues yes or no as the fact and law dictated, Mr. Collins said that he could not answer the fourth issue in favor of the State because of his general opposition to the death penalty. (1991 S.F. vol. 44 at 5538, 5543-44.) The State promptly argued that he was disqualified because of his inability to follow the law. The trial court and CCA agreed.

The matter is not as simple as that. First, unlike the first three issues, the fourth special issue does not have a burden of proof assigned. Consequently neither party has a burden of production of evidence on the issue. Lacking a burden of proof, the state was not in a position to argue that it was *entitled* to a juror who would follow the law in a manner to its favor because the state had no corresponding *duty* to prove the absence of mitigating evidence.

Second, the mitigation special issue differs from the other three issues in that it calls directly upon the juror's individualistic and personal set of values. This is because the special issue asks jurors to define and assess "mitigating circumstances," leaving it to the juror alone to determine what

142

constitutes a mitigating circumstance.  Consequently, when a juror is asked before trial begins to decide what or whether mitigation circumstances would call for a "no" answer – that is, what personal value the juror will assign – the juror's only logical response is to supply that mitigating circumstance / personal value which comes to mind, which in the instance of Mr. Collins was his general *Witherspoon* opposition to the death penalty.  The question asked of Mr. Collins was whether he possessed at the moment a personal value or defined mitigating circumstance in a way which compelled a "no" answer.  He responded that as he sat there he did not.  The proper question was whether Collins could and would follow the instruction provided to him and answer the question based on the evidence presented when the time came.  Mr. Collins responded that he could:

> [Defense]: . . . I just need to know whether or not you would, if picked as a juror, whether or not you would ignore your oath, violate your oath, and answer that question if there were no sufficient mitigating circumstances, that you would violate your oath as a juror and answer that question yes.

> [Objection]

> [Mr. Collins]: I wouldn't – I wouldn't – what I would find, I'm sure, is a sufficient mitigating circumstance that would enable me to answer yes. . . . That's what I'm sure I would be able to find.

> [Defense]: And in other words, you're going to do everything you can to follow your oath?

> [Mr. Collins]: Oh, sure.  Certainly.

> 1991 SF 44:5539-40 (defense interjection omitted).

> [Mr. Collins]: I'll answer it as I answered it before.  I will find sufficient mitigating circumstances.  There would be.  I would answer the question yes. . . I would find – well, I'll find some kind of significant mitigating circumstances to warrant that where I'm not violating my oath as a juror.

> [Mr. Collins]: Well, I wouldn't create one [mitigating circumstance], certainly not, but I feel confident that I could find one in the evidence presented. . . . .

143

[Defense]: That you could probably come up with one legitimately out of the evidence.  Is that right?

[Mr. Collins]: That is true.

[Defense]: Therefore you would not be violating your oath either way?

[Mr. Collins]: That's right.
1991 SF 44:5543-45 (defense interjections / questions omitted).

What Mr. Collins was explaining was that *he would* read the special issue, *he would* follow the dictates of the special issue, *he would* follow his oath to render a true verdict, and *he would* answer the special issue as the question required given the instructions and the law.  This is all the Supreme Court requires.  But the state wants something more – it demands a juror who will commit to the possibility of answering the special mitigation issue "no."  The Supreme Court has never required this.  At the moment of jury selection, Mr. Collins explained that he predicted he would answer the issue "yes," anticipating that he would find sufficient mitigating circumstances to justify it.  His response is merely the flip side of the more common jurors who said they would answer the special issue "no" because they could not visualize any mitigating circumstance justifying a life sentence.  Their response reflects their personal value judgment, just as Mr. Collins'.

The Supreme Court has held that "The jury is given broad discretion to decide whether or not death is 'the proper penalty' in a give case, and a juror's general views about capital punishment play an inevitable role in any such decision."  *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty, or expressed conscientious or religious scruples against its infliction."  *Id*. at 522.

144

Special issue number four was unique in this case because it was submitted by agreement of the parties and not mandated at the time by Texas Code of Criminal Procedure article 37.071.  The fact that a prospective juror would find some mitigating circumstance which would warrant answering "yes" is not sufficient to excuse him for cause in violation of *Witherspoon v. Illinois.*

*Prejudice Analysis.*  There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  A violation of *Witherspoon* requires automatic reversal of the death sentence.  *Davis v. Georgia*, 429 U.S. 122 (1976); *but see Ross v. Oklahoma*, 487 U.S. 81 (1988).

*Claim Number 19: In the 1991 Trial, the Trial Court Improperly Excused Venireman General A. Adam Gallo on Grounds that he Would Always Find a Mitigating Circumstance When Answering Special Issue Number Four, Thereby Violating Witherspoon v. Illinois.*

|  | Presentation to State Trial Court | Presentation to CCA | Presentation to U.S. District Court |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 38 at 4279-81 | *Garcia v. State,* 919 S.W.2d 370, 390-91 (Tex. Crim. App. 1996)*; Appellant's 1992 CCA Bf.* at pp. 22-23, claim 9. | |
| **1999 WHC** | | | Claim 13 |
| **2002 Trial** | | | |
| **2003 WHC** | Garcia AWHC, Claim 51 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). | |
| | | | |

In this issue, Garcia challenges the removal of venireman General A. Adam Gallo.  Mr. Gallo

is a retired U.S. Army General who served in the Korea and Vietnam wars. 1991 SF 38 at 4252.  He

is familiar with death in war.  *Id.*

The prosecutor, who did not serve in the military, asked a question which should never be

asked of service members, "You have shot people and people have shot at you?"  1991 SF 38 at

4252.  Gen. Gallo politely answered, "Yes."  *Id.*  General Gallo said he preferred to put the taking

of human life behind him and did not feel he could be fair given his war experiences and desire to

see no more deaths.  1991 SF 38 at 4254-55.  The state challenged him for cause.

Once the jury decision making process, guided by special issues, was explained to him, Gen.

Gallo, however, he responded that he could assess the evidence, follow the legal instructions, and

answer the special issues:

> [Defense]: But could you just take a look at the evidence, not - because we're
> going to get to it in a second [the sentencing phase].  If you can find a man guilty if
> you prove beyond a reasonable doubt that he did it, there ain't no question in your
> mind, there's not a doubt in your mind he did it, are you going to be able to say he
> did it and return a verdict of guilty?

> [Gen. Gallo]: Yes.

> [Defense]: On that issue alone?

> [Gen. Gallo]: Yes.   1991 SF vol. 38 at 4267.

Further, Gen. Gallo explained that he could certainly answer the first three special issues:

> [Defense]: If those facts are proven to you beyond a reasonable doubt based
> upon the presentation of evidence, and that means that a yes answer should be there,
> because that's what the law says, could you follow your oath and say yes to them
> because the evidence compelled it beyond a reasonable doubt on these three issues?

> [Gen. Gallo]: Yes.      1991 SF 38 at 4274.

146

Further, Gen. Gallo, once the fourth special issue on mitigation was explained to him carefully, said he could answer it yes or no as the evidence and law dictated:

> [Defense]: . . . You're entitled to levy a reasoned moral response here, your feelings and attitudes.  This is where it all comes in and you can let them all out right here on the question and you're entitled, as long as you follow the law and make sure in your mind that you've taken into consideration all of the evidence and you feel that there is a sufficient mitigating circumstance that would warrant a life sentence, you can sign off yes for whatever reason that you feel equates to a mitigating circumstance that's sufficient.  Could you do that?
>
> [Gen. Gallo]: If there were sufficient mitigating circumstances.
>
> [Defense]: Okay, but –
>
> [Gen. Gallo]: But in the case where there's not –
>
> [Defense]: Okay.  That's my last question.
>
> [Gen. Gallo]: Absolutely.  Because now we're talking about if there is no – no mitigating circumstances, there's no way.  Me as a juror, I'd have to answer that no.
>
> 1991 SF 38 at 4276.
> . . .
> [Defense]: . . . [T]hat in the appropriate case where there clearly is no sufficient mitigating circumstance in your mind, however small, slight, that chance may be, but if that case does come up and the evidence clearly says there is no mitigating circumstance that is sufficient in your mind -- remember, we're talking about your mind -- there is none and you clearly know that and you look at the evidence and say, man, there is none.  Could you answer that question [fourth special issue on mitigation] no?
>
> [Gen. Gallo]: Of course.
>
> [Defense]: And so essentially by that process you can take a look at all of these questions that we've covered, evaluate the evidence, and base your decision, follow the law, and base your decision on the evidence; is that correct?
>
> [Gen. Gallo]: Yes.      1991 SF 38:4278.

The trial court granted the state's cause motion because the court asked whether Gen. Gallo would always find a mitigating circumstance in answering special issue number four.  1991 S.F. vol. 38 at 4278-79.  He said yes.  *Id.*

> [Court]: Mr. Gallo, let me see if I understand.  Because you've made your – you've made your opinions quite clear, but assuming in this hypothetical case we've been batting around that you have found the defendant guilty, the jury has found the defendant guilty, and that the answer to questions one, two, three are yes, you found that beyond a reasonable doubt that the conduct was committed deliberately and so forth or that there is – well, we refer to it as future dangerousness, that the response to any provocation was unreasonable, and now we're talking about the fourth question which is mitigation.  Are you saying that any mitigating circumstance whatsoever is going to be sufficient in your mind simply because you have such a bias against participating in the death – participating on a jury in a capital case, that you're going to answer that question yes, that there's always going to be sufficient mitigating circumstance?

> [Gen. Gallo]: Yes.

> [Court]: I'll grant the challenge for cause.  1991 SF 38:4278-79.

What occurred here is that the court concluded, mistakenly, that because Gen. Gallo possessed a set of values, at the moment of jury selection, which defined or assessed "mitigating circumstance" to exist, that he was not qualified to serve as a juror.  In other words, unless he committed to answering "no" to the special issue, thereby affirming that he currently possesses a personal value which defines "mitigating circumstances" not to exist in certain capital murders trials, then he is not qualified.  Or in another words, the state is entitled to a juror who possesses a personal value which defines "mitigating circumstances" not to exist in certain capital murders trials.  As discussed above, the Supreme Court has never said that the state is entitled to a juror possessing the personal value that there are certain capital murder cases in which no mitigating circumstances exist.  The Supreme Court has only required that the prospective juror review the evidence proffered,

148

follow the jury instructions provided, and truthfully answer the questions provided in accordance with the evidence, guided by the instructions.  Gen. Gallo said he would do this.  Gen. Gallo was precisely the type juror anticipated by *Witherspoon*.  He had general concerns about the death penalty, but he was willing to perform his duty, consider the evidence, and answer the special issues truthfully.  His only sin, according to the court and state, is that he predicted his answer to mitigation special issue would be "yes."

Garcia adopts the arguments presented above pertaining to Mr. Phillips and Mr. Collins.  The transcript of Gen. Gallo's interview appears at 2003 State WHC P.R.E. at 24.

***Preservation of Error and Exhaustion of Remedies.***  This issue was preserved at trial and presented on direct appeal.  (1991 S.F. vol. 38 at 4279-81; *Appellant's Bf. at 22-23*, P.R.E. at tab 11.)  The Court of Criminal Appeals reviewed the merits of Garcia's federal claim, specifically citing *Wainwright v. Witt.*  The CCA wrote, "Gallo opposed the death penalty and testified his past experiences as an army general and combat veteran would prevent him from being a fair and impartial juror."  *Garcia*, 919 S.W.2d at 390.  Selectively quoting General Gallo, the CCA listed justifications for removing him:

- "Gallo indicated he could return a verdict of guilty 'if they prove beyond a reasonable doubt, there ain't no doubt in your mind that appellant committed the crime.'" *Id.*

- "During voir dire, Gallo initially testified he could not answer the first three special issues in such a way as to result in imposition of the death penalty." *Id.*

- "Later, he indicated he could answer the special issues based on the facts.  However, in response to a question asked by the court, Gallo stated he would answer special issue three in the affirmative as he would always find there to be sufficient mitigating evidence." *Id.*

149

***Discussion.***  The prosecutors challenged Mr. Gallo on the theory that he would not be able to answer special issue four in the State's favor under any circumstance, and therefore could not be a fair and impartial juror.  (1991 S.F. vol. 38 at 4255, 4269.)  Mr. Gallo, however, said that he could return a verdict of guilty if proved beyond a reasonable doubt.  (1991 S.F. vol. 38 at 4267.)  He also said that answer the first three special issues in favor of the State if proved by the evidence.  (1991 S.F. vol. 38 at 4274.)

[Defense]: If those facts are proven to you beyond a reasonable doubt based upon the presentation of evidence, and that means that a yes answer should be there, because that's what the law says, could you follow your oath and say yes to them because the evidence compelled it beyond a reasonable doubt on these three issues?

[Mr. Gallo]: Yes.

On the fourth special issue, he said that he could answer it "no" in favor of the State.  (1991 S.F. vol. 38 at 4278.)  Finally, Mr. Gallo said that he could base his decision on the evidence and the law given to him.  (1991 S.F. vol. 38 at 4278.)

The trial judge nonetheless excused Mr. Gallo for cause, finding that he would always find a mitigating circumstance in the fourth special issue.  (1991 S.F. vol. 38 at 4279.)

***Prejudice Analysis.***  There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  A violation of *Witherspoon* requires automatic reversal of the death sentence.  *Davis v. Georgia*, 429 U.S. 122 (1976); *but see Ross v. Oklahoma*, 487 U.S. 81 (1988).

***Claim Number 20: In the 1991 Trial, the Trial Court Improperly Excused
Venireman Richard Eugene Wycoff on Grounds that he Would Always Find a
Mitigating Circumstance When Answering Special Issue Number Four, Thereby
Violating Witherspoon v. Illinois.***

|  | **Presentation to State Trial Court** | **Presentation to CCA** | **Presentation to U.S. District Court** |
|---|---|---|---|
| **1991 Trial** | 1991 S.F. vol. 47 at 5906-07 | *Garcia v. State,* 919 S.W.2d 370, 391 (Tex. Crim. App. 1996)*; Appellant's 1992 CCA Bf.* at pp. 24-25, claim 10. | |
| **1999 WHC** | | | Claim 14 |
| **2002 Trial** | | | |
| **2003 WHC** | Garcia AWHC, Claim 52 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). | |
| | | | |

In this issue, Garcia challenges the removal for cause of venireman Richard Eugene Wycoff as a violation of *Witherspoon v. Illinois*.  Mr. Wycoff's transcript appears at P.R.E. at tab 25.

***Preservation of Error and Exhaustion of Remedies.***  This issue was preserved at trial and presented on direct appeal.  (1991 S.F. vol. 47 at 5906-07; *Appellant's Bf at 24-25,* P.R.E. at tab 11.)  The Court of Criminal Appeals ignored Garcia's federal claim, neither commenting nor declaring it procedurally barred.  Therefore, as discussed, the federal district court may review the issue *de novo.*  The CCA wrote, "Wycoff testified that, due to his religious or personal beliefs against the death penalty, he could not answer the special issues in such a way so as to allow imposition of the death penalty.  He testified that he would always answer special issue three in the affirmative *unless*

151

appellant testified he committed the murder or *unless* at least *two* eyewitnesses testified appellant committed the murder."  *Garcia*, 919 S.W.2d at 391.

   ***Discussion.***   The State challenged for cause Mr. Wycoff on grounds that he was biased against the law on the basis that he could not answer in favor of the State on the fourth special issue if there were no eyewitnesses to the crime.  (1991 S.F. vol. 47 at 5890.)  Upon questioning by Garcia's lawyer, however, Mr. Wycoff said that he "could vote the death penalty."  (1991 S.F. vol. 47 at 5900.)  He could also answer in favor of the State on the first three special issues if supported by the evidence.  (1991 S.F. vol. 47 at 5900-01.)  On the final mitigating special issue, he said that he could answer that issue truthfully under oath.  (1991 S.F. vol. 47 at 5902-03.)  Nevertheless, the trial judge removed the juror.  (1991 S.F. vol. 47 at 5906-07.)

   The trial court also failed to ask Mr. Wycoff the critical question: whether in the appropriate case where no or insufficient mitigating circumstances were found would he follow the law and return a "no" verdict on special issue four in favor of the State?

   ***Prejudice Analysis.***   There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  A violation of *Witherspoon* requires automatic reversal of the death sentence.  *Davis v. Georgia*, 429 U.S. 122 (1976); *but see Ross v. Oklahoma*, 487 U.S. 81 (1988).

### *CHALLENGES TO THE PROCEDURES USE TO SELECT JURY*

*Claim Number 21: The Grand Jurors Who Indicted Garcia Were Selected in a Racially Discriminatory Manner, Violating the Equal Protection Clause of the Fourteenth Amendment.*

|  | **Presentation to State Trial Court** | **Presentation to CCA** | **Presentation to U.S. District Court** |
|---|---|---|---|
| **1991 Trial** | C.R. at 352-53; S.F. vol. 11 at 786. | *Garcia v. State*, 919 S.W.2d 370, 393(Tex. Crim. App. 1996)*;* *Appellant's 1992 CCA Bf.* at pp. 33-34, claim _____. |  |
| **1999 WHC** |  |  | Claim 28. |
| **2002 Trial** |  |  |  |
| **2003 WHC** | Garcia AWHC, Claim 68-69 (Apr. 15, 2003); rejected in 2008 state trial court F&Cs at pp. 2-3. | *Ex parte Garcia*, No. 40,214-02, pp. 3-4 (Tex. Crim. App. Oct. 15, 2008) (unpublished). |  |
|  |  |  |  |

In this issue, Garcia contends that the grand jurors who indicted him were selected in a racially discriminatory manner.

**Preservation of Error and Exhaustion of Remedies.** This issue was preserved at trial and presented on direct appeal. The trial court denied Garcia's motion to quash the indictment. (1991 C.R. at 352-53; 1991 S.F. vol. 11 at 786; *Appellant's Bf.* at 33-34, 2003 State P.R.E. at tab 11.) The Texas Court of Criminal Appeals reviewed this federal claim on the merits. *Garcia*, 919 S.W.2d at 393; 2003 State P.R.E. at tab 2.

153

*Summary of Events*   At a pretrial hearing on his motion to quash the indictment, two witnesses testified.  The first was Johnny C. Rutledge, a grand jury commissioner appointed to select the grand jurors in Garcia's case.  The second was Ms. Hannah Kunkle, the District Clerk of Collin County.

The grand jury commissioners were appointed on November 2, 1990.  (1991 S.F. vol. 75 at 23: 1991 C.R. at 391.)  All were white.  (1991 S.F. vol. 11 at 783.)  The grand jurors chosen in Garcia's case were sworn and impaneled on January 7, 1991.  (1991 S.F. vol. 75 at 22.)

Texas created procedures for selecting the grand jury.  Collin County did not comply with all requirements.  For instance, Texas Code of Criminal Procedure article 19.01(a) provided that the District Judge shall appoint not more than five jury commissioners.  Tex. Code Crim. Proc. Art. 19.01(a) (Vernon 1991).  Mr. Rutledge testified that six commissioners were present in selecting the names of the grand jurors.  (1991 S.F. vol. 10 at 698, 700.)  Moreover, the commissioners selected grand jurors from only a voter registration list, not from the county's latest tax assessment roll as required by Code of Criminal Procedure 19.04.  (1991 S.F. vol. 10 at 704, 743-44.)  In addition, the names of those selected as grand jurors were not delivered by the commissioners to the district judge in open court as required by Code of Criminal Procedure article 19.09.  (1991 S.F. vol. 10 at 724-25.)  Nor were the names delivered by the district judge to the district clerk in open court as required by article 19.10.  (1991 S.F. vol. 10 at 725.)  Nor is there any indication that the commissioners gave any consideration to the race, sex, or age of the grand jurors as required by article 19.06.  (1991 S.F. vol. 10 at 725.)  The commissioners were not provided with the names of those appearing from court records to be exempt or disqualified, thereby violating article 19.04.  (1991 S.F. vol. 10 at 704, 744-45.)

154

Mrs. Kunkle assumed office in January 1, 1987.  (1991 S.F. vol. 10 at 727.)  She explained that the only documentation furnished to the district judges of Collin County by the district clerk's office for use by the grand jury commissioners as part of the grand jury selection process was a list of those who had served previously as grand jurors.  (1991 S.F. vol. 10 at 743.)  She also confirmed that the tax assessment rolls have never been furnished to any grand jury commissioners during her tenure.  (1991 S.F. vol. 10 at 744-45.)

*Trial Court Findings and Conclusions.*  Following the hearing, the trial court rendered written findings of fact and conclusions of law, which appear in the record at 1991 C.R. vol. 3 at 424.  The trial judge found that:

- "The clerk furnished them the necessary stationary, the names of those appearing from the records of the Court to be exempt or disqualified from serving on the jury."

- "There is no conclusive evidence that the commissioners were not provided with the last assessment roll of the county."

- "Nevertheless, [Johnny Rutledge, one commissioner] also testified that he did not consider selecting Grand Jurors who represented a broad cross-section of the population of the county considering the factors of race, sex and age."

- "There is no evidence that the non-testifying commissioners did not, to the extent possible, select as grand jurors persons who they determined to represent a broad cross-section of the population of the county considering the factors of race, sex and age."

- "There is no evidence that the commissioners, as a body, did not, to the extent possible, select Grand Jurors who the commissioners determined represented a broad cross-section of the population of the county, considering the factors of race, sex and age."

- "There is no evidence that the Defendant was harmed by the selection procedures employed by the grand jury commissioners."

- "There is no evidence that there has been a virtual exclusion of Hispanics on grand juries in Collin County, Texas for a substantial number of years."

155

- "With respect to the Grand Jury that indicted the Defendant herein, the evidence shows that one of the grand jurors selected was white.  There is no evidence of the race of the other 11 grand jurors selected."

- "The Defendant is a member of a recognizable, distinct class, namely, Hispanic.

- "The Grand Jury which returned the indictments herein was not selected in a racially discriminatory manner."

    (1991 C.R. vol. 3 at 424-27.)

*Discussion.*  The Fourteenth Amendment prohibits the selection of grand jury venires, that is, the panel from which the grand jurors are eventually chosen, in a discriminatory manner which gives rise to disproportionately unrepresentative results.  *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).  *Castaneda* created a three-part test for proving racial discrimination

- The group alleged to have been excluded is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied";

- The group has been under represented in the grand or petit jury venires over a significant period of time;

- The State employs a selection procedure "that is susceptible to abuse or is not racially neutral" *Id.* at 494.

In addition, unlike under the Sixth Amendment, the petitioner must show that the State intended to discriminate.  *Duren v. Missouri*, 439 U.S. 357, 368 n.26 (1979).

Garcia contends that statistical evidence is not necessary here.  The conduct of the grand jury commissioners can establish a prima facie case without reference to statistical or historical evidence.  *See Cassell v. Texas*, 339 U.S. 282 (1950).  Certainly that is the case here.  The commissioners received no instruction or information as to the consideration of age, sex or race as a factor in selecting grand jurors.  (1991 S.F. vol. 10 at 713, 722-23.)  Therefore, the State cannot contend that

the commissioners had any desire to assure a racially balanced grand jury.   Nor did the commissioners discuss the type of person to be selected.  (1991 S.F. vol. 10 at 718.)

Garcia contends that the equal protection clause imposes on Texas an affirmative duty to provide those selecting grand jury members with statistical information about the racial makeup of the community, and the ability to consider race with identifying features in the data base of potential grand jurors.  Without such information, the grand jury selection process behind Garcia's indictment fatally violated the equal protection clause.

***Prejudice Analysis.***  There are certain types of constitutional violations which do not require a showing of prejudice or harm to the petitioner in a federal habeas corpus application.  Claims of racial under representation fall into this category.  If racial discrimination occurs in the selection process of the grand or petit jury, the conviction must be reversed notwithstanding "overwhelming" evidence of guilt.  *Vasquez v. Hillary*, 106 S. Ct. 617, 622 (1986).

***Claim Number 22: The Trial Court Conducted Voir Dire Examination of Eleven Jurors Without the Presence of Garcia or his Attorney, Violating the Due Process Clause of the United States Constitution.***

***Claim Number 23: The Trial Court Conducted Voir Dire Examination of Eleven Jurors Without the Presence of Garcia or his Attorney, Violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.***

***Claim Number 24: The Trial Court Conducted Voir Dire Examination of Eleven Jurors Without the Presence of Garcia or his Attorney, Violating the Confrontation Clause of the Sixth Amendment to the United States Constitution.***

In this unusual claim, Garcia contends that the trial court improperly conducted trial proceedings in his absence.  He was absent from the questioning and oath of eleven veniremen.  Although he and his lawyer later agreed to waive the error, it appears that the presence of the defendant at this stage cannot be waived without violating the constitution.

***Preservation of Error and Exhaustion of Remedies.***  There was an attempt to waive this issue at trial, but it was presented on direct appeal in the same fashion as presented here.  (*See 1991 Appellant's Bf.* at 39-40; 2003 State Habeas P.R.E. at tab 11.)  The Court of Criminal Appeals neither reviewed the federal claim on the merits, nor found the claim procedurally defaulted under state rules.  *De novo* review is therefore appropriate.

***Statutory Entitlement Right Granted by Texas Statute and Common Law.***  Texas law provided that "In all prosecutions for felonies, the defendant must be personally present at trial . . . ." Tex. Code Crim. Proc. Art. Ann. 33.03 (Vernon 1991).  The Court of Criminal Appeals held that "an accused's right to be present at his trial is unwaivable until such time as the jury has been selected." *Miller v. State*, 692 S.W.2d 88, 91 (Tex. Crim. App. 1985).  In *Miller v. State*, the court concluded that the jury had been "selected" for article 33.03 purposes when the parties handed in their respective jury lists.  *Id.* at 93.

158

*Events.*  In Garcia's case, on August 21, 1991, the trial court swore and questioned approximately eleven prospective jurors about their qualifications.  (1991 S.F. vol. 17 at 3 *et seq.*) (*Note:* S.F. vol. 17 given here is the number assigned by someone other than court reporter.  The actual volume  S.F. is unnumbered and contains the August 29, 1991 hearing.  A copy appears at 2003 State Habeas P.R.E. tab 17.)  The court did so without waiting for Garcia or his lawyers to be present.  (1991 S.F. vol. 17 at 1; *See* 2003 State Habeas P.R.E. tab 17.)  The questioning by the trial judge occurred nine days after the general venire questioning by the trial judge on August 12, 1991 and prior to beginning individual voir dire on September 9, 1991.  (1991 S.F. vol. 15 at 1; vol. 19 at 1.)  On August 21, 1991, the trial judge found all eleven jurors qualified.  None claimed their exemption.  (1991 S.F. vol. 17 at 28.)

Sometime later everyone recognized the mistake.  The trial judge conducted a hearing. Garcia and his lawyer and the trial judge placed on the record the explanation for Garcia's absence from the August 21 voir dire.  (1991 S.F. vol. 17 at 28-30.)  Garcia and his attorney both agreed to waive any rights to appear at the August 21 hearing and waived any error in the proceedings.  (1991 S.F. vol. 17 at 30-31.)

The State recognized that there was still a fatal error in the proceedings and tried to restart voir dire.  On August 27, 1991, the State filed a motion to quash the special venire.  (1991 C.R. at 667-68.)  The State argued that the absence of Garcia from the August 21 proceedings required the special venire to be excused and another summoned.  (*See* lengthy discussion, 1991 S.F. vol. 17 or unnumbered S.F. of Aug. 29, 1991 hearing, at 2-6; State Habeas P.R.E. tab 17.)  The trial court held a hearing.  Garcia opposed the State's request.  (1991 S.F. vol. 18 at 8.)  The trial court denied the State's motion to quash.  (1991 C.R. at 668.)

The trial judge revisited the issue before beginning individual voir dire on September 9, 1991.  (1991 S.F. vol. 19 at 2-14.)  The record was updated to record that Garcia's second attorney was also absence from the August 21 voir dire proceedings.

*Discussion.*  "The right to be present at trial is actually an expression of the right to confrontation."  *Weber v. State*, 829 S.W.2d 394, 396 (Tex. App.--Beaumont 1992, ___) (citing the Sixth Amendment and Texas Constitution).

Garcia argues that the proceedings on August 21, 1991 in his absence denied him the right to confront prospective jurors.  It also denied him the due process right to observe and participate in events highly important to his trial.  He contends that his right to be present at voir dire is one which cannot be waived.  The reason is because his voluntary absence occurred before the jury had been selected.  In a capital case, the jury is not "selected" for article 33.03 purposes until the twelfth juror is accepted.  In this case, the twelfth juror was not accepted until November 15, 1991.  (1991 S.F. vol. 63 at 7948.)

The *Weber* case by the Beaumont Court of Appeals held that claims of the denial of the right of confrontation are subject to a harmless error analysis.  Garcia contends that violations of the Sixth and Fourteenth Amendments rights to confrontation of jurors and due process in the voir dire process are so grave that no harmless error test should be applied.  Moreover, under a federal constitutional analysis, Garcia argues that these violations are not waivable by a capital murder defendant.

160

**SENTENCING ISSUES**

***PERIPATETIC PRISON SPECIALIST ROYCE SMITHEY***

***Claim Number 25: State Prosecutors Introduced Evidence That Texas Does Not Provide Adequate Prison Guard Staffing, Which Therefor Leads to More Violence in Prison. The State Used This Evidence to Argue That Because of its Lack of Staffing, Mr. Garcia Should Be Executed. This Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.***

***Claim Number 26: State Prosecutors Introduced Evidence That Texas Does Not Provide Adequate Prison Guard Staffing, Which Therefor Leads to More Violence in Prison. The State Used This Evidence to Argue That Because of its Lack of Staffing, Mr. Garcia Should Be Executed. This Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.***

***Claim Number 27: State Prosecutors Introduced Evidence That Texas Does Not Provide Adequate Prison Guard Staffing, Which Leads to More Violence in Prison. The State Used This Evidence to Argue That Because of its Lack of Staffing, Mr. Garcia Should Be Executed. This Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution.***

***Claim Number 28: If the Court Determines that These Issues Have Been Procedurally Defaulted by Trial or Direct Appeal Counsel, then Mr. Garcia Asserts a Claim for Ineffective Assistance of Counsel For Trial and Appeal In Violation of the Sixth Amendment.***

In his first arguments, Mr. Garcia claims that it is unconstitutional for the Government to ask for his execution on grounds that the Government is unwilling to hire enough guards who will follow TDCJ-ID's internal procedures and build the facilities necessary to provide a secure prison. The Government argued that Mr. Garcia would display good behavior in prison as a subterfuge for seeking the opportunity to commit violence. By its actions, therefore, the Government placed Mr. Garcia in a no-win situation: if he presented evidence that he would not be violent in the future, then the Government contended that it was merely a subterfuge for seeking violent opportunities. If he presented evidence of future violence, the Government countered by arguing that its guards did not always follow its internal security procedures and was not willing to hire the guards necessary for

adequate staffing or construct the facilities needed for sufficient administrative segregation. Executing Texans as a cost-savings measure must surely violate the constitution.

These claims were exhausted.  They were included in Garcia's timely filed 2003 state habeas application, later denied by the CCA without comment.

### A. Introduction to Royce Smithey, State Expert Who Told Jurors That TDCJ-ID is Understaffed and Underfunded, and Guards Do Not Follow the Rules, Therefore Mr. Garcia Will Be More Violent.

The State concluded its case by presenting an official from TDCJ-ID, **Royce Smithey**, the peripatetic TDCJ-ID prison investigator who now testifies in almost every Texas capital trial.  (2001 RR vol. 34 at 17-18, 57-58.)  His job is to investigate and help prosecute inmates who commit crimes in prison.  Mr. Smithey reviewed the videotape sponsored by Defense expert witness, Dr. Walter Quijano.  Recall that the tape showed the movement and control of prisoners in the administrative segregation section, and emphasized the tight control over inmates by TDCJ-ID.  The thrust of Mr. Smithey's testimony was that under the right conditions a capital murder inmate with one escape attempt could be relocated from administrative segregation to general population in a medium security unit.  The Defense objected that Mr. Smithey did not satisfy Rules 701 or 702 or *Daubert* standards.  (2001 RR vol. 34 at 52-53, 67, 69, 75, 76.)  Moreover, Mr. Smithey's testimony repeated Dr. Quijano's who candidly told jurors at length that TDCJ-ID is full of dangerous people who commit crimes.  (RR vol. 34 at 53-54.)

Mr. Smithey, oddly enough, told jurors that TDCJ-ID often does not comply with its internal procedures.  Therefore, the control is not as tight as one would hope.  (Rule 701 hearing: RR vol. 34 at 21-23.)  He said that TDCJ-ID often fails to follow its policies and guidelines.  Therefore, it cannot control its inmates, allowing them the opportunity to hurt guards or other inmates.

162

For instance, Mr. Smithey said that under staffing is a serious and common problem.  (Rule 701 hearing:  R.R. vol. 34 at 22-23.)  In his Rule 701 hearing away from jurors, Mr. Smith said that although there are strict guidelines in place for moving inmates in administrative segregation, "it's my experience that, unfortunately, on a day-to-day basis that doesn't always happen that way."  (Rule 701 hearing: R.R. vol. 34 at 21.)  "[Y]ou just don't have the personnel.  Most units are shorthanded.  You have other activities that could be going on at the same time that requires officers to be some other place than what they may be assigned during that particular day or that particular hour."  (Rule 701 hearing:  R.R. vol. 34 at 21-22.)  "So . . . there's just a combination of things that could cause the transferring of an inmate to be somewhat different that what maybe procedure calls for."  (Rule 701 hearing:  R.R. vol. 34 at 22.)

Here is what Mr. Smithey explained to jurors about TDCJ-ID's inadequate staffing and how it makes the prison more dangerous:

> PROSECUTOR:  Mr. Smithey, in your experience having investigated these kinds of offenses in virtually -- I guess you'd say most of the prisons in the State of Texas, is administrative segregation in the different prisons, is it usually full, sometimes full, never full?  What have you seen?
>
> MR. SMITHEY:  *There have been occasions when administrative segregation has been full.  Yes, sir.*
>
> PROSECUTOR:  Now, I guess between administrative segregation and general population is close custody; is that right?
>
> MR. SMITHEY:  Yes, sir.  Close custody status, which is the step right before administrative segregation.
>
> PROSECUTOR:  *Now, if -- if we have a situation where you have a – a shortage of cells.*  Say you got one cell and got two inmates that potentially could be put in it, one who you know is a chronic rules violater, is a current threat to prison security at the time.  Now, let's say he's just convicted of forgery, some other felony offense, and

you've got somebody convicted of capital murder.  I mean, which -- person doesn't have disciplinaries – which person is going to get that cell?

MR. SMITHEY: ***Well, if he doesn't have any disciplinaries, may not be any reason to put him in administrative segregation.  So the person with the disciplinary problem would go to administrative segregation.***

PROSECUTOR:  So it doesn't matter what the nature of the crime was, doesn't matter, you know, what they have done in the past.  It only matters now, what you're doing now, that gets you put in ad seg?

MR. SMITHEY:  What you've done in the past could certainly be a determining factor, but what the prison system is concerned with is your -- your current behavior, what you're doing right now.

PROSECUTOR: So let's say this -- let's say we get into a situation where, even same scenario, you've got a guy charged with forgery or some other felony offense.  He's a current rule violater, disciplinary problem, and you've got a person charged with capital murder who also has an escape history.  Is the – is your answer going to be the same?  Is the current disciplinary problem still going to be the one who gets the cell?

MR. SMITHEY:  Yes, sir.

(R.R. vol. 34 at 83-85) (emphasis added).


Mr. Smithey said that when he investigates crimes in TDCJ-ID, he commonly traces the

problem back to a failure by TDCJ-ID guards to follow the proper internal procedures.  (Rule 701

hearing: 2001 R.R. vol. 34 at 22.)  Here is what he told jurors:

PROSECUTOR:  Now, in investigating those types of offenses, have you had to review the security procedures that were used and whether or not they were followed?

MR. SMITHEY:  Yes, sir.

PROSECUTOR:  Now, on that particular tape where it shows -- it shows, like, two guards escorting an inmate to a rec yard that's enclosed within the pod or feeding -- two inmates feeding -- excuse me -- two guards feeding inmates inside a cell.  I mean, are those ideal conditions?

164

MR. SMITHEY:  Yes, sir.

PROSECUTOR:  Are those the ideal security procedures?

MR. SMITHEY:  Yes, sir.  That's the way they should do it.

PROSECUTOR:  *Does that always happen?*

MR. SMITHEY: *No, sir.*

PROSECUTOR:  Why is that?

MR. SMITHEY: *Well, you have a shortage of personnel in the prison system.  You have times when other things are going on that may require you to take personnel from one section to another.  So it could possibly be one individual that is conducting that type of security on -- on that particular pod at any given time.*

PROSECUTOR:  Have you investigated offenses before having occurred in the ad seg portion of a pod-type unit where, because of a deviation in security protocol, it has given an inmate the opportunity to commit a crime?

MR. SMITHEY:  Yes, sir.

PROSECUTOR:  Now -- I mean, have you -- have you ever worked as a prison guard before?

MR. SMITHEY:  No, sir.  I have not.

PROSECUTOR:  Have you ever worked, I guess, in the consulting portion where you established procedures for administrative segregation, anything like that?

MR. SMITHEY:  No, sir.  I have not.

PROSECUTOR:  So -- but were you -- as an investigator, are you still able to review the procedures to see whether or not they were followed at the time?

MR. SMITHEY:  Yes, sir.

PROSECUTOR:  *Now, is that a common way for, I guess, crimes of opportunity to happen, a deviation of the security protocol and procedure?*

MR. SMITHEY:  *Sure.*

165

PROSECUTOR:  And in the crimes -- first off, could you estimate how many crimes you've investigated in the prison system itself?

MR. SMITHEY:  Be thousands.

PROSECUTOR:  Is that -- when you say it's common, roughly what percentage of those types do you think -- ***roughly what percentage of those times do you think some deviation of security protocol gave rise to opportunity to commit crime?***

MR. SMITHEY:  I really don't know.  ***It's been quite a few times,*** but I have no way of telling at this point, you know, how many times it was.

(2001 R.R. vol. 34 at 70-73) (emphasis added).


Here is what Mr. Smithey said during the Rule 701 hearing (away from jury):

PROSECUTOR:  ***Is that a common -- is that a common element that you will see investigating these offenses where there is some kind f interruption in procedure? Even though they're attempting to follow proper procedure, there's some kind of interruption and that gives rise to an opportunity to commit crimes?***

   [MR. SMITHEY]:  ***Yes.***

(2001 R.R. vol. 34 at 22) (emphasis added).


Mr. Smithey, presented by the State as an expert on classification of prisoners, told jurors that

another problem TDCJ-ID has is that it does not always follow its own classification procedures, and

therefore, this can lead to placing inmates in units where the inmates might attack a guard or another

inmate.  Here is what he said in the Rule 701 hearing, away from jurors:

PROSECUTOR:  Let's say we have a non-gang member individual who's in administrative segregation, placed there through classification.  What is the longest period of time they are going to have to sit in administrative segregation before they are eligible to be reclassified?

MR. SMITHEY:  Well, they will -- they will receive -- they will receive a classification hearing at least every ninety days.  They -- they go through a process of reclassification all the time.  This helps the unit officials to determine who needs

to remain in administrative segregation, who needs to be either up or down in class, It's -- I, mean it's an ongoing process.  You're not just put in a certain location and forgot about and left there.  You will be reviewed.

PROSECUTOR:  Mr. Smithey, let me you ask this.  Is it -- are the classification guidelines, are those laws that are written down in, like, a code book somewhere?

MR. SMITHEY:  They are -- there is a procedure.  There are -- there are custody procedures that are handled by the state classification committee, as well as the unit classification committee, and what they do is they follow these guidelines.  But then, here again, on the unit level if you have an individual that has shown a potential to -- to not be a security threat, you know, and the warden may have a place that he wants to place that inmate, it's possible for that warden to take that individual out of administrative segregation, place him somewhere else, as long as the warden can determine that it's not a security threat.

PROSECUTOR:  That's basically the warden's determination.  He says I don't think this man is a security threat based on what I've seen.  He can, I guess, move outside the guidelines of the classification?

MR. SMITHEY:  Well, that is part of the guidelines, also, that the warden has some discretion.

PROSECUTOR:  So can you guarantee that from unit to unit, assuming each unit has its own warden, that a inmate that's placed in administrative segregation in, let's say, Unit A would stay there as long as the same inmate if he was placed in Unit B?

MR. SMITHEY:  Ideally he should, but then in reality things change.

PROSECUTOR:  But if I understand you correctly, though, those guidelines, they're not laws.

MR. SMITHEY:  No, sir.  They're not.

PROSECUTOR:  They are policies to be followed?

MR. SMITHEY:  Yes.

PROSECUTOR:  *But there's no guarantee that, based on how a certain prison is made up at the time, what inmates it has, that those guidelines are going to be followed to the letter?*

MR. SMITHEY:  *That's correct*.

167

(2001 R.R. vol. 34 at 23-25) (emphasis added).

When Mr. Smithey and the prosecutor said that the policies are not followed to the letter, they said in a polite way that the policies are commonly ignored.

Mr. Smithey also told jurors that overcrowding is another factor that might allow an inmate like Mr. Garcia to be released prematurely from administrative segregation.  He said that there are times when administrative segregation fills up, forcing TDCJ-ID to release dangerous inmates into the general population prematurely.

> PROSECUTOR:  Based on your training and experience in having investigated crimes within the penitentiary system, is it, in your experience, is administrative segregation always full, sometimes full, ever full?
>
> MR. SMITHEY:  It -- here again, it goes with the population of the unit.  *Once the administration part gets full and you have an inmate that possibly should go into administrative segregation, he -- it may be prolonged.  He may stay in close custody classification for an extended period of time that, if administrative segregation wasn't full, he would go on into administration segregation.*
>
> *You know, here again, it's just like the problem that the State of Texas has had in the past, is once they reach a certain percentage of inmates, well, then, they're considered full and in order to put somebody in you have to take somebody out. That's always a possibility.*
>
> PROSECUTOR:  So would it be more fair to characterize administrative as a place where they keep the problem inmates who are problems at the time and when they're no longer a problem they get moved out?
>
> MR. SMITHEY:  That's very possible.  Yes, sir.
>
> (2001 R.R. vol. 34 at 25-26.)

When TDCJ-ID says that overcrowding is a problem, what it is really saying is that it has not built enough prisons.  Mr. Smithey elaborated, away from jurors in the 701 hearing:

168

PROSECUTOR:  Now, based on your experience in investigating crimes within ad seg, is there a pressure to open those cells up for the people who are current problems?

MR. SMITHEY:  There could be.  We have in the past -- now, I'm not -- I'm not familiar with it in the last week, but in the past last 30-45 days we've -- we've kind of seen a -- you know, some -- *some units administration segregation is full so, therefore, an individual may stay in a close custody level a little bit longer than what they normally would.*

Here again, theoretically, *once a person has enough disciplinary cases should go into administrative segregation, but because there is a large administrative segregation population there are inmates staying in close custody status longer than they normally would.*

PROSECUTOR:  So if we -- I guess what I'm trying to figure out is which inmate is more appropriate for administrative segregation, those inmates who are in the prison system right now still being problems, discipline problems, committing other offenses, or those who come into the system with perhaps an egregious violent offense and maybe an escape?

MR. SMITHEY:  Well, it would be the one that would be currently in administrative segregation that they feel like is a security threat.

PROSECUTOR:  *So -- I mean, regardless of how we might think about it, you said the security of the institution is first and foremost.  So if you've got a capital murderer who has, you know, a prior escape, and you have a person who is currently committing problems within the prison, currently has a disciplinary record, which one of those two individuals is going to be the person that gets that one ad seg cell that's available?*

MR. SMITHEY:  *It would be the one that's in administrative segregation that is security to the institution at that time.*

(2001 R.R. vol. 34 at 36-38) (emphasis added).

### B.    The Prosecutor Played on Jurors' Fears By Emphasizing that TDCJ-ID Lacked Sufficient Staffing to Secure Mr. Garcia.

The prosecutors reminded jurors in closing arguments what Mr. Smithey had told them: that

Mr. Garcia was likely to be released from administrative segregation.  (2001 R.R. vol. 34 at 199-

200.)

169

[Prosecutor]: I mean, look at what he did when he was in the penitentiary. High security.  North end of the Ellis Unit.  And doesn't get any more secure than that.  That's what the guards told you.  And he, along with six other inmates, not just attempted to escape.  I mean, they actually make it out of the building.  They make it off the block, along the spine of the building, and off the building to the first fence.  Then they make it over the fence completely undetected.  Do you think they just -- do you think that was just a random act?  They just got lucky one day, said, hey, let's go for it.  No.  They planned it, folks.  *All the time he was pretending to be a good boy.  All the time he's pretending, you know, to be a model prisoner.  All the time the classification board would have thought, hey, you know, he's getting up there.*

[Prosecutor]: You know, what did Mr. Smithey tell you?  What did Quijano [tell] you?  What did Capt. O'Dwyer tell you?  *No disciplines, no big, major problems, those people are going to get reclassified to a lower security.*

(2001 R.R. vol. 34 at 154) (emphasis added).

* * *

[Prosecutor]: *We know he's probably not even going to go to admin seg 3, based on what you heard from Royce Smithey*, who you heard during cross-examination.  Who did he talk to about this?  Bruce Thaylor.

[Defense]: Objection to hear – that came – if he wants to rely on a liar's hearsay in here, I object to it as evidence not in the record.

[Court]: Overruled.

[Prosecutor]: Mr. Miears brought it up.  He's the one that brought that to you through his questioning from – from Bruce Thaylor.  *That's why we know that it's likely he won't even go to admin seg, that he's going to just go in – into a prison*.

(2001 R.R. vol. 34 at 199-200) (emphasis added).

* * *

[Prosecutor]:   Now, before we leave this special issue of future dangerousness, note there's nothing in there that talks about, you know, whether or not he would be a future danger in light of the security that can be provided by the penitentiary.  That's not what that issue is talking about.  They may want you to think that.  You know, they may want you to think, well, if we put him in prison, he won't be a future danger.

170

But, I mean, what do we know from what he did in the penitentiary last time? I mean, he almost escaped.  Not high security is going to make a difference here. Folks, you know, what that issue is asking is as he exists is he a future danger?  And it says to society.  That can mean in the prison or out.  What did all these doctors tell you?  They told you in the prison or out he's an antisocial personality.  In or out, he's a future danger.

(2001 R.R. vol. 34 at 160.)

[Prosecutor]:  He is a danger.  He is one of the most dangerous that you can have, according to Dr. Clayton.  The people that can bide their time until they can get in a position to do things like that.  That's what all that stuff was.  We brought you Royce Smithey and we talked about it with Capt. O'Dwyer just so you'd know how these things work.

(2001 R.R. vol. 34 at 200.)

## C.    Discussion of Due Process Analysis

Mr. Garcia contends that the act by the Government of encouraging jurors to execute him because the Government is unwilling or unable to provide adequate security violates both the substantive and procedural components of the Due Process Clause of the Fourteenth Amendment.

### *Substantive Due Process*

The "substantive" component of the Due Process Clause protects individual liberty and life against certain governmental actions regardless of the fairness of the procedures used to implement them.  *Collins v. City of Harker Heights,* 117 L. Ed. 2d 261, 112 S. Ct. 1061 1068 (1992).  The protections of substantive due process extend to such matters as marriage, family, procreation and the right to bodily integrity. *See Albright v. Oliver,* 127 L. Ed. 2d 114, 114 S. Ct. 807, 812 (1994) (plurality).  The Supreme Court has described substantive due process as having "scarce and open-ended" "guideposts." *Id.* at 814.

171

The right which Mr. Garcia seeks to protect is the loss of his life and liberty on the basis of the refusal of the Government to provide adequate prison security.  To be clear, he is not advocating that he plans additional violence and therefore the Government needs to protect him from himself. What he is saying is that is one thing for the Government to argue that he will be violent in prison because of his own actions; it is completely another thing, and one which is improper, for the Government to contend that he will be violent in prison *as a result of the Government's inability or refusal to comply with its own rules or hire adequate staff and build appropriate facilities.*  This is where Mr. Smithey and the State crossed the line, and violated the due process clause.  Executing an inmate for matters entirely beyond his control does not comply with the requirement of the Due Process Clause that death sentences be tailored to the individual's circumstances, or the Clause's requirement that a person receive punishment only for his own actions or of those under his control or participation, not ones of someone well beyond his control.  "The essence of due process is fundamental fairness. ..."  United States ex rel. Crist v. Lane, 745 F.2d 476, 482 (7th Cir. 1984).

This argument called into play the dangerous conditions theory which imposes liability on state officials for allowing dangerous conditions to develop under their control.

In *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 201, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989), held there is no affirmative duty of the state to protect a child who is in his parents' custody.  In a footnote, the Court recognized that due process violations may occur when the State places children into dangerous foster homes.  *DeShaney,* 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9 (citing *Doe v. New York City Dep't of Social Servs.,* 649 F.2d 134, 141-42 (2d Cir. 1981), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), and *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791, 794-97 (11th Cir. 1987) (en banc), *cert. denied,* 489 U.S. 1065, 109 S.Ct.

172

1337, 103 L.Ed.2d 808 (1989)).  The Supreme Court has found a substantive due process interest

in safe conditions, personal security, and bodily integrity for persons in state custody, and they assert

that the right they seek to enforce in the instant case is already established, albeit in slightly different

factual contexts, in those cases.  *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 103

S.Ct. 2979, 77 L.Ed.2d 605 (1983) (pretrial detainees);  *Youngberg v. Romeo,* 457 U.S. 307, 102

S.Ct. 2452, 73 L.Ed.2d 28 (1982) (mentally retarded); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285,

50 L.Ed.2d 251 (1976) (prisoners).  The Court has found that inmates may claim the protection of

the Due Process Clause to prevent additional deprivation of life, liberty, or property without due

process of law.  *See Meachum v. Fano,* 427 U.S. 215, 225 (1976); *Wolff v. McDonnell,* 418 U.S. 539,

555-556 (1974).

For instance, in *Martinez v. Uphoff*, 265 F.3d 1130 (10th Cir. 2001), the Tenth Circuit

discussed the lack of civil liability against prison officials for inadequate security and staffing.  The

Supreme Court has held that state prison officials may be held liable for civil damages for allowing

dangerous conditions to fester under their watch.  "While state actors are generally liable under the

Due Process Clause only for their own acts and not for private violence,  *DeShaney v. Winnebago*

*Soc. Servs.,* 489 U.S. 189, 196-97, 117 L.Ed.2d 249 (1989),  . . . there are two recognized . . .

exceptions to this rule: (1) the special relationship doctrine; and (2) the `danger' creation theory."

*Uhlrig, supra,* 64 F.3d at 572 (two footnotes omitted).

The court in *Martinez* also said, 265 F.3d at 1134, "We further emphasized that the "shock

the conscience" standard "requires a high level of outrageousness. . . . (since) a substantive due

process violation requires more than an ordinary tort and that merely allowing unreasonable risks

to persist in the workplace is not necessarily conscience shocking." (*Uhlrig,* 64 F.3d at 574, *quoting*

173

*Collins v. City of Harker Heights Tex.* , 503 U.S. 115, 128; 117 L.Ed.2d 261 (1992) (No remedy under § 1983 for employee's death.)

The Court should consider on *Sutton v. Utah State School for the Deaf and Blind,* 173 F.3d 1226 (10th Cir. 1999) (imposing civil liability for due process violation of state officials for abuse of handicapped child in state custody).

In the Fifth Circuit, the rules for prison civil liability are established by two *en banc* decisions: *Hare v. City of Corinth,* 74 F.3d 633 (5th Cir. 1996) (en banc), and *Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) (en banc). Although these cases establish very high thresholds for civil liability, the point of both from a constitutional standpoint is the same: prison officials have a constitutional duty to provide safe and staffed facilities to protect inmates.

In *Youngberg,* the Supreme Court held that retarded persons committed to state institutions have a Fourteenth Amendment substantive due process right to "reasonable care and safety." 457 U.S. at 324, 102 S.Ct. at 2462. In 1982 the Supreme Court held that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199-200, 109 S.Ct. at 1004-05.

### Procedural Due Process

The procedural due process component of the Due Process Clause is also violated. There is a two-step analysis applied to procedural due process challenges. First, one "must determine whether a protected liberty or property interest exists." *Ex parte Montgomery*, 894 S.W.2d 324, 327 (Tex. Crim. App. 1995). Second, one must "decide whether sufficient procedural safeguards are employed to assure the deprivation of that interest is not arbitrary." *Id.; citing Morrissey v. Brewer*,

174

408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); *Hewitt v. Helms*, 459 U.S. 460, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983).

First, Mr. Garcia obviously has protected interests in his life and liberty.

Second, certainly it constitutes an arbitrary deprivation of these interests to execute him because the State is unwilling to provide the guards and facilities to house him securely, when at the same time the State argues that he will be dangerous in prison by feigning good behavior as a subterfuge for lulling authorities into believing his good behavior justified a lower risk classification and therefore providing opportunities for violence.

### D.    Discussion of Equal Protection Analysis

"The equal protection clause of the Fourteenth Amendment requires that states treat similarly situated persons alike." *Ex parte Montgomery*, 894 S.W.2d at 329 (*citing Plyler v. Doe*, 457 U.S. 202, 102 S. Ct. 2382 (1982)). The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "If a fundamental right is abridged or the differential treatment is based on a suspect classification, such as race, it will be subject to strict scrutiny; otherwise, it need only bear 'some fair relationship to a legitimate public purpose.'" *Ex parte Montgomery*, 894 S.W.2d at 329 (*quoting Plyler*, 102 S. Ct. at 2394-95.)

Garcia contends that the "suspect classification" here is that he is a capital murder inmate, which distinguishes him from other non-death inmates because of the heightened scrutiny required for prosecution and execution of such inmates. He therefore has a fundamental right to a sentencing hearing involving his life and liberty. The Court should apply the strict scrutiny standard of review. *See San Antonio Indep. Sch. Dist. V. Rodriguez*, 411 U.S. 1 (1973). Under this standard, a regulation

discriminating against a suspect class, or in this case a fundamental interest, will be held to violate equal protection unless found to be necessary to promote a compelling state interest.  A classification is necessary when it is narrowly drawn so that no alternative, less burdensome means is available to accomplish the state interest.  *See, e.g., Hernandez v. Texas*, 347 U.S. 475 (1954) (discrimination against Mexican-Americans in respect to jury service).   The Equal Protection Clause extends to prison cells to protect inmates from invidious discrimination.  *Lee v. Washington,* 390 U.S. 333 (1968).

"If a classification disadvantages a 'suspect class' or impinges upon a 'fundamental right,' the ordinance is subject to strict scrutiny. Under the strict scrutiny standard, we accord the classification no presumption of constitutionality. Instead, we ask whether the classification promotes a compelling governmental interest and, if so, whether the ordinance is narrowly tailored such that there are no less restrictive means available to effectuate the desired end. *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993), *cert. denied,* 114 S. Ct. 2134 (1994).  Rights are fundamental if they find their source, explicitly or implicitly, in the Constitution. *Ball v. Rapides Parish Police Jury,* 746 F.2d 1049, 1059 (5th Cir. 1984).

Under this standard, in an attack on the facial validity of the statute, Mr. Garcia is required to show intentional discrimination.  *See, e.g., Washington v. Davis*, 426 U.S. 229 (1976).  Here, of course, the State intentionally argued that his execution was warranted, in part, because it could not provide the resources necessary to assure that he remaining in appropriate administrative segregation, or that its staff followed all rules.  *Cf. Louisiana v. United States*, 380 U.S. 145 (1965) (literacy test for voting invalid on face).  Having made a showing of intentional discrimination, the burden now shifts to the state to show that the impact of its classification of death row inmates is constitutionally

176

permissible.  *See, e.g. McCleskey v. Kemp,* 481 U.S. 279 (1987) (attempt to show by statistics that the death sentence was unevenly imposed on blacks); *Castaneda v. Partida*, 430 U.S. 482 (1977); *Williams v. Rhodes*, 393 U.S. 23 (1968) (barriers to new political parties against placing candidates on ballot without compelling state interest).

The essence of the arguments made by Smithey and the prosecutors is that there is an irrebuttable presumption that a man convicted of capital murder cannot be securely housed, even if his behavior is above average.  The Supreme Court has long held that such irrebuttable presumptions violate equal protection and procedural due process.  *See, e.g., Jiminez v. Weinberger*, 417 U.S. 628 (1974) (Social Security Act which denied benefits to some illegitimate children born after parent's disability violated equal protection); *Stanley v. Illinois*, 405 U.S. 645 (1972) (striking law which automatically terminated a father's rights to illegitimate children upon death of mother);  *see generally* Michael A. Mello & Donna Duffy, *Suspending Justice: The Unconstitutionality of the Proposed Six-Month Time Limit on the Filing of Habeas Corpus Petitions by Death Row Inmates,* 18 N.Y.U. Rev. L. & Soc. Change 451, 452 (1990-91) (concluding that imposing time limits for filing habeas petitions violates Suspension Clause of United States Constitution).

### *Traditional Equal Protection Test*

Alternatively, the classification imposed by the prosecutor and Smithey's construct fails the traditional equal protection test.  Under this test, a classification is presumed valid and will be upheld unless the person challenging it proves that it fails to bear some fair relationship to a legitimate public purpose.  *Royster Guano Co. v. Virginia*, 253 U.S. 412 (1920).  Here, arbitrary theory does not.  There can be no legitimate public purpose for executing a man who is conducting himself properly in a prison which refuses to provide adequate staffing, training and facilities, when the State

177

implies that adequate staffing, training and facilities would be sufficient to provide a secure environment for a life term.

Regarding the traditional test, the Court may wish to consider *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), where the Supreme Court held that a federal food stamp program which excluded any household containing unrelated persons was a classification wholly without any rational basis.  Similarly, in*Allegheny Pittsburgh Coal Co. v. County Commission*, 109 S. Ct. 633 (1989), the Court reviewed a case in which a county tax assessor valued real property at its sales price but made only minor modifications for property that had not been recently sold.  As a result, some property was assessed at as much as thirty-five times more than comparable neighboring property.  The Court held that this practice was not rationally related to the state policy of assessing all property at its estimated market value.  *See generally Bell v. Wolfish*, 441 U.S. 520, 586 (1979) (Stevens J., dissenting) ("In short, a careful reading of the Court's opinion reveals that it has attenuated the detainee's constitutional protection against punishment into nothing more than a prohibition against irrational classifications or barbaric treatment. Having recognized in theory that the source of that protection is the Due Process Clause, the Court has in practice defined its scope in the far more permissive terms of equal protection and Eighth Amendment analysis.").

**E.     Discussion of Cruel and Unusual Punishment Analysis**

The Supreme Court has recognized that the two primary constitutionally-legitimate reasons justifying capital punishment are retribution and deterrence.  Gregg v. Georgia, 428 U.S. 153, 183 (1976).

Prison officials may be found liable under the Eighth Amendment if they know of and disregard an excessive risk to inmate health and safety.  *Farmer v. Brennan,* 511 U.S. 825, 837

178

(1994). The Eighth Amendment forbids prison officials from using excessive force against prisoners. *Hudson v. McMillian,* 503 U.S. 1 (1992). The Eighth Amendment also requires officials to provide humane conditions of confinement, ensure that inmates receive adequate food, clothing, shelter, and medical care, and take reasonable measures to guarantee the safety of the inmates. *Hudson v. Palmer,* 468 U.S. 517, 526-527 (1984); Washington v. Harper, 494 U.S. 210, 225 (1990); *see also Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971); *Carlson v. Green,* 446 U.S. 14 (1980).

"In *Farmer v. Brennan,* 511 U.S. at 828, the Supreme Court held that '[a] prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment.' The Supreme Court further explained that such deliberate indifference exists if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' *Id.* at 837." *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002).

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious;" a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."

"The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'"  In prison conditions cases that state of mind is one of "deliberate indifference" to inmate health

 or safety. . . ."  *Farmer*, 511 U.S. at 834 (citations and footnotes omitted).

*Farmer* supports Mr. Garcia's arguments.  Through Smithey, the State has announced that it intentionally is not going to provide sufficient staffing, training and guards to assure that Garcia remains in administrative segregation if he needs to.  Moreover, the State argues that jurors cannot take the chance that his good behavior is merely a subterfuge for seeking a favorable venue and opportunity for violence; jurors instead must order his execution.

*Farmer* condemns this by holding that when a prison officials intentionally create conditions which they know will lead to violence, they have violated the Eighth Amendment.  *Farmer* involved a male transsexual with feminine mannerisms.  He was housed in a male prison where he was attacked.  One may feel that Farmer's sexual identity was certainly within his control, just as Garcia's conduct is within his.  The Court held that a prison officials' deliberate indifference to a prisoner's treatment may violate the Eighth Amendment.  The Court remanded for a hearing and evidence.  Likewise, Mr. Garcia merely asks for a trial in which the special issues may be evaluated by jurors without arguments and testimony that even good behavior by him should be disregarded and that the State is not going to spend the money and time necessary to provide a secure environment, compelling the need for execution.

***Claim Number 29: The Testimony of Royce Smithey Did Not Satisfy the Reliability Requirements of* Daubert v. Merrill Dow *or* Nenno v. State*, and its Introduction in a Death Penalty Sentencing Hearing Violated the Due Process Clause of the Fourteenth Amendment.***

***Claim Number 30: The Testimony of Royce Smithey Did Not Satisfy the Reliability Requirements of* Daubert v. Merrill Dow *or* Nenno v. State*, and its Introduction in a Death Penalty Sentencing Hearing Violated the Equal Protection Clause of the Fourteenth Amendment.***

***Claim Number 31: The Testimony of Royce Smithey Did Not Satisfy the Reliability Requirements of* Daubert v. Merrill Dow *or* Nenno v. State*, and its Introduction in a Death Penalty Sentencing Hearing Violated the Cruel & Unusual Punishment Clause of the Eighth and Fourteenth Amendments.***

***Claim Number 32: If the Court Determines that These Issues Have Been Procedurally Defaulted by Trial or Direct Appeal Counsel, then Mr. Garcia Asserts a Claim for Ineffective Assistance of Counsel For Trial and Appeal In Violation of the Sixth Amendment.***

The State's TDCJ-ID self-proclaimed "lay expert," Royce Smithey, was unqualified.  The legal issue is whether in capital trials in Texas, the State should be permitted to present unqualified expert witnesses to speculate generally as to whether inmates may be violent in prison, for purposes of proving future dangerousness.  These issues are important because what is at stake is whether any man or woman who claims to be an expert can walk into a capital trial and speculate about the future.

These claims were exhausted.  They were included in Garcia's timely filed 2003 state habeas application, later denied by the CCA without comment.

> **A.    The Trial Court and the State Failed to Prove that Mr. Smithey's Methods and Opinions Were Reliable Under *Daubert v. Merrill Dow* or *Kelly v. State* or *Nenno v. State.***

Although offered as an expert, the State made no effort to establish Mr. Smithey's reliability, preferring to allow defense counsel to merely cross examine him.  Smithey had no particular

education expertise or training.  He was merely an investigator for the Prison Prosecution Unit.  He admitted that he could not say with any assurance how Mr. Garcia would be classified in the prison system.  He had not looked at any of Mr. Garcia's prior records, records which he himself admitted were factors that would have to be considered before an intelligent discussion of prison classification could take place.  He admitted that he was not an expert in classification.

> **B.    The Supreme Court and the Court of Criminal Appeals Insists that Expert Witnesses Be Genuinely Qualified, and Not Merely Reporters of Unsubstantiated Speculation.**

The first case to challenge the accepted wisdom of expert testimony and to insist upon a heightened standard or reliability under Tex. R. Evid. 702 was **Kelly v. State,** 824 S.W.2d 568 (Tex.Crim.App.- 1992).  There Judge Campbell noted that the long standing **Frye** test, (**Frye v. United States,** 293 F. 1013 (D.C.  Cir. 1923) and reasoned that **Frye** had not survived the adoption of Tex.Cr.Evid. 702.  He further stated that the touchstone of any analysis of rule 702 was relevance:

> We have recognized before that the "threshold determination" for a trial court to make regarding the admission of expert testimony is whether that testimony will help the trier of fact understand the evidence or determine a fact in issue. (citation omitted). Thus, in a case such as this – where the trial court was faced with an offer of expert testimony on a scientific topic unfamiliar to lay jurors – the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reach accurate results. "Unreliable . . . scientific evidence simply will not assist the jury to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts. (citation omitted).

> If the trial judges determines that the proffered expert testimony is reliable (and thus probative and relevant), then she must next determine whether, in balance, that testimony might nevertheless be unhelpful to the trier of fact for other reasons.

The Court then went on to set out the usual analysis under Tex.Cr.Evid.  403.  Judge Campbell concluded by stating that **Frye** was no longer a part of a rule 702 analysis.

Three criteria had to be met for evidence derived from a scientific theory, to be considered reliable: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question.  All three criteria must be proven to the trial court, in a hearing outside the jury's presence, before the evidence may be admitted.   Factors that could affect a trial court's determination include but are not limited to (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question.   The proponent of the evidence must establish its reliability by clear and convincing evidence.

None of these factors were addressed by the prosecution in this case.

Eighteen months after **Kelly**, the Supreme Court decided **Daubert v. Merrill Dow**, 509 U.S. 579, 113 S.Ct. 2786 (1993) and reached a very similar result.  **Frye** was held not to have survived the adoption of Rule 702.  Further, Rule 702's requirement [3] that the expert evidence "assist the trier of fact to understand the evidence or determine a fact in issue" is a condition that goes primarily to the issue of relevance.  In that sense, the expert testimony must be sufficiently tied to the facts of the case as to aid the jury in resolving a factual dispute.

---

[3] Federal Rule 702 is virtually identical to Tex. Cr. Evid. 702.

The consideration has been aptly described by Judge Becker as one of "fit". "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other unrelated purposes. . . . Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

The Court posited a number of criteria to determine whether theory or technique will be of the requisite assistance.  One is whether the theory or technique can be tested. Can others in the field test the hypotheses and determine if they can be falsified. Another consideration is whether the theory or technique has been subject to peer review and publication.

Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability, (citation omitted), and in some instances well-grounded but innovative theories will not have been published. . . . But submission to the scrutiny of the scientific community is a component of good science in part because it increases the likelihood that substantive flaws in methodology will be detected.

The trial court should also consider the known or potential rate of error. Finally, general acceptance can yet have a bearing on the inquiry.

Again the State made no effort to comply with **Daubert's** requirements.

In **Emerson v. State,** 880 S.W.2d 759 (Tex. Crim. App.- 1994), the Court was confronted with the State's failure to introduce any evidence to support a **Kelly** determination on an HGN, or horizontal gaze nystagmus test in a DWI case.  In a 5-4 vote, the Court held that it could judicially notice the various publications and court decisions and ruled that HGN was a reliable scientific theory and technique.  But none of that material is before the Court here; the State made no effort to introduce any of the underlying data or theories that would allow a forensic anthropologist to determine when wounds were inflicted based upon an examination of photographs.

In **Nenno v. State,** 970 S.W.2d 549 (Tex. Crim. App.- 1998), the Court consider the application of **Kelly** to psychology and other social sciences. "The question we confront today is

184

whether Kelly is applicable to nonscientific expert testimony (i.e. that involving technical or other specialized knowledge)."  The Court ruled that both **Daubert** and **Kelly** applied but not the specific factors outlined in those cases.  The Court distilled **Daubert** into two important propositions: that the trial court was required to act as a gatekeeper to determine the reliability of expert evidence and that the four factors of **Daubert** did not necessarily apply outside the hard sciences.

> When addressing fields of study aside from the hard sciences, such as the social sciences or filed that are primarily based upon experience and training as opposed to the scientific method, **Kelly's** requirement of reliability applies but with less rigor than to the hard sciences.  To speak of the validity of a "theory" or "technique" in these fields may be roughly accurate but somewhat misleading.  The appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in that field.  These questions are merely an appropriately tailored translation of the **Kelly** test to areas outside of hard science.  And, hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences.

Whatever portion of **Nenno** survives **Kumho Tire** infra, it is clear that whatever the field of expertise, any expert opinion must be determined to be reliable.  While an expert's qualifications are important, it must be established that the techniques used are scientifically valid and reliable.  This the State failed to do here.

Finally, the Supreme Court weighed in again on the same issue as **Nenno** in **Kumho Tire Company v. Carmichael**, 119 S. Ct. 1167 (1999).  The Court ruled that **Daubert**'s general principles applied to all expert matters.  Rule 702 was a standard of evidentiary reliability.  **Daubert**, however, is a flexible inquiry; a trial court may consider the various factors.  Reliability concerns may focus on scientific foundations or personal knowledge or experience.  The **Daubert** questions may help to evaluate the reliability of even experienced based testimony.  How often, for example,

185

does an expert's experience based methodology produce erroneous results? Is such a method generally accepted in the relevant community? Would others in the field recognize the method or technique as acceptable?

What is essential, according to the Court, is that the expert use the same level of intellectual rigor in the courtroom as outside of it.   A trial court should consider the **Daubert** factors where they are considered reasonable measures of the reliability of expert testimony.   Again, none of these factors are present in this case.

The State made no effort to follow, for example, the type of **Kelly** hearing approved by the Court in **Reid v. State,** 964 S.W.2d 723 (Tex. App.- Amarillo, 1998).   There, the State presented an exhaustive array of evidence to justify the application of Munchausen's Syndrome by Proxy.   While not every case should require such an comprehensive approach, it is clear that something more than accomplished by the State in the instant case is required.   The State here did little more than establish their expert's qualifications and made no effort to establish the bona fides of his methodology.   *See also* **Ochoa v. State,** 994 S.W.2d 283 (Tex. App.- El Paso, 1999); **Sosa v. State,** 841 S.W.2d 912 (Tex. App.- Houston [1st Dist.] 1992), where counsel, just as with state's counsel here, made no effort to comply with Rule 702's reliability requirements. *See also* **Fowler v. State,** 958 S.W.2d 853 (Tex. App.- Waco 1997 pdr grt'd); **Forte v. State,**   935 S.W.2d 172, 177 (Tex.App. - Fort Worth, 1996 pdr ref'd).   Because the State failed to establish that Mr. Smithey's methods or opinions were reliable, this case should be reversed and remanded for a new trial.

Mr. Smithey's opinion about prison violence was based on nothing more the theory that if people wanted to be violent, they would be.   He had not empirical data, no studies, no peer review,

nothing that might suggest his "expertise" would have any reliability at all.  He had not worked in TDC's diagnostic's section.

The State made no effort to demonstrate how Mr. Smithey's expert opinion could in any way be deemed reliable.  Because of its failure to do so, this case should be reversed.  Because this error occurred at the punishment phase, the remand should be limited to a new punishment hearing.

One of the essential questions to be answered before admitting an expert's testimony is whether it will assist the trier of fact.  *See generally* **Duckett v. State,** 797 S.W.2d 906 (Tex. Crim. App. 1990).   To ascertain that threshold question, the court must determine whether the expert testimony is being offered generically or whether it is tailored to the facts of the instant case. **Williams v. State**, 895 S.W.2d 363 (Tex. Crim. App. 1994).   If the testimony is generic, or does not fit the facts of the case on trial, it is inadmissible; if it is specifically tailored, it satisfies Rule 702.  In **Perryman v. State,** 798 S.W.2d 326 (Tex. App. - Dallas, 1990 no pet.), the Court deemed inadmissible an expert's evidence that the perpetrator of the offense fit the profile of a power assurance rapist.  Nothing in the record matched that profile to the defendant.  In **McIntosh v. State,** 8 55 S.W.2d 753 (Tex. App.--Dallas, 1993 no pet.), the Court found the same evidence admissible where the record supported the theory.

In the case at bar, Mr. Smithey admitted he had no particular expertise in classification or prison diagnostics. He admitted he was there only to speak in general terms about the structure of prison classification and the possibility of violence.  Because that testimony had the capacity to frighten the jury about potential violence without making any effort to specifically tailor that evidence to Mr. Garcia's background or the facts of the case, it was inadmissible.

187

### C.     Dr. Mark Cunningham, a Real TDCJ Expert, Has Demonstrated that Mr. Smithey's Testimony was Completely Misleading and Inaccurate.

Mr. Smithey's testimony was utterly bogus.  It was designed to convince jurors that the Texas prisons are rife with violence bordering anarchy and destruction.  The statistics speak otherwise. Attached is the affidavit of Dr. Mark Cunningham, one of the few researchers actually to look at the statistics on violence inside TDCJ-IJ.  Dr. Cunningham unmasks Smithey as an imposter who "testifies in broad generalizations regarding violence in TDCJ.  These characterizations, in their tone and implication, are likely to mislead the jury regarding the actual frequency of serious violence." *Cunningham Aff. at 4 (*2003 State Habeas PRE).

Dr. Cunningham recommends that Mr. Smithey return to TDCJ and get the printouts readily available.  For instance, had Smithey bothered to pick up the TDCJ-ID Emergency Action Statistics and looked at the section which documents the frequency of more significant misconduct - particularly the frequency of serious violence - "a much different impression would be left with the jury."  "For example, the rate of inmate on inmate assaults in TDCJ resulting in an injury that required more than first aid treatment was .46 (less than half an assault) per 100 inmates in 2001. The rate of inmate on staff assault in TDCJ resulting in a more than first aid injury was 4.2 per 10,000 inmates in 2001. At that rate, an inmate serving a 40 year term would have a 1.6% likelihood of such an assault."  *Cunningham Aff. at 4* (2003 State Habeas PRE).

Mr. Smithey also misled jurors into believing that the Texas prison system is pathetically inadequate to prevent widespread violence among inmates.  Dr. Cunningham, however, reveals that "While the control is not perfect, such numbers demonstrate the success of TDCJ architecture and procedure in limiting that violence."  *Cunningham Aff. at 4.*

188

Although Mr. Smithey correctly says that there is violence in administrative segregation, he overstated the frequency.  "[W]ith 9,700 inmates on Ad Seg last year, there were only 6 assaults on staff requiring more than first aid treatment. This translates to a lifetime risk of 2.4% for an inmate serving 40 years on Ad Seg. When it is considered that Ad Seg is comprised of those deemed the worst of the worst, such a low rate is a testament to effective containment procedures." *Cunningham Aff. at 4.*

"Mr. Smithey has reported in his testimony that homicides of staff and inmates occur in TDCJ.  Not said, however, is that only two TDCJ employees have been killed by inmates in the past 20 years."  *Cunningham Aff. at 4.*

Similarly, Mr. Smithey misled jurors about the rate of inmate homicidal violence.  "[T]he rate of inmate on inmate homicide last year (2.7 per 100,000) was about 40% of the rate of the free community in Texas.  These statistics are truly remarkable when it is considered that 49% of the TDCJ inmate population have a violent felony offense of conviction, and 37% have served prior terms of imprisonment in TDCJ."  *Cunningham Aff. at 4.*

> **D.**    **Introduction of Mr. Smithey's testimony violated the requirement that the sentencing process in a capital case be individualized, and thereby violated the need for heightened reliability in the sentencing process under Woodson.  His testimony was not related to Mr. Garcia.**

Mr. Smithey had not met Mr. Garcia.  He did not know anything about the crime, other than what he had been told.  He offered no testimony which pertained to Mr. Garcia, his family, his background, his psychological makeup, or in fact, any aspect of Mr. Garcia which could be said to be individually tailored to his case.  Mr. Smithey simply goes from trial to trial repeating that prisons are full of dangerous people.  For this reason, Mr. Smithey's testimony does not satisfy the

requirement that death penalty processes be individualized to the unique circumstances of the one

on trial, required by *Lockett* and *Woodson.*

> ### E.    Less Than One Year Before Trial, Mr. Smithey Confessed in Another Capital Trial That He was Unqualified to Testify as an Expert.

In 1999, Mr. Smithey admitted on the record that he was unqualified.  He testified in a case

called *State v. Edward Rowton*, CCA No. 73,777, that he had no expertise in classification,

diagnostics or psychology.  Inexperience notwithstanding, he testified less than a year later in Mr.

Garcia's trial as an expert.

In Rowton's trial, Mr. Smithey testified that he has a bachelor's degree in law enforcement

and police science and a master's certificate from TCLEOS.  He has conducted no published studies

on prison violence.  There has been no peer review of his work nor was there any empirical data to

look at and review.  Further there was  no data that he had with him that could be examined; all the

cases they collected were sent to governor''s office.  All the data his office kept are not correlated.

He was there to opine how Mr. Rowton would be classified in TDC and his opportunities to commit

violence while incarcerated.  Smithey has worked classification off and on for fifteen years.  He was

familiar with some but not all of the classification process.  He did not work in nor was he assigned

to classification.

In  Rowton's 1999 trial, Mr. Smithey finally conceded that he         *was not an expert in*

*classification:*

> [Rowton's Defense Attorney]: Well, then what are you going to testify?  Are you going to say how he's [the defendant] going to be classified when he gets down there [TDCJ]?
>
> [Mr. Smithey]: No, I – what – no one can say at this point until they look at – until he goes through the process of where he would be classified.  My information

to the jury is to better educate the jury as to how the process works in general, not just specifically for him, but how it works in general, and when an individual comes through the diagnostic process, what happens during that process and what happens after that process.

> [Defense Attorney]: Okay.  But you're not a classification officer?
>
> [Mr. Smithey]: No sir, I am not.
>
> [Defense Attorney]: And have no expertise in that area?
>
> [Mr. Smithey]: Well, I've got some expertise because I've worked with them.
>
> [Defense Attorney]: Are you an expert in that area?
>
> [Mr. Smithey]: No, sir.
>
> *(See Smithey testimony in Rowton case, page 102-03, under tab 23 of 2003 State Habeas PRE.)*

In Rowton's trial, Mr. Smithey went on to describe in general terms his testimony.  While he was there to talk about generally how Mr. Rowton would be classified, "I don't think anybody could come up here and say how he would be classified. It would depend on how he does different things." He admitted he had not looked at any of Rowton's prior incarceration records, which he admitted was a factor.  *Id* at 102.  He hoped "to better educate the jury as to how the process works in general, not just specifically for him, but how it works in general, and when an individual comes through the diagnostic process, what happens during that process and what happens after that process."  It is critical to Mr. Garcia's case to observe that Mr. Smithey admitted he was not an expert in the area of classification.

In Rowton's case, like Mr. Garcia's the State then sought to bolster Mr. Smithey's qualifications. Smithey had investigated thousands of assaults and 60-80 murders in the prison

191

system. He stated that there had been escapes from both ad seg, a high security area of a prison unit

as well as from death row. He knew more about violence in prison than an ordinary juror would

know.  Smithey also talked about housing on death row.  A person given a life sentence for capital

murder could be placed in the general prison population.   Where a prisoner would be placed in the

system would depend on their background.  Classification would not depend on the nature of the

offense but past disciplinary problems in the  penitentiary.

Smithey discussed the classification process.  If placed in general population, a prisoner

would have contact with other inmates as well as prison employees.  *Id.* at 111.  Even in

administrative segregation, they would have contact with civilian staff members.  *Id.* at 112.

Smithey opined that there are still problems with violence in prison. if someone wants to be violent,

they can be.  *Id at* 113.  The source of Smithey's information was the Emergency Action Center.  *Id.*

at 114.

### F.     Mr. Garcia Was Severely Prejudiced as a Result of Mr. Smithey's Destructive Testimony.

The prejudice suffered by Mr. Garcia as a result of Mr. Smithey's damaging testimony was

severe.  First, it permitted prosecutors to hammer home to jurors in closing arguments that Mr.

Garcia would strike again in prison, and more ominously, any good acts or equanimous behavior

would be merely a ruse to seek a favorable opportunity and venue for violence:

> [Prosecutor]: I mean, look at what he did when he was in the penitentiary.
> High security.  North end of the Ellis Unit.  And doesn't get any more secure than
> that.  That's what the guards told you.  And he, along with six other inmates, not just
> attempted to escape.  I mean, they actually make it out of the building.  They make
> it off the block, along the spine of the building, and off the building to the first fence.
> Then they make it over the fence completely undetected.   Do you think they just --
> do you think that was  just a random act?  They just got lucky one day, said, hey, let's
> go for it.  No.  They planned it, folks.  ***All the time he was pretending to be a good***

192

**boy.  All the time he's pretending, you know, to be a model prisoner.  All the time the classification board would have thought, hey, you know, he's getting up there.**

[Prosecutor]: You know, what did Mr. Smithey tell you?  What did Quijano [tell] you?  What did Capt. O'Dwyer tell you?  **No disciplines, no big, major problems, those people are going to get reclassified to a lower security.**

(2001 R.R. vol. 34 at 154) (emphasis added).

* * *

[Prosecutor]: **We know he's probably not even going to go to admin seg 3, based on what you heard from Royce Smithey**, who you heard during cross-examination.  Who did he talk to about this?  Bruce Thaylor.

[Defense]: Objection to hear – that came – if he wants to rely on a liar's hearsay in here, I object to it as evidence not in the record.

[Court]: Overruled.

[Prosecutor]: Mr. Miears brought it up.  He's the one that brought that to you through his questioning from – from Bruce Thaylor.  **That's why we know that it's likely he won't even go to admin seg, that he's going to just go in – into a prison**.

(2001 R.R. vol. 34 at 199-200) (emphasis added).

* * *

[Prosecutor]:    Now, before we leave this special issue of future dangerousness, note there's nothing in there that talks about, you know, whether or not he would be a future danger in light of the security that can be provided by the penitentiary.  That's not what that issue is talking about.  They may want you to think that.  You know, they may want you to think, well, if we put him in prison, he won't be a future danger.

But, I mean, what do we know from what he did in the penitentiary last time?  I mean, he almost escaped.  Not high security is going to make a difference here.  Folks, you know, what that issue is asking is as he exists is he a future danger?  And it says to society.  That can mean in the prison or out.  What did all these doctors tell you?  They told you in the prison or out he's an antisocial personality.  In  or out, he's a future danger.

(2001 R.R. vol. 34 at 160.)

> [Prosecutor]:  He is a danger.  He is one of the most dangerous that you can have, according to Dr. Clayton.  The people that can bide their time until they can get in a position to do things like that.  That's what all that stuff was.  We brought you Royce Smithey and we talked about it with Capt. O'Dwyer just so you'd know how these things work.

> (2001 R.R. vol. 34 at 200.)

In addition, Mr. Smithey's testimony provided jurors with a basis of false information upon which to answer "yes" to the second special issue on future dangerousness.  The concept was to sell jurors the idea that it was not possible to control a man like Mr. Garcia and therefore conditions were such that it was inevitable that he would be violent in some manner in prison over the course of a life sentence.  By contrast, if jurors could have been convinced that walls, and wire, and guards were enough to keep him well controlled, then Mr. Garcia stood a good chance of obtaining a "no" answer to the special issue.  And this of course is what one would expect if T.D.C. were adequately staffed and structured.

Third, Mr. Smithey's testimony convinced jurors that there was no place on Earth at which Mr. Garcia could serve a life sentence.  In effect, the prosecutors wrote a life sentence right out of the Code of Criminal Procedure, because although provided by the Texas Legislature, the prosecutors were able to convince jurors through Mr. Smithey that this was not a viable option.  It was not an option because the Texas prison system was incapable of providing sufficient staff and walls and bars to keep Mr. Garcia from harming other inmates or guards.  Therefore, execution was the only means open to jurors.

For these reasons, it was improper to permit the testimony of Mr. Smithey and a new sentencing trial is required.

194

**Claim Number 33: In Violation of <u>Brady v. Maryland</u> and <u>Kyles v. Whitley,</u> The State Withheld Critical Evidence in its Possession Which was Both Mitigating and Capable of Impeachment of One of Its Star Witnesses, Thereby Violating the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.**

**Claim Number 34: If the Court Determines that This Issue Has Been Procedurally Defaulted by Trial or Direct Appeal Counsel, then Mr. Garcia Asserts a Claim for Ineffective Assistance of Counsel For Trial and Appeal In Violation of the Sixth Amendment.**

The State violated a long-standing series of Supreme Court rules which require prosecutors, particularly in a death penalty case, to disclose evidence of which it is aware or in its possession, which can serve to impeach a critical State witness.

These claims were exhausted.  They were included in Garcia's timely filed 2003 state habeas application, later denied by the CCA without comment.

The internal TDCJ-ID information obtained by Dr. Cunningham has been in the State's possession for years.  It should have been disclosed to the Garcia Defense as material which would have impeached Mr. Smithey. Consequently, the failure of the State to disclose such important records violates *Brady v. Maryland* and *Kyles v. Whitley.*

A.     **Mr. Smithey Revealed in Another 2000 Trial, *State v. Danielle Simpson*, That He had Internal TDCJ Statistics.**

In an unrelated capital trial in 2000, *State v. Danielle Simpson*, Mr. Smithey admitted that he had internal TDCJ statistics which would have undermined his testimony if disclosed.

In the 2000 Simpson trial, when it was too late for the Defense to obtain the records, much less an expert to review them, Mr. Smithey revealed that TDCJ had statistics which explain the true level of violent incidents in the prison:

[Prosecutor]: All right.  And with regard to the statistics on violence, the nature of the violence, those kinds of things?

195

Mr. Smithey: Yes, sir, they do.

[Prosecutor]: All right.  And as a result of your work at the unit have you become familiar with those statistics?

Mr. Smithey: Yes, sir.

[Prosecutor]: Why do you think that that - why is that ancilliary to your job, what aspect of your job relates to knowing statistics about gangs and prison and classifications?

Mr. Smithey: Well, it helps us in the investigation of the criminal activity that goes on inside the prison system, plus it also helps us statewide to know where we may need to put more personnel, where we may – areas that we may need to look at a little bit more closer to spend more time on gang initiatives or work a little closer with the gang intelligence people in those particular areas.

(R.R. vol. 35 at 205-06, Trial of Danielle Simpson, Attachment to 2003 Garcia State Habeas PRE.)

* * *

[Prosecutor]: All right.  Let's talk about some numbers.  I think you brought the most current statistics from the EAT, so you have to tell me what the EAT stands for?

Mr. Smithey: EAC.

[Prosecutor]: EAC?

Mr. Smithey: Stands for the Emergency Action Center.  That is a department within the Texas Department of Criminal Justice Institutional Division.

[Prosecutor]: All right.  And so as near as you can be what is the current population of the Texas Department of Corrections?

Mr. Smithey: Current population is a little over 150,000 now.

[Prosecutor]: And compare that to the population of – prison population in, say, 1990?

Mr. Smithey: In 1990 the population was a little over 49,000.

196

[Prosecutor]: Okay.  And with regard to the number of violent crimes that occur in prison, has that number equaled the growth in the prison or greater than the growth in the prison or greater than the growth of the prison system?

Mr. Smithey: In some years it's been greater.

[Objection overruled.]

Mr. Smithey: Some years the growth may be a little bit higher percentage than the amount of violence, but it always tends to either catch up or go ahead.  Both of them have made a steady scale upward.

(Simpson trial, R.R. vol. 35 at 216-17.)

* * *

[Prosecutor]: And in spite of the word super seg [super administrative segregation], are inmates, do they – even when they're assigned to super seg, do they commit acts of violence against inmates and guards?

Mr. Smithey: Yes, sir.

[Discussion of a particular assault on a guard who was severely injured.]

* * *

[Prosecutor]: All right.  And as a result of that, let's talk about staff assaults. Are you familiar with the numbers for staff assaults?

Mr. Smithey: Yes, sir, I am.

[Prosecutor]: And does a staff assault, does that mean you've got – we've heard of this new law, this spitting on and chunking where you throw some foreign substance; is that considered an assault?

Mr. Smithey: Yes, sir, it is.

[Prosecutor]: All right.  How many assaults were there against staff last year?

Mr. Smithey: There were 2,044 staff assaults last year in the system.

[Prosecutor]: All right.  And was there a guard that was murdered last year --

197

Mr. Smithey: Yes, sir.

[Prosecutor] – by an inmate?

Mr. Smithey: Yes, sir, there was.

[Prosecutor]: Where did that happen?

Mr. Smithey: Happened in South Texas, in Bee County.

(Simpson trial R.R. vol. 35 at 220-21; Trial of Danielle Simpson, Attachment to Garcia 2003 State Habeas PRE.)

This 2000 testimony, a few months before Mr. Garcia's trial, demonstrates that the State had possession of internal TDCJ statistics and records which, if revealed, would have directly contradicted Mr. Smithey's testimony.

### B.     The State Failed to Reveal to Mr. Garcia's Attorneys That Mr. Smithey Had Earlier Denied Being a Classification Expert.

In Mr. Garcia's trial, Mr. Smithey claimed to be an expert in TDCJ classification. Yet in 1999, Mr. Smithey admitted on the record that he was unqualified. He testified in a case called *State v. Edward Rowton*, CCA No. 73,777, that he had no expertise in classification, diagnostics or psychology. Inexperience notwithstanding, he testified less than a year later in Mr. Garcia's trial as an expert. The transcript of this testimony was not disclosed in advance to the attorneys for Mr. Garcia before trial. It was first revealed for the first time during Mr. Garcia's trial during cross-examination by the defense counsel. The prosecutors did not reveal this information at a time and place where and when the defense lawyers could not research it and gather additional impeachment information or subpoena the undisclosed records.[4]

––––––––––––––––––––

[4]The CCA is considering a similar claim in which the state failed to reveal impeachment evidence pertaining to another frequent death penalty future danger expert, A. P. Merillat. In *Ex*

In Rowton's trial, Mr. Smithey testified that he has a bachelor's degree in law enforcement and police science and a master's certificate from TCLEOS.  He has conducted no published studies on prison violence.  There has been no peer review of his work nor was there any empirical data to look at and review.  Further there was  no data that he had with him that could be examined; all the cases they collected were sent to governor''s office.  All the data his office kept are not correlated. He was there to opine how Mr. Rowton would be classified in TDC and his opportunities to commit violence while incarcerated.  Smithey has worked classification off and on for fifteen years.  He was familiar with some but not all of the classification process.  He did not work in nor was he assigned to classification.

In  Rowton's  1999 trial, Mr. Smithey finally conceded that he *was not an expert in classification:*

> [Rowton's Defense Attorney]: Well, then what are you going to testify?  Are you going to say how he's [the defendant] going to be classified when he gets down there [TDCJ]?
>
> [Mr. Smithey]: No, I – what – no one can say at this point until they look at – until he goes through the process of where he would be classified.  My information to the jury is to better educate the jury as to how the process works in general, not just specifically for him, but how it works in general, and when an individual comes through the diagnostic process, what happens during that process and what happens after that process.
>
> [Defense Attorney]: Okay.  But you're not a classification officer?
>
> [Mr. Smithey]: No sir, I am not.
>
> [Defense Attorney]: And have no expertise in that area?

---

parte *Clinton Lee Young,* No. WR-65,137-03 (Tex. Crim. App. Jun 3, 2009), the CCA remanded for consideration of Young's "Claim II: The prosecution's suppression of evidence concerning State witness A.P. Merillat violated applicant's constitutional rights."

[Mr. Smithey]: Well, I've got some expertise because I've worked with them.

[Defense Attorney]: Are you an expert in that area?

[Mr. Smithey]: No, sir.

(*See Smithey testimony in Rowton case, page 102-03, under tab 23 of Garcia 2003 State Habeas PRE.*)

In Rowton's trial, Mr. Smithey went on to describe in general terms his testimony.  While he was there to talk about generally how Mr. Rowton would be classified, "I don't think anybody could come up here and say how he would be classified. It would depend on how he does different things." He admitted he had not looked at any of Rowton's prior incarceration records, which he admitted was a factor.  *Id* at 102.  He hoped "to better educate the jury as to how the process works in general, not just specifically for him, but how it works in general, and when an individual comes through the diagnostic process, what happens during that process and what happens after that process."  It is critical to Mr. Garcia's case to observe that Mr. Smithey admitted he was not an expert in the area of classification.

**C.     Mr. Smithey Initially Tried to Hide His Earlier Disqualification, And Later Finally Admitted That He Did Not Qualify as a Classification or Security Expert, But Claimed That He Was a "Lay Expert."**

In Mr. Garcia's case, the prosecutors did not reveal this vital impeachment information.  Here is how the information came out, as Mr. Smithey confessed his weak qualifications and initially denied any knowledge of having testified in Eddie Rowton's case:

MR. GONZALEZ [Prosecutor]:  Your Honor, that would conclude, I guess, offer of proof on this witness. [Note: no mention of Mr. Smithey's prior testimony had been revealed at this point].

THE COURT:  Cross-examination.

200

MR. MIEARS [Defense]:  You bet.

BY MR. MIEARS: Mr. Smithey, tell the Court what your background, experience and training is.

[Mr. Smithey]: My background is law enforcement.  I've been a peace officer for over 24 years, the last fifteen years working within the prison system on a daily basis, work with all areas of the prison system.   We've been involved in the classification process.  We've been involved –

\* \* \*

[DEFENSE COUNSEL]:    Do you consider this to be an official we're in right now?

[MR. SMITHEY]:   Yes, sir.

[DEFENSE COUNSEL]:   Do you consider your statements to be material?

[MR. SMITHEY]:   Yes, sir.

(2001 R.R. vol. 34 at 40.)

**Here is Where Smithey Claimed to Be a Classification Expert:**

[DEFENSE COUNSEL]:    Turn around there and tell the Judge whether you're tendering yourself as an expert in prison classification.

[MR. SMITHEY]:   Yes, sir.

[DEFENSE COUNSEL]:   Has anything changed about your experience and background in the last two or three years?  You done anything different?

[MR. SMITHEY]:   No, sir.

(2001 R.R. vol. 34 at 40.)

**Here is Where Smithey Tried to Hide His Previous Disqualification**

[DEFENSE COUNSEL]:    Do you remember testifying in a case State of Texas versus Eddie Routon?

[MR. SMITHEY]:   No, sir.  Where would -- where would it have been?

201

[DEFENSE COUNSEL]:    Well, it's in Texas.

MR. MIEARS:  What county is it?

MR. PIERCE:  Ector.

[DEFENSE COUNSEL]:    (By Mr. Miears) Ector County.

[MR. SMITHEY]:   (By the witness) I don't remember the name.  No, sir.

[DEFENSE COUNSEL]:   You don't remember State of Texas versus Eddie Routon where you testified back in December 8 of 1999?

[MR. SMITHEY]:   I very well could have been there.  I don't remember the name.  No, sir.  I testify in a lot of cases.

[DEFENSE COUNSEL]:   Well, do you remember being asked the question of whether or not you're a classification expert in that case?

[MR. SMITHEY]:   No, sir.

[DEFENSE COUNSEL]:    Let me show you this transcript of your testimony.

[MR. SMITHEY]:   Okay.

[DEFENSE COUNSEL]:    Look that over a little bit.  Tell me when you finish reviewing it.

[MR. SMITHEY]:   Do you want me to review the whole page or just what's in yellow?

[DEFENSE COUNSEL]:   You can review as much as you want.  Because it's pretty important.

[MR. SMITHEY]:   Okay.

(Pause.)

[MR. SMITHEY]:   (By the witness) Okay, sir.

(2001 R.R. vol. 34 at 40-41.)

202

***Here is Where Smithey Began to Realize He was In Trouble and Tried to Craw Fish Away From His Early Broad Claims of Expertise.  He Declared Himself Merely a "Lay Expert":***

[DEFENSE COUNSEL]:    (By Mr. Miears) I want to ask you again.  Give you a chance to change your answer.  Are you tendering yourself as an expert in classifications in the prison system?

[MR. SMITHEY]:   Let me rephrase.

[DEFENSE COUNSEL]:    Just yes or no.

[MR. SMITHEY]:   I have an expertise in that area that would better --  that would certainly assist the jury in better understanding that process.

[DEFENSE COUNSEL]:   Are you tendering yourself as an expert in prison classification?  Yes or no.

[MR. SMITHEY]:   ***Lay expert.***

(2001 R.R. vol. 34 at 42.)

***Here is Where the Prosecutor Tried to Hide, or At Least Gloss Over, The State's Failure to Reveal Earlier Impeachment Information and Smithey's Disqualification:***

MR. GONZALEZ [Prosecutor]: Judge, I'm going to object to that.  Asked and answered.  He's not allowing the witness -- the witness has already given a response.  At this point it's badgering.

THE COURT:  I've heard an answer to the question.  Go ahead and ask your next question.

[DEFENSE COUNSEL]:   (By Mr. Miears) Do you recall making -- having a question asked you in the case of State of Texas versus Eddie Routon, "Okay.  But you're not a classification officer?"  Answer:  "No, sir, I am not."  Question: "And you have no expertise in that area?"  Answer:  "Well, I've got some expertise because I've worked with them."  Question:  "Are you an expert in that area?"  Your answer was?

[MR. SMITHEY]:   (By the witness) No.

[DEFENSE COUNSEL]:    No.  So where are you lying?  Today or back then?

203

***Again, the Prosecutor Tried to Gloss Over Smithey's Failures.  Smithey
Reiterated That He Was Merely a "Lay Expert":***

MR. GONZALEZ:    Objection, Your Honor.    Mischaracterization of
testimony. That question is not relevant. Improper impeachment. It's argumentative,
Your Honor.

THE COURT:  Overruled.  You may answer the question.

[DEFENSE COUNSEL]:    (By Mr. Miears) In which case were you lying?

[MR. SMITHEY]:    (By the witness) I'm not lying in either one of them.

[DEFENSE COUNSEL]:    Well, you said -- are you saying you're an expert
in classification here?

[MR. SMITHEY]:    I have an expertise that would -- under the definition

[DEFENSE COUNSEL]:    No.  That –

[MR. SMITHEY]:    Yes, sir.  I would be an expert.

[DEFENSE COUNSEL]:    No.

[MR. SMITHEY]:    ***A lay expert.***

[DEFENSE COUNSEL]:    Are you a lawyer?

[MR. SMITHEY]:    No, sir.

[DEFENSE COUNSEL]:    Well, then, what definition are you talking about?

[MR. SMITHEY]:    I'm talking about the information that I have, you know,
would better assist the jury in understanding this process, and I would assume that
it would be considered a lay expert.

[DEFENSE COUNSEL]:    Are you or are you not testifying today in this
official proceeding to a material fact that you are an expert in classification?

[MR. SMITHEY]:    ***A lay expert.***  Yes, sir.

[DEFENSE COUNSEL]:    Did you or did you not testify in the case of State
of Texas versus Eddie Routon that you were not a classification expert?

[MR. SMITHEY]:   I believe I did.  Yes, sir.

[DEFENSE COUNSEL]:    I want to give you one more chance to change your answer.  Withdraw it.

[MR. SMITHEY]:   I don't know any other way to answer it.

(2001 R.R. vol. 34 at 42-44.)

***Here is Where Smithey Reveals His Utter Lack of Experience:***

[DEFENSE COUNSEL]:    Do you sit on any state -- the classification committee for the prison system is a separate committee; is that correct?

[MR. SMITHEY]:   The state classification committee?  Yes, sir.

[DEFENSE COUNSEL]:    Do you sit -- have you ever sat on a state classification committee?

[MR. SMITHEY]:   No, sir.

[DEFENSE COUNSEL]:    Have you ever been to a meeting of the state classification committee?

[MR. SMITHEY]:   Yes, sir.

[DEFENSE COUNSEL]:   How many times?

[MR. SMITHEY]:   Few times.  Not many.

[DEFENSE COUNSEL]:   How many?

[MR. SMITHEY]:   I'd say four, five maybe.  Maybe three or four.

[DEFENSE COUNSEL]:   When was the last one?

[MR. SMITHEY]:   The state classification committee?  It's been several years.  I don't really know.  It's been several years.

[DEFENSE COUNSEL]:   Have you read the state classification committee guidelines?

205

[MR. SMITHEY]:   I am familiar with some of them.  I'm not familiar with all of them.

[DEFENSE COUNSEL]:   When is the last time you read some of them?

[MR. SMITHEY]:   Oh, that would have been probably several years ago. I understand that they are currently in the process of changing that.

[DEFENSE COUNSEL]:   How much is some of it?

[MR. SMITHEY]:   I don't know.

[DEFENSE COUNSEL]:   Well, how many pages do these guidelines consist of?

[MR. SMITHEY]:   I couldn't tell you.

[DEFENSE COUNSEL]:   Well, is it hundreds, thousands?

[MR. SMITHEY]:   The best I can remember, it's probably hundreds.

[DEFENSE COUNSEL]:   Of those hundreds you've read a few?

[MR. SMITHEY]:   I've probably not read every page in it.  I have reviewed -- I have reviewed some of it.  I don't know to what extent how much of it.

[DEFENSE COUNSEL]:   The state classification committee consists of chairman and SCC members; is that correct?

[MR. SMITHEY]:   Yes, sir.

[DEFENSE COUNSEL]:   How many members are on the committee?

[MR. SMITHEY]:   I'm not sure.  I think there's ten, but I could be wrong.

[DEFENSE COUNSEL]:   Are you the chairman of the committee?

[MR. SMITHEY]:   No, sir.

[DEFENSE COUNSEL]:   You ever been a member of the committee?

[MR. SMITHEY]:   No, sir.

(2001 R.R. vol. 34 at 44-46.)

***Here is Where Smithey Reveals The Existence of Hidden Records and Documents Which Had Not Been Revealed by the State:***

[DEFENSE COUNSEL]:   Well, tell me what -- what data you know about classification.  Did you bring some data with you?

[MR. SMITHEY]:  No, sir.  I did not.

[DEFENSE COUNSEL]:   Did you bring any study with you?

[MR. SMITHEY]:  No, sir.  I did not.

[DEFENSE COUNSEL]:   Did you bring any published papers that you've done on the subject?

[MR. SMITHEY]:  No, sir.  I did not.

[DEFENSE COUNSEL]:   Have you published any papers on this subject?

[MR. SMITHEY]:  No, sir.  I have not.

[DEFENSE COUNSEL]:   Other than a few pages of the guidelines, have you read any stuff on this -- on topics on this?  Subjects on this?

[MR. SMITHEY]:  Not topics.  I've read -- I've read some of the procedures, have reviewed some of the procedures.

[DEFENSE COUNSEL]:   When you say that the tape doesn't depict ad seg, when is the last time you were in ad seg at the Michaels Unit?

[MR. SMITHEY]:   At the Michaels Unit?  Oh, it's been probably maybe three or four years.  Maybe a little longer.

[DEFENSE COUNSEL]:   How long were you there?

[MR. SMITHEY]:   Probably several hours.

[DEFENSE COUNSEL]:    And in those hours you saw what an abnormal day looked like in ad seg?

[MR. SMITHEY]:   No.  I think I probably would have seen what would be a normal day in ad seg.

[DEFENSE COUNSEL]:    Are you tendering yourself here as an expert on administrative segregation?

[MR. SMITHEY]:   Yes, sir.  I believe so.

[DEFENSE COUNSEL]:    Well, okay.  What gives you that expertise?  Besides what you've already told us about.  You don't -- you haven't -- you're not on the committee; right?

[MR. SMITHEY]:   That's correct.

[DEFENSE COUNSEL]:    Did you help set up ad seg?

[MR. SMITHEY]:   No, sir.

[DEFENSE COUNSEL]:    Do you have anything to do with the rules of ad seg?

[MR. SMITHEY]:   No, sir.

[DEFENSE COUNSEL]:    Do you have anything to do with collecting statistics regarding ad seg?

[MR. SMITHEY]:   No, sir.

[DEFENSE COUNSEL]:    Are there statistics regarding ad seg?

[MR. SMITHEY]:   ***There would be statistics that would be entered into the Emergency Action Center of data of offenses that occur in administrative segregation.***

[DEFENSE COUNSEL]:    Let's -- give the Judge the data.

[MR. SMITHEY]:   I don't have it.

[DEFENSE COUNSEL]:    Well, why not?

[MR. SMITHEY]:   I just don't.

[DEFENSE COUNSEL]:    Well, where is it?

208

[MR. SMITHEY]:  ***The Emergency Action Center would have it, I'm sure.***

[DEFENSE COUNSEL]:   There's data, but you're not going to disclose it?

[MR. SMITHEY]:   I don't have any in my possession.  I'm not -- care, custody, control of it.

[DEFENSE COUNSEL]:   So you don't -- you're not even the person who controls that data, are you?

[MR. SMITHEY]:  No, sir.

[DEFENSE COUNSEL]:   Do you study ad seg?

[MR. SMITHEY]:  No, sir.  I don't study it.

[DEFENSE COUNSEL]:   You ever been confined to ad seg?

[MR. SMITHEY]:  No, sir.  Sure haven't.

[DEFENSE COUNSEL]:   You ever been an officer that worked on ad seg?

[MR. SMITHEY]:  No, sir.  I have not.

[DEFENSE COUNSEL]:   Have you ever taken a picture of ad seg?

[MR. SMITHEY]:  Many times.

[DEFENSE COUNSEL]:   Where are the pictures?

[MR. SMITHEY]:   They're probably in case files.  They're admitted into courts.

[DEFENSE COUNSEL]:   So you've been to ad seg for a couple hours and you're an expert on ad seg?

[MR. SMITHEY]:   I've been working in and out of administrative segregation for over fifteen years.

[DEFENSE COUNSEL]:   You just told me a minute ago you've been in ad seg for a few hours.

209

[MR. SMITHEY]:   I was -- the last time I was at the Michael Unit administrative segregation was just for a couple hours.

[DEFENSE COUNSEL]:   What about this idea of staffing in prison?  Are you an expert in staffing prisons?

[MR. SMITHEY]:   No, sir.  I'm not.

[DEFENSE COUNSEL]:   Have you published any studies about staffing in prison?

[MR. SMITHEY]:   No, sir.  I have not.

[DEFENSE COUNSEL]:   Have you read any studies about staffing in prison?

[MR. SMITHEY]:   *Other than newspaper articles, articles that come out through the professional facilities themselves about how understaffed they are.*

[DEFENSE COUNSEL]:   Okay.  Well, turn over to the Judge your data and statistics and studies about staffing or understaffing in prison.

[MR. SMITHEY]:   *I don't have any.*

[DEFENSE COUNSEL]:   What about risks of committing crimes in prison, violence in prison?  Are you an expert on that?

[MR. SMITHEY]:   I have an expertise in that.  Yes, sir.

[DEFENSE COUNSEL]:   Are you an expert -- are you tendering yourself as an expert to this Court in that?

[MR. SMITHEY]:   *I think I'm a lay expert.*

[DEFENSE COUNSEL]:   What do you mean by lay expert?  What does that mean?

I mean, you're a peace officer.  Are you saying you're just as much an expert as anybody off the street?

[MR. SMITHEY]:   I have a -- I have a knowledge of the workings and the procedures that go on that the normal person wouldn't have.

210

[DEFENSE COUNSEL]:    So where is the data that goes with this lay expertise?

[MR. SMITHEY]:   It's -- it's what I do every day.

[DEFENSE COUNSEL]:    Well, turn it over to the Court.  Reach down in your briefcase and get it.

[MR. SMITHEY]:   I didn't even bring a briefcase with me.

[DEFENSE COUNSEL]:    Where is the data?

[MR. SMITHEY]:   What data?

[DEFENSE COUNSEL]:   That's what I'm trying to find out.  What data are you going to base your opinion on to this jury?

[MR. SMITHEY]:   Just a -- an expertise that I have, the experience that I've had for over fifteen years.

[DEFENSE COUNSEL]:   Just some general idea that, yeah, there's violence in prison?

[MR. SMITHEY]:   Yes, sir.

[DEFENSE COUNSEL]:    Okay.  Well, turn the data over to the Judge so this can be helpful to this jury.

[MR. SMITHEY]:   I don't have the data.

MR. GONZALEZ: Objection, Your Honor.  Asked and answered.

THE COURT:  I don't hear a question there, either.

[DEFENSE COUNSEL]:    (By Mr. Miears) Can you turn that data over?

[MR. SMITHEY]:   (By the witness) No.

[DEFENSE COUNSEL]:    Because you don't have it?

[MR. SMITHEY]:   No.

[DEFENSE COUNSEL]:    It doesn't exist?

211

[MR. SMITHEY]:  *There is data that exists.  Yes, sir.*

[DEFENSE COUNSEL]:  But you're not going to bring it.

[MR. SMITHEY]:  I was not asked to.  I don't know that -- that I could get hold of everything you want.

[DEFENSE COUNSEL]:  How are we supposed to make a determination about your lay expertise if you're not going to turn over the data?  If you're not going to bring the data, if you're not going to discuss the data.

[MR. SMITHEY]:  I'll discuss the data with you as much as I can.

[DEFENSE COUNSEL]:  *Well, wouldn't it kind of be helpful to have it in a written form where we can look at it?*

[MR. SMITHEY]:  *Yes, sir.  I guess it would be.*

[DEFENSE COUNSEL]:  As far as proper procedure in administrative segregation, you -- you've worked in ad seg so you know what proper procedure in ad seg is?

[MR. SMITHEY]:  No, sir.  I have not worked in administrative segregation. No, sir.

[DEFENSE COUNSEL]:  I'm asking.  You know what the proper procedure in ad seg is?

[MR. SMITHEY]:  Yes, sir.

[DEFENSE COUNSEL]:  Based on what?  What experience and training do you have in that?

[MR. SMITHEY]:  Here again, it's just the everyday workings of handling prison cases, knowing that when there's supposed to be two officers that escort inmates that that's not always the case, that -- because of staffing problems.  I mean, that's -- that's what I see.  That's what I know.  I don't need any data for that.  I've seen that.

[DEFENSE COUNSEL]:  You've seen that as an employee of ad seg?

[MR. SMITHEY]:  I've seen that as an investigator working a criminal case or investigating cases.

212

[DEFENSE COUNSEL]:   You've seen that as somebody who's studied ad seg?

[MR. SMITHEY]:   I don't study ad seg.  No, sir.

[DEFENSE COUNSEL]:   You've published reports and opinions, your opinions, about ad seg?

[MR. SMITHEY]:   I've already testified I haven't published anything.

[DEFENSE COUNSEL]:   Do you think that's a material statement in this court proceeding, that you haven't published anything?

[MR. SMITHEY]:   I would assume it is if you're going to ask me that question, because I haven't published anything.

[DEFENSE COUNSEL]:   Okay.  All right.  So we can -- we can, then, look at some stuff that you've put out in written form and we can ask you questions about that?

[MR. SMITHEY]:   The only thing that I know that I've put out in any kind of written form would be case notes that would have been prepared for the prosecutor for cases.

[DEFENSE COUNSEL]:   Okay.  So as far as papers, you've never published any.  Is that what you're telling us?

[MR. SMITHEY]:   I believe that was my testimony.  Yes, sir.

[DEFENSE COUNSEL]:   So you don't sit on any classification committee, you don't make any classification decisions, you don't study classifications, you've written no papers about classification, you don't have any data about classifications, you haven't brought any books about classifications, you haven't brought any guidelines about classifications, but you're here to make a statement to this jury about this man's classification in the prison system?

[MR. SMITHEY]:   To the knowledge that I have.  Yes, sir.

***Here is Where the Trial Attorney Made a Proper Objection to Smithey's Testimony, Which Was Overruled:***

MR. MIEARS:  Judge, I object to this witness testifying to anything in this case.  First of all, he's not an opinion under Rule -- he's not an expert under Rule 701.

213

He's not an expert under Rule 702.  He's failed to provide anything that would be the basis of an opinion of testimony under Rule 703, under Rule 704.  His opinions, if there are any, should be inadmissible because he doesn't have any facts, he doesn't have any data, he's not brought anything to provide us a sufficient basis for his opinion with the exception of just saying trust me, I've been there, I saw it once or twice, and I've read it a few times.

THE COURT:  Any further questions?

MR. GONZALEZ:  I have some.  Yes, Your Honor.

THE COURT:  All right.

MR. GONZALEZ:  If Mr. Miears is --

MR. MIEARS:  And further, just complete the objection.  Further object under Rule 403 in that anything he would provide at this point that would be helpful and admissible is that there's violence in prison?  How can that be anything other than cumulative of what else -- what other testimony has already been presented by Dr. Quijano, that they went over with him line by line as to yes, there's violence in prison?  403 is not just prejudicial versus probative.  It also deals with cumulative evidence.  That's all this is.  It's not rebuttal.  He's not an expert.  That's it.

MR. GONZALEZ:  Actually, Judge, I have no more questions.

THE COURT:  Those objections will be overruled.

The testimony will be received by the Court.  Let's take a short break, and we'll bring our jury in.

(2001 R.R. vol. 34 at 46-54.)

**D.      The Supreme Court and Court of Criminal Appeals Has Held that Material Impeachment Evidence Must Be Turned Over to Defense Attorneys Before Trial.**

The State was obligated to disclose the internal TDCJ-ID statistics and identify Mr.

Smithey's previous disqualification, *without prodding*, under decades old Supreme Court precedent.

The State has long had the duty "to produce to the defense all physical evidence that would be

offered at trial and explicitly required that all exculpatory evidence known to the prosecutor be

214

produced in accordance with the Brady rule." *Taylor v. State*, No. 06-01-00217-CR (Tex. App.–Texarkana 2002, pet. his. unknown) (*citing Brady v. Maryland,* 373 U.S. 83 (1963)). The prosecutor is obligated to produce evidence which will assist the defense in impeaching a State witness, and is obligated to look outside of its own file and must inquire of law enforcement personnel. *See United States v. Bagley,* 473 U.S. 667 (1985); *United States v. Agurs,* 427 U.S. 97 (1976).

The Court of Criminal Appeals has summarized the duty of a prosecutor to turn over impeachment or exculpatory evidence. In *Thomas v. State*, 841 S.W.2d 399, 402 (Tex. Crim. App. 1992), the Court commented that, "The State's duty to disclose evidence favorable to the defendant is an extension of *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In *Mooney,* the Supreme Court established the general rule that a prosecutor's knowing use of perjured testimony violated the defendant's right to due process under the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Thomas*, 841 S.W.2d at 402 (citations omitted).

Later, in *Alcorta v. Texas,* 355 U.S. 28, 78 S. Ct. 103 (1957), "the Supreme Court expanded the rule in *Mooney* and held the prosecutor's knowing failure to correct a witness' perjured testimony denied the defendant due process. The Court noted the prosecution's failure to correct a witness' perjured testimony, which would have supported the defendant's theory of mitigating circumstances, prevented the defendant from effectively corroborating his own defensive theory." *Thomas*, 841 S.W.2d at 402 (citations omitted). "The Supreme Court expanded the prosecutorial duty to correct perjured testimony to include perjured testimony which related to the witness' credibility and not just the facts of the case." *Thomas*, 841 S.W.2d at 402 (*citing Napue v. Illinois,* 360 U.S. 264, 79 S. Ct. 1173 (1959)). "In *Napue*, the Court held a prosecutor's knowing failure to correct perjured

testimony which related to the witness' credibility violated the defendant's right to due process." *Thomas*, 841 S.W.2d at 402 (citation omitted).

In *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963), the Supreme Court "held the suppression of the co-defendant's confession was a violation of the Due Process Clause of the Fourteenth Amendment." *Thomas*, 841 S.W.2d at 402 (citation omitted). "Specifically, the Court held, 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution.'" *Thomas*, 841 S.W.2d at 402 (*citing Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97).

In *United States v. Agurs,* 427 U.S. 97, 96 S. Ct. 2392 (1976), "the Supreme Court was called upon to determine whether the prosecutor has a duty, in the absence of a specific request, to disclose exculpatory evidence to the defense, and if so, what standard of materiality gives rise to that duty. *Thomas*, 841 S.W.2d at 402 (citation omitted). "To resolve the issue the Court recognized three standards of materiality. First, in the case of a prosecutor's knowing use of perjured testimony, the conviction will be reversed 'if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury.'" *Thomas*, 841 S.W.2d at 402 (*citing Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397 (footnote omitted)).

The critical point by the Supreme Court occurs when the Defendant has made a specific request. "Although there is, of course no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When

216

the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399.

"Finally, when there was no request or only a general request, a "reasonable doubt" standard applied because a finding of guilt is permitted only when supported by 'evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence create[d] a reasonable doubt that did not otherwise exist, constitutional error has been committed.'" *Thomas*, 841 S.W.2d at 402 (*quoting Agurs,* 427 U.S. at 113, 96 S.Ct. at 2402). "Restated, if the withheld evidence created a reasonable doubt as to the defendant's guilt or punishment, the conviction had to be reversed. However, 'if there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.'" *Id.* "Furthermore, in determining whether the omitted evidence raised a reasonable doubt, 'the omission must be evaluated in the context of the entire record.'" *Id.* (footnote omitted). "However, the Court recognized there were 'situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request.'" *Thomas*, 841 S.W.2d at 402 (*quoting Agurs*, 427 U.S. at 110, 96 S.Ct. at 2401 (footnote omitted)).

In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court expanded the definition of favorable evidence to include both exculpatory evidence and impeachment evidence, because '[s]uch evidence is 'favorable to the accused' [citation omitted], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.'" *Thomas*, 841 S.W.2d at 402 (*quoting Bagley,* 473 U.S. at 676, 105 S. Ct. at 3380).

"The *Bagley* Court eliminated the request prong of Brady and revised the three standards of materiality in Agurs to two standards. First, in situations of the knowing use of perjured testimony

the Court retained the harmless error standard. *Bagley,* 473 U.S. at 679, 105 S.Ct. at 3382, n. 9.  The

Court then combined the materiality standards for situations where the prosecutor failed to disclose

favorable evidence." *Thomas*, 841 S.W.2d at 403 (citation omitted).

> **E.    Mr. Garcia Made Specific Requests Before Trial For All Impeachment, Mitigating and Exculpatory Evidence, and Therefore the Strict Standard of *Agurs*.**

Anticipating that the State might claim that it was unaware of the duty to provide Smithey's

prior impeachment evidence or TDCJ-ID's internal contradicting data, or that Mr. Garcia's attorney

was under some sort of obligation to issue subpoenas duces tecum for evidence the nature of which

he could only guess.

Here are the requests made by the defense in 2000 for *Brady* impeachment and exculpatory

evidence:

| | |
|---|---|
| Motion for Production of Witness Statements | 2001 C.R. vol. 1 at 71 (granted) |
| Motion for Evidence Favorable to Defendant | 2001 C.R. vol. 1 at 90 (granted, at 93) |
| Motion for Equal Access to Background on Jurors (Brady request) | 2001 C.R. vol. 2 at 367 (denied, at 369) |

In addition, in 1991, Mr. Garcia first attorney made similar requests, and there is no reason

to think that these requests lack their original force and effect.

For all of these reasons, Mr. Garcia is entitled to a new sentencing hearing.

***Claim Number 35: Testimony by The State's Psychologist That Mr. Garcia Was a Future Danger Lacked Scientific Reliability Required by Daubert v. Merrill Dow Pharmaceuticals, Inc., and Kumho Tire Co., Ltd. v. Carmichael.***

***Claim Number 36: The State's Psychologist Who Testified That Mr. Garcia Was a Future Danger Lacked Sufficient Qualifications as Required by Daubert v. Merrill Dow Pharmaceuticals, Inc., and Kumho Tire Co., Ltd. v. Carmichael.***

***Claim Number 37:  Testimony by the State's Psychologist That Mr. Garcia Was a Future Danger Lacked Scientific Reliability, and Thereby Violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.***

Mr. Garcia challenges the qualifications and testimony of Dr. Lisa K. Clayton, the State's psychologist, under *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 143 L.Ed.2d 238 (1999).

These claims were properly exhausted.  They were included in Garcia's timely filed 2003 state habeas application as claims 29-31.

As mentioned, in rebuttal, the State called Dr. Lisa K. Clayton, a psychologist.  (2001 RR vol. 33 at 7-8.)  She interviewed Mr. Garcia and conducted various tests on him.  She told jurors:

- • Mr. Garcia suffers from an Axis II diagnosis, termed "anti-social personality disorder."  (2001 RR vol. 33 at 15-16.);

- • She did not detect any meaningful remorse;

- • He is a future danger to society (2001 RR vol. 33 at 31-32; 55-56.).

Garcia objected to Dr. Clayton's testimony that he was a future danger to society as improper rebuttal testimony.  (2001 RR vol. 33 at 1-6.)  Garcia argued that he did not offer testimony that he was <u>not</u> a future danger to society.  Garcia had called in his sentencing case in chief two expert witnesses, Dr. Kessner and Dr. Quijano.  Dr. Kessner only described mitigating circumstances in Garcia's life which might warrant a life sentence.  It was only in response to State cross-examination, she that she discussed future dangerousness at all, and she in fact conceded that all evidence pointed

219

that he would remain a future danger.  Dr. Quijano did not interview Garcia at all.  He merely

described the state penitentiary and the layers of control which would secure Mr. Garcia.  He did not

testify at all whether Garcia would constitute a future danger.

In his 2003 state habeas application, Garcia asserted that his trial counsel was ineffective in

part for failing to object to Dr. Clayton's interview of Garcia:

> W.    Trial Counsel Failed to Object to Interview of Mr. Garcia by the
> State's Psychologist and Forced Waiver of his Fifth Amendment
> Right to Silence or to Challenge Constitutionality of *Lagrone v. State*.

> The trial counsel allowed Gustavo to be interviewed by a state psychologist
> without objecting or preserving the issue.  (R.R. vol. 25 at 203.)
> In this point, it may be impossible for anyone to overcome *Lagrone v. State*,
> but without an objection, the matter may be procedurally defaulted for federal review.

Garcia 2003 State WHC at 170-71.

In its 12 February 2008 F&Cs, pages 16-17, the state trial court held that the Dr. Clayton

claims should have been raised on direct appeal and were not; consequently they were procedurally

barred under state law.  The CCA adopted the F&Cs.

This portion of the IAC claim was sufficient to preserve the challenge to Clayton's testimony

because although the IAC claim challenges the trial counsel's failure to object to a forced 5th

Amendment waiver of his right to remain silent, the only purpose of the interview was to gather

information by Dr. Clayton for her future dangerousness assessment.  Therefore, Garcia's counsel's

failure to object to the 5th Amendment violation cascaded into a failure to challenge the due process

and 8th amendment challenges to future dangerousness predictions in general.  Consequently, the

IAC challenge to the one preserves the IAC challenge to the derivative claims.

220

### A.    *Psychiatric predictions of future dangerousness.*

The best arguments against future dangerousness assessments by psychologists was written

by Judge Gaza in his concurrence in **Flores v Johnson**, 210 F.3d 456 (5th Cir. 2000), which Garcia

adopts and presents:

> This court, see, e.g. Little v. Johnson, 162 F.3d 855, 863 (5th
> Cir. 1998), as well as the Texas Court of Criminal Appeals, often
> rests the admissibility of this type of testimony on the precedent
> of Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77
> L.Ed.2d 1090 (1983). In Barefoot, the Supreme Court squarely rejected
> the claim that the unreliability of psychiatric predictions of
> future dangerousness should render it inadmissible, asserting
> that:
>
>> If the likelihood of a defendant committing future crimes is a
>> constitutionally acceptable criterion for imposing the death
>> penalty, which it is, and if it is not impossible for even a lay
>> person sensibly to arrive at that conclusion, it makes little
>> sense, if any, to submit that psychiatrists, out of the entire
>> universe of persons who might have an opinion on the issue, would
>> know so little about the subject that they should not be permitted
>> to testify.
>
> Id. at 896-97, 103 S.Ct. at 3396, 77 L.Ed.2d at __. The Court
> held that, even assuming that this evidence was unreliable, the
> adversary system would redress this problem by creating a
> credibility evaluation by the jury; the defense could, through its
> own experts, challenge a state psychiatrist's testimony in
> particular or the practice of predicting future dangerousness in
> general. See id. at 898, 103 S.Ct. at 3398, 77 L.Ed.2d at __
> ("If [psychologists] are so obviously wrong and should be
> discredited, there should be no insuperable problem in doing so by
> calling members of the Association who are of that view and who
> confidently assert that opinion in their amicus brief.").[fn8] The
> Court held that, faced with conflicting evidence on the
> reliability of such predictions in general and the future
> dangerousness of the defendant in particular, the jury could
> adequately process the information and come to a rational
> evaluation of the defendant.

221

The scientific community virtually unanimously agrees that
psychiatric testimony on future dangerousness is, to put it
bluntly, unreliable and unscientific. It is as true today as it
was in 1983 that "[n]either the Court nor the State of Texas has
cited a single reputable scientific source contradicting the
unanimous conclusion of professionals in this field that
psychiatric predictions of long-term future violence are wrong
more often than they are right." Id. at 920, 103 S.Ct. at 3409,
77 L.Ed.2d at ___ (Blackmun, J., dissenting) (citing
studies).[fn9] As those in the field have often noted, nothing
within the training of a psychiatrist makes him or her
particularly able to predict whether a particular individual
will be a continuing threat to society. See Brief
of the American Psychiatric Association, Barefoot v. Estelle,
463 U.S. 880 (1983) (hereinafter "APA Br."), at 9
("psychiatrists . . . bring no special interpretative skills"). In fact,
not even the Barefoot majority could identify a "scientific"
basis for predictions of future dangerousness; its opinion expressly
rests on the analysis that "even a lay person" could make such predictions.
See Barefoot, 463 U.S. at 896-97, 103 S.Ct. at 3383, 77 L.Ed.2d at __.

The inadequacy of the science underlying Dr. Griffith's testimony
become strikingly apparent when considered relative to scientific
evidence generally admissible at trial. In the federal courts, one
does not become qualified to provide "expert scientific" evidence
merely by virtue of possessing a medical or other advanced degree;
rather, "[t]he adjective `scientific' implies [that one's opinion
has] a grounding in the methods and procedures of science."
Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579,
589-90, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469, ___ (1993);
see also Kumho Tire Co., Ltd. v. Carmichael, ___ U.S. ___, ___, 119
S.Ct. 1167, 1176-77, ___ L.Ed.2d ___, ___ (1999) (approving
district court's rejection of expert scientific testimony because
despite the expert's qualifications, including a masters degree in
mechanical engineering, 10 years in practice, and prior testimony
in similar cases, "it doubted, and then found unreliable, the
methodology employed by the expert"). Under the Federal Rules of
Evidence, expert testimony is not admissible unless "an expert,
whether basing testimony upon professional studies or personal
experience, employs in the courtroom the same level of
intellectual rigor that characterizes the practice of an expert in
the relevant field." Kumho, ___ U.S. at ___, 119 S.Ct. at 1176, __
L.Ed.2d at __; Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 359,

222

371 (5th Cir. 2000).[fn10]

To address this particularized need for reliability in expert scientific testimony, the Supreme Court has set out five non-exclusive factors to assist trial courts' determination of whether scientific evidence is reliable, and thus admissible. Those factors are:

(1) whether the theory has been tested,

(2) whether the theory has been subjected to peer review and publication,

(3) the known or potential rate of error

(4) the existence of standards controlling the operation of the technique, and

(5) the degree to which the theory has been generally accepted by the scientific community.

Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97, 125 L.Ed.2d at __; see also Moore v. Ashland Chemical Inc., 151 F.3d 269, 275 (5th Cir. 1998) (en banc), cert. denied ___ U.S. ___, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999). On the basis of any evidence thus far presented to a court, it appears that the use of psychiatric evidence to predict a murderer's "future dangerousness" fails all five Daubert factors.[fn11] First, "testing" of these theories has never truly been done, as "such predictions often rest . . . on psychiatric categories and intuitive clinical judgments not susceptible to cross-examination and rebuttal." Barefoot, 463 U.S. at 932, 103 S.Ct. at 3414-15, 77 L.Ed.2d at ___ (Blackmun, J., dissenting) (citing Dix, Expert Prediction Testimony in Capital Sentencing: Evidentiary and Constitutional Considerations, 19 Am. Crim. L. Rev. 1, 16 (1981)); see also APA Br. at 17 ("Because most psychiatrists do not believe that they possess the expertise to make long-term predictions of dangerousness, they cannot dispute the conclusions of the few who do.").[fn12] Second, as is clear from a review of the literature in the field, peer review of individual predictions is rare, and peer review of making such predictions in general has been uniformly negative. See, e.g., Grant Morris, Defining Dangerousness: Risking a Dangerousness Definition, 10 J. Contemp. Legal Issues 61, 85-86 (1999) (citing studies) ("More than twenty years ago, Alan Stone acknowledged that psychiatrists

223

cannot predict whether a person will engage in dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. As to clinically-based predictions of dangerousness, the passage of time has not altered the accuracy of Stone's judgment."). Third, the rate of error, at a minimum, is fifty percent, meaning such predictions are wrong at least half of the time. See, e.g., Otto, supra note 11, at 64 & n. 65. Fourth, standards controlling the operation of the technique are nonexistent. See APA Br. at 13 (noting that "the professional literature demonstrate[s] no reliable criteria for psychiatric predictions of long-term future behavior"). Overall, the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness.

As some courts have indicated, the problem here (as with all expert testimony) is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an "expert") gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact.[fn13] As has been previously recognized, when a medical doctor testifies that "future dangerousness" is a scientific inquiry on which they have particular expertise, and testifies that a particular defendant would be a "continuing threat to society," juries are almost always persuaded. See, e.g., Satterwhite, 486 U.S. at 258, 108 S.Ct. at 1799, 100 L.Ed.2d at ___ ("[Dr. Grigson's] testimony stands out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message . . . that [the defendant] was beyond the reach of psychiatric rehabilitation."); Barefoot, 463 U.S. at 916, 103 S.Ct. at 3407, 77 L.Ed.2d at ___ (Blackmun, J., dissenting) ("In a capital case, the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself."); White v. Estelle, 554 F. Supp. 851, 858 (S.D.Tex. 1982) ("[W]hen this lay opinion is proffered by a witness bearing the title of `Doctor,' its impact on the jury is much greater than if it were not masquerading as something it is not."). Jurors, faced with the responsibility of determining whether an individual

who committed at least one murder will kill or otherwise commit violence again, and threatened with the immeasurable potential consequences of an incorrect determination, are understandably likely to defer to an "expert" determination which will eliminate those consequences, even if its reliability is questioned by another "expert." See APA Br. at 9 ("[I]t permits the jury to avoid the difficult actuarial questions by seeking refuge in a medical diagnosis that provides a false aura of certainty."); Craig Haney, Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death, 49 Stan. L. Rev. 1447, 1469-70 & n. 113 (1997) ("In this light, capital penalty trials sometimes become forums in which grossly prejudicial and unreliable predictions of future dangerousness are presented with the imprimatur of state authority.") (citations omitted).[fn14]

Though Mr. Flores' conviction was affirmed and relief denied, the issue before the Court was not the admissibility of the psychiatric testimony, but whether defense counsel was ineffective for failing to challenge it.   The **Flores** concurrence presents, then, a legal road map for a challenge to the admissibility of psychiatric testimony under Tex.R.Evid. 702.

The following is a summary of Dr. Mark Cunningham's expert analysis of the scientific unreliability of future dangerousness prediction, especially in the absence of an exam; it was part of a legal memorandum attacking the use of Dr. Edward Gripon by the State in a case in Hale County where defense counsel obtained a life sentence:[5]

### The Science Underlying Predictions of Future Dangerousness

Predictions of future dangerousness have a scientific basis.  They are rooted in what is called "base rates."  As explained in materials designed to prepare psychiatrists for the examinations required for board certification in forensic psychiatry., "[t]he base rate is defined as the statistical prevalence of violence behavior in a given group, i.e., the frequency

---

[5]Mr. Garcia's counsel contacted Dr. Cunningham.  Dr. Cunningham reports that it was not an affidavit which he wrote, but published peer articles which later formed the basis of the legal memorandum.  The supporting statements from Dr. Cunningham can be found in the articles which are contained in his record excerpts, attached to his 2003 state habeas application.

225

with which violence is committed in a given period of time, usually one year." Smith, S.M., The Prediction of Dangerous Behavior, in P.J. Resnick (ed.), FORENSIC PSYCHIATRY REVIEW COURSE 539 (American Academy of Psychiatry and Law 1993) [hereafter referred to as "Smith"].  In a capital sentencing proceeding, assessments of future dangerousness must examine whether the defendant will be a future danger if he is sentenced to life rather than death.  Thus, the "base rate" that is relevant for such assessments looks to the frequency of violent behavior in the population of people who have been sentenced to life instead of death in capital trials.

In the mental health professions, the base rate "is considered to be the single most important piece of data necessary in making an accurate risk estimate (Monahan, 1981; Webster, Harris, Rice, Cormier, & Quinsey, 1994)." Cunningham, M.D. & Reidy, T.J, Don't Confuse Me with the Facts: Common Errors in Risk Assessment in Capital Sentencing, 26 CRIM. JUSTICE AND BEHAVIOR 20, 23 (1999) [hereafter referred to as, "Cunningham"].  See also Smith, at 540 ("[k]nowledge of the appropriate base rate is the most important single piece of information necessary to make an accurate prediction").  Base rates are so significant that "[w]ithout this anchor of a comparative reference point, individual risk estimates may be little more than speculation."

The use of base rates is especially important when the base rates for violence in a particular group are not what one would expect.  Thus, while intuition suggests that murderers, especially those convicted of capital murder and sentenced to life, would be the most likely prisoners to engage in further violence, the base rates for such prisoners demonstrates otherwise.  As Dr. Cunningham explained in examining the relevant studies, "base rates of serious institutional violence in capital commutees, murderers, long-term inmates, and federal high-security prisoners do not significantly exceed and in some studies are below inmates convicted of less serious offenses. Bedau, 1964; Cunningham & Reidy, 1998b; Flanagan, 1980; Harer, 1992; Marquart, Eckland-Olson, & Sorenson, 1989; Sorenson & Wrinkle, 1996)." Cunningham.  When such prisoners are paroled, their base rates for violence continue to be lower than the base rates for violence of non-homicide parolees. Cunningham, (citing studies).  "Base rates such as these demonstrate why multiple authors (Hall, 1987; Monahan, 1981; Morris & Miller, 1985; Serin & Amos. 1995) have asserted that base rates are essential to an accurate violence risk assessment." Cunningham.

> The established and accepted method for estimating the risk of dangerousness of a particular capital convict, therefore, must begin with establishing the base rate of similar prisoners' and parolees' violence.  Once that has been done, there is also an established method for individualizing the risk assessment of the individual.  This involves examining prisoners within the cohort of convicted murderers who <u>do</u> commit violence and "identifying particular characteristics of [these] research subjects who subsequently engaged in violent behavior." Grisso, T. & Appelbaum, P.S., Is It Unethical to Offer Predictions of Future Violence?, 16 LAW AND HUMAN BEHAVIOR 621, 628 (1992).  With these characteristics identified, the characteristics of the person whose risk of dangerousness is being assessed can then be compared and an estimate made – taking this and the base rate into account – of the risk that this person will be dangerous in the future.  Id.

226

Again, this aspect of the process may seem counter-intuitive to mental health professionals who are not expert in the field of violence risk assessment.  Many untrained mental health professionals make assessments of future dangerousness on the basis of clinical "judgment" alone, *i.e.*, predicting the risk of dangerousness on the basis of the prior criminal behavior, personality characteristics, personality disorders, and/or symptoms of mental illness or brain damage observed in the defendant.  Without comparing these characteristics and historical data to objective research concerning the relevant prisoner population and the individual characteristics of persons within that population that are correlated with incidents of subsequent violence, the mental health professional's clinical judgment is likely to be wrong.  As Dr. Smith has explained,

> Systematic errors of observation have consistently been linked with the clinician's prior expectations about which characteristics imply dangerousness. The six most frequent responses elicited from psychiatrists as most characteristic of dangerous persons include, "often acts on impulse, has no conscience whatsoever, is addicted to heroin, is utterly irresponsible, fears that people are out to get him, and resents even the slightest criticism."  Hartogs, (1970), has listed 48 alleged predictors of violence including "lack of family interest, love, support, or acceptance" and "conflict over basic identity."  Such descriptions lack scientific validity and have been repeated so often that unfortunately, they have become part of accepted clinical practice.

Smith, at 540.  Even the factors most strongly thought to be predictive of future violence, on the basis of clinical judgment, are not:

> Studies sponsored by the U.S. Justice Department (Alexander & Austin, 1992; National Institute of Corrections, 1992) have concluded:

> 1.   Past community violence is not strongly or consistently associated with prison violence.

> 2.   Current offense, prior convictions, and escape history are only weekly associated with prison misconduct.

227

3.    Severity of offense is not a good predictor of
      prison adjustment.

Prison violence does not predictably follow from preconfinement
violence or the capital offense of conviction.

Cunningham, (citing Alexander, Jack & Austin, James, HANDBOOK FOR EVALUATING
OBJECTIVE PRISON CLASSIFICATION SYSTEMS, United States Department of Justice, National
Institute of Corrections (June, 1992)).

Dr. Cunningham provides one telling example of the fatal flaw in a mental health
professional's reliance on clinical judgment in predicting future dangerousness.  He notes
that many professional who rely on clinical judgment rather than empirical data find that a
person is likely to be dangerous in the future because he has an antisocial personality
disorder.  As he explains, however,

Antisocial personality disorder [APD] is not in and of itself an
indication of a particularly dangerous or incorrigible inmate.
Again, base rates are instructive.  The prevalence or base rate
of APD in a prison population is about 75% (Meloy, 1988).
Thus a diagnosis of APD alone describes little about prison
behavior and recidivism outcome except that the individual is
similar to other prison inmates.

Because of the prevalence of the traits associated with antisocial personality disorder in the
prison setting, these traits are "of little benefit in distinguishing those inmates likely to be a
particular violence risk."  Cunningham.

Notably, in the data that is available concerning the accuracy of predictions of future
dangerousness which were based solely on clinical judgment, time has shown the predictions
to be egregiously inaccurate.  In an informal study of such persons sentenced to death in
Dallas County, the District Attorney's office found that 10 out of 11 person sentenced to
death prior to 1988, who were found to present a risk of future dangerousness, were not – in
fact most had become model inmates without ever having had a disciplinary infraction.  See
Exhibit C.  Similarly, in a study conducted of former death-sentenced Texas inmates,
researchers found that the level of violence in prison or thereafter was generally lower than
the level of violence for non-capital inmates.

Finally, the science of violence risk assessment requires that the expert making such
an estimate take into account two variables in addition to those already discussed.  First, such
risk assessments must take into account the clearly established "[l]ower likelihood of
criminal activity and violence with aging...."  Cunningham.  "Risk assessments that fail to
address the reduced likelihood of violence with progressive aging are fundamentally flawed."
Cunningham.  Second, "Assessment of risk is not simply a static enterprise.  It also involves

228

consideration of what preventive measures can be undertaken that would modify or reduce the level of violence risk posed by a particular inmate." Cunningham. "Capital risk assessment, then, calls for consideration of how the probability of institutional violence would be affected by confinement of the defendant under special conditions of increased security, supervision, and isolation." Cunningham.

In sum,

> Clinicians who rely on traditional mental health evaluation sources of information in performing a capital risk assessment are woefully data deficient. Violence risk assessment at capital sentencing is a broadly data intensive task. These assessments require knowledge of multiple applicable base rates, various prison contexts, differing empirical correlates of violence risk factors in the community and within prison, parole recidivism risk correlates, institutional records of the defendant, patterns of criminal conduct, and situational and interpersonal variables.

Cunningham report, Garcia's 2003 state habeas application, PRE attachments.

The use of clinical evaluations or crime scene evidence as the basis for a prediction of future dangerousness has been completely and thoroughly repudiated by all experts in the field of psychology. It cannot be gainsaid that the State's expert's theories lack any acceptance in the requisite field whatsoever.

Dr. Clayton's examination of Garcia was extremely limited and insufficient to support an opinion that Garcia was a future danger to society. His unfocused testimony cannot be supported by any acceptable scientific methodology and therefore Garcia's case must be returned for a new sentencing hearing.

229

## <u>CHALLENGES TO JURY INSTRUCTIONS</u>

***Claim Number 38: In Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Mitigating Evidence Which Would Have Permitted Jurors to Apply a Reasoned Moral Response to Mr. Garcia's Crime.***

***Claim Number 39: In Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Mitigating Evidence Which Would Have Permitted Jurors to Apply a Reasoned Moral Response to Mr. Garcia's Crime.***

***Claim Number 40: In Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Mitigating Evidence Which Would Have Permitted Jurors to Apply a Reasoned Moral Response to Mr. Garcia's Crime.***

At Mr. Garcia's 2001 punishment re-trial, the trial court refused to give the following instruction requested by the Defense designed to provide jurors with a vehicle for applying a reasoned moral response to mitigating circumstances:

"You are instructed that when you deliberate on the questions posed in the special issues you are to consider all relevant mitigating circumstances, if any, by the evidence presented by the State or the Defendant.  A mitigating circumstance may include, but is not limited, to any aspect of the defendant's character, background, record, emotional instability, intelligence, or circumstances of the crime which you believe could make a death sentence inappropriate in this case.  If you find that there are any -- if you find that there are any, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue.  If you determine, in giving effect to the mitigating evidence, if any, that a life sentence as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration."

(2001 R.R. vol. 34 at 132-33.)

Garcia also complained to the trial court that the meaning of the phrase "moral blameworthiness" as used in the statutory supplemental instruction was not defined for the sentencing jurors.

230

Garcia raised these issues in his direct appeal brief to the Texas CCA. In affirming the instant death sentence, the Texas court reached the federal questions inherent in the refusal of the trial court to 1) give the requested instruction and 2) define the meaning of moral blameworthiness. *Garcia v. State*, (Tex. Crim. App.  11.12.2003), No. 71,417.  Garcia also raised these claims as grounds 18-20 in his 2003 state habeas application.

Garcia will demonstrate that by charging the sentencing jury as it did on the meaning of mitigating circumstances, the Texas court at once improperly relied on dicta found in  *Penry v. Johnson*, (*Penry II*) 532 U.S. 782, 803, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001), and offended the principles of  *Lockett v. Ohio,* 438 U.S. 586 (1978) and progeny. *Penry II* reversed a case that was tried before the 1993 Penry amendments added the mitigation inquiry that the sentencing jury was required to answer in Mr. Garcia's second trial. Thus, the Supreme Court in *Penry II* could not have approved the current Texas capital sentencing scheme: it was not even before the high court. Further, the comment made in dicta in *Penry II* was not directed at the supplemental instruction complained of here, but at the language in the mitigation special issue itself.

The Texas CCA also found support for its decision in the mandatory language of the Texas statute, Art. 37.0711 § 3(e) and several of its earlier decisions. Garcia argues that these decisions must give way to the Lockett doctrine as enunciated in Lockett and its progeny discussed below. Mr. Garcia would call special attention to  *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), (en banc) cert denied *Quarterman v. Nelson*, 127 S.Ct. 2974, 75 USLW 3512, 75 USLW 3674, 75 USLW 3678 (U.S. Jun 18, 2007) (NO. 06-1254).  Nelson is an *en banc* decision of the Fifth Circuit holding that a state's capital sentencing system must permit full consideration of the defense mitigation case for its mitigating effect. In summary form, that is Mr. Garcia's argument here: the

231

definition of mitigation was too restrictive; the jury likely disregarded much or all of his mitigation case for that reason.

In this claim, Mr. Garcia complains about the trial judge giving the sentencing jury permission, perhaps even encouragement, to disregard some of his mitigating evidence. Mr. Garcia's mitigation case presented at this punishment phase included evidence of brain damage, poor family background and upbringing, alcohol and drug abuse by himself and his parents.[6] All of Mr. Garcia's mitigation case may have been disregarded by the jury because of this instruction.

The instruction does not identify the evidence to which it applies. Instead, the instruction, required by Texas law, leaves it up to the jurors to identify the evidence to be disregarded. Indeed, the prosecutors did not make a request for this instruction contemporaneous with the admission with any evidence.

The Texas capital sentencing statute's supplemental instruction limiting mitigating evidence to "evidence that a juror might regard as reducing the defendant's moral blameworthiness," impermissibly instructs jurors to disregard an important class of mitigating evidence when sentencing a capital defendant.  Given that the mitigation special issue already instructs jurors to consider the mitigating circumstances of the offense, including the defendant's character, background, and personal moral culpability, the only way for a reasonable juror to read the moral blameworthiness instruction is as a limiting one.  Any other reading would render the supplemental instruction entirely superfluous.  This instruction violates the Court's repeated decisions affirming that all mitigating evidence is relevant at capital sentencing.  *Lockett v. Ohio*, 438 U.S. 586 (1978);

---

[6] The defense mitigation presentation is more fully described in this petition, commencing at page 21. This description contains citations to the record that should make this evidence and testimony easy to find.

*Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Penry v. Lynaugh*, 492 U.S. 302 (1989). In *Eddings*, the Court highlighted the clear unconstitutionality of a sentencer's refusal to consider relevant evidence by analogizing, "It was as if the trial judge had instructed the jury to disregard the mitigating evidence Eddings proffered on his behalf." *Eddings*, 455 U.S. at 114. The moral blameworthiness supplemental instruction at issue here does just that.

The charge submitted in the case at bar is significantly different from the one approved in *Jurek v. Texas*, 428 U.S. 262 (1976). The statutory scheme upheld in *Jurek* neither directly articulated—nor limited—the mitigating evidence jurors could consider in sentencing a capital defendant. In contrast, the post-*Penry* sentencing scheme requires jurors to consider possible mitigating evidence in answering the third special issue, but then directs them to exclude from that consideration evidence unrelated to the defendant's moral blameworthiness. In this way, the moral blameworthiness instruction cordons off a portion of Mr.Garcia's mitigation evidence from consideration in a way that the sentencing scheme upheld in *Jurek* never did. In *Penry I*, the Supreme Court recognized, "The facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry I*, 492 U.S. at 318. The current statute, with its moral blameworthiness limiting instruction, falls short of that promise and should be struck down as a clear violation of *Lockett* and progeny.

The more general language of the mitigation special issue does not save the Texas statute's constitutionality. The common sense reading of the jury instruction is that the specific "moral blameworthiness" definition of mitigating evidence controls over the more general language in the

special issue.  Furthermore, even if the moral blameworthiness instruction was not actually intended to narrow the scope of mitigating evidence that jurors are permitted to consider, statutory authority to present mitigating evidence alone is not enough if the sentencer may have believed that it could not consider some of that evidence in imposing the sentence.  *Eddings v. Oklahoma*, 455 U.S. 104, 118-19 (1982) (O'Connor, J., concurring).  Under *Lockett* and *Eddings*, "The sentencer … may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114-15.

Defining mitigating evidence as limited to evidence that reduced petitioner's moral blameworthiness created an impermissible <u>risk</u> that the death penalty would be imposed in spite of factors which may call for a less severe penalty.  This Court has squarely held, "When the choice is between life and death,  that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."  *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

Without further guidance, jurors often will not have a proper understanding of what is meant by "moral blameworthiness" in the context of a capital murder prosecution.  Reasonable, law-abiding, and conscientious jurors could have equated moral blameworthiness with being guilty of committing the crime without legal justification or excuse. Jurors who applied this narrow definition were acting completely within their oaths to render a true verdict according to the law and the evidence.  Or perhaps they drew the line elsewhere. Jurors may have concluded that petitioner's brain damage, neglect and abuse as a child, alcohol and drug abuse, and other mental health issues falling short of insanity  had no bearing on his moral blameworthiness for the murder he committed. If so, they would have improperly disregarded much of his legitimate mitigation case.

234

Where the record is unclear about whether all mitigating circumstances were taken into consideration, the Supreme Court has intervened. *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Penry v. Lynaugh*, 492 U.S. 302 (1989).  In *Eddings*, the Court set aside a death sentence on a record revealing it was possible,  but unclear,  whether the sentencing judge thought the law precluded his consideration of Eddings' youthfulness and troubled background.  The evidence here suggests that the jurors who sentenced petitioner followed the instructions the judge gave them and only considered the subset of his mitigating evidence that bore on his moral blameworthiness when they imposed death.  It is not clear how narrowly jurors applied this limitation or how much of petitioner's mitigation case those jurors believed they were permitted to consider under the supplemental instruction.  Here the case at bar is analogous to *Penry I*.  In reaching its decision to reverse and remand Penry's death sentence, the Supreme Court relied,  in part,  on its finding that since the jury was not given a definition or instruction on the term 'deliberately,' "we do not know precisely what meaning the jury gave to it."  As the *Penry I* court continued:

> In the absence of jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigation evidence as it bears on his personal culpability, <u>we cannot be sure</u> that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse… . *Penry I*, 492 U.S. at 322-323 (emphasis added).

In the absence of a jury instruction defining  "moral blameworthiness"  in a way that would clearly direct the jury to consider petitioner's full mitigating evidence, this Court  "cannot be sure" that the jury was able to give full consideration and effect to his evidence.  An instruction from the trial judge explicitly limiting the jury's consideration of mitigating case to evidence that reduces petitioner's moral blameworthiness for the crime creates, at the very least, a reasonable likelihood that jurors would indeed follow that instruction and disregard evidence they did not consider relevant to

defendant's moral blameworthiness.  By giving that instruction, the trial court created a reasonable likelihood and impermissible risk that an entire category of petitioner's mitigation evidence would be placed beyond the effective reach of the jury in violation of Eighth and Fourteenth Amendments. *Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); Skipper v. South Carolina*, 476 U.S. 1 (1986); *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Boyde v. California*, 494 U.S. 370 (1990); *Johnson v. Texas*, 509 U.S. 350 (1993).

The full Fifth Circuit has embraced the concept that the sentencing jury must be afforded "full consideration" of the capital defendant's mitigation case. See *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), (en banc) cert denied *Quarterman v. Nelson*, 127 S.Ct. 2974, 75 USLW 3512, 75 USLW 3674, 75 USLW 3678 (U.S. Jun 18, 2007) (NO. 06-1254).  Following and applying *Nelson* is *Coble vs. Dretke*, (5th. Cir.  08/14/2007), Slip Op. No. 01-50010.

The CCA has previously rejected this argument in Mr. Garcia's case.  However, that decision is not controlling because the state court's decision directly conflicts with the U.S. Supreme Court's decisions in *Lockett, Penry I,  Skipper, Tennard* and *Smith v. State* as well as the *en banc* Fifth Circuit decision in *Nelson, supra.* Therefore,  the state court's decision on this claim "was contrary to, [and] involved an unreasonable application of,  clearly established Federal law,  as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

236

## *REASONABLE DOUBT*

*Claim Number 41: In Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof.*

*Claim Number 42: In Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof.*

*Claim Number 43: In Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof.*

*Claim Number 44: In Violation of the Constitutional Guarantee Against Ex Post Facto Laws, the Trial Court Excluded the Definition of Reasonable Doubt Which Would Have Permitted Jurors to Apply a The Appropriate Burden of Proof.*

The trial court rejected the Defense request for a definition of reasonable doubt, which would have permitted jurors to apply the appropriate burden of proof.  By contrast, jurors in Mr. Garcia's first trial were given the definition of reasonable doubt, while jurors in his sentencing trial were not.

"A 'reasonable doubt' is doubt based upon reason and common sense after a careful and impartial consideration of all the evidence in the case.  It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.  Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs."

(R.R. vol. 34 at 135-37.)

**A.      *When the Crimes Occurred in 1990 and 1991, A Defendant Was Entitled to Definition of Reasonable Doubt.***

Under *Geesa v. State*, Mr. Garcia was entitled to the standard instruction on reasonable doubt and it was given in the 1991 trial.  *See 1991 Sentencing Instructions, P.R.E. at tab 9.*

237

**B.**     **The law and procedures in effect of the defendant's offense determine what procedures are applied at trial.**

A substantive right such as instruction in a capital case to the definition of reasonable doubt would be governed by the law in effect at the time of the offense.  *See Bell v. State*, *948 S.W.2d 535* (Tex. App.-Beaumont 1997, ___) (reversing non-capital case).

**C.**     **It is a Violation of Ex Post Facto Principles to Apply the Later Decision of Paulson v. State *Retroactively and Deny Mr. Garcia the Definition of a Critical Jury Instruction Which Jurors in His 1991 Liability Trial Received and to Which Mr. Garcia Was Entitled.***

As the Court knows, *Geesa* was later overruled by *Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000).  Until *Paulson*, Mr. Garcia would have been entitled to a reasonable doubt instruction.

**D.**     **Mr. Garcia Was Clearly Harmed as a Result of the Denial of This Instruction.**

None of the twelve jurors were instructed as to the definition of reasonable doubt.  It was vital in this case to argue to jurors that they could not be certain beyond a reasonable doubt that Mr. Garcia would be a future danger.  The arguments as to reasonable doubt by the defense counsel were substantially weaker than they would have been because there was no definition of reasonable doubt provided.  Moreover, one must combine the effects of the loss of this instruction with other improper evidence admitted, such as improper expert testimony on future dangerousness, the unqualified testimony by Smithey, and the mistakes by trial counsel which otherwise would have excluded evidence of Garcia's juvenile record.

238

***Claim Number 45:  Applicant's Fourteenth Amendment Right to Due Process and
Eighth Amendment Right to Be Free from the Arbitrary and Capricious Infliction
of the Death Penalty Were Violated Because the Statute under Which Applicant
Was Sentenced to Death  Allows the Jury Too Much Discretion to Determine Who
Should Live and Who Should Die and Because it Lacks the Minimal Standards
and Guidance Necessary for the Jury to Avoid the Arbitrary and Capricious
Imposition of the Death Penalty.***

Mr. Garcia raised these issues by a trial motion at his 2001 punishment phase re-trial. The trial
court denied his motion and request for jury instructions to cure the constitutional defects outlined
in the motion just before the charge was read to the jury. RR Vol. 34 p. 137-138.  On direct appeal,
Garcia argued that the trial court erred in overruling his motion to quash the indictment and declare
article 37.0711 C.C.P. section 3(e) and article 37.0711 C.C.P. section 3(f)(3) (the mitigation special
issue and the accompanying definition of "moral blameworthiness") of the Texas death penalty statute
unconstitutional. Garcia argued on direct appeal that the punishment charge as a whole failed to
provide the guidance to the sentencing jurors required by *Furman v. Georgia* and progeny. Mr.
Garcia further argued that the mitigation inquiry is vague, indefinite, and overbroad in many ways,
including the failure to define "moral blameworthiness" in violation of the Eighth and Fourteenth
amendments to the U.S. Constitution.  Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash,
Filed March 13, 2001), RR Vol. 34 p. 137-138.

Prior to the court's charge to the jury the appellant filed a motion to quash the indictment
based upon the unconstitutionality of the statute. Specifically, the appellant challenged the
constitutionality of the statute's use of the term "moral blameworthiness". Prior to the jury being
charged, the trial court overruled and denied the motion. Clerk's Record Vol. 3 pp. 508 – 516 (*See*
Motion to Quash section IX, Filed March 13, 2001), RR Vol. 34 p. 137. Rejecting Mr. Garcia's

239

objections to the charge based on the principles of *Furman* and progeny, the trial court charged the

jury in accordance with articles 37.0711 C.C.P. section 3(e) and  37.0711 C.C.P. section 3(f)(3).

These claims were raised and carried forward  at points 19 through 21 of Mr. Garcia's direct

appeal brief to the Texas CCA. Below appears the text of these three claims.

**Point of Error Nineteen Stated**

The trial court erred in overruling the appellant's motion to quash the indictment and declare
article 37.0711 C.C.P. section 3(e) and article 37.0711 C.C.P. section 3(f)(3) (the mitigation special
issue and the accompanying definition of "moral blameworthiness") of the Texas death penalty statute
unconstitutional, because it is vague, indefinite, and overbroad in failing to define "moral
blameworthiness" in violation of the eighth and fourteenth amendments to the U.S.Constitution.
Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash section IX, Filed March 13, 2001), RR
Vol. 34 p. 137.

**Point of Error Twenty Stated**

Does Article 37.0711 C.C.P. violate the state or federal constitution as applied because it does
not define certain critical terms used in the special issues, thereby failing to provide "guidance"
required by *Furman v. Georgia*?

**Point of Error Twenty-One Stated**

The jury instructions used in the sentencing phase failed to define key terms used in the
sentencing phase, "deliberate", "acts", "criminal acts of violence," "probability," "continuing threat,"
"moral blameworthiness" or "society," thereby cumulatively violating his rights to due course of law
and not to suffer cruel and unusual punishment as Guaranteed by Article I, Sections 13 and 19 of the
Texas Constitution.

In these issues, Mr. Garcia attacked the constitutionality of Texas Code of Criminal Procedure

Article 37.071 as it was applied to him through the jury charge at the punishment phase of the 2001

re-trial.  This statute requires the jury in a death penalty case to answer a special issue in the

sentencing phase answering whether there are sufficient mitigating circumstances to warrant a life

sentence. In *Garcia II*, the Texas CCA reached and rejected the merits of these federal constitutional

claims. *Garcia v. State*, (Tex. Crim. App. 2003), No. 71,417 decided 11.12.2003, unpublished.

Garcia also raised this claim in ground 27 in his 2003 state habeas application.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."   U.S. CONST. amend VIII.   The ban on cruel and unusual punishments is applicable to the States via the due process clause of the Fourteenth Amendment.  *See, e.g.*, *Robinson*, 370 U.S. at 675.[7]

The fundamental respect for humanity underlying the Eighth Amendment requires that consideration of the character and record of the individual offender and the circumstances of the particular offense are constitutionally indispensable parts of the process of inflicting the death penalty.  *See, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976).   Unfortunately, the evolution of the Death Penalty has come full circle because, under the present Texas statute applied to Applicant, the jury has again been given unfettered discretion that both invites and permits arbitrary application of the ultimate penalty.  *Cf. Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality op.) ("*Furman*[8] mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

The Texas Legislature reacted to *Penry I*[9] by amending article 37.071 to include a mitigation instruction.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1)(Vernon Supp. 2002).   This

---

[7]  This section was written by Texas attorney Reagan Wynn, to whom the author expresses appreciation.

[8]  *See Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam).

[9]  *See Penry v. Lynaugh*, 492 U.S. 302, 322-28 (1989).

241

instruction in effect allows the jury to impose a life sentence if, in their sole discretion, they choose to do so.  *See id.*

As Justice Blackmun noted in his dissent to denial of certiorari in *Callins v. Collins*, to comply with the mandates of the Eighth Amendment, the death penalty must be fairly administered with reasonable consistency.  *See Callins v. Collins*, 114 S. Ct. 1127, 1129 (1994) (mem.) (Blackmun, J., dissenting).  In its current formulation, the Texas scheme does not insure such a reasonably consistent application of the ultimate penalty.  Therefore, the statute should be found unconstitutional.

The very nature of the mitigation special issue allows the jury to decide, without any guidance, who should live and who should die.  The mitigation special issue allows juries to decide what, if anything, is "mitigation" and to completely disregard any such mitigation evidence if they so choose. Thus, the instruction allows juries to kill a defendant simply because they are afraid of a person who is different, whether that difference is race,[10] unsightliness, mental illness, or a difference relating to a host of other improper considerations.  The arbitrariness and capriciousness that results from this unfettered discretion renders the present scheme unconstitutional.  *See Gregg*, 428 U.S. at 189.

Under these circumstances, this Court should declare the statutory scheme under which Applicant was convicted and sentenced to death unconstitutional in violation of the Eighth Amendment and vacate his death sentence.

---

[10]  *Cf.* James Kimberly et al., *More Racial Testimony Found in Capital Cases*, HOUS. CHRON., June 9, 2000, at A1 (discussing testimony of expert asserting race as factor that contributes to future dangerousness that caused the U.S. Supreme Court to overturn a Texas death penalty sentence); *Saldano v. Texas*, 530 U.S. 1212 (2000) (mem.).

***Claim Number 46: Applicant's Fourteenth Amendment Right to Due Process and Eighth Amendment Rights as Interpreted in*** Penry v. Johnson ***Were Violated Because the Mitigation Special Issue Set Forth in the Texas Death Penalty Statute Sends Mixed Signals to the Jury Thereby Rendering Any Verdict Reached in Response to That Special Issue Intolerably Unreliable.***

Mr. Garcia raised these issues by a trial motion at his 2001 punishment phase re-trial. The trial court denied his motion and request for jury instructions to cure the constitutional defects outlined in the motion just before the charge was read to the jury. RR Vol. 34 p. 137-138.  On direct appeal, Garcia argued that the trial court erred in overruling his motion to quash the indictment and declare article 37.0711 C.C.P. section 3(e) and article 37.0711 C.C.P. section 3(f)(3) (the mitigation special issue and the accompanying definition of "moral blameworthiness") of the Texas death penalty statute unconstitutional. Garcia argued on direct appeal that the punishment charge as a whole failed to provide the guidance to the sentencing jurors required by *Furman v. Georgia* and progeny. Mr. Garcia further argued that the mitigation inquiry is vague, indefinite, and overbroad in many ways, including the failure to define "moral blameworthiness" in violation of the Eighth and Fourteenth amendments to the U.S. Constitution.  Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash, Filed March 13, 2001), RR Vol. 34 p. 137-138.

Prior to the court's charge to the jury the appellant filed a motion to quash the indictment based upon the unconstitutionality of the statute. Specifically, the appellant challenged the constitutionality of the statute's use of the term "moral blameworthiness". Prior to the jury being charged, the trial court overruled and denied the motion. Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash section IX, Filed March 13, 2001), RR Vol. 34 p. 137. Rejecting Mr. Garcia's objections to the charge based on the principles of *Furman* and progeny, the trial court charged the jury in accordance with articles 37.0711 C.C.P. section 3(e) and  37.0711 C.C.P. section 3(f)(3).

243

These claims were raised and carried forward  at points 19 through 21 of Mr. Garcia's direct appeal brief to the Texas CCA. Below appears the text of these three claims.

**Point of Error Nineteen Stated**

The trial court erred in overruling the appellant's motion to quash the indictment and declare article 37.0711 C.C.P. section 3(e) and article 37.0711 C.C.P. section 3(f)(3) (the mitigation special issue and the accompanying definition of "moral blameworthiness") of the Texas death penalty statute unconstitutional, because it is vague, indefinite, and overbroad in failing to define "moral blameworthiness" in violation of the eighth and fourteenth amendments to the U.S.Constitution. Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash section IX, Filed March 13, 2001), RR Vol. 34 p. 137.

**Point of Error Twenty Stated**

Does Article 37.0711 C.C.P. violate the state or federal constitution as applied because it does not define certain critical terms used in the special issues, thereby failing to provide "guidance" required by *Furman v. Georgia*?

**Point of Error Twenty-One Stated**

The jury instructions used in the sentencing phase failed to define key terms used in the sentencing phase, "deliberate", "acts", "criminal acts of violence," "probability," "continuing threat," "moral blameworthiness" or "society," thereby cumulatively violating his rights to due course of law and not to suffer cruel and unusual punishment as Guaranteed by Article I, Sections 13 and 19 of the Texas Constitution.

In these issues, Mr. Garcia attacked the constitutionality of Texas Code of Criminal Procedure Article 37.071 as it was applied to him through the jury charge at the punishment phase of the 2001 re-trial.  This statute requires the jury in a death penalty case to answer a special issue in the sentencing phase answering whether there are sufficient mitigating circumstances to warrant a life sentence. In *Garcia II*, the Texas CCA reached and rejected the merits of these federal constitutional claims. *Garcia v. State*, (Tex. Crim. App. 2003), No. 71,417 decided 11.12.2003, unpublished.

Moreover, this claim was number 28 in Garcia's 2003 state habeas application.

244

This Court should hold that the Texas death penalty scheme violates the Eighth Amendment under the Supreme Court's recent decision in *Penry v. Johnson*, 121 S. Ct. 1910 (2001) (hereinafter "*Penry II*").  While the opinion in that case only repudiated a judicially-crafted mitigation instruction, the statutory mitigation special issue given in Applicant's case is similarly vulnerable to the criticism that it sends "mixed signals" to the jury.

In *Penry II*, the Supreme Court addressed a judicially-crafted response to the defect in Texas law identified in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (hereinafter "*Penry I*").  In *Penry I*, the Supreme Court held that the then-existing statutory special issues did not provide an adequate mechanism for the jury to give effect to mitigating factors which could justify the assessment of a life sentence rather than the death penalty.  *See Penry I*, 492 U.S. at 322-28.  The original concept in *Penry I* was that the statutory instructions were inadequate, even if mitigating evidence might fit within a statutory special issue, if the introduction of such evidence was a "two-edged sword," *i.e.* if the evidence could also have aggravating effect.  *See id.* at 323-24.

In *Penry II*, a supplemental instruction was given that basically told the jury that it should show its finding of sufficient mitigating evidence by converting what otherwise would be a "Yes" answer to one of the special issues into a "No" answer.  *See id.* at 1921-22.  This method was deemed a "nullification instruction" because the answer which otherwise would fit a special-issue question would be "nullified" for the sake of giving effect to mitigating evidence.  *See id.*

The Court began by holding that the "nullification" technique was "confusing" because the instructions, taken as a whole, were susceptible to two different readings by the jury.  *See id.*  The first possibility was that the jurors might understand the instruction as requiring them to "take Penry's mitigating evidence into account in determining their truthful answers to each special issue."  *See id.*

245

at 1921.  If so, however, "the supplemental instruction placed the jury in no better position than was the jury in *Penry I*." *See id.*  This was because "none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse.  *See id.* (citing *Penry I*, 492 U.S. at 322-25).

The Court then went on to consider the possibility that the jury understood the supplemental instruction as a "nullification instruction."  *See Penry II*, 121 S. Ct. at 1921-22.  If so, the Court held, "it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation."  *See id.*  The Court specifically referred to the fact that jurors took an oath to render a "true verdict"under article 35.22, Texas Code of Criminal Procedure,[11] and "nullifying" for the sake of mitigation would violate the oath. *See Penry II*, 121 S. Ct. at 1922.  The Court found that there was at least a "reasonable likelihood" that jurors who believed in their oath would not follow the "nullification instruction."  *See id.*  Even when the explanatory role of attorneys' argument was taken into account, the majority opinion held that "at best, the jury received mixed signals."  *See id.* at 1923.

Thus, the rationale of *Penry II* is the finding that the charge sent the jury "mixed signals," even when the full charge and the trial context were considered.   This rationale went to the heart of the "reliability" issue which, as noted in *Penry II*, underlay the original holding in *Penry I. See Penry II*, 121 S. Ct. at 1920-1921.

The question here then becomes whether the statutory "mitigation" issue submitted to the jury in this case also suffers from the constitutional flaw of sending "mixed signals."  To pose the question

---

[11]  *See* TEX. CODE CRIM. PROC. ANN. art. 35.22 (Vernon 1989) (jurors to be administered oath swearing "you will a true verdict render").

is to answer it, for this Court has already acknowledged that the statutory issue is unclear as to the burden of proof.  *See Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996).

Because the mitigation special issue submitted to the jury pursuant to the dictates of article 37.071 sent "mixed signals" to the jury, that statute is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry II*.  Consequently, Applicant's conviction was secured in violation of his right to Eighth Amendment rights as applicable via the Due Process clause of the Fourteenth Amendment.  Therefore, this Court should reverse Applicant's conviction and sentence, and remand this cause to the trial court.

> **Claim Number 47: The Mitigation Inquiry Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Does Not Provide Adequate Guidance for Jurors to Consider and Give Effect to Mr. Garcia's Mitigating Circumstances.**
>
> **Claim Number 48: The Mitigation Inquiry Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Does Not Provide  Adequate Guidance for Jurors to Consider and Give Effect to Mr. Garcia's Mitigating Circumstances.**
>
> **Claim Number 49: The Mitigation Inquiry Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Fails to Assign the Burden of Proof to Either Party to Prove Whether or not Mr. Garcia's Mitigating Circumstances are Sufficient to Warrant a Life Sentence.**
>
> **Claim Number 50:  The Mitigation Inquiry Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Fails to Assign the Burden of Proof to Either Party to Prove Whether or not Mr. Garcia's Mitigating Circumstances are Sufficient to Warrant a Life Sentence.**
>
> **Claim Number 51: The Mitigation Inquiry Violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution Because It Fails to Assign the Burden of Proof to the Prosecution to Prove the Truth of the Facts it Offered in Rebuttal of  Mr. Garcia's  Mitigation Case Beyond a Reasonable Doubt.**

247

***Claim Number 52:  The Mitigation Inquiry Violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution Because It Fails to Assign the Burden of Proof to the Prosecution to Prove the Truth of the Facts it Offered in Rebuttal of Mr. Garcia's  Capital Defendant's Mitigation Case Beyond a Reasonable Doubt.***

Mr. Garcia raised these issues by a trial motion at his 2001 punishment phase re-trial. The trial court denied his motion and request for jury instructions to cure the constitutional defects outlined in the motion just before the charge was read to the jury. RR Vol. 34 p. 137-138.  On direct appeal, Garcia argued that the trial court erred in overruling his motion to quash the indictment and declare article 37.0711 C.C.P. section 3(e) and article 37.0711 C.C.P. section 3(f)(3) (the mitigation special issue and the accompanying definition of "moral blameworthiness") of the Texas death penalty statute unconstitutional. Garcia argued on direct appeal that the punishment charge as a whole failed to provide the guidance to the sentencing jurors required by *Furman v. Georgia* and progeny. Mr. Garcia further argued that the mitigation inquiry is vague, indefinite, and overbroad in many ways, including the failure to define "moral blameworthiness" in violation of the Eighth and Fourteenth amendments to the U.S. Constitution.  Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash, Filed March 13, 2001), RR Vol. 34 p. 137-138.

Prior to the court's charge to the jury the appellant filed a motion to quash the indictment based upon the unconstitutionality of the statute. Specifically, the appellant challenged the constitutionality of the statute's use of the term "moral blameworthiness". Prior to the jury being charged, the trial court overruled and denied the motion. Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash section IX, Filed March 13, 2001), RR Vol. 34 p. 137. Rejecting Mr. Garcia's objections to the charge based on the principles of *Furman* and progeny, the trial court charged the jury in accordance with articles 37.0711 C.C.P. section 3(e) and  37.0711 C.C.P. section 3(f)(3).

248

These claims were raised and carried forward at points 19 through 21 of Mr. Garcia's direct appeal brief to the Texas CCA. Below appears the text of these three claims.

**Point of Error Nineteen Stated**

The trial court erred in overruling the appellant's motion to quash the indictment and declare article 37.0711 C.C.P. section 3(e) and article 37.0711 C.C.P. section 3(f)(3) (the mitigation special issue and the accompanying definition of "moral blameworthiness") of the Texas death penalty statute unconstitutional, because it is vague, indefinite, and overbroad in failing to define "moral blameworthiness" in violation of the eighth and fourteenth amendments to the U.S.Constitution. Clerk's Record Vol. 3 pp. 508 – 516 (*See* Motion to Quash section IX, Filed March 13, 2001), RR Vol. 34 p. 137.

**Point of Error Twenty Stated**

Does Article 37.0711 C.C.P. violate the state or federal constitution as applied because it does not define certain critical terms used in the special issues, thereby failing to provide "guidance" required by *Furman v. Georgia*?

**Point of Error Twenty-One Stated**

The jury instructions used in the sentencing phase failed to define key terms used in the sentencing phase, "deliberate", "acts", "criminal acts of violence," "probability," "continuing threat," "moral blameworthiness" or "society," thereby cumulatively violating his rights to due course of law and not to suffer cruel and unusual punishment as Guaranteed by Article I, Sections 13 and 19 of the Texas Constitution.

In these issues, Mr. Garcia attacked the constitutionality of Texas Code of Criminal Procedure Article 37.071 as it was applied to him through the jury charge at the punishment phase of the 2001 re-trial.  This statute requires the jury in a death penalty case to answer a special issue in the sentencing phase answering whether there are sufficient mitigating circumstances to warrant a life sentence. In *Garcia II*, the Texas CCA reached and rejected the merits of these federal constitutional claims. *Garcia v. State*, (Tex. Crim. App. 2003), No. 71,417 decided 11.12.2003, unpublished.

***Discussion.***  As mentioned, in the sentencing phase of the trial, the jurors were required to answer three special issues.  Of concern here is the third special issue:

249

### Special Issue Number 3

*Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?*

*You may not answer this Special Issue "no" unless you agree unanimously, and you may not answer this Special Issue "yes" unless 10 or more jurors agree.*

*You need not agree on what particular evidence supports an affirmative finding on this special issue.*

*You shall consider mitigating evidence to be evidence that you might regard as reducing the defendant's moral blameworthiness.*

Answer "Yes" or "No"
<u>Answer</u>          *No*

A bit of the history that produced this special issue and its surrounding legislation may be helpful here.    The original Texas special issue capital sentencing system was constructed in response to the Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238 (1972). The lack of a vehicle to permit consideration of a good many types of mitigating circumstances was quickly noticed, but it took some 17 years for the Supreme Court to mandate the use of a vehicle that would permit sentencing jurors to fully consider and give effect to mitigating circumstances. See *Penry I.*

The Texas legislative response to *Penry I* was a grudging one. Here is a list and description of what this writer calls the "crippling amendments" that were enacted with the legislation providing for the special issue set forth above.  First, in a departure from the long accepted practice that prevailed in Texas as of the date of the *Penry* amendments, the Texas legislature relieved the

prosecutors from the burden of proving the lack of sufficient mitigating circumstances beyond a reasonable doubt. See e. g. *Steadham v. State*, 119 Tex.Crim. 475, 43 S.W.2d 944 (1931)[12]

 Second, in the face of *Skipper v. South Carolina*, supra. the Texas legislature enacted a mandatory supplemental instruction limiting Texas capital sentencing jurors, in deciding the mitigation inquiry, to the consideration of evidence that they believe to reduce "moral blameworthiness." Intended or not, this instruction directs many jurors away from consideration of mitigating facts other than the circumstances of the offense, especially background facts like abuse as a child or mental illness less severe than insanity, where the nexus to the crime is not present or less pronounced.  Third, the Texas legislature provided that jurors must be told that a life verdict requires 10 votes, and not told the practical result of a failure to reach a unanimous verdict, when the law actually only requires that 1) a life verdict results if there is  one vote dissenting from a death verdict, and 2) no mistrial or new trial will result from a failure to reach a unanimous verdict.

The result of these crippling amendments is to deny full consideration of mitigating evidence, especially the kind Mr. Garcia presented to his sentencing jury. A reasonable, law abiding Texas capital sentencing juror after hearing the horrific crime facts, and the evidence of extraneous misconduct, including an attempt to escape from death row, might well decide to place the burden of proving facts in mitigation of sentence upon Mr. Garcia. Absent a proper jury instruction, such a

---

[12] Prior to the 1972 amendments in response to *Furman*, Texas prosecutors had an onerous burden of proof of "malice aforethought" defined as follows: "Malice aforethought" is the voluntary and intentional doing of an unlawful act by one of sound memory and discretion, with the purpose, means, and ability to accomplish the reasonable and probable consequence of the act; and includes all of those states of mind under which the killing of a person takes place without any cause which will, in law, justify, excuse, or extenuate the homicide. It is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." *Steadham, supra.*

juror could very well require proof *beyond all doubt* that Mr. Garcia was badly and consistently abused and neglected as a child, became an alcoholic and a drug abuser at a very young age through introduction to substance abuse in his home by family members, and that Garcia suffered brain damage. A Texas capital sentencing juror that placed such an impossibly high burden of proof and persuasion on Mr. Garcia in the mitigation inquiry would not be violating his oath as a juror to render a true verdict based on the law and the evidence. Such a Texas capital sentencing juror would not be in violation of any law given him by the trial court because the charge does not purport to set any burden of proof or persuasion on any fact for any party. This feature of the charge, even considered alone, demonstrates an egregious violation of the principles of *Furman v. Georgia.*     While the *Furman* Court "did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments," *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it did recognize that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." Id. Because of its uniqueness, the death penalty can not be imposed under sentencing procedures that "create a substantial risk that it [will] ... be inflicted in an arbitrary and capricious manner." Id. Because the Court found that the capital sentencing procedures then being utilized did create such a risk, the *Furman* Court invalidated those procedures as incompatible with contemporary standards of decency.

There is another feature of the failure to assign a burden of proof or persuasion in the mitigation inquiry that leads directly to the arbitrary and capricious infliction of death as a penalty that *Furman* forbids. The state will often offer evidence of its own that tends to rebut the defense mitigation case. In this case, the state offered the expert opinion of Dr. Lisa Clayton that Mr. Garcia's misconduct was better explained by his lack of remorse and antisocial personality. (R.R. vol. 33 at

252

7-8.)   A reasonable law abiding Texas capital sentencing juror, exposed to the horrific crime facts and the extraneous misconduct, might well decide to believe Dr. Clayton, and to use her opinion against Mr. Garcia if he or she thought there was even a one percent chance that Dr. Clayton's opinion was true and accurate. Again, such a Texas capital sentencing juror would not violate his or her oath to render a true verdict according to the evidence and the law because the court's charge, the only law the jurors are to follow, leaves the evidentiary threshold for consideration of facts adverse to the defendant completely up to the sentencing juror. The Texas mitigation inquiry simply does not provide the guided discretion required in *Furman* that saved the Texas system from facial attack in *Jurek* or the vehicle for reasoned moral response that the Supreme Court required in *Penry I.* Whether a sentencing juror will conclude that a mitigating circumstance exists or whether  life or death is "warranted"  depends heavily on how the court channels his or her thought processes.

Mr. Garcia argues that the constitutional principles, derived from *Furman*, and more recently acknowledged by the Supreme Court in  *Kansas v. Marsh*, 548 U. S. 163 (2006) are offended by the Texas CCA's refusal to grant relief from the constitutional frailties of the Texas capital sentencing system, and the mitigation inquiry in particular.

The *Marsh* opinion, authored by Justice Thomas, acknowledged that the high court had long required due process in the capital sentencing process, citing to the concurrence by Justice Thomas in *Graham v. Collins*, 506 U.S. 461 (1993), which, in turn cited *Gardner v. Florida* 430 U.S. 349 (1977)[due process required that the capital defendant be afforded an opportunity to rebut and explain the evidence adduced to support the state's death aggravators] and *Walton v. Arizona*, 497 U.S. 639, 672 (Scalia, J., concurring in part and concurring in judgment). Other Supreme Court cases have upheld the notion that the right to present mitigating evidence and to rebut aggravating evidence can

253

only be vindicated with a rational process, one that will permit a reasoned moral response to the body of evidence before the jury.[13]

As Justice Thomas noted in his concurrence in *Graham*, supra., the major emphasis of our Eighth Amendment jurisprudence has been on "reasoned" sentencing. The Supreme Court has continually sought to verify that States' capital procedures provide a "rational basis" for predictably determining which defendants shall be sentenced to death. [14] States may satisfy *Furman*'s demands--providing objective standards to ensure that the sentencer's discretion is "guided and channeled by . . . examination of specific factors." [15] "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of the factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). With respect to guilt phase elements, the beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship,* 397 at 364 (internal quotation marks and citation omitted). The same principle applies to aggravating factors in death penalty cases. See *Ring v.*

---

[13]  See *Simmons v. South Carolina*, 512 U.S. 154 (1994) [right to inform the sentencing jury that the capital defendant will never parole.]

[14]  *Furman*, supra, at 294 (Brennan, J., concurring). See also *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *California v. Brown*, supra, at 541; *Barclay v. Florida*, 463 U.S. 939, 960 (1983) (Stevens, J., concurring in judgment) ("A constant theme of our cases . . . has been emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner"); *McCleskey v. Kemp*, 481 U. S., at 323 (Brennan, J., dissenting) ("[C]oncern for arbitrariness focuses on the rationality of the system as a whole, and . . . a system that features a significant probability that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational").

[15]  *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

254

*Arizona*, supra., *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).   The principles of *Ring,* derived from *Furman,* require that the same rule must apply to the prosecution's facts offered to rebut the defense mitigation case, such as the Dr. Clayton testimony here.

Applying these principles to Mr. Garcia's case, the Court can readily see that Garcia explained his misconduct as the product of childhood abuse and neglect and brain damage, whereas the prosecutors argued to the contrary, that he was a remorseless antisocial personality. To decide these issues without the application of a burden of proof to any party at all is a clear violation of our traditional notions of due process that all members of the *Marsh* court acknowledge are applicable in capital sentencing.

Though Mr. Garcia does claim that the constitution requires the state to prove its basic, underlying facts used to rebut the defense mitigation case beyond a reasonable doubt, he does not go so far as to demand that the overall burden of proof and persuasion on the ultimate mitigation inquiry be placed on the prosecution in this case. What Mr. Garcia asks the Court to require the prosecution to prove beyond a reasonable doubt is just the truth of the adverse facts–like the Dr. Clayton testimony–that the state presented in rebuttal to his mitigation case. As to the ultimate mitigation issue, Mr. Garcia merely asks for our usual adversarial process, the traditional means of assuring reliability and due process of law in the resolution of important disputes. In the present state of capital sentencing law, this could mean that the burden of proof might be assigned to either party by one of the three recognized burdens of persuasion, a preponderance, clear and convincing and beyond a

255

reasonable doubt. See *Walton v. Arizona, 497 U.S. 639 (1990)*[16] and *Ring v. Arizona*, and cases cited

therein. But it cannot mean that the court does not assign any burden of proof or persuasion to any

party on any issue bearing on mitigation of punishment in a capital case. The failure to afford even

the most rudimentary features of our traditional adversarial process at capital sentencing is objectively

unreasonable in light of the principles of *Furman* and progeny requiring the proper guidance of the

discretion of the sentencing jury.

The sentencing jury in this case selected Mr. Garcia for the death penalty without the benefit

of any burden of proof or persuasion on any party at all. No reviewing court can possibly divine

whether or how the sentencing jury gave full consideration and effect to Mr. Garcia's mitigation case.

The *Richardson v. Marsh* presumption that jurors follow their instructions simply has no application

here, because the sentencing jurors had  inadequate instructions guiding the great discretion given

them in deciding their response to the  mitigation inquiry. Without proper guidance, the jury's

decision may have been entirely irrational and arbitrary.  This not only offends the Due Process

Clause, it violates the principle of heightened reliability in capital proceedings right up to the point

of execution. See, e. g. *Ford v. Wainright*, 477 U.S. 399 (1986)

The sentencing process that produced Mr. Garcia's death sentence is constitutionally flawed

for failure to provide for and enforce the rule of guided discretion in another way. *Gregg* and its

---

[16]In *Martin v. Ohio,* 480 U.S. 228 (1987), the high court  upheld the Ohio practice of imposing on a capital defendant the burden of proving by a preponderance of the evidence that she was acting in self defense when she allegedly committed the murder. In *Leland v. Oregon*, 343 U.S. 790 (1952), the Supreme Court upheld, in a capital case, a requirement that the defense of insanity be proved beyond a reasonable doubt by the defendant, see also *Rivera v. Delaware*, 429 U.S. 877 (1976), and in *Patterson v. New York*, 432 U.S. 197 (1977), the Supreme Court rejected the argument that a State violated due process by imposing a preponderance of the evidence standard on a defendant to prove the affirmative defense of extreme emotional disturbance.

companion cases reviewing the several state's responses to the *Furman* mandate stressed the fact that all of the approved statues required meaningful appellate review. 428 U.S. at 153. The purpose of appellate review is to provide "a means to promote the evenhanded, rational, and consistent imposition of death sentences..." *Jurek v. Texas,* 428 U.S. at 276. In *Parker v. Dugger*, 498 U.S. 308 (1991),  the Court re-emphasized "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.". It is a "crucial protection." Id. While the Court has held that comparative proportionality review is not required by the Eighth Amendment, see *Pulley v. Harris*, 465 U.S. 37 (1984), some form of meaningful appellate review is still required. See also *Sochor v. Florida*, 504 U.S. 527 (1992). In this respect, Mr. Garcia says that the Texas system that produced his death sentence is facially flawed in that the CCA simply does not review this aspect of the process. It was objectively unreasonable for the CCA to uphold Mr. Garcia's death sentenced over his *Furman* based claim of error presented in the Texas trial court and the CCA. Clerk's Record at  514.

To this writer's knowledge, the previous attacks on the application of the crippling amendments to the fairly straightforward terms of the special issue itself have taken the form of a global demand for the assignment of the burden of proof and persuasion to the state in the mitigation inquiry. See *Rowell v. Dretke*, 398 F.3d 370, 376-77 (5th Cir. 2005); *Granados v.Quarterman*, 455 F.3d 529, 537 (5th Cir.), cert denied, 127 S. Ct. 732 (2006); *Ortiz v. Quarterman*, No. 06-70020, 2007 WL 2936244, at *10 (5th Cir. Oct. 10, 2007); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007)

 Mr. Garcia's argument is different, and it rests on a much firmer foundation. The demand here is also a more modest one, to simply require Texas to honor the Due Process Clause and the

heightened reliability requirement of the Eighth Amendment by requiring the trial courts to tell the parties and the jurors who has the burden of proof at mitigation and how high is the standard of proof of the facts at issue. Put another way, Mr Garcia's complaint is that he and the sentencing jurors did not know the rules of the mitigation game before play started, or, indeed, at any later time. There is no justification for jettisoning our usual adversarial process right at the point where life or death is to be finally decided. To do so is objectively unreasonable.

The Texas CCA overruled Mr. Garcia's *Furman* argument in a single paragraph without citing any federal authority. The failure to require properly guidance to the discretion to the sentencing jury was objectively unreasonable in light of *Furman* and its progeny.

> *Claim Number 53: The Trial Court Violated the Eighth and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e).*

In response to the Supreme Court decision in *Penry I*, the Texas legislature provided for a special inquiry into mitigating circumstances. Instead of just taking the straightforward step of enacting a special issue in the terms suggested by *Lockett v. Ohio* and progeny, the legislature engrafted a series of amendments that serve to diminish, or even outright defeat the ability of Texas sentencing jurors to fully consider and give mitigating effect to the capital defendant's mitigation case. This claim is directed at the portion of the Texas statute that ostensibly requires ten jurors to return a life verdict based on mitigating circumstances, but secretly, so far as the jury is concerned, allows for a life verdict in the event of a single holdout juror for life. Mr. Garcia argues that this particular crippling amendment is analogous to the similarly crippling "nullification instruction" that

has recently been condemned in several Supreme Court cases[17] and in *Nelson v. Quarterman*, 472

F.3d 287 (5th Cir. 2006), (en banc) cert denied *Quarterman v. Nelson*, 127 S.Ct. 2974, 75 USLW

3512, 75 USLW 3674, 75 USLW 3678 (U.S. Jun 18, 2007) (NO. 06-1254).

At trial, Mr. Garcia timely and properly complained about this feature of the Texas mitigation

inquiry by written motion. (See Motion to Quash, Filed March 13, 2001) Clerk's Record Vol. 3 pp.

508 – 516 . The trial court denied his motion and request for jury instructions to cure the

constitutional defects outlined in the motion just before the charge was read to the jury. RR Vol. 34

p. 137-138.

In his twenty-second, twenty-third, and twenty-fourth points of error, Mr. Garcia argued in

his direct appeal brief to the Texas CCA that the 12-10 rule of Article 37.0711, section 3(a)(d)(2),

which requires ten votes for the jury to return a negative answer to the first or second special issue

and at least ten votes for the jury to return an affirmative answer to the third special issue, violates

the Eighth and Fourteenth Amendments to the United States Constitution. The CCA denied relief,

noting that it has repeatedly rejected identical claims. Citing *Johnson v. State*, 68 S.W.3d 644, 656

(Tex. Crim. App. 2002); *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000), cert. denied,

531 U.S. 1128 (2001); *Chamberlain*, 998 S.W.2d at 238, the CCA overruled Mr. Garcia's points of

error attacking the Texas 12-10 rule.  Garcia also raised the claim again in his 38th claim in his 2003

state application for writ of habeas corpus.

---

[17] See *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001)(Penry II);
*Abdul-Kabir v. Quarterman,* 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007);
*Brewer v. Quarterman*, 550 U.S. 286, 127 S. Ct. 1706, 167 L. Ed. 2d 622 (2007);
*Smith v. Texas*, 550 U .S. 297, 127 S. Ct. 1686, 167 L. Ed. 2d 632 (2007)

The Fifth Circuit has also rejected attacks on the Texas 12-10 rule. See *Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir.2000).  But see the pending Supreme Court case of *Smith v. Spisak* (08-724) — unanimity of jury as an issue in finding mitigating evidence in a capital case (to be argued Oct. 13, 2009).[18]

The Fifth Circuit has also held that any ruling that "the 12-10 rule" violated the federal Constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and therefore could not form the basis for federal habeas-corpus relief. See *Hughes v. Dretke*, 412 F.3d 582 (5th Cir.2005);  *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir.1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir.1993).

Mr. Garcia argues that the precedential value of the Fifth Circuit cases cited above has diminished in light of the *en banc* ruling in *Nelson v. Quarterman*, supra, which simply followed and enforced the principles of *Penry II.* Mr. Garcia takes from the *Penry II* line of cases the principle that a capital sentencing system must afford the sentencing jurors a vehicle with which to give full consideration and full mitigating effect to a capital defendant's mitigation case. When the Texas 12-10 rule is viewed against this principle, the conclusion is inescapable that the 12-10 rule must give way to *Nelson* and the cases upon which it relies. It is beyond serious dispute that this rule is designed to discourage lone or minority jurors[19] from holding to their convictions, and to encourage them to "cave in" and join the majority to form a unanimous verdict. Further, this end is accomplished by withholding material facts from the minority jurors. This introduces an element

---

[18] Mr. Garcia requests the Court to postpone its decision on this claim, and, if necessary, hold this case in abeyance until the Supreme Court decides *Smith v. Spisak*.

[19] By minority jurors, this writer means jurors who are fewer in number on the jury, not that the jurors will belong to minority groups in society at large, such as racial minorities, etc.

of dishonesty into the capital sentencing process. A jury system that operates dishonestly commands little of the respect for the law that is essential for accurate fact finding and proper sentencing decisions.

This odd and frankly dishonest feature of the Texas 12-10 rule bears great similarity to the former "nullification instruction" condemned in *Penry II* and progeny. The trouble with the nullification instruction as a vehicle for handling mitigating circumstances was that, in a fairly wide range of circumstances, it required jurors who were sworn to return a true verdict according to the law and the evidence, to disregard that oath, and sign a false verdict in order to give effect to record evidence of mitigating circumstances. The 12-10 rule also encourages jurors to lie about their true response to the special issue, and to sign a false verdict form in order to go along with the majority on the jury. Further, the 12-10 rule explicitly requires the judge and the attorneys to withhold material information; that a failure to reach a unanimous verdict amounts to a life verdict after all. Thus the common thread that runs within the nullification instruction and the 12-10 rule is reliance on the jurors' violation of their oaths to produce a verdict. The 12-10 rule is actually somewhat worse because it not only encourages jurors to violate their oaths, it also requires officers of the court and the court itself to withhold from the jurors the truth about how the system actually works.

Mr. Garcia argues that the 12-10 rule is another one of the Texas crippling amendments that destroyed or greatly diminished the ability of his sentencing jury to fully consider and give effect to his mitigation case. The crippling of the statutory vehicle for the consideration of mitigating circumstances has placed the jury charge before this Court in a posture very similar to the one before the Supreme Court in *Penry I*: childhood abuse and mental health evidence cannot be fully considered or given effect in the deliberation or future dangerousness special issues. A properly

functioning mitigation inquiry is required to meet the demands of *Penry I.* The Supreme Court has never issued an opinion that approves the present Texas capital sentencing system that was overhauled in the wake of *Penry I.* Thus, the controlling principles of capital sentencing law are those laid down in *Furman*, supra. requiring the discretion of the jury to be properly guided by the trial court. As justice Rehnquist put it in *Boyde v. California*, 494 U.S. 370 (1990),

"... States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." Id., citing *Franklin v. Lynaugh*, 487 U. S. 164, 487 U. S. 181 (1988) (plurality opinion).

The encouragement of dishonesty on the part of jurors, judges and lawyers hardly qualifies as an effort to achieve rationality and equity in capital sentencing. Instead, it offends the principles of rational guided discretion announced in *Furman*, and confirmed in *Penry I.* The refusal by the Texas CCA to remove this crippling amendment from its capital sentencing system was objectively unreasonable. The writ must issue.

> **Claim Number 54: Garcia's right to a fair trial was fundamentally compromised because jurors were instructed that they may infer intent to commit murder generally, rather than find intent specifically, in violation of the Due Process Clause of the 14th Amendment and the heightened reliability of the 8th Amendment.**

Garcia complains that his 1991 jury instructions contained *Sandstrom* error.

**A.      The Claim was Exhausted.**

Garcia's 1991 jurors were instructed that "intent or knowledge may be inferred by acts done or words spoken." 1991 Jury Charge, Tr. 1048-59 (these documents are unnumbered between Bate stamps 1050 and 1051.) Garcia objected that the instruction allowed jurors to find intent as an element of the offense based upon conduct resulting in a death, thereby instructing the jurors to find

intent if it was Garcia's conduct causes the result of death.  1991 SF 65 at 856-58, overruled 859).

The trial attorney argued, "We object to language specifically pointed at the conduct of the

defendant in that it says intent or knowledge may be inferred by acts done, conduct, or words

spoken, which is also conduct.  If the jury is allowed to look at conduct only and make – and the

Court tells them that satisfies the intent factor, then [state law requirement] that intent be limited

to results is negated in this case.  Basically what the language does . . . [is to inform jurors that] it's

okay if you look at the conduct of the defendant and find the requisite intent , . . . ."  *Id.* at 858.

Garcia raised this claim in point of error 52 of his 1992 direct appeal brief.  The CCA found

the instruction improper but denied relief as harmless error.  *See Garcia v. State*, 919 S.W.2d 370,

396-97 (Tex. Crim. App. 1996).

Although the CCA did not address Garcia's claim in the context of a federal claim, even the

CCA recognized that the instruction was a serious error, the CCA – without realizing it – defined

the issue as one of constitutional magnitude, writing, "Appellant also claims that the inclusion of

the phrase complained of allowed the jury to impermissibly find appellant intentionally committed

the murder (a required element for capital murder) based on inferences as opposed to specifically

finding that appellant had a conscious desire or intent to cause the death of Mr. Turski."  *Garcia

v. State*, 919 S.W.2d at 396.  This is precisely the definition of *Sandstrom* error.

> **B.    *Applicable Constitutional Principles on Instruction Error, Unconstitutional
> Presumptions and Harmless Error.***

The due process clause of the Fourteenth Amendment requires that juries receive adequate

guidance in applying the law.  *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Cupp v. Naughten*,

414 U.S. 141, 147-48 (1973).  Its concern is with what might be called the "accuracy" of the verdict

and in assuring that no citizen is convicted unless the government is held to the high standard of "beyond a reasonable doubt." "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "The reasonable doubt standard reduces the risk that an error in fact finding could deprive an innocent man his good name and freedom." *Cupp v. Naughten,* 414 U.S. 141, 155 (1973) (Brennan, J., dissenting). Further, the standard "impresses the jurors with their solemn responsibility to avoid being misled by suspicion, conjecture, or mere appearance." *Id.* Thus, it is because of the Due Process Clause's demand for accuracy, that jury instructions which can be read by a juror to presume an element of the State's case are unconstitutional. *See, e.g., Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). Likewise, the Due Process Clause prohibits a charge requiring, as a predicate to considering a witness' testimony, that the jury find the witness' evidence true beyond a reasonable doubt. *See Cool v. United States*, 409 U.S. 100, 104 (1972). Obviously, the quality of instructions supplied to a jury is vital to conducting a fair trial because the accuracy with which law is applied is largely a function of each juror's ability to understand a correct statement of the law.

In capital cases, the Cruel and Unusual Punishment Clause of the Eighth Amendment requires the jury to weigh mitigating and aggravating circumstances in order to assure that death is the appropriate punishment in a particular case. *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976). As with the Due Process Clause, the concern underlying the Constitution's protection against Cruel and Unusual Punishment is accuracy that the punishment should be "directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 2947 (1989). The Court will reject

a jury charge which restricts a jury from considering all relevant mitigating factors.  *See id.*, 109 S.

Ct. at 2947; *Lockett v. Ohio*, 438 U.S. 586, 605-09 (1978).  Further, the instructions in a capital case

must go beyond merely allowing a jury to consider the defendant's mitigating circumstances and

must direct jurors to give effect to any mitigating factors in favor of a sentence short of death.  *See*

*Penry*, 109 S. Ct. at 2947, 2951.  Obviously, a jury cannot appropriately balance various mitigating

and aggravating aspects of the defendant's life and conduct without clear instructions which

methodically guide jurors through the necessary considerations.

In order for a defendant to receive a fair trial in compliance with these constitutional

imperatives, the Supreme Court has determined that jury instructions must be technically corrects

as well as comprehensible to the juror.  A verdict will be reversed for faulty instructions when (1)

there is a *reasonable likelihood* that the jury misinterpreted the instructions, (2) the resulting error

was harmful, and (3) the error was not corrected.  Each of the concepts raised by these rules will

be examined in detail.

### *(1)      Instructions Must Be Accurate and Comprehensible*

Above all, the Supreme Court demands jury instructions which accurately state the law. *See,*

*e.g., United States v. Bayer*, 331 U.S. 532, 536 (1947) ("Once the judge has made an accurate and

correct charge, the extent of its amplification must rest largely in his discretion."); *Sparf v. United*

*States*, 156 U.S. 51 (1895).  The Court also requires that instructions be comprehensible. *See, e.g.,*

*Mills v. Maryland*, 486 U.S. 367, 375-77 (1988); *United States v. Nance*, 502 F.2d 615, 619 (8th

Cir. 1974), *cert. denied,* 420 U.S. 926 (1975); *Hoffert v. State*, 559 So.2d 1246, 1247-49 (Fla. Dist.

Ct. App. 1990).  Courts will meticulously scrutinize the charge to the jury to assure that the

defendant had the benefit of instructions which meet both of these criteria.  *See, e.g., Yates v. Evatt*,

111 S. Ct. 1884, 1892 (1991); *Mills v. Maryland*, 486 U.S. 367 (1988); *Francis v. Franklin*, 471 U.S. 307, 315-25 (1985); *Allen v. United States*, 164 U.S. 492 (1896); *Skillern v. Estelle*, 720 F.2d 839, 844-49 (5th Cir. 1983) (concluding instructions adequate after extensive review, but conceding they were unclear), *cert. denied*, 469 U.S. 873 (1984); *People v. Drake*, 748 P.2d 1237, 1252-60 (Colo. 1988) (en banc).  To evaluate comprehensibility, judges will frequently cast themselves in the roles of "reasonable jurors" in order to determine how a juror would have interpreted a particular instruction.  *See, e.g., Yates v. Evatt*, 111 S. Ct. 1884, 1892 (1991); *Penry v. Lynaugh,* 492 U.S. 302, 322, 326 (1990); *California v. Brown*, 479 U.S. 538, 541-43 (1987).  Courts may attempt to place themselves in the mind of the reasonable juror because of the historical lack of competent research studies revealing how jurors actually think.  *See Addington v. Texas,* 441 U.S.418, 424-25 (1979).

*Sandstrom v. Montana*, illustrates how courts examine jury instructions for accuracy and comprehensibility.  442 U.S. 510 (1979).  In *Sandstrom*, the defendant appealed his conviction of the brutal slaying of an elderly widow.  At trial, Sandstrom objected to the following portion of the jury charge: "The law presumes that a person intends the ordinary consequences of his voluntary acts."  *State v. Sandstrom*, 580 P.2d 106, 109 (Mont. 1978), *rev'd,* 442 U.S. 510 (1979).  Sandstrom protested that the effect of this instruction was to improperly shift to the defendant the burden of *disproving* intent, the critical element of deliberate homicide.  *Id.*  Thus, the United States Supreme Court was faced with many of the questions addressed by this Comment.  Did the jury read the instruction?  Did the jury understand it?  Did the jury act on the instruction and actually presume that David Sandstrom intended to see Mrs. Jessen die when he stabbed her?

266

In a unanimous decision, the Supreme Court reversed Sandstrom's conviction. The Court first addressed the comprehensibility aspect of the instructions. *Sandstrom*, 442 U.S. at 514-19. Following the approach taken by most courts which have dealt with jury instructions, the Court considered how a reasonable juror could have interpreted the instruction. *Id.* at 514. The Montana Attorney General argued that the instruction on intent was merely a "permissive inference." That the is, "it allowed but did not require the jury to draw conclusions" about Sandstrom's intent. *Id.* Rejecting the Attorney General's interpretation, the Court concluded that a reasonable juror could draw any number of inferences. A juror might, as suggested by the attorney general for Montana, treat the instruction as merely a "permissive presumption" which innocuously allowed jurors to gauge Sandstrom's intent by reviewing his actions. On the other hand, the Court feared, a juror might also treat the instruction as a "conclusive presumption," that is, one *requiring* the juror to conclude that a defendant's actions always reflected his intent. *See generally Yates v. Evatt*, 111 S. Ct. at 1892 n.7 (explaining further the difference between these two presumptions). There was simply no way to know, the *Sandstrom* Court concluded, how most jurors interpreted this instruction. *Sandstrom*, 442 U.S. at 515-19.

Having addressed the comprehensibility of the disputed instructions, the Court went on to address their legal accuracy. *Id.* at 520-24. It concluded that such an instruction did not satisfy the Constitution's guarantee of due process. *Id.* at 524. "[A] conclusive presumption in this case would 'conflict with the overriding presumption of innocence with which the law endows the accused which extends to every element of the crime . . . .'" *Id.* at 523 (*quoting Morrissette v. United States,* 342 U.S. 246, 275 (1952)). As *Sandstrom* illustrates, the Court insists that jury charges be both comprehensible as well as legally accurate.

267

### (2)    An Instruction Will Be Error Only if There is a "Reasonable Likelihood" of Juror Misunderstanding

The Supreme Court has struggled for some time to agree upon a test to apply in assessing the possibility that jurors may have misunderstood an instruction.  For later purposes, it is important to understand and contrast both the old and the new tests for assessing juror comprehension.

During the 1970's and 1980's, the Court applied a generous test.  The Court would reverse a criminal conviction if it found *any* possibility that the jury may have improperly applied the law. *See, e.g., Mills v. Maryland,* 486 U.S. 367, 377 (1988); *Connecticut v. Johnson*, 460 U.S. 73, 83-86, 86 n.15 (1983); *Sandstrom,* 442 U.S. at 519-24.  The test used by the Court to assess jury comprehension was to ask whether a particular interpretation was conceptually feasible.  *See Mills*, 486 U.S. at 375-80; *id.* at 393-95 (Rehnquist, C.J., dissenting); *Sandstrom*, 442 U.S. at 516-19.  If there existed two conceivable interpretations to a criminal charge, then *both* interpretations must be constitutional in order for the instruction to pass constitutional muster.  *Mills*, 486 U.S. at 376; *Sandstrom*, 442 U.S. at 519; *Yates v. United States*, 354 U.S. 298, 312 (1957).  In *Sandstrom*, for example, the Court reversed Sandstrom's conviction, speculating that because a reasonable juror *could have* given the presumption conclusive effect, one cannot "discount the possibility that Sandstrom's jurors" *actually did* interpret the instructions as an irrebuttable directive that Sandstrom actually possessed the requisite intent.  *Sandstrom*, 442 U.S. at 517, 519.

During the late 1980's, several justices began calling for a more restrictive test for assessing jury instructions which would require courts to consider *all* the evidence and instructions to which the jury was exposed.  In other words, several justices argued that courts should not assess complex legal instructions in a vacuum, but in light of how ordinary jurors would actually deal with the

268

challenged instructions.  Foremost among the critics of the old test was Chief Justice Rehnquist who called for courts to assess what a reasonable juror *would* have understood the instructions to mean, not whether a particular interpretation was conceptually possible.    *See Mills*, 486 U.S. at 390 (Rehnquist, C.J., dissenting); *see also California v. Brown*, 479 U.S. 538, 541 (1987); *Francis v. Franklin*, 471 U.S. 307, 332 (1985) (Rehnquist, C.J., dissenting); *Sandstrom*, 442 U.S. at 527-28 (Rehnquist, J., concurring).  The Chief Justice's dissenting view in *Mills v. Maryland*, illustrates this more restrictive approach and provides a clear contrast to the old test applied by the Court.  486 U.S. 367 (1988).  (Justices O'Connor, Scalia and Kennedy joined the Chief Justice in his dissent in *Mills*.  Justice Thomas appears to have written no opinions while on the Supreme Court or the District of Columbia Circuit Court of Appeals which would shed light on his view of jury instructions.  Justice Souter, however, has written several opinions which indicate that he shares the Chief Justice's views. *See, e.g., Yates*, 111 S. Ct. 1884; *State v. Prisby*, 550 A.2d 89, 90 (N.H. 1988).

In *Mills*, the Chief Justice criticized the Court's belief that  *any* possibility of juror misunderstanding required reversal and suggested that reviewing courts give more weight to all of the evidence and instructions presented to jurors at trial which might have compensated for any semantic ambiguities contained in the jury instructions.  Ralph Mills was found guilty of stabbing his cellmate to death while serving time for another murder.  *Mills,* 486 U.S. at 390 (Rehnquist, C.J., dissenting).  The instructions given to the jury during the sentencing portion of the Mill's capital murder trial read as follows:

> Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked "Yes" has been proven to exist by A

PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked "No" has not been proved by A PREPONDERANCE OF THE EVIDENCE.

*Mills*, 486 U.S. at 369.

The instructions then went on to list eight possible mitigating circumstances. The jury checked "no" against each mitigating circumstance indicating that they did not believe any mitigating circumstances existed. *Id.* at 387-88 (Appendix). On appeal, Mills argued that the instruction bared jurors from checking "yes" to identify the existence of a mitigating circumstance unless the twelve jurors *unanimously* agreed that the mitigating circumstances existed. *Id.* at 373-74. The correct procedure is that the jury should find a mitigating circumstance exists if *only one* juror believes in the existence of that mitigating circumstance. Unanimity is not required. *Id.* at 374-75. Writing for a five-member majority, Justice Blackmun reiterated the traditional rule that Mills must be resentenced if there was *any* possibility that the jurors could have misinterpreted the instructions and believed that they were not permitted to consider all mitigating circumstances surrounding Mills' crime. *Id.* at 376-77, 384. Justice Blackmun conceded that a reasonable jury could have improperly interpreted the instructions. *Id.* at 377. Yet in the end, he remained convinced that there was a "substantial probability" that reasonable jurors could have misunderstood the jury charge. *Id.* at 384. Mills' death sentence was vacated and remanded for resentencing. *Id.*

Chief Justice Rehnquist dissented. He emphasized that the test should be what a reasonable juror *would have understood* the instructions to mean, not merely whether a particular interpretation is *conceptually possible*. *Id.* at 390 (Rehnquist, C.J., dissenting); *see also California v. Brown*, 479

270

U.S. 538, 541 (1987); *Francis v. Franklin*, 471 U.S. 307, 332 (1985) (Rehnquist, C.J., dissenting); *Sandstrom*, 442 U.S. at 527-28 (Rehnquist, J., concurring).

The Chief Justice's new test, that is, requiring courts to consider the full panoply of instructions and evidence presented to the jury rather than focusing on the challenged instructions in isolation, has now been fully embraced by the Court. In *Boyde v. California*, the Court stated that appeals involving instruction challenges would now only be reversed if "there is a *reasonable likelihood*, that the jury has applied the challenged instruction in a way that prevents consideration of constitutionally relevant evidence." 494 U.S. 370, 380 (1990) (emphasis added) (written by Chief Justice Rehnquist, joined by Justices White, O'Connor, Scalia and Kennedy.) In *Boyde*, the Court reviewed a defendant's capital murder conviction in which the trial court provided the jury with a list of eleven factors for it to consider in determining whether Boyde should receive the death penalty or a life sentence. The last of these factors was a "catch all" factor which permitted the jury to consider, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Boyde*, 494 U.S. at 374. Boyde argued that this phrase effectively barred the jury from considering mitigating evidence *unrelated* to the crime. Writing for a five-member majority, the Chief Justice reviewed the Court's struggle to settle upon a single standard for assessing jury instruction error and admitted that the Court had been "less than clear." *Id.* at 378-79. He explained his "reasonable likelihood" standard and stated his belief that this standard "better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror would or might have interpreted the instruction." *Id.* at 380 (quotation marks in original). Applying this "reasonable likelihood" standard to Boyde's challenge to his sentencing instructions, the Court affirmed Boyde's conviction.

271

*Id.* at 381-86.  Fundamental to his position is the Chief Justice's position is his belief that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might."  *Id.* at 380-81.  Any ambiguities which might exist are "thrashed out in the deliberative process, with common sense understanding of the instructions in light of all that has taken place at the trial likely to prevail over technical hair splitting."  *Boyde*, 494 U.S. at 381.

Perhaps the most common argument made by courts when confronted with poorly drafted instructions is that any confusion caused by a particular instruction would have been corrected when the jury read the entire charge.  *See, e.g., Francis v. Franklin*, 471 U.S. 307, 318-25 (1985); *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973); *Skillern v. Estelle*, 720 F.2d 839, 849 (5th Cir. 1983), *cert. denied*, 469 U.S. 873 (1984);  *Sattiewhite v. State*, 786 S.W.2d 271, 289 (Tex. Crim. App. 1989), *cert. denied*, 111 S. Ct. 226 (1990).  Psychologist Lorelei Sontag warns, however, that "[r]eviewing courts should be far less sanguine about the harm done by instructional error or any error in the penalty phase, than they presently are."  Lorelei Sontag, Deciding Death: A Legal and Empirical Analysis of Penalty Phase Jury Instructions and Capital Decision Making (1990) (unpublished Ph.D. dissertation, University of California at Santa Cruz).  Dr. Sontag conducted the best study to date dealing with how well jurors understand the concepts of mitigating and aggravating circumstances.  She interviewed thirty jurors who sat on capital murder trials and found that only thirteen demonstrated a competent understanding of the relationship between mitigating and aggravating circumstances.  *Id.* tbl. 3 at 118, 119.  Of the remainder, "[a]t least 4 jurors had crucial misconceptions about the meanings of aggravation and mitigation, and possibility a total of 9 did not grasp the terms well enough to have been guided by them in anything like the intended way."  *Id.* at 118.

272

Dr. Sontag observed that scientists have been unable to find any basis for assuming that instruction errors are cured by context. *Id.* In fact, she claims what work has been done reveals that, at least in capital cases, "it is highly unlikely that jurors will understand the correct use of the mitigating evidence, or the scope of this discretion, just because the full range of mitigation is presented." *Id.* Indeed, most of the studies revealing glaring jury failures were recorded by juries which had been presented the entire charge. *See, e.g.,* Amiram Elwork et al., Making Jury Instructions Understandable § 3-1, at 43-45, § 6-2(A) at 112-13 (1982); Geoffrey P. Kramer & Dorean M. Koenig, *Do Jurors Understand Criminal Jury Instructions? Analyzing the Results of the Michigan Juror Comprehension Project*, 23 U. Mich. J.L. Ref. 401, 409-11 (1990).

To a certain extent this assumption has been proven true. For example, researcher Elwork, Sales and Alfini tested the comprehension levels of jurors both before and after deliberation. Elwork et al., § 3-4(B), at 65-66. They found that jurors who were given pattern jury instructions but not permitted to deliberate understood only 23% of the content of the instructions. *Id.* § 3-4(B), at 67 (Table VII). After deliberation, however, comprehension levels rose to 40%. *Id.* In another well-conducted study, Dr. Robert Forston tested pattern criminal instructions on 114 mock jurors drawn from county jury panels. Robert F. Forston, *Sense and Non Sense: Jury Trial Communication*, 1975 B.Y.U.L. Rev. 601, 613. He compared the comprehension levels of jurors who had not deliberated with those who had deliberated in six-member petit juries. The mean percent of comprehension for jurors who had not deliberated was 53%. *Id.* at 614 (Table 2). Jurors who had deliberated scored a mean comprehension rate of 63%--an increase in comprehension of nearly 20%. *Id.*

273

Unfortunately, these studies indicate that even after deliberation a large portion of jurors does not adequately understand the law.  The Elwork, Sales and Alfini tests showed that 60% of deliberation jurors failed to adequately understand while Forston study found similar failures by 37% of test jurors.  These results have been born out in similar studies.  *See, e.g.,* Phoebe C. Ellsworth, *Are Twelve Heads Better Than One?*, 52 L. & Contemp. Probs. Autumn 1989, at 205, 218-23 (finding that, following deliberation, 49% of juror responses to researchers' legal questions were unclear or wrong); Kramer & Koenig, at 431-32. (finding widespread juror failure although subjects were actual jurors who submitted to testing immediately after deliberation and rendition of a verdict).

To summarize this second aspect of the test, the Court has adopted the Rehnquist approach and tightened standards for challenges to the wording of jury instructions by requiring the defendant to show that there is a "reasonable likelihood" that the instruction, in light of all the evidence and countervailing instructions presented at trial, led the jury to misapply the law.  *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475 (1991) (applying standard);  *Williams v. Chrans*, 945 F.2d 926, 937-38 (7th Cir. 1991) (applying the new standard).

### (3)    *The Error Must Be Harmful and Uncorrected*

A finding of instructional error does not compel reversal *per se.  See Yates v. Evatt*, 111 S. Ct. 1884, 1892-93 (1991); *Rose v. Clark*, 478 U.S. 570 (1986) (*Sandstrom* error is not harmful if there is no prejudice to defendant); *Chapman v. California*, 386 U.S. 18, 22 (1967) (reversal for constitutional error also requires showing of harm).  A challenger must also demonstrate that the instructions were harmful and that the harm was not corrected by other events at trial.  *California v. Brown*, 479 U.S. 538, 541 (1987); *Clark*, 478 U.S. at 576-82; *Francis v. Franklin*, 471 U.S. 307,

274

315, 318-25 (1985); *Chapman*, 386 U.S. at 24 (The *Chapman* test is stated as whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") The Supreme Court will not reverse a conviction if it finds that the instructional error was harmless. *Clark*, 478 U.S. at 576-82; *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *Chapman*, 386 U.S. at 22, 24 (establishing that harmless error doctrine applies in constitutional analyses). The test for determining whether an instruction was harmless involves an esoteric analysis which is best understood by careful explanation and an example.

A court can determine that an instructional error was harmless only by concluding that the error was "unimportant in relation to everything else the jury considered on the issue in question." *Yates*, 111 S. Ct. at 1893. This is not to say that the jury is required to be unaware of the improper instruction, but merely that, considering all of the events to which the jury was exposed, it is beyond reasonable doubt that the jurors would *not* have relied upon the false instruction to reach a verdict against the defendant. *Id.* This determination requires a court to apply a two-part test. First, a court must identify precisely what evidence the jury actually considered in reaching its verdict and secondly, conclude whether this evidence possessed sufficient probative force to cause the jury to reach the proper verdict despite the demand of the improper instruction. *Id.* In other words, the court must first decide whether the government's evidence was so weak in a particular element that the jury acted upon the improper instruction (which was thus harmful) or whether the evidence presented by the government on an element of its case was so strong that the jury would have disregarded the improper instruction and acted upon some other aspect of the jury charge which *was* proper (and thus the instruction was not harmful). *Id.* at 1893-94.

In order to satisfy the first part of this test, a court must initially decide whether the instruction at issue involves an element of the government's *prima facie* case. Next, the court must sift through all the evidence presented by the government and, in light of a fair reading of the erroneous instruction, make an educated guess as to which pieces of evidence the jurors *actually* relied upon in reaching its verdict. *Yates*, 111 S. Ct. at 1893 ("First, [the reviewing court] must ask what evidence the jury actually considered in reaching its verdict."). This assessment requires the court to determine what evidence the jury would have relied upon to support the element *independently* of the erroneous instruction and which pieces of evidence the jury could rely on *only* if the jurors had relied upon the erroneous instruction. *See Yates*, 111 S. Ct. at 1893 ("If, for example, the fact presumed is necessary to support the verdict, a reviewing court must ask what evidence the jury considered as tending to prove or disprove that fact.") This analysis is not meant to be a subjective inquiry into the minds of the jury, but rather an objective reading of the charge handed to the jurors with the assumption that jurors were reasonable people who followed the trial court's instructions. *See id.*

In order to determine what evidence the jury relied upon, the court is required to make a preliminary decision, that is, whether the court is to sift the entire record or only a part of it. *See id.* ("When applying a harmless error analysis in presumption cases, therefore, it is critical to ascertain from the trial court's instructions that the jurors, as reasonable persons, would have considered the entire trial record, before looking to that record to assess the significance of the erroneous presumption.") This preliminary decision requires the court to scrutinize the instruction and ascertain whether the improper instruction would have permitted the jurors to look at the entire record (and one must then assume they did), or instead whether the jurors would have limited

themselves to only a portion of the record in compliance with the directive of the improper instruction. *See, e.g., Yates*, 111 S. Ct. At 1895-96 (evidence of evidence rebutting malice "left the jury free to look beyond the unlawful act presumption . . . .").

Once a court has made this first inquiry and identified the evidence relied upon by the jury, the court must then apply the second step of the test, that is, to "weigh the probative force of that evidence as against the probative force of the presumption standing alone." *Yates*, 111 S. Ct. at 1893. An improper instruction is not made harmless merely because there was *some* evidence presented upon which the jury could have based its verdict without relying upon the improper instruction. *See id.* Rather, the issue is whether it is beyond a reasonable doubt that the jury *actually* rested its verdict on evidence establishing the requisite *prima facie* element, independently of the improper instruction. *See id.* Since a court cannot make a subjective inquiry into the jurors' minds, the court must approach the investigation in an objective fashion by asking whether the key evidence presented by the government and determined by the court in the first test to have been relied upon by the jury, was so strong (*i.e.,* of such probative force) that it is beyond reasonable doubt that the jury would have reached the same verdict even if the challenged instruction had been given properly. *See id.* at 1893-94. If indeed the critical evidence can be said to be such objectively strong pieces of evidence that it is beyond reasonable doubt that a reasonable jury would have found the existence of the *prima facie* element at issue if the instructions had been given properly, then the court should affirm the conviction--the error was harmless. *Id.* On the other hand, if the evidence was fairly weak, then the court should reverse. The error was harmful.

To summarize, the Supreme Court has interpreted the federal Constitution to require accurate and well-understood jury instructions. In determining whether a conviction should be

vacated, a court must consider whether there is reasonable likelihood that the jury misunderstood its instructions, the instructional error was harmful, and the error went uncorrected.   *See, e.g., United States v. Parker*, 73 F.3d 48, 53 (5th Cir. 1996) (applying tests), *suggestion for reh'g en banc granted* 1996 U.S. App. LEXIS 7036 (Apr. 4, 1996).

### C.    *Application to Garcia.*

The 1991 court's instruction to jurors that they may infer Garcia's intent by acts done or words spoken is classic *Sandstrom* error.  It freed jurors from the difficult but constitutionally required task of determining whether Garcia possessed the specific intent to kill, and allowed them to presume that he did by inferring his intent by any acts or words – whether his or someone else's – that were made.

The CCA lazily analyzed the issue, skipping the difficult work of determining whether the instruction was error, and by doing so tacitly recognized that it was, and waived off Garcia's complaint as harmless error.  Declining to cite specific evidence, the CCA laconically asserted that the entire record proved Garcia was overwhelmingly guilty.  *Garcia*, 919 S.W.2d at 396-97.

What the CCA failed to do was to examine the issue precisely and forcefully, which is what makes its decision AEDPA an unreasonable application of federal law.  First, the court should have defined the issue precisely and treated Garcia's claim as the constitutional error that it was.  This would have led to a *Sandstrom* analysis, which would necessarily compel the CCA to conclude that Garcia's instruction was so strikingly similar to Sandstrom's that there was no alternative but to acknowledge the improper presumption cast upon jurors.  Any procedure that  bars consideration of that material facts by the fact-finder, here, the jury, is necessarily inadequate.  *Ford v. Wainwright*, 477 U.S. 399 (1986).  Probably the CCA reached this conclusion and decided to

exclude it from the published analysis, as the CCA assumed "arguendo," see page 396 of opinion, that there was error.

Second, the CCA failed to conduct a meaningful harmless error analysis, first by applying the wrong standard, and second, by failing to consider evidence for and against proof of Garcia's intent.  The CCA reached for a state law harmless error test instead of the "reasonable likelihood" test explained above.  Moreover, the most compelling evidence in Garcia's favor was his extreme intoxication and his youth, which his defense lawyer argued to jurors through witnesses and closing argument, demonstrated his lack of actual intent.  In closing argument the state countered that voluntary intoxication is not a legal defense – which is true – but misses the point because while intoxication is not a legal defense, the intoxication may rise to a level high enough to justify a finding of lack of specific intent to kill, while justifying a lower standard such as robbery, which is precisely why the lesser included offenses of aggravated robbery and robbery were included in the jury charge on liability in 1991.  *See* 1991 Jury Instructions, CR 1049-59 (note: the Bates stamp references are unclear on counsel's copy; these reference may be inaccurate).

> ***Claim Number 55. The refusal of the Texas courts to properly define the terms and phrases in the future dangerousness special issue was a decision contrary to, and an unreasonable application of clearly established constitutional law in that Mr. Garcia was 1) deemed eligible for the imposition of death as a penalty by the use of an unconstitutionally vague aggravator, and 2) Mr. Garcia was selected for the death penalty without giving full consideration and effect to record evidence of his mitigating circumstances.***

Mr. Garcia was only 18 years old at the time of the offense in question. He suffered from brain damage that may well have affected his behavior. With proper treatment, his behavior would

279

likely improve.[20]  Garcia will demonstrate that Texas has broken the promises it made to the

Supreme Court in oral argument in *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950 (1976)[and later

recognized by Justice O'Connor in *Penry v. Lynaugh,* 492 U.S. 302 (1989) (*Penry I*)][21],  and that,

as a result, the application of the undefined terms and phrases of the Texas future dangerousness

inquiry offended the constitutional principles that underlay *Jurek* under the facts and circumstances

of Mr. Garcia's case. The argument that follows is not a facial attack on the structure of the Texas

capital sentencing system, but on its application to the facts of this case.

      This claim was fully preserved.  Trial and direct appeal counsel for Mr. Garcia, recognizing

the importance of  the question about what was meant by a "continuing threat to society" to an

abused and neglected, brain damaged,  mentally ill eighteen year old facing death or 40 years of

actual incarceration as  punishment, requested the Texas courts to define these terms.  In his tenth,

eleventh, nineteenth, twentieth, and twenty-first points of error in his direct appeal brief to the Texas

CCA, Mr. Garcia, citing *Furman v. Georgia,* 408 U.S. 238 (1971), *Gregg v. Georgia,* 428 U.S. 153

(1976) and  *Spaziano v. Florida,* 468 U.S. 447, 460-64 (1984) claimed that the trial court erred in

overruling his motion to quash the indictment and failed to properly instruct the sentencing jury

because the words, "deliberate," "acts," "criminal acts of violence," "probability," "continuing

threat," and "society" were not defined in the statute or the jury instructions. The CCA rejected Mr.

Garcia's arguments and  affirmed, citing a series of its own decisions: *Feldman v. State*, 71 S.W.3d

---

[20] The record evidence of Mr. Garcia's mitigation case is more fully described in this
petition.

[21] " ... Penry simply asks the State to fulfill the assurance upon which Jurek was based:
namely, that the special issues would be interpreted broadly enough to permit the sentencer to
consider all of the relevant mitigating evidence a defendant might present in imposing sentence."
*Penry I at 315.*

738, 757 (Tex. Crim. App. 2002); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *McDuff v. State*, 939 S.W.2d 607, 620 (Tex. Crim. App.1997), progeny of *Jurek v. Texas,* 428 U.S. 262, 96 S. Ct. 2950 (1976).

In *Jurek,* the Texas special issue system survived a facial attack made on vagueness grounds. In *Penry I*, the high court found that the Texas system was unconstitutional only as it applied to the facts of that case. A few years later, in *Johnson v. Texas* and *Graham v. Collins*, (1993) the Supreme Court rejected "as applied" claims that record evidence of youthfulness required a separate vehicle for consideration of that mitigating factor for its mitigating effect. Garcia's claim is not for a separate vehicle; he just wants the dealer to deliver what was promised.

Jurors are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200 (1987) Mr. Garcia argues that a reviewing court must conclude that the sentencing jurors in his case considered his record evidence of youthfulness and curable or treatable mental illness in the way that *Johnson v. Texas* and *Graham v. Collins* said they would,  as factors tending to show that he would not be a continuing threat to society. Since the jury returned an affirmative finding on the future dangerousness special issue, this court must presume that the jury rejected Mr. Garcia's argument that his tendencies toward criminal acts of violence would subside over time during incarceration, such that he would not qualify as a continuing threat to society. The court should note that a finding of future dangerousness is a punishment phase aggravator in Texas, one that must be established before the jury considers mitigating circumstances. *Blue v. State* 125 S.W.3d 491 (Tex.Crim.App. 2003), cert. denied, U.S.L.W. (U.S. October 4, 2004) (No. 03-10832). Thus, Mr. Garcia would not be on Texas' death row but for this finding.

Mindful that the Supreme Court in *Jurek* rejected facial claims that the terms and phrases of the Texas future dangerousness special issue are too vague to support any death sentence, Mr. Garcia will demonstrate that they are nonetheless too vague to support this one. On this record, the trouble in predicting crimes of violence that justify calling Mr. Garcia a "continuing threat to society" is exacerbated by Mr. Garcia's age of 18 years and about four months at the time of the crime.  Had the murder been committed a few months earlier, Garcia's death sentence would have been commuted to life along with about 20 other Texas death row inmates that received this relief pursuant to *Roper v. Simmons*, 543 U.S. 551 (2005)

The trouble with the use and application of the terms and phrases of the Texas future dangerousness special issue in this case  becomes clear when viewed through the lens of *Roper v. Simmons*. In three areas, the *Rope*r court found sufficient evidence that our society views juveniles up to age 18 as  less culpable than the average criminal.

First, the *Roper v. Simmons* court noted that a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. Id. It has been noted that  adolescents are overrepresented statistically in virtually every category of reckless behavior.  Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Review 339 (1992). Id.

The Roper court found a  second area of difference,  that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. *Eddings*, supra, at 115 ( [Y]outh is more than a chronological fact. It is a

time and condition of life when a person may be most susceptible to influence and to psychological

damage ). This is explained in part by the prevailing circumstance that juveniles have less control,

or less experience with control, over their own environment. See Steinberg & Scott, Less Guilty by

Reason of Adolescence: Developmental

Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009,

1014 (2003)

     The *Roper* court identified a third broad difference. The character of a juvenile is not as well

formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. Id.

Citing, generally E. Erikson, Identity: Youth and Crisis (1968).

     The *Roper* court found these differences sufficient to render suspect any conclusion that a

juvenile falls among the worst offenders. The susceptibility of juveniles to immature and

irresponsible behavior means  their irresponsible conduct is not as morally reprehensible as that of

an adult. *Roper,* supra,, citing  Thompson, supra, at 835 (plurality opinion). Their own vulnerability

and comparative lack of control over their immediate surroundings mean juveniles have a greater

claim than adults to be forgiven for failing to escape negative influences in their whole

environment. Id. Citing Stanford v. Kentucky, 492 U. S., at 395 (Brennan, J., dissenting). The

reality that juveniles still struggle to define their identity means it is less supportable to conclude

that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.

From a moral standpoint it would be misguided to equate the failings of a minor with those of an

adult, for a greater possibility exists that a minor s character deficiencies will be reformed. Indeed,

[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of

youth are transient; as individuals mature, the impetuousness and recklessness that may dominate

in younger years can subside. *Roper*, citing *Johnson v. Texas*, supra,  at 368; see also Steinberg & Scott, supra. at 1014 ( For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood).

These three areas of concern had to be well known to the Texas courts, just as it was to the Supreme Court and the Missouri Supreme Court in the years 2001-2004 during which Garcia's punishment was re-tried and appealed. When Mr. Garcia, just over 18 at the time of the crime, demanded that the Texas courts grant the modest relief that the meaning of a "continuing threat to society" be defined, those courts could not have overlooked the well known facts recognized and summarized in *Roper*. The trouble perceived by Garcia's counsel was that the word "continuing" could, in the mind of a reasonable, law abiding juror, encompass such a short time that the mitigating effect of the circumstance of near-exempt youthfulness can be entirely avoided. Without a proper definition of the phrase "continuing threat to society, a juror that is inclined to find future dangerousness may not be looking far enough into the future to  give proper consideration to youthfulness. He can literally find a threat continuing if he believes it will last five minutes, five hours or five days. On the other hand, a juror who would be inclined to decline to find future dangerousness does not have any place to hang his hat on the barebones instructions the court issued him to follow.

It is simply irrational for the Texas courts to continue to decide death eligibility for eighteen year olds based on an ostensible finding of future dangerousness that does not actually require jurors to fully consider and give effect to youthfulness. Moreover, the use of the undefined terms of the

future dangerousness question as a way of establishing an aggravating factor offends the principles

of *Zant v. Stephens*, 462 U.S. 862, 877 (1983) Aggravating factors must "genuinely narrow the class

of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe

sentence on the defendant compared to others found guilty of murder."[22]. On their face, and as

applied, aggravating circumstances must permit the sentencer to make a "principled distinction

between those who deserve the death penalty and those who do not." [23]

In *Maynard v. Cartwright*, supra, the Supreme Court unanimously set out the legal

principles which control vagueness claims directed at an aggravator. In addressing the validity of

a death sentence based solely on the statutory aggravating circumstance that the murder was

"especially heinous, atrocious and cruel," the *Maynard* court reasoned that an Eighth Amendment

vagueness challenge to an aggravating factor in a capital case may not be analyzed under the

"as-applied" approach used in vagueness challenges to criminal statutes under the Due Process

Clause. 486 U.S. at 361.

An Eighth Amendment challenge requires that reviewing court to conduct its review in

several steps. First, the reviewing court must  evaluate the challenged aggravating circumstance on

its face, entirely apart from the facts of the particular case in which it was applied. An overbroad

---

[22] *Zant v. Stephens*, 462 U.S. 862, 877 (1983)

[23] *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); see also *Richmond v. Lewis*, 506 U.S. 40, 46 (1992) ("a statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty"); *Clemons v. Mississippi*, 494 U.S. 738, 758 (1990) ("invalid aggravating circumstance provided "no principled way to distinguish the case in which the death penalty is imposed, from the many cases in which it was not "); *Maynard v. Cartwright*, 486 U.S. 356 (1988) ("[t]he construction or application of an aggravating circumstance is unconstitutionally broad or vague if it does not channel or limit the sentencer's discretion in imposing the death penalty").

aggravating circumstance vests in sentencing courts the "open-ended discretion" to impose the death penalty which the Supreme Court condemned in *Furman v. Georgia*.[24] Where a death sentence is imposed under a system that permits unbridled discretion, the state may not save the sentence by demonstrating that the outcome would have been the same even if the sentencer's discretion had been properly narrowed and guided.[25]

Secondly, even if the text of a statutory aggravating circumstance does not provide meaningful guidance to a capital sentencing jury, such an aggravating circumstance can nevertheless support a death sentence if the state courts have narrowed its scope to a constitutionally sufficient degree. Finally, the reviewing court must determine whether such a narrowing construction actually guided the sentencing jury in the case under review.[26] The Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness."[27] If the aggravating circumstance at issue is invalid for reasons such as these, due process of law requires that the jury's decision to impose death be set aside. Id.

Mr. Garcia argues that, in the case of offenders just over the age of 18 at the time of their capital offense permits jurors to return an affirmative finding of future dangerousness because of

---

[24] 408 U. S. 238 (1972).

[25] *Maynard*, 486 U.S. at 361-363.

[26] *Godfrey v. Georgia*, 446 U.S. 420 (1980); see also *Walton v. Arizona*, 497 U.S. 639 (1990) (recognizing the authority of a state reviewing court to supply a limiting definition of a facially overbroad or vague aggravating circumstance).

[27] *Zant v. Stephens*, 462 U.S. at 885, citing *Miller v. Florida*, 373 So.2d 882, 885-886 (Fla.1979).

the frailties of youth. The refusal to define terms offended the principles *Maynard v. Cartright*, supra. The Great Writ must issue to remedy this improper aggravator.

The writ must issue for another reason. Garcia's jurors probably considered youthfulness--a classic mitigating circumstance--under the future dangerousness special issue, just as *Johnson v. Texas* and *Graham v. Collins* told us was the case. Reasonable jurors would likely regard the more specific inquiry to supplant the more general language of the mitigation inquiry. The failure to define terms so as to require that the "continuing threat" to actually continue over a substantial period of time in incarceration had the practical effect of preventing or impairing the jurors' full consideration of youthfulness for its mitigating effect. This offends the constitutional principles recognized in *Nelson v. Quarterman*, supra and the Supreme court cases cited therein. The important principle that Mr. Garcia takes from *Nelson*, supra. is that a capital sentencing system must permit full consideration of the capital defendant's mitigation case for its mitigating effect. Texas, by taking the positions that it did in *Johnson v. Texas* and *Graham v. Collins*, has elected to handle youthfulness with its future dangerousness special issue. That issue, without proper definition of terms, is not, post-*Nelson*, adequate to meet the demands of the capital sentencing jurisprudence of the Fifth Circuit or the Supreme Court in the case of a nearly exempt youthful capital offender such as Mr. Garcia.

For several reasons, Texas cannot take resort in its so-called *Penry* issue. First, the most reasonable reading of the charge given Mr. Garcia's jury is that youthfulness is to be considered in the future dangerousness inquiry. Without some sort of encouragement to re-visit that issue in the mitigation inquiry, there is no reason to believe that the jurors believed they could consider youthfulness again. Even if they did think so, youthfulness is the sort of circumstance that many

287

jurors will not regard as reducing moral blameworthiness. For evidence of the tendency of many reasonable people to disregard or greatly discount youthfulness as a reason to grant mercy in capital cases, we need look no further than the vigorous dissents in *Roper v. Simmons*. Texas jurors are much more likely to think like the dissenters, Justices Scalia, Thomas, Reinquist and O'Connor did. Not many Texas jurors will think like Justices Kennedy, Ginsburg, Souter, Breyer and Stevens, who made the majority in *Roper*.

Mr. Garcia argues that the punishment charge was constitutionally flawed for failure to define these terms under the principles of *Maynard v. Cartright* and *Eddings*, supra. The Great Writ must issue on both grounds.

### Claim Number 56:  Article 37.071 § 2(e) Is Unconstitutional Under the Eighth and Fourteenth Amendments to the United States Constitution Because Appellate Review of the Second Special Issue Is Impossible.

In this ground, Mr. Garcia makes precisely the same argument rejected in *Eldridge v. State*, 940 S.W.2d 646, 1996 Tex. Crim. App. LEXIS 235, *12-13 (Tex. Crim. App. 1996), ___.  The second special issue asks jurors to decide whether the defendant is a future danger to society.  The problem is that the jury's answer is not capable of appellate review.  *Eldridge* resolved the matter this way:

> Under Article 37.071 § 2(f), the jury determines whether any evidence has mitigating effect and, if so, how much.  We have said that these two decisions are normative and therefore are not reviewable by this Court.    *Lawton v. State,* 913 S.W.2d 542, 557 (Tex. Crim. App. 1995).  So long as the jury has all potentially relevant evidence before it, we continue to defer to the jury and believe its unfettered discretion under Article 37.071 § 2(e) is constitutionally valid.   *Id.*  As we have consistently done in the past, we decline to review the jury's decision on the mitigation special issue. *See Hughes v. State,* 897 S.W.2d 285, 294 (Tex. Crim. App. 1994), *cert. denied,* 131 L. Ed. 2d 857, 115 S. Ct. 1967 (1995); *Colella v. State,* 915 S.W.2d 834 (Tex. Crim. App. 1995).

Appellant is therefore correct to say that appellate review of a capital jury's Article 37.071 § 2(e) decision is impossible. But this is not enough to render the capital sentencing scheme unconstitutional. This Court makes sufficiency reviews of Texas juries' guilt/innocence and Article 37.071 § 2(b)(1) future dangerousness decisions. These decisions are factbound and hence reviewable for sufficiency of the evidence. As long as these determinations can be reviewed, we are satisfied that the constitutionality of Article 37.071 is not contingent on appellate review of the second special issue. In *Burns v. State,* 761 S.W.2d 353 (Tex. Crim. App. 1988), we said that "it is doubtful [that] Eighth Amendment or Due Process considerations absolutely require this Court to reweigh punishment evidence . . ." *Id.,* at 356, n. 4., *citing Pulley v. Harris,* 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). We have never regarded a mitigation sufficiency review as a prerequisite to the constitutionality of Article 37.071. See *Lawton,* 913 S.W.2d at 547. Accordingly, we overrule appellant's fourth point of error.

*Eldridge v. State*, 940 S.W.2d 646, 1996 Tex. Crim. App. LEXIS 235 at *14-15.

Again, the matter is raised merely to preserve for Supreme Court review.

***Claim Number 57:  Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Explain the Concept of Mitigating Evidence, Thereby Violating Mr. Garcia's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the Federal Constitution.***

***Claim Number 58: Social Science Evidence Demonstrates That the Jury Instructions Used in the Sentencing Phase Failed to Define Key Terms "Deliberately," "Criminal Acts of Violence," "Probability," "Continuing Threat," "Society," Thereby Violating Mr. Garcia's Rights to a Fair Trial, Due Process, Equal Protection, and Not to Suffer Cruel and Unusual Punishment as Guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the Federal Constitution.***

Mr. Garcia next contends that several of his constitutional rights were violated by the use of jury instructions in the sentencing phase which failed to permit the jury to consider and give effect to mitigating evidence.  The point here is that because of the language used in the instructions, a reasonable juror would not have believed he or she was permitted to consider mitigating evidence.  This ground for relief requires a comprehensive explanation of the demand

289

by the Supreme Court that jury instructions not only be technically accurate, but actually succeed in conveying vital concepts to the ordinary men and women called upon to decide life and death issues.

A professor at the University of Tennessee has Mr. Garcia's jury charge and is preparing an affidavit summarizing her qualifications and conclusions.  Mr. Garcia respectfully asks the Court to delay a decision until this affidavit is received.

### A.      Overview of Constitutional Law

Accurate and well-understood jury instructions are not simply a good idea, they are required by the federal and state constitution.  Instructions which do not state the law properly or which cannot be adequately understood by a jury violate no the Eighth Amendment's guarantee against cruel and unusual punishment and the due process clause of the Fourteenth Amendment.

Parenthetically, the terms "instruction" and "charge" will be used interchangeably to refer to the written instructions on the law supplied to a jury and designed to guide the jury to a verdict. There is a technical distinction between the two, however.  The charge is often referred to as the final address to the jury by the judge in which he instructs the jury as to the law it is to apply to the case.  Black's Law Dictionary 233 (6th ed. 1990).  Conversely, instructions are oral statements made to the jury at various points throughout the trial.  *Id.* at 356; *see also* J. Patrick Jones, Note, *Jury Instructions v. Jury Charge*, 82 W. Va. L. Rev. 555, 555-56 (1980).

The due process clause of the Fourteenth Amendment requires that juries receive adequate guidance in applying the law.  *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Cupp v. Naughten*, 414 U.S. 141, 147-48 (1973).  Its concern is with what might be called the "accuracy" of the verdict and in assuring that no citizen is convicted unless the government is held to the high standard of

290

"beyond a reasonable doubt." "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "The reasonable doubt standard reduces the risk that an error in fact finding could deprive an innocent man his good name and freedom." *Cupp v. Naughten,* 414 U.S. 141, 155 (1973) (Brennan, J., dissenting). Further, the standard "impresses the jurors with their solemn responsibility to avoid being misled by suspicion, conjecture, or mere appearance." *Id.* Thus, it is because of the Due Process Clause's demand for accuracy, that jury instructions which can be read by a juror to presume an element of the State's case are unconstitutional. *See, e.g., Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). Likewise, the Due Process Clause prohibits a charge requiring, as a predicate to considering a witness' testimony, that the jury find the witness' evidence true beyond a reasonable doubt. *See Cool v. United States*, 409 U.S. 100, 104 (1972). Obviously, the quality of instructions supplied to a jury is vital to conducting a fair trial because the accuracy with which law is applied is largely a function of each juror's ability to understand a correct statement of the law.

In capital cases, the Cruel and Unusual Punishment Clause of the Eighth Amendment requires the jury to weigh mitigating and aggravating circumstances in order to assure that death is the appropriate punishment in a particular case. *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976). As with the Due Process Clause, the concern underlying the Constitution's protection against Cruel and Unusual Punishment is accuracy that the punishment should be "directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 2947 (1989). The Court will reject a jury charge which restricts a jury from considering all relevant mitigating factors. *See id.*, 109 S.

Ct. at 2947; *Lockett v. Ohio*, 438 U.S. 586, 605-09 (1978).  Further, the instructions in a capital case must go beyond merely allowing a jury to consider the defendant's mitigating circumstances and must direct jurors to give effect to any mitigating factors in favor of a sentence short of death.  *See Penry*, 492 U.S. at _____, 109 S. Ct. at 2947, 2951.  Obviously, a jury cannot appropriately balance various mitigating and aggravating aspects of the defendant's life and conduct without clear instructions which methodically guide jurors through the necessary considerations.

In order for a defendant to receive a fair trial in compliance with these constitutional imperatives, the Supreme Court has determined that jury instructions must be technically corrects as well as comprehensible to the juror.  A verdict will be reversed for faulty instructions when (1) there is a *reasonable likelihood* that the jury misinterpreted the instructions, (2) the resulting error was harmful, and (3) the error was not corrected.  Each of the concepts raised by these rules will be examined in detail.

### B.      Social Science Studies

Legal scholars have long suspected that juries have difficulty understanding court instructions.  *See, e.g.,* Jerome Frank, Law and the Modern Mind 181-82 (1930); Lawrence Friedman, A History of American Law 137 (1973) (lamenting instructions as "stereotyped, antiseptic statements of abstract rules"); Robert M. Hunter, *Law in the Jury Room*, 2 Ohio St. L.J. 1 (1935) (collection of anecdotal observations).    *See generally* Arthur D. Austin, Complex Litigation Confronts the Jury System: A Case Study 55-65 (1984) (author interviewed two sets of jurors in a complex antitrust suit and found that jurors had a great deal of difficulty with the concepts involved and the poor language of instructions); John Guinther, The Jury in America 70-73 (1988) (survey of jury decision making); Saul M. Kassin & Lawrence S. Wrightsman, The

American Jury on Trial 141-63 (1988) (criticism of the incomprehensibility of jury instructions); Edith Greene, *Judge's Instruction on Eyewitness Testimony: Evaluation and Revision*, 18 J. Applied Soc. Psychol. 252, 259 (1988) (standard instruction on eyewitness testimony did not increase juror understanding); Saul M. Kassin & Lawrence S. Wrightsman, *On the Requirements of Proof: The Timing of Judicial Instruction and Mock Juror Verdicts*, *in* In the Jury Box 143, 144-45 (Lawrence S. Wrightsman et al. eds., 1977) (summarizing criticisms of jury instructions); Robert L. Winslow, *The Instruction Ritual*, 13 Hast. L.J. 456 (1962) (recommending that pattern instructions define abstract legal concepts by describing within factual context).

Serious empirical testing of juror comprehension, however, did not begin until the early 1970's. *See, e.g.,* Robert F. Forston, *Judge's Instructions: A Quantitative Analysis of Jurors' Listening Comprehension*, Today's Speech, Fall 1970, at 34. All studies consistently point to failure by jurors to understand jury instructions. For example, the 1990 Michigan Juror Comprehension Project tested actual jurors who had rendered verdicts in criminal trials only a few minutes before being interviewed by researchers. As jurors completed jury duty, they were asked to complete an extensive questionnaire regarding their understanding of the pattern jury instructions used in the trial just completed. Kramer & Koenig, *supra*, at 410. The researchers found that many jurors failed to understand critical aspects of the law even after having heard the judge read the instructions, after having read the instructions themselves, and after having discussed the instructions in deliberation. *Id.* at 429-33. For example, when asked whether an assault must include actual physical injury to the victim, only 32% of those jurors who heard patterns instructions on assault--jurors who had completed only minutes before a trial in which the defendant

293

had been charge with assault--answered correctly that an assault did not require a physical injury. *Id.* at 423; *see also id.* at 409-10.

Findings by other social scientists consistently confirm that lay persons are frequently bewildered by the wording of jury instructions.  Reid Hastie et al., Inside the Jury (1983) (examination of dynamics of jury decision making); Ellsworth, *supra*, at 218-23 (finding that deliberation did not cure juror misunderstanding); Amiram Elwork, et al., *Juridic Decisions in Ignorance of the Law or in Light of It?* 1 L. & Hum. Behav. 163, 175-76 (1977) (finding that mock jurors were much more likely to comprehend and remember revised instructions than pattern ones.); Norman J. Finkel & Sharon F. Handel, *Jurors and Insanity*: *Do Test Instructions Instruct?* 1 Forensic Reports 65, 75 (1988) (finding that jury instructions on insanity had no more effect on verdicts than giving no instructions at all); Forston,   *supra*, at 610-12 (finding that jurors were confused by legal concepts as well as by deliberation proceedings); Jane Goodman & Edith Greene, *The Use of Paraphrase Analysis in the Simplification of Jury Instructions*, 4 J. Soc. Behav. & Personality 237, 246-50 (1989) (finding that jurors failed to understand intent and burden of proof); Harold M. Hoffman & Joseph Brodley, *Jurors on Trial*, 17 Mo. L. Rev. 235 (1952) (revealing from juror interviews that jurors misunderstand a variety of aspects of trial); Irene Glassman Prager, *Improving Juror Understanding For Intervening Causation Instructions*, 3 Forensic Reports 187, 187-88 (1989) (finding that jurors were far more likely to understand revised instruction on intervening causation than pattern version); William W. Schwarzer, *Communicating with Juries: Problems and Remedies*, 69 Calif. L. Rev. 731, 738-39 (1981) (describing comprehensibility problems with pattern jury instructions); Laurence J. Severance & Elizabeth F. Loftus, *Improving the Ability of Jurors to Comprehend and Apply Criminal Jury Instructions*, 17 L. & Soc'y Rev. 153,

183 (1982) (finding that mock jurors given pattern instructions on intent and reasonable doubt did not perform any better than jurors who received no instructions at all); Walter M. Steele, Jr. & Elizabeth G. Thornburg, *Jury Instructions: A Persistent Failure to Communicate*, 67 N.C.L. Rev. 77, 88-89 (1988) (finding that jurors had a poor grasp of pattern instructions but improved with revised versions).

Researchers blame poor understanding on legal phraseology and undefined terms by lawyers. *See, e.g.,* Robert P. Charrow & Veda R. Charrow, *Making Legal Language Understandable: A Psycholinguistic Study of Jury Instructions*, 79 Colum. L. Rev. 1306 (1979) (ground-breaking research on jury misunderstanding).

Even research in the last three years continues to bear out earlier studies, finding over and over that jurors commonly fail to understand capital sentencing instructions. *See* Shari S. Diamond & Judith N. Levi, *Improving Decisions on Death By Revising and Testing Jury Instructions*, 79 Judicature 224 (Mar.-Apr. 1996) (Review of *Free* Zeisel study and proposing revisions); William J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 Ind. L.J. 1043 (1995); Shari S. Diamond & Jonathan D. Casper, *Empirical Evidence and the Death Penalty*, 50 J. Soc. Issues 177 (1994); Shari S. Diamond, *Instructing on Death*, 48 Am. Psychol. 423 (Apr. 1993) (analyzing affect of instructions on comprehension); James Luginbuhl & Julie Howe, *Discretion in Capital Sentencing Instructions Guided or Misguided*, 70 Ind. L.J. 1161 (1995) (finding 41% of tested jurors believed mitigating evidence required proof beyond reasonable doubt).

**C.     *Application to Mr. Garcia's Trial.***

Having examined the Supreme Court's requirements at length and further considered social science reports demonstrating that jurors commonly fail to understand jury instructions, one can

now turn to the case at hand.  Despite the Supreme Court's demand in *Lockett* and *Penry* that capital juries be permitted to give independent mitigating weight to the defendant's character and evidence offered in mitigation of a capital murder, the trial court submitted instructions and special issues at punishment to the jury which prohibited the jury from giving full consideration to mitigating evidence offered by Mr. Garcia.

Several shortcomings of Mr. Garcia's instructions are apparent immediately.  The most critical terms are left undefined.  The term "reasonable expectation" in the first issue is undefined. Jurors were left to guess the meaning of vital words in the second issue such as "probability," "criminal acts of violence," "continuing threat," and "society."  There is no option permitting jurors to sentence Mr. Garcia to life without parole.  Nor is there any indication that jurors could consider "society" to mean Garcia's society among inmates in a structured prison environment.

The Court should consider the two most glaring failures: the omission of any reference to mitigating circumstances, and the failure to define "deliberately."  These two failures alone compel reversal of this case for a new trial.

Applying the test initiated by Chief Justice Rehnquist in *Boyde*, there is a reasonable likelihood that the jurors in Mr. Garcia's trial failed to understand the court's charge to the jury in two critical respects.  First, the jurors almost certainly failed to understand that the law permitted them to consider and give effect to the mitigating evidence offered by his lawyers in the punishment phase.  Second, the jurors failed to understand that the term "deliberately" used in the first special punishment issue had special legal significance that meant far more than "intentionally."

The next step is to determine whether these errors were harmful to Mr. Garcia and went uncorrected by other events at trial.  The careful analysis required by *Yates* indicates that these

errors were vitally important in relation to everything else the jury considered on these special issues. Given the brief number of words in the special issues and the irresistible force by the court's instructions and State's effort to concentrate jurors' attention on the murder of Mrs. Davidson Garcia's past crimes, it is beyond reasonable doubt that the jurors relied on these misleading instructions to reach their verdict of death against Mr. Garcia. Recalling the harmless error analysis, one must first identify precisely what evidence the jury actually considered in reaching its verdict and secondly, conclude whether this evidence possessed sufficient probative force to cause the jury to reach the proper verdict despite the demand of the improper instruction.

Here, the evidence was overwhelming that a violent and senseless murder of a lovely woman had occurred. In answering the first question regarding the murder at hand, the jury obviously considered the circumstances of the killing in determining whether it was committed "deliberately," regardless of whatever that term may have mean to the jurors. In the second question regarding future dangerousness, there was evidence that Mr. Garcia had committed other violent acts. One can reasonably conclude that the jury considered this evidence in answering the future dangerousness issue.

The real question then is whether the jury could have considered Mr. Garcia's mitigating evidence in answering these three questions. One must conclude that they did not. Mr. Garcia offered substantial mitigating evidence. The jury would have been constrained by the instructions to consider such evidence irrelevant in answering the first issue on deliberateness. Moreover, such evidence is of no use as to whether he is a future threat to society. The third special issue likewise does not sufficiently allow consideration of mitigating evidence and places the burden of proof on Mr. Garcia.

Having identified that the jury would have considered the State's evidence but not Mr. Garcia's the second step in the harmful error analysis is to determine whether the evidence presented to by the State possessed such probative force to cause the jury to reach the proper verdict despite the demand of the improper instructions.  Here too, the instructions fall short.  The State presented powerful evidence demonstrating the viciousness of the attack and Garcia's past violent crimes.  The State did not present any evidence to overcome the error in the instructions that would have permitted the jury to realize they could consider mitigating evidence despite the poorly worded instructions compelling them to believe otherwise.  Indeed, given the adversarial relationship, the State was not interested in presenting evidence to compel the jury to consider mitigating circumstances or evidence, or to suggest that "deliberately" meant far more than "intentional."

Notwithstanding the evidence presented by the State in punishment and presumptively relied upon by the jury, the State's evidence cannot be said to have been so strong (*i.e.,* of such probative force) that it is beyond reasonable doubt that the jury would have reached the same verdict even if the jury instructions (1) clearly contained language explicitly permitting unrestrained mitigating evidence, and (2) contained a carefully drafted definition of "deliberately."  In the plainest language, the Court can only deny Garcia's writ petition if it concludes that it is beyond any reasonable doubt that the State's evidence was so overwhelming that the jury would have still voted for death even if the instructions had flawlessly permitted full consideration of mitigating evidence and defined "deliberately."  It is impossible to do so in this case.  There is no mechanism therefore, for the jury to grant a sentence of life to Garcia notwithstanding whatever else it may think about him or his crime.

In *Free v. Peters,* 806 F. Supp. 705 (N.D. Ill. 1992), *rev'd* 12 F.3d 700 (7th Cir. 1993), *cert.
denied*, 115 U.S. 433 (1994), a federal district court ordered Illinois to resentence a death row
inmate, concluding that the instructions to the jury in his case were fatally flawed.  The basis for
the court's decision was a detailed study by a social scientist named Dr. Hans Zeisel.  The court
determined that there was a reasonable likelihood under the *Boyde v. California* standard that the
instructions failed to provide sufficient guidance as the allocation of the burden of persuasion when
determining whether to impose the death penalty upon consideration of the aggravating and
mitigating factors.  The district court also accepted Dr. Zeisel's finding that tests on mock jurors
indicated the instructions would cause jurors to limit consideration of mitigating evidence.  *Id.*

The Seventh Circuit Court of Appeals reversed, unwilling to void a state court's sentencing
based on social science tests it viewed as flawed.  *Free*, 12 F.3d at 704-05.

In *McDougall v. Dixon*, 921 F.2d 518 (4th Cir. 1990), *cert. denied*, 111 S. Ct. 2840 (1991),
the Fourth Circuit Court of Appeals turned back a challenge to North Carolina's capital jury
instructions based on testimony by a set of distinguished social science professors who determined
the instructions limited consideration of mitigating evidence.

### D.     Conclusion

Having considered the jury instructions in careful detail, one must conclude that they are
flawed beyond repair.  The analysis called for by *Sandstrom v. Montana* and *Boyde v California*
demonstrates that the instructions are defective because they limited the jury's ability to consider
Garcia's mitigating evidence.  Moreover, the error was harmful and uncorrected.  For these reasons,
the Court must reverse and remand for a new trial with instructions to define deliberately, and

instruct that the jury that it may consider and give effect to any offered mitigating evidence offered by Mr. Garcia.

> ### Claim Number 59:  The Texas Capital Punishment Scheme and Texas Code of Criminal Procedure Article 37.071 Violate the Cruel and Unusual Punishment Clause of the Eighth and Fourteenth Amendments to the Federal Constitution Because They Fail to Provide for Life Without Parole.

In these grounds for relief, Mr. Garcia asserts that the Texas capital punishment scheme is unconstitutional because it fails to present to jurors the option of life without parole.

Texas and the Fifth Circuit have held that the state and federal constitutions do not require life without parole as an option.  *Arnold v. State*, 873 S.W.2d 27, 39 (Tex. Crim. App. 1993); *Andrade v. McCotter*, 805 F.2d 1190 (5th Cir.), *cert. denied*, 475 U.S. 1112 (1986).  Nevertheless, the Supreme Court has never ruled on the matter.  The decision by the Court that due process requires juries to know that a defendant will not be paroled if they impose life imprisonment suggests that the Court may take the next step and require states to offer life without parole.  *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187 (1994).

Had Texas allowed Mr. Garcia's jury to consider life without parole, there is a strong chance that he would not have received death, the jurors assured that he would never be free.

> ### Claim Number 60: Mr. Garcia was only 18 years, 2 months and 12 days old at the time of his crime. The Application of the Texas Capital Punishment Scheme and Texas Code of Criminal Procedure Article 37.071 Violated Mr. Garcia's Right to be free of  Cruel and Unusual Punishment under the Eighth and Fourteenth Amendments to the Federal Constitution Because The Texas Courts Failed to Exempt Him From the Death Penalty.

Mr. Garcia was only 18 at the time of his crime. Had he been born two months and 12 days later, or, if he had committed his crime that much earlier, he would not now be facing the death penalty. *Roper*, supra. Mr. Garcia contends that it is arbitrary and capricious to withhold from him

300

the juvenile exemption from death as a penalty on the basis of chronological age alone. Modern science has established that the human brain does not fully mature until age 21 or after, and that the type of maturation that occurs in late adolescence and early adulthood affects moral blameworthiness.[28]

Mr. Garcia's trial took place some four years before the *Roper* decision. By written motion, Mr. Garcia complained to the trial court about the failure of his sentencing process to properly narrow the class of persons eligible for death. Clerk's Record, Vol. 3, P. 508-516, especially at IX, X, XI, XII, and XX. Mr. Garcia's motion did not address the issue of chronological age. The trial court overruled the motion just prior to the reading of the punishment charge to the jury. Clerk's Record Vol. 3 pp. 508 – 516 (See Motion to Quash section IX, Filed March 13, 2001), RR Vol. 34 p. 137-8.

In his twentieth point of error in his brief to the Texas CCA, Mr. Garcia raised issues about the failure of the Texas system and the jury charge in this case to properly narrow the class of persons eligible for death, and the arbitrary and capricious features of the system which found their place in the punishment charge.

**Point of Error Twenty Stated**

Does Article 37.0711 C.C.P. violate the state or federal constitution as applied because it does not define certain critical terms used in the special issues, thereby failing to provide "guidance" required by Furman v. Georgia?

The Texas CCA overruled all of Mr. Garcia's points of error and affirmed his death sentence in *Garcia II.*

---

[28] Gur, Ruben C. Declaration of Ruben C. Gur., PhD, Patterson v. Texas. Petition for Writ of Certiorari to US Supreme Court, J. Gary Hart, Counsel. (Online at: www.abanet.org/crimjust/juvjus/patterson.html)

In his state habeas petition, Mr. Garcia asserted that the Eighth Amendment would not permit the execution of a person only 18 at the time of his crime:

**Claim Number 61: Execution of a Man Who was Only 18 Years of Age at the Time of His Offense Would Violate the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Federal Constitution.**

The CCA dismissed this claim as barred from habeas review because it was supposedly available to be raised on direct appeal, but was not. *Ex parte Garcia*, (Tex. Crim. App. 2008) No. WR-40,214-02, October 15, 2008, unpublished.  Further the CCA adopted the findings and conclusions of the convicting court that the law permits the execution of a person of Mr. Garcia's age at the time of the crime. See February 18, 2008 findings and conclusions, no. 19 and 24, on p. 17-18.

Texas law simply does not recognize an exemption from the death penalty for persons who have just attained age 18 at the time of their crime, even after the 2005 *Roper* decision. At the time Mr. Garcia filed his state habeas petition, Texas did have  a process in place to vindicate rights that are not recognized at the time of trial or direct appeal. Mr. Garcia has honored that process. There has been no default.

This record shows that Mr. Garcia's direct appeal brief was filed on or about June 25, 2002, some three years before *Roper*, and that the CCA affirmed his death sentence in November, 2003, two years before *Roper*. Mr. Garcia argues that the dismissal of this claim was done on grounds that are neither independent of federal constitutional law nor adequate to bar relief in this court. Texas will often permit state habeas petitioners to vindicate a right that was not recognized earlier in the process, such as direct appeal.

302

Mr. Garcia's situation is very similar to that before the CCA in *Ex parte Moreno*, 245 S.W.3d 419 (Tex.Crim.App.2008) where the petitioner was allowed to make a *Penry I* claim at state habeas because *Penry I* had not been decided. See also *Ex parte Goodman*, 816 S.W.2d 383 (Tex.Crim.App.1991). The CCA may have backed away from the "right not recognized" doctrine in recent years. See *Karenev v. State*, 281 S.W.3d 428 (Tex.Crim.App.2009), citing *Sanchez v. State*, 120 S.W.3d 359 (Tex.Crim.App.2003). But both *Karanev* and *Sanchez* were decided too late to signal to Mr. Garcia's trial or appellate counsel, performing their work in 2001 and 2002, that they needed to challenge to teenage death penalty in those years, even before *Roper* was decided. The grounds the CCA used to dismiss this claim are not adequate to bar relief in this court. The mere statement by the CCA, that Mr. Garcia, supposedly, could have raised this issue on direct appeal seems to fall within the rule of *Harris v. Reed*, 489 U.S. 255 (1989) where the Supreme Court declined to bar federal habeas review under very similar circumstances. The CCA dismissal of this claim is inadequate to bar review in this court.

AEDPA deference does not a bar this claim. The Supreme Court has stated with respect to § 2254(d)(1) that "a decision by a state court is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000)).

There can be  no material distinction between almost age 18 and two months, 12 days over age 18 in the capital sentencing context. The prohibition against arbitrariness, irrationality and capriciousness in capital sentencing is well established in American constitutional law. See *Gregg*

303

*v. Georgia*, 428 U.S. 153, 188 (1976) citing *Furman v. Georgia*, 408 U.S. 238 (1972). The bedrock principles of *Gregg* and *Furman* can have little meaning if chronological age, unhinged from psychological development, is allowed to determine the outcome of capital prosecutions of defendants just past their 18th birthday.

*Roper v. Simmons, supra.* cannot be read to foreclose a claim for exemption brought by a person in Mr. Garcia's situation. Mr. Simmons convinced the Missouri Supreme Court and then the Supreme Court of the United States that he was entitled to an exemption because of his chronological age of 17.[29] The age of 18 years, two months and 12 days was not in the *Roper* case. Any dicta that might purport to govern this case is not binding on this court. *Yarborough v. Alvarado* 541 U.S. 652, 660-61 (2004) (quoting *Williams*, 529 U.S. at 412).

When Mr. Garcia asked the highest court of his state to consider whether his slightly greater age would exempt him from the death penalty, the court refused to take up or consider the matter. Mr. Garcia argues that the closely divided (5-4) *Roper* decision served to create and exacerbate much of the arbitrariness present in the Texas process that he complained about at state habeas, and, more generally, on direct appeal.

In her dissent in *Roper*, Justice O'Connor made a persuasive case against the grant of an exemption based entirely on the chronological age of less than 18. ("Although it may be that many 17-year-old murderers lack sufficient maturity to deserve the death penalty, some juvenile murderers may be quite mature. Chronological age is not an unfailing measure of psychological development, and common experience suggests that many 17-year-olds are more mature than the

---

[29] Christopher Simmons was seven months shy of his eighteenth birthday at the time of his crime. *Roper*, supra. (Justice Scalia, dissenting.)

average young "adult." In short, the class of offenders exempted from capital punishment by today's

decision is too broad and too diverse to warrant a categorical prohibition. Indeed, the age-based line

drawn by the Court is indefensibly arbitrary–it quite likely will protect a number of offenders who

are mature enough to deserve the death penalty and may well leave vulnerable many who are not.")

Id.

Also dissenting in *Roper*, Justice Scalia, joined by Justices Thomas and  Rehnquist, noted

that  values and moral judgments of the American people are demonstrated by verdicts of juries.

[" ...  we have, in our determination of society's moral standards, consulted the practices of

sentencing juries: Juries " 'maintain a link between contemporary community values and the penal

system' " that this Court cannot claim for itself. Gregg, supra, at 181 (quoting *Witherspoon v.

Illinois*, 391 U.S. 510, 519, n. 15 (1968)]. With this in mind, Mr. Garcia has attached the web pages

published by the Texas Department of Criminal Justice entitled "Offenders on Death Row" as

Exhibit "1"[30] Further, counsel for Mr. Garcia have prepared Exhibit "2" which is a list of the

offenders on Texas death row, taken from the TDCJ website, shown to have been over age eighteen,

but less than 19. Out of 286 offenders shown to be on Texas' death row on the TDCJ website, only

21 were 18 year olds at the time of their crimes. Further, only four of the 18 year olds were younger

than Mr. Garcia was at the time of his crime.

Another telling fact that emerges upon review of the TDCJ web page is that none of the 18

year olds now on Texas death row is shown to have committed his crime in the year of the *Roper*

decision, 2005, or later. This suggests that Texas prosecutors are no longer seeking death in cases

---

[30] See http://www.tdcj.state.tx.us/stat/offendersondrow.htm

involving 18 year olds.  Or, perhaps Texas juries are not returning death verdicts in the cases of such young capital defendants.

Mr. Garcia argues that there is no principled distinction to be drawn between him and another capital defendant a few months younger.  In *Atkins* the United States Supreme Court recognized that a fundamental "'precept of justice'" is that "'punishment for crime should be graduated and proportioned to the offense'."  *Atkins*, 536 U.S. at 311 (quoting *Weems v. United States*, 217 U.S. 349 (1910)).  The Court reiterated that determining whether a punishment is constitutionally excessive or cruel and unusual is judged by current standards, not by those that existed at the time the Eighth Amendment was ratified.  The core Eighth Amendment concept is the "'dignity of man,'" and thus its constitutional content must be informed by "'the evolving standards of decency that mark the progress of a maturing society'."  *Atkins*, 536 U.S. at 311 (quoting *Trop v. Dulles* (1958) 356 U.S. 86, 100-01).  The Court concluded that "our society views mentally retarded offenders as categorically less culpable than the average criminal."  *Atkins*, 536 U.S. at 314-315.

In finding a national consensus opposing death for mentally retarded offenders, the Court relied primarily upon the fact that the state legislatures are overwhelmingly in favor of the prohibition.  The Court, however, also looked to the opinions of social and professional organizations with "germane expertise," such as the American Psychological Association, *Atkins*, 536 U.S. at 316, n. 21, the opposition to the practice by "widely diverse religious" organizations, international practice and polling data.  Although "by no means dispositive," these factors gave further support to the Court's opinion that there was a consensus opposing the practice "among those who have addressed the issue."  Id.  Finally, the Court also noted that even in those states that

306

retained the death penalty for the retarded, only five had actually carried out the execution of a mentally retarded individual since Penry. *Atkins*, 536 U.S. at 316.  Since the practice had become "truly unusual," it was "fair to say," according to the Court, that "a national consensus has developed against it."  Id.

The Court then examined the underlying merits of the consensus, beginning with the observation that it reflected a judgment about the "relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty." *Atkins*, 536 U.S. at 317.  The Court noted that due to their impairments those with mental retardation "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses and to understand the reactions of others."  Id.  These deficiencies, while not justifying a complete exemption from criminal liability, do diminish personal culpability to the extent that neither of the justifications advanced by states in support of the death penalty – retribution and deterrence – would be served by permitting their execution.  Id. at 317-18.

Retribution in the capital context has been constitutionally limited, and requires that "only the most deserving of execution are put to death." *Atkins*, 536 U.S. at 318.  Since "just desserts" necessarily depends on the culpability of the offender, the most extreme punishment was excessive due to the "lesser culpability of the mentally retarded offender." Id.  The Court also concluded that no legitimate deterrence interests are served by the execution of the mentally retarded.  According to the Court, capital punishment can only serve as a deterrent when a crime is the result of premeditation and deliberation, i.e., when the threat of death will "inhibit criminal actors from carrying out murderous conduct," but this type of calculus is at the "opposite end of the spectrum"

from the behavior of the mentally retarded due to their cognitive and behavioral impairments.  Id.

In addition to concluding that retaining the death penalty for the mentally retarded would not further

any interest in retribution or deterrence, the Court also held that the reduced capacity of mentally

retarded offenders provided a "second justification for a categorical rule making such offenders

ineligible for the death penalty."  Ibid.  Due to their impairments, there were a host of reasons,

including the increased risk of false confessions, difficulties in communicating with counsel, lesser

ability due to limited communication skill to effectively testify on their own behalf or express

remorse that, "in the aggregate," carried an unacceptable "risk of wrongful execution."  Id. at 319.

The Court also noted the particular danger that a mentally retarded person's demeanor "may create

an unwarranted impression of lack of remorse from their crimes" which could enhance the

likelihood that the jury will impose the death penalty due to a belief that they pose a future danger.

Id. at 319.

The Court concluded that its "independent evaluation of the issue reveals no reasons to

disagree with the judgement of the legislatures that have . . . concluded that death is not a suitable

punishment for a mentally retarded criminal," and therefore the Constitution "'places a substantive

restriction on the State's power to take the life' of a mentally retarded offender."  *Atkins*, supra, 536

U.S. at 321 [quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)].

In considering claims that particular categories of convicted murderers are not

constitutionally punishable by death, the Supreme Court has always focused on the offenders' moral

culpability and their degree of personal responsibility for the harm resulting from the offense.

*Atkins*, supra [death penalty unconstitutional for mentally retarded offenders]; *Enmund v. Florida*,

458 U.S. 782 (1982) [death penalty unconstitutional for minor participant who did not intend to

kill]; *Tison v. Arizona*, 481 U.S. 137 (1987) [death penalty not unconstitutional for nontriggerman who was major participant in dangerous felony and acted with reckless indifference to human life]; *Thompson v. Oklahoma*, 487 U.S. 815 (1988) [death penalty unconstitutional for offenders under sixteen]; *Roper v. Simmons*, 125 S. Ct. 1183 (2005) [execution of individuals under 18 at the time of their crime unconstitutional].

The Supreme Court accepted the contention that mentally retarded murderers are categorically so lacking in moral blameworthiness as to be ineligible for the death penalty.  Its rationale for doing so compels the conclusion that the volitionally incapacitated are likewise ineligible.  The Court noted the obvious cognitive limitations of the retarded, but also stressed their "diminished capacit[y]...to control impulses," and the "abundant evidence that they often act on impulse rather than pursuant to a premeditated plan," characterizations that have even greater applicability to those who because of mental illness are completely unable to conform their conduct to the requirements of the law.  *Atkins*, supra, 536 U.S. at 317.  Moreover, this inference as to the moral centrality of volitional control is corroborated by the Court's reasoning in *Roper v. Simmons*, supra, 125 S. Ct. 1183, in which it held the execution of individuals under 18 at the time of their crime is unconstitutional, because the death penalty is a disproportionate punishment for juveniles. Id. at 1192-98. The rationale of *Roper* applies here as well as it did to Christopher Simmons.

The Court in *Roper* found three general differences between juveniles under the age of 18 and adults that demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.  Juveniles' susceptibility to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson*, supra, 487 U.S. at 835. Their own vulnerability and comparative lack of control over their immediate

309

surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See *Stanford v. Kentucky*, 492 U.S. 361 at 395 (1989). The reality that juveniles still struggle to define their identity means that even a heinous crime committed by a juvenile is not necessarily evidence of irretrievably depraved character. Simmons, supra, 125 S. Ct. at 1198-1200.

The *Thompson* plurality recognized the import of these characteristics with respect to juveniles under 16. *Thompson,* supra, 487 U.S. at 833-38. The same reasoning applies to all juvenile offenders under 18. Once juveniles' diminished culpability is recognized, it is evident that neither of the two penological justifications for the death penalty – retribution and deterrence of capital crimes by prospective offenders, e.g., *Atkins*, 536 U.S. at 319, – provides adequate justification for imposing that penalty on juveniles. *Simmons*, supra, 125 S. Ct. at 1200.

Adolescents are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. *Thompson*, supra, 487 U.S. at 834.
If crimes committed by the retarded and by young adolescents deserve less punishment due to those groups' lesser capacity to control their own conduct, the crimes of person life Mr. Garcia, who, by reason of youth and a history of abuse, neglect, and alcoholism, lacks sufficient capacity to control his conduct are also deserving of less than the most severe punishment.

Neither retribution nor deterrence is served by Mr. Garcia's death sentence. A capital sentence violates the Eighth Amendment when it is "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153 at 183 (1976)

[joint opinion on Steward, Powell, and Stevens, JJ.].   Unless the death penalty "measurably contributes" to either the goal of deterrence or the goal of retribution, it is "nothing more than the purposeless and needless imposition of pain and suffering." and therefore an unconstitutional punishment.   *Enmund,* supra, 458 U.S. at 798 [quoting Coker v. Georgia, 433 U.S. 584 at 592 (1977)].   Neither retribution nor deterrence is served by the execution of defendants whose mental illness impaired their ability to make reasoned judgments.

The State may choose to make those whose youth, abused background and alcoholism "equally responsible" as those who act with completely unimpaired capacity, but in order to justify a capital sentence for such offenders, it must explain how executing such offenders "measurably contribute[s] to the retributive end of ensuring that the criminal gets his just desserts."   *Enmund,* supra, 458 U.S. at 801.

In light of his age and background, Mr. Garcia's death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment, and must be vacated.   The imposition of a judgment of conviction and sentence of death under such circumstances violates fundamental notions of due process and human dignity, offends any acceptable standard of civilized behavior, including, but not limited to, those mandated by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and deprived Mr. Garcia of a reliable determination of guilt and penalty.   Mr. Garcia's death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment and must be vacated.

## *CHALLENGES TO THE EFFECTIVENESS OF TRIAL COUNSEL*

In the remaining claims. Garcia challenges the effectiveness of his trial representation.

**Standard of Review.**   To show that he received constitutionally ineffective assistance of counsel, Garcia must show both that his trial counsel's performance was deficient and that his deficient performance prejudiced Garcia's defense.  *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Williams v. Cain,* 125 F.3d 269, 276-77 (5th Cir. 1997); *Faulder v. Johnson,* 81 F.3d 515, 519 (5th Cir.), *cert. denied,* 117 S. Ct. 487 (1996).  The Fifth Circuit has held that such examinations must be "highly deferential," and must consider the facts and resources available to the defense lawyer at the time of trial.  *Motley v. Collins,* 18 F.3d 1223, 1226 (5th Cir.), *cert. denied,* 513 U.S. 960, 115 S. Ct. 418 (1994).  Garcia must also overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id; accord Nichols v. Scott,* 69 F.3d 1255, 1284 (5th Cir. 1995); *Duff-Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir. 1992).

"The failure to prove either deficient performance or actual prejudice forecloses an ineffective assistance claim."  *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).  "In order to satisfy the first prong of the Strickland analysis, [a petitioner] must prove that his counsel's performance 'fell below an objective standard of reasonableness.'"  *Green*, 160 F.3d at 1035 (*quoting Strickland,* 104 S. Ct. at 2064).  "The second prong of *Strickland* is satisfied if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Green*, 160 F.3d at 1035-36 (*quoting Strickland*, 104 S. Ct. at 2068); *see also Lockhart v. Fretwell,* 506 U.S. 364, 113 S. Ct. 838, 844 (1993) (stating that the prejudice

prong of *Strickland* "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"). "The determination whether counsel was constitutionally ineffective is a mixed question of law and fact that this court reviews de novo." *Green*, 160 F.3d at 1036; *see, e.g., Bobby James Moore v. Johnson*, 1999 WL 604313, No. 95-20871 (5th Cir. Aug. 10, 1999) (remanded to the state district court for sentence of less than life or a new sentencing hearing for IAC).

> ### Claim Number 62: Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Object at Trial to Garcia's Confession On the Basis That He is Legally Blind and Could Not Read the <u>Miranda</u> Warnings or the Statement?

In this issue, Garcia asserts that his trial counsel was ineffective because the counsel failed to object at trial to Garcia's confession after learning that Garcia was legally blind, and could read neither the confession put in front of him or the *Miranda* warnings. Consequently, he was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments.

**Exhaustion Requirement.** This claim was timely raised in Garcia's original state petition for writ of habeas corpus. *See Application for Writ of Habeas Corpus*, p. 3 (filed July 24, 1997). The claim was denied by the convicting court and the Court of Criminal Appeals.

**Discussion.** Garcia is extremely far-sighted. Without his glasses, he is legally blind and unable to see anything but blurs several inches away. During his arrest, Garcia's glasses were knocked away, and evidently damaged. He was unable to secure another set until sometime after his interview and confession. During the interview, it would have been extremely difficult for him to read and statements drafted by police. Eliciting this information from Det. Wilson, the officer who obtained the confessions, would have been extremely helpful to show that Garcia's statements

313

were far less likely to be found voluntary if shown that he could not have read the statements well without his glasses.

The trial counsel was aware of the loss of glasses.  The matter came up during the pretrial suppression hearing.  *(See* S.F. vol. 2-4, and cross-examination of Det. Wilson).

We are endeavoring to obtain his eye prescription from Garcia's T.D.C. medical records, and will supply them when obtained.

Failing to introduce evidence of Garcia's inability to read the statements adequately without his glasses is ineffective assistance of counsel.  *Cf. Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995) (counsel ineffective for failing to investigate and present available evidence of bipolar disorder).

### Claim Number 63:  Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Explain to Garcia that Garcia had the Right to Testify in his Suppression Hearing for the Limited Purpose of Challenging the Admissibility of his Statement?

In this issue, Garcia asserts that his trial counsel was ineffective because the counsel failed to explain to Garcia that he had the right to testify at his suppression hearing for the limited purpose of challenging the admissibility of his statement.  Consequently, he was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments.

*Exhaustion Requirement.*  This claim was timely raised in Garcia's original state petition for writ of habeas corpus.  *See Application for Writ of Habeas Corpus*, p. 3 (filed July 24, 1997). The claim was denied by the convicting court and the Court of Criminal Appeals.

*Discussion.*  In his affidavit supporting the State's response to Garcia's article 11.071 writ application, Garcia's trial counsel says that he had several conversations with Garcia about whether to testify at the suppression hearing and together, they decided against it.  Garcia says otherwise.

314

A hearing is required so that the Court can assess the credibility of each.  If Garcia is correct, then

he is entitled to relief.  For this reason, as explained earlier, he is entitled to a hearing on this claim.

### Claim Number 64: Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Investigate and Call an Eyewitness Who Could Not Identify Garcia, But Instead Described the Assailant as African-American?

In this issue, Garcia asserts that his trial counsel was ineffective because the counsel failed

to investigate and call a certain eyewitness to the Beverage Warehouse robbery.  This eyewitness

did not identify Garcia, but instead described the robber as African-American.  Consequently,

Garcia was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth

Amendments.

**Exhaustion Requirement.**  This claim was timely raised in Garcia's original state petition

for writ of habeas corpus.  *See Application for Writ of Habeas Corpus*, p. 4 (filed July 24, 1997).

The claim was denied by the convicting court and the Court of Criminal Appeals.

**Discussion.**   One of the investigating officers, Officer Billy Meeks, testified that the

investigation into the Beverage Warehouse murder focused initially on two black males.  The reason

that police began looking for two black men, was because a witness named Donna Delozier told

police she had walked in on the robbery in progress and seen two black men holding up the store.

In addition, the victim, Craig Turski, just before he died, told Mr. Meeks that he had been robbed

by a black male with an Afro and a shotgun.  (S.F. vol. 63 at 404-12, 469-70.)

Officers searched the area for weeks for African-Americans driving cream or yellow cars.

They looked into similar robberies by African-Americans.  They turned up nothing, until they

obtained Gustavo Garcia's confession.

315

At trial, the State sought a capital murder conviction of Garcia on the Beverage Warehouse murder of Mr. Turski.  The State did not present, nor did the Court allow, reference in the liability phase to the Texaco murder of Mr. Martin.  Mrs. Delozier did not testify for the State.  The defense called no witnesses at all, and rested when the State closed.

So the question is whether Mr. Strasser, the trial lawyer, was ineffective for failing to call Mrs. Delozier.  The state habeas counsel asserted that he was, providing no arguments or explanation how.  The Petitioner's current counsel do not feel that Mr. Strasser was ineffective, however.  Here is why.

During trial, Mr. Strasser was able to elicit from Det. Bobby Meeks precisely the information needed, that Mrs. Delozier saw two African-Americans, not two Hispanics.  Det. Meeks conceded plainly that he spoke with her, that she was upset, and that she told them flatly that it was two African-Americans they were after.  The State did not interfere with the cross-examination of Det. Meeks on this score, and the jury heard the explanation fully.

It makes perfect sense not to call Mrs. Delozier as a witness at this point.  Why on earth would a lawyer want to put a traumatized victim on the stand, shaking and in tears, to relive with jurors what she thought were her final moments on earth as the shotgun was leveled at her, saved only by the merciful hand of God who pulled her from the store?  A better technique would be to get the critical information before the jury from a third party, such as a police officer like Det. Meeks, in as unemotional fashion as possible.  Det. Meeks' testimony was already upsetting to the jury.  The officer was obviously deeply upset when he testified, explaining that he was the last man Mr. Turski saw alive as Mr. Turski lay on a surgical table.  Mr. Turski could only communicate by blinking his eyes, obviously aware that he was moments away from death, and then slipped away

316

as the officer watched.  It would not be wise for a defense lawyer to make matters worse by following up Det. Meeks with Mrs. Delozier.

Additionally, the defense lawyer would have been treading dangerous ground toward opening the door in the guilt-innocence phase to the Texaco murder.  The focus on the guilt phase was the Beverage Warehouse murder.  Toward the end of that phase, the State prosecutor warned Mr. Strasser plainly that the prosecutor would seek to introduce all the evidence of Mr. Martin's murder to rebut any dispute of Garcia's identity.  Such evidence would have very likely been admissible as an exception to character evidence under Texas Rule of Evidence 404(b) to prove identity or absence of mistake.  The prudent step at this point would be to *not* put on Mrs. Delozier. At the very least, it was a sound trial option available to the defense counsel, and he cannot be seriously criticized for selecting it.

Nevertheless, the issue has been raised, and for the sake of all concerned to assure that the case is completely examined, Garcia's counsel asks this Court to consider it.  The article 11.071 counsel raised few issues, and we are reluctant to discard any of them, at least without allowing consideration by this Court.

### Claim Number 65:  Was Garcia Denied Effective Assistance of Counsel Because his Trial Counsel Failed to Raise the Issue of Collateral Estoppel in Response to the State's Conflicting Positions as to Who Was the Shooter?

In this issue, Garcia asserts that his trial counsel was ineffective because the counsel failed to raise the issue of collateral estoppel in response to the State's contradictory positions in two trials as to who was the shooter.  Consequently, Garcia was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments.

317

***Exhaustion Requirement.*** This claim was timely raised in Garcia's original state petition

for writ of habeas corpus. *See Application for Writ of Habeas Corpus*, p. 4 (filed July 24, 1997).

The claim was denied by the convicting court and the Court of Criminal Appeals.

### A.    The State Argued In the Punishment Phase of Garcia's Trial that Garcia was the Triggerman Behind the Texaco Murder and Killed Mr. Gregory Martin

In opening statements, the prosecutors told jurors that they did not know whether Garcia

killed Mr. Martin:

> We have not played games with you. We have not tried to deceive you in any manner. I don't know who the trigger man is. It is entirely possible, it may even be likely that Vargas is the trigger man because he's got a spent shell on him. Okay? But you know from voir dire and the process we went through and the discussions about criminal responsibility, back robber, getaway driver, you know he is criminally responsible for the death of Gregory Martin, and it doesn't matter if he pulled the trigger or not because on January 3 what happened with Shawn Robinson.

(S.F. vol. 68 at 275.)

In closing arguments during punishment, the prosecutors adamantly insisted that Garcia

personally killed Mr. Martin:

> The next time he feels the need to acquire something by a criminal means, does he do it in a non-confrontational manner? No. He goes in, he puts Gregory Martin on his face in a back room, he puts that shotgun to the base of his head and blows and inch and a half hole in the back of his head.
> And then he lies about it. He lied to David Wilson, he lied to Grigson, he lied to Powitzky. And we know he lied. We know he lied. He is dangerous. We got two bodies because he gets a charge out of killing.

(S.F. vol. 73 at 1494; P.R.E. at tab 14.)

> Where is his evidence of kindness and mercy and others? Think about Craig Turski, second shots to the back of the head. Is that evidence of kindness or mercy? No. You know, maybe it was a merciful killing of Gregory Martin because he was dead on impact. It's not there. It's not there. He is a cold-blooded, manipulative, lying sociopath.

(S.F. vol. 73 at 1496, P.R.E. at tab 14.)

They find the Texaco up here and he wants to hit the Texaco that night, but it he doesn't have the gun with him, he doesn't have a mask.  So he takes steps to procure a mask.  Planning.  He is unsuccessful.  What does he say then?  I'll come back tomorrow, I'll bring the gun, we can do it real fast that way.

Any one of you who doesn't think that Greg Martin's fate was sealed at that time?  Christopher Vargas says, okay, sure, whatever, and then what does the Defendant do?  He laughs in anticipation of murdering another human being.  He laughs.  In anticipation of taking a life he laughs.

(S.F. vol. 73 at 1492, P.R.E. at tab 14.)

Remember the one January 3 going around looking for masks.  He knows how to do it without killing people.  On January 5 he walks into the Texaco with hose.  He had a mask.  Vargas had a mask.  He chose to kill.  I have the option.  I can leave Gregory Martin, a human being with loving family and friends and alive, to live or I can kill him and get the thrill out of it.  It's a trip, remember?  He could have avoided it.  He had the means.  What does that tell you about the person you're dealing with?  He wants to kill.

(S.F. vol. 73 at 1527; P.R.E. at tab 14.)

Now, Defense Counsel was quite upset at this suggestion that the Defendant may well have been the trigger man in the Texaco case.  But we've been straight with you the whole time.  It's an open question.  But I'd suggest to you some of the very best evidence of who was the trigger man in that Texaco case came from the Defendant in his self-serving interviews with these two psychologists.  Why?  Because he's getting himself out of store, away from the action, and you know that's not true.  Well, when you know that he's lying about that participation, then what you start doing is looking back and forth and comparing the two.  Who is the leader?  He is.  Who is the person who is responsible for loading up the car?  Vargas is.  Who is the person whose fingerprints are found inside?  Gustavo Julian Garcia.  Who is the person, when he's arrested, has the money on him?  Where did the money come from?  The money came from the clerk.  Are we to believe that Vargas and he were switching the money back and forth?

They got caught right in the middle of this.  They didn't have time.  The Defendant, Gustavo Garcia, had the money on him.  He was the one inside.  He was the one dealing with Gregory Martin.  He is the one that told Gregory Martin to get down on the floor.  He's the one that stuck the gun in the back of his head and pulled the trigger.  You don't have any question of that.  He wants to kill.  He'll do it again.  It's a thrill.

(S.F. vol. 73 at 1529-30; P.R.E. at tab 14.)

How many of you would characterize two executions as immaturity?  The guy is a sociopath.  Every expert that testified in this trial agreed.  He's a sociopath.

319

(S.F. vol. 73 at 1531; P.R.E. at tab 14.)

Now, Defense Counsel says, wait a minute, we're talking about that offense on December 9, 1990, and before that he hadn't murdered anybody, and you can't count the one after that, so he doesn't have a history of violence.  If you're buying that, you know, there's nothing I can do it about it.  Two murders is not a history of violence.

(S.F. vol. 73 at 1533; P.R.E. at tab 14.)

You know, he's only killed twice.  It's not that big a deal.  This guy, TDC can cage him. He's killed twice, but you know he pointed that gun at Donna Sawtelle, and Mark mentioned to you, he pulled that hammer back.

(S.F. vol. 73 at 1537; P.R.E. at 14.)

Curiously, the prosecutor who wrote the State's response to Garcia's article 11.071 habeas petition must have overlooked these passages.  He denied that the trial prosecutors had left the question of Mr. Martin's killer as anything but open: "The State, on the other hand, simply said 'we don't know' who the second shooter was, but the evidence could be interpreted to implicate the Applicant." *(State's Response to Art. 11.071 Petition, at p. 14, State Habeas Record, at 39.)*

### B.     The State Argued Earlier at Mr. Chris Vargas' Trial that Vargas was the Triggerman at the Texaco Murder, and That it Was Vargas Who Killed Mr. Gregory Martin

Chris Vargas was certified as an adult and tried him for murder several months before Garcia.  The Collin County District Attorney prosecuted him for the Texaco robbery, and the murder of Mr. Martin.  Vargas was convicted and sentenced to life.

At his trial, the State prosecutor argued forcefully that Vargas was not merely a party to the Texaco robbery and murder, but the actually killer of Mr. Martin.  Confirming this, we have attached the affidavit of Richard Weaver, the Collin County lawyer who represented Vargas at trial. *(See Attachment 27, End of this Brief.)*

320

We have not yet been able to obtain the transcript of Vargas' trial.  His file in the Collin County District Clerk's Office indicates that after he was convicted of the Texaco murder, he reached a plea agreement with the State.  In exchange for his agreement to waive appeal, and accept a life sentence on the Beverage Warehouse murder, the State would agree to allow the second life sentence to run concurrently.  Therefore, no transcript of his trial was prepared.  We have identified the court reporter, and in a separate motion, will ask the Court to authorize payment of the transcript so that we can determine precisely what was argued at his trial.

> **C.     Garcia Contends That in the Sentencing Phase of a Capital Case, The Sixth Amendment is Violated When a State Introduces Evidence and Argues That the First Co-Defendant is the Triggerman, and in a Later Trial Argues Inconsistently That the Second Co-Defendant is the Triggerman**

Garcia challenges the inconsistent positions taken by the State between his trial and that of his co-defendant, Chris Vargas.

> **1.     The Doctrine of Collateral Estoppel Applies in Criminal Cases as a Component of the Double Jeopardy Clause to Prevent Relitigation of Critical Issues Found In Favor of the Defendant**

The leading case by the Supreme Court is *Ashe v. Swenson.*  The doctrine of collateral estoppel bars relitigation of any issue that has been determined in a prior final and valid judgment. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189 (1970); *see United States v. Lee,* 622 F.2d 787 (5th Cir. 1980).

Along with several others, Ashe was charged with robbing six men playing poker.  Ashe was tried and acquitted for robbing one of the six men.  The State then prosecuted him for robbing another victim and obtained a conviction.  The Supreme Court concluded that because the robbery

of the second poker player was a separate crime, the Double Jeopardy Clause did not bar the second trial.  397 U.S. at 437-40, 446, 90 S.Ct. at 1190-92, 1195.

Nevertheless, the Supreme Court reversed Ashe's conviction.  The Court held that the Double Jeopardy Clause contained a collateral estoppel element that barred relitigation of any ultimate fact necessarily decided in an earlier trial.  *Id.* at 442-43, 445, 90 S.Ct. at 1193-94, 1195.  The Court concluded that the only contested issue in the first trial was identity of Ashe as one of the robbers.  Therefore, the acquittal in the first trial indicated that the State had failed to prove beyond a reasonable doubt that Ashe was one of the robbers.  *Id.* at 445, 90 S.Ct. at 1195.  The Court held that the State was therefore barred by the doctrine of collateral estoppel from trying Ashe for the robbery of any of the other poker players, since identity would be an ultimate issue in each such trial.  *See Santa maria v. Horsey*, 133 F.3d 1242, 1245 (9th Cir. 1998) (the discussion of *Ashe* comes from this case, quotations omitted and text modified).

In *Put away v. Plummer,* 943 F.2d 1041 (9th Cir.1991), the Ninth Circuit held that a jury finding of "not true" that defendant used firearm or personally inflicted bodily injury barred evidence on that score at his retrial because of collateral estoppel component of the Double Jeopardy Clause.

*Mitchell v. Runty,* 107 F.3d 1337 (9th Cir.)*, cert. denied,* 118 S.Ct. 295, 139 LED.2d 227 (1997), involved a conviction of a defendant for second-degree murder.  The jury, however, found a weapon enhancement to be not true and rendered a special verdict that Mitchell did not drive the car that ran over the victim.  The Ninth Circuit held that if Mitchell were retried, the State would be limited to arguing that he was merely an accomplice.  *Mitchell* observed that "Special findings, by contrast, are dispositive of the questions put to the jury. Having agreed to the questions, the

322

government cannot now ask us to ignore the answers; to do so would be a clear violation of petitioner's Sixth Amendment rights." *Mitchell*, 107 F.3d at 1339 n.2.

By contrast, in *Santa maria v. Horsey*, the Ninth Circuit overturned both *Mitchell* and *Put away*. The Ninth Circuit held that the jury's finding of not-true that Santa maria used a knife to commit the murder did not bar the State from retrying Santa maria as a party to the murder, while not the principal. Nor was the State barred from presenting evidence that Santa maria used a knife to commit murder. *Santa maria*, 133 F.3d at 1246-47.

In *United States v. Lee*, the Fifth Circuit stated that "The protection of collateral estoppel is an established rule of federal criminal law and extends to prevent redetermination of evidentiary facts as well as ultimate facts." 622 F.2d 787, 789 (5th Cir.1980)*, cert. denied,* 451 U.S. 913, 101 S.Ct. 1987 (1981).

More recently, *United States v. Garcia*, 78 F.3d 1517 (11th Cir. 1996), involved a defendant charged with a drug importation conspiracy. He was completely acquitted. Later, he was charged with a violation of the Travel Act. The court found that trial was barred by the collateral estoppel component of the Double Jeopardy Clause: "To accept the government's attempted reconciliation of the results of the two trials, we would have to believe it logical for Garcia to have traveled with the intent to promote the conspiracy, and then a few days later to have had no knowledge of that same conspiracy. Because these two propositions are logically inconsistent, the acquittal at the first trial cannot be reconciled with the conviction at the second trial." *Garcia*, 78 F.3d at 1522.

The legal doctrine of collateral estoppel is incorporated into constitutional notions of due process and fair play. See, e.g., Buck v. Maschner, 878 F.2d 344, 346 (10th Cir. 1989); Salcedo v. State, 376 S.E.2d 360 (Ga. 1989). Collateral estoppel is properly invoked "if the issue in the

323

subsequent proceeding is identical to the one involved in the prior action [and] the issue is actually

litigated.  . . ."  <u>Williams v. Bennett</u>, 689 F.2d 1370, 1381 (11th Cir. 1982); <u>State v. Brooks</u>, 541

So. 2d 801, 810 (La. 1989); <u>see also</u> <u>Jordan v. McKenna</u>, 573 So. 2d 1371, 1375 (Miss. 1990)

("[W]here a question of fact . . . is actually litigated and determined by a valid and final judgment,

that determination is conclusive . . . [against the party against whom it was made] in a subsequent

suit on a different cause of action").

Collateral estoppel does not just bar relitigation of certain facts and theories -- "it may bar

prosecution *or argumentation* of facts. ..."  <u>Ferenc v. Dugger</u>, 867 F.2d 1301, 1303 (11th Cir. 1989)

(emphasis supplied).

Even without direct resort to constitutional principles, it is fundamental that a litigant in any

court cannot be permitted to assert a position in one proceeding and later adopt the contrary position

in a related proceeding simply to better its lot.  *See Ex Parte Young,* 222 N.C. 708, 24 S.E.2d 539

(1943) (husband estopped from asserting paternity of child when he had obtained divorce on ground

of non-paternity); *United States v. Flowers,* 813 F.2d 1320 (4th Cir. 1987) (judicial estoppel not

applied where positions not materially different); *Allen v. Zurich Insurance Co.,* 667 F.2d 1162 (4th

Cir. 1982) (party estopped from asserting in federal court position contrary to position it had taken

in related state court litigation).[31]

---

[31]Paragraph written by Mr. Staples Hughes, of North Carolina, to whom appreciation is
expressed.

2.   *The Federal Constitution Should Be Interpreted to Bar a State Prosecutor in a Capital Case From Asserting That A Defendant is The Actual Triggerman, After the Prosecutor Has Previously Argued and Convicted Another as the Triggerman*

Garcia contends that the federal constitution prohibits a State from contending in separate trials that two men are the triggerman, when it knows only one could be.  Here, a Texas prosecutor argued forcefully to a jury that it was Chris Vargas who leveled the shotgun at Mr. Martin's head and killed him.  All the evidence admitted was directed to the conclusion that he was the principal.  The State pointed out that Chris was seen standing over Mr. Martin's body, that the gun was nearby, and that he had a shell in his pocket.

A few months later, different prosecutors, but employed by the same district attorney, and well versed with the evidence and arguments at Vargas' trial, angrily pointed to Garcia, pointing out that there sat Mr. Martin's killer.

Several comments are in order.  First, this was a capital case.  As discussed elsewhere in this petition, death penalty cases require a heightened degree of reliability.  The prosecutors were asking jurors to sentence Garcia to death on the basis of a fact scenario they knew to be untrue.

Second, the arguments occurred in the sentencing phase, not the guilt-innocence phase.  In all other cases found, the collateral estoppel issues developed as a result of evidence and arguments taken by the prosecutor to obtain a conviction.  At stake here were three special issues, each precariously resting in party on the jury's conclusions as to whether Garcia was the actual triggerman in Mr. Martin's murder.  The future dangerousness issue, the prosecutor contended, was foreordained because Garcia had personally killed not once, but twice.  What could be more pressing in the mind of a juror weighing whether Garcia would be violent in the future than whether

325

he would kill again?  The prosecutor sought hard to convince jurors that if there was ever the slightest doubt that gunning down of Mr. Martin by Garcia put it to rest.

Moreover, this was a man for whom no mitigation in the third special issue should apply, because he had shot not one man, but two.  In the weighing of mitigating and aggravating circumstances, the personal killing of a second man must have rested heavily in favor of death over life.

Garcia contends that the Due Process Clause imposes upon prosecutors the duty to seek only one version of the truth, and nowhere is this more true than on the ultimate issue of who actually committed the killing.  Our concepts of justice casts truth in absolute terms, not relative ones.

"The essence of due process is fundamental fairness. ..."  <u>United States ex rel. Crist v. Lane</u>, 745 F.2d 476, 482 (7th Cir. 1984).[32]  That prosecutors should conduct themselves in a manner which is fundamentally fair is not simply a talisman, the rote incantation of which forgives its subsequent violation.  Indeed, the *Canons of Ethics* of the American Bar Association Code of Professional Responsibility provide that "[a] government lawyer who has discretionary power relative to litigation should refrain from instituting or continuing litigation that is obviously unfair." *EC 7-14*.

Combining both the legal and the ethical, Judge Clark noted in <u>Drake v. Kemp</u>, 762 F.2d 1449 (11th Cir. 1985), that "[i]t is the duty of a prosecutor not only to convict but to seek justice. He has the responsibility to guard the rights of the accused as well as those of society at large.  This is so because '[s]ociety wins not only when the guilty are convicted but when criminal trials are fair;

---

[32]These comments were provided by Prof. Eric M. Freedman, to whom appreciation is expressed.

our system of justice suffers when any accused is treated unfairly.'" Id. at 1478 (separate opinion

of Clark, J.) (citations omitted).

In Drake the prosecution sought to apply two different theories in two different trials:

> [The co-defendant] Campbell told essentially the
> same story in both trials, i.e. that Drake and only
> Drake was the murderer.  In Campbell's trial,
> however, the prosecutor attacked that story as
> unbelievable and argued that Drake was merely the
> one who "cased" the barbershop.  Having destroyed
> Campbell's credibility in that trial and secured one
> death penalty, he then called Campbell as the state's
> principal witness in Drake's trial in order to obtain a
> second one.

Id. at 1478.

However, this type of tactic is simply unfair.  The "Supreme Court [has] made clear that ...

[t]he prosecutor has a duty not only to refrain from soliciting false evidence but also a constitutional

duty to correct false evidence that he does not intentionally elicit.  * * *  The conclusion [from the

inconsistent theories] seems inescapable that the prosecutor obtained Henry Drake's conviction [and

death sentence] through the use of testimony he did not believe; bringing this case under the logical

... framework of [the Supreme Court case law].  As the state habeas judge recognized, the

prosecution's theories of the same crime in two different trials ... are totally inconsistent.  This flip

flopping of theories of the offense was inherently unfair." Id. at 1478-79.

Similarly, in Saylor v. Cornelius, 845 F.2d 1401 (6th Cir. 1988), the Court condemned the

use of inconsistent theories, since "[t]he state had the option of presenting the jury with a number

of theories of criminal liability.  It chose to present the jury with [one] theory and ... failed to present

the [other], despite the fact that it clearly could have done so." Id. at 1409.  Both due process and

327

principles of double jeopardy allow that "[t]he state ha[ve] its opportunity to put its best proof and theories of criminality before the jury [but] it is not entitled to a second chance." Id. at 1409. See also Tibbs v. Florida, 457 U.S. 31, 41, 102 S. Ct. 2211, 2218, 72 L.Ed.652 (1982) (the Double Jeopardy clause "forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding").

Thus the Louisiana Supreme Court has recognized that there may be "a situation where the prosecutor has adopted such a fundamentally inconsistent position in the separate trials of two co-conspirators that basic fairness might require the trial court to permit exposure of the inconsistent positions." State v. Wingo, 457 So. 2d 1159, 1166 (La. 1984); see also Nichols v. Collins, 802 F. Supp. 66 (S.D. Tex. 1992) (finding "blatant misconduct by the prosecutor [that] violated doctrines of judicial estoppel, collateral estoppel, due process, and the duty to seek justice" where the state convicted two persons as the trigger man in a one-shot crime, "unfairly convict[ing] two different men of firing that single bullet"; two people can be convicted for one crime "as long as law *and* physics provide for such").  The prosecution cannot take different theories in different cases -- alleging that one theory is appropriate in one case, and another in another case. *Accord Troedel v. Wainwright,* 667 F. Supp. 1456 (S.D. Fla. 1986), *aff'd*, 828 F.2d 670 (11th Cir. 1987).

Moreover, the Cruel and Unusual Punishment Clause requires that when seeking to tailor the punishment in a death penalty case to the unique facts and circumstances of a given crime and defendant, prosecutors are obliged to assure accuracy of the information conveyed about the defendant's culpability, not shifting the burden of culpability among co-defendants like a shell game in order to extract the maximum punishment of each.  The reasoned moral response required of each

328

juror insists that he or she know the true degree of the defendant's culpability for any extraneous offenses introduced in the sentencing phase.

Vargas' transcript was easily available to the trial counsel for Garcia, who could have obtained it at no cost and made the constitutional arguments here.   Consequently, he was ineffective.

### 3.   The Non-Mutual Collateral Estoppel Doctrine Does not Apply in This Case

The Fifth Circuit has held that the non-mutual collateral estoppel doctrine does not apply in the criminal arena.  This doctrine, however, does not apply in Garcia's case.

In *United States v. Mollier*, 853 F.2d 1169, 1175 (5th Cir. 1988), Mollier argued that the Government was prohibited from introducing certain evidence in favor of a conspiracy conviction because that same evidence had been found legally insufficient in the trial of his co-defendant, who was acquitted of the offenses for which Mollier was prosecuted.   Although Mollier was also acquitted of the same charges, he argued that the evidence should not have even been admitted because it prejudiced the rest of his case and contributed to his conviction on other counts.

The Fifth Circuit rejected Mollier's arguments, holding that he was essentially making a non-mutual collateral estoppel argument.  The Fifth Circuit held that this the civil doctrine of non-mutual collateral estoppel does not apply in the criminal arena.  *Mollier*, 853 F.2d at 1175-76.

The Fifth Circuit succinctly defined the doctrine of non-mutual collateral estoppel:

Essentially, the principle of non-mutual collateral estoppel is that if a litigant has fully and fairly litigated an issue and lost, then third parties unrelated to the original action can bar the litigant from re- litigating that same issue in a subsequent suit.   The stated requirement of being a loser is accurate but superfluous;  it is built into the structure of the principle that there must have been a previous opportunity to litigate.  If "A" sues "B" and loses on issue "X", then "C" can avail itself of an estoppel against "A" on issue "X" if "A" sues "B".  *See*

329

*Blonder-Tongue Laboratories, Inc. v. Univ. of Ill. Found*, 402 U.S. 313, 321-35, 91 S.Ct. 1434, 1439-46 (1971) (defensive use of collateral estoppel).  If "A" sues "B" and "B" loses on issue "X", then (with some exceptions), "C" can sue "B" and prevail on issue "X" by operation of collateral estoppel.  *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329-31, 99 S.Ct. 645, 650-52 (1979) (offensive use).  But previous winners can never invoke the principle, because the new opponent will not have had an opportunity to litigate the issue. For example, if "A" sues "B" and "A" wins on issue "X", then "A" sues "C" in a case involving issue "X", "A" cannot invoke collateral estoppel but must re-litigate the issue with "C". Or again, if "A" sues "B" and "B" wins on issue "X", "B" cannot bar a suit by "C" based upon issue "X".

*Mollier*, 853 F.2d at 1175 n.7.

The Fifth Circuit followed *Mollier* in *Nichols v. Scott*, 69 F.3d 1255, 1269 (5th Cir. 1995), holding that the non-mutual collateral estoppel doctrine did not prevent the State from arguing inconsistent theories as to the identity of the triggerman between two defendants.

In *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999 (1980), the Supreme Court held the civil rule of non-mutual collateral estoppel could not be used against the government by a defendant accused of aiding and abetting a person who had been acquitted in an earlier trial by a jury.

Here, however, the non-mutual collateral estoppel doctrine does not apply, because no one is attempted to assert the prior jury's finding against Chris Vargas.  Chris Vargas lost at trial and was convicted of murder.  The non-mutual collateral estoppel doctrine would apply if a third party, such as Mr. Martin's heirs, sued him for wrongful death.  The issue of liability has been established, and in fact by a higher standard of proof than would exist in a civil case.  By contrast, Garcia is not trying to assert any claims against Vargas.

### D.   Garcia Does Not Seek to Create a New Rule Barred by Teague.  The Principles Here Are Well-Established.

Garcia does not seek to have this Court establish a new rule that would be barred by *Teague*. The principle is one of a prosecutor's commitment to fair play, truth and justice, which have long been seen to flow from the fountain of the Sixth Amendment right to a fair trial, and the Fourteenth Amendment right to due process.

An adverse case is *Jacobs v. Johnson*, 31 F.3d 1319 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067 (1995).  In *Jacobs*, the Fifth Circuit reviewed claims by a death row inmate that the State had taken inconsistent positions as to who was the triggerman, Jacobs or his co-defendant.  The court stated that there was no authority that the prosecutor's contradictory positions amounted to federal constitutional error.  The court concluded that Jacobs was seeking the benefit of a new rule of constitutional law and was therefore barred by *Teague* from relief.  Here, however, Garcia is not seeking the benefit of a new rule.  Alternatively, he adopts the opinion of Justice Stevens, dissenting from the denial of a writ of certiorari to Jacobs.  *Jacobs v. Johnson*, 513 U.S. 1067, 115 S. Ct. 711 (1995) (Stevens, J, dissenting).

"The Supreme Court and the several federal appellate courts have long recognized that the prosecutor has a distinctive role in criminal prosecutions.  As representative of the government the prosecutor is compelled to seek justice, not convictions.  Justice is served only when convictions are sought and secured in a manner consistent with the rules that have been crafted with great care over the centuries.  Those rules have not resulted from happenstance or indifference but are the product of measured, reasoned thought, marching under the guidon that criminal convictions should be based upon guilt clearly proven in a calm, reflective atmosphere, free of undue passion and

prejudice." *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989) (a case arising in Judge Paul Brown's court).

For these reasons, a "prosecutor may not directly refer to or even allude to evidence that was not adduced at trial. *United States v. Morris,* 568 F.2d 396 (5th Cir. 1978). A prosecutor may not give a personal opinion about the veracity of a witness. *United States v. Herrera,* 531 F.2d 788 (5th Cir. 1976). A prosecutor may not suggest that other supportive evidence exists which the government chose not to develop. *Ginsberg v. United States,* 257 F.2d 950 (5th Cir. 1958). In addition to these trial verbotens, the prosecutor may not charge the defendant with extrinsic offenses other than those specifically allowed by the Federal Rules of Evidence and interpretive jurisprudence. See e.g., Fed.R.Evid. 404; *United States v. Beechum,* 582 F.2d 898 (5th Cir. 1978) (en banc)." *Murrah*, 888 F.2d at 26-27 (citations and quotations in *Murrah*). Nor may a prosecutor "challenge the integrity and ethical standards of defense counsel unless the prosecutor has certain proof of an offense and the matter is relevant to the case being tried." *Murrah*, 888 F.2d at 27.

"Prosecutors do not have a hunting license exempt from the ethical constraints on advocacy." *United States v. Bursten,* 453 F.2d 605, 610-611 (5th Cir. 1971), *quoting Patriarca v. United States,* 402 F.2d 314 (1st Cir.1968), cert. denied, 393 U.S. 1022, 89 S. Ct. 633 (1969). Sixty years ago, the Supreme Court observed that a prosecutor "may prosecute with earnestness and vigor--indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633 (1935).

***Claim Number 66: Mr. Garcia Did Not Receive Effective Assistance of Counsel in his 2001 Trial In Violation of the Sixth and Fourteenth Amendments to the Federal Constitution.***

Mr. Garcia contends in this issue that he did not receive effective assistance of counsel in his 2001 trial.  At the outset, Mr. Garcia points out that his trial counsel is a fine man an excellent attorney.  He volunteered for a difficult case.  Counsel has heard that he was going through a divorce during the trial, which would be difficult for anyone.  No disrespect at all is intended by raising this point.  He appears to have done his very best to represent Mr. Garcia with challenging adverse facts.  In capital habeas litigation, presenting ineffective claims is almost unavoidable and often the only issue which results in a new trial.

**A.     Trial Counsel Introduced Mr. Garcia's Juvenile Criminal Record and Permitted Other Aspects Without Challenge.**

Trial counsel asked Mrs. Knox, Sheila's mother, about her knowledge of Gustavo's juvenile criminal history.  This was his first reference to juvenile crimes.  (R.R. vol. 26 at 15-16.)  This revealed that he had previously broken into the same liquor store where he murdered Mr. Turski, when he was a juvenile.  He was placed on probation consequently.  Many juvenile records were introduced as a result.  *See generally State v. Sexton*, No. E2000-01779-CCA-R3-CD (Tenn. Crim. App. 8-2-2002) (although disposition of juvenile disposition admissible in his adult trial, reversed because facts of juvenile disposition could not be used to impeach character witness).  The juvenile convictions were based in several instances on improperly juvenile statements, which should have been challenged.  This is discussed below.

**B.**     **Trial Counsel Allowed Introduction of Extraneous Offenses in Through Mrs. Knox.**

Mrs. Knox, Sheila's mother, explained that a juvenile named "Mo" ran around with Shiela and Gustavo and that one night they were pulled over for stealing gasoline.  Gustavo was driving but before the officer reached the window, he changed places with Shiela.  Gustavo was on probation at the time.  So Shiela went to jail.  Gustavo and Mo went back to Mo's house.  Mrs. Knox was becoming worried because she could not locate Shiela.  She went to Mo's house.  Mo had a gun in his belt.  He ordered Mrs. Knox to leave and threatened her.   Both Mo and Gustavo were drinking.  (R.R. vol. 26 at 20-25.)  Gustavo did nothing to protect Mrs. Knox.

The prosecutor was unaware of this extraneous offense, a small gift to him.  (R.R. vol. 26 at 31-32.)  He questioned Mrs. Knox at length.

Supporting cases include the following:

***United States v. Villalpando*** , 259 F.3d 934 (8 [th] Cir. 2001).  Counsel ineffective in drug conspiracy and felon in possession of firearms case for eliciting testimony from a government's witness on cross-examination that the defendant made threats to her and told her that he had ordered a murder.  Although the court normally would not address an issue of ineffective assistance of counsel on direct appeal, the court found that this error could not be explained by any possible strategy.  *Id.* at 939.  Prejudice found only on drug charges because the defendant stipulated that he was a felon and had admitted on cross-examination that he had possessed the firearms in question.

334

**C.    Trial Counsel Failed to Object to Hearsay Statements of SWIFT, Without Requiring SWIFT to Prove Firearm Ballistics Similarity.**

Detective Meeks said that a Dallas laboratory had tested the gun and concluded that the gun produced a similar strike point on the primer of a cartridge as that used in the Beverage Warehouse crime.  (R.R. vol. 26 at 170.)  There was no objection.

**D.    Trial Counsel Failed to Object to Hearsay of SWIFT on Fingerprint Issues, Without Requiring SWIFT to Prove the Fingerprints on the Texaco Cigarettes and Containers were Garcia's.**

Gustavo's and Chris' fingerprints were found on cigarette cartons and a plastic storage box found in Shiela's car, indicating that they had hauled the goods from the store to the car.  (R.R. vol. 26 at 154-55.)  There was no objection or attempt to require the State to prove the fingerprints.

(It may be that the State's witness on this issue would have been a man named A.J. Jumper. If so, Mr. Jumper, now with SWIFT, recently testified in a murder trial in Quitman, *State v. Warren Rodgers*.  The defense lawyer cross-examined Mr. Jumper carefully and the transcript will reveal that Jumper grossly exaggerated his ability to make tire and shoe print identifications.)

**E.    Trial Counsel Failed to Object to First Confession.**

Trial counsel did not object to the introduction of Mr. Garcia's confession in the 2001 sentencing trial on the theory that since their admissibility was upheld by the Court of Criminal Appeals in 1996, there remained no grounds or need for challenge.  Although there is some logic in this theory, it overlooks that for later federal review and avoid federal procedural default, it is may be necessary that the trial counsel make a strong challenge to the confessions, even if such a challenge was likely to fail in state court.

335

Det. Wilson read Gustavo his *Miranda* rights.  (R.R. vol. 26 at 181-82; St. Exh. N.) According to Det. Wilson, Mr. Garcia waived his rights and talked.  The interview began at 5 a.m. at the jail, about four or five hours after his arrest.  Mr. Garcia signed a confession written by Det. Wilson.  (St. Exh. I.)  Gustavo speaks English fluently.  His defense lawyer did not object to the statement in the punishment phase.  (R.R. vol. 26 at 184-85.)

Det. Wilson interviewed Mr. Garcia a second time at around 8:15 a.m., three hours after the first interview, and seven or eight hours after his arrest.  (R.R. vol. 26 at 184-85; St. Exh. 3.)  This time the topic was the Beverage Warehouse robbery.  Det. Wilson again read his *Miranda* rights. Mr. Garcia confessed his role.  (R.R. vol. 26 at 185-86; St. Exh. 3.)  Again, his defense lawyer waived objection in the punishment phase.  (R.R. vol. 26 at 187.)

The State introduced the videotapes.  (St. Exh. 327, 328.)  The defense lawyer failed to object to the videotapes of the interviews.  (R.R. vol. 26 at 194-95.)

The trial counsel failed to file a motion to suppress.  He failed to seek a suppression hearing where he could explore the good cop bad copy interrogation, and in which Gustavo could testify.

### F. Trial Counsel Failed to Object to Hearsay Information in the Reports From Faubion Middle School.  These contain many hearsay reports of improper behavior.

These reports are contained in the exhibits introduced by the State.  The State was allowed to introduce abundant hearsay statements about Garcia's juvenile record without any interruption by defense counsel, who could have objected on Rule 404(b), Rule 403, confrontation clause, and hearsay grounds.

**G.      Trial Counsel Failed to Object to Mr. Garcia's Juvenile Confession.**

One of the witnesses was Mr. Jack Tulley, a former McKinney police officer.  (R.R. vol. 27 at 179).  He investigated the two burglaries Gustavo committed in 1988 when he was a juvenile. Gustavo confessed to both crimes.  (R.R. vol. 27 at 182-85; St. Exh. B.)  There was no objection by the defense attorney.  (R.R. vol. 27 at 185.)

There were ample grounds for a constitutional challenge to the confessions of a juvenile. Admission of the written confession was improper in several respects.  Mr. Garcia was not adequately warned before his juvenile confession.

Under Texas law, a person taking a child into custody must promptly notify the child's parent, guardian, or custodian of that fact and of the reason for taking the child into custody.  See Tex. Fam. Code Ann. § 52.02 FAM.(b)(1) (Vernon Supp. 2002).  The trial attorney should have investigated and challenged the juvenile confessions.  Had he done so, he would have found from his client that the statements were not properly made.

Litigation on this issue goes both ways.  *See, e.g., Rodriguez v. State*, 699 S.W.2d 358 (Tex. App.--Dallas 1985, no pet.) (confession of 15 year-old upheld); *Petree v. State*, 778 S.W.2d 507 (Tex. App.--Dallas 1989, pet. ref'd) (same); *Choate v. State*, 425 S.W.2d 706 (Tex. App.--Houston [1st Dist.] 1968, no pet.) (confession of 14 year-old reversed).  The Supreme Court has held that there is no age certain where a child may not waive rights and confess.  *Fare v. Michael C.*, 442 U.S. 707, 725-26, 99 S. Ct. 2560, 2572 (1979).  The Fifth Circuit has upheld the confession of a fourteen-year-old.  *United States v. Rybka*, 507 F.2d 53, 57 (5th Cir.), *cert. denied*, 95 S. Ct. 1684 (1975).  Under current law, age is simply one factor considered in the totality of the circumstances test.  *See Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002) (14-year-old's confession upheld on

habeas); *In the Matter of B.V.*, No. C2-02-476, Feb. 4, 2003 (Minn. App. 2-4-2003) (12-year-old's

confession reversed); *see general Vega v. State*, 84 S.W.3d 613 (Tex. Crim. App. 2002) (explaining

choice of law rules for 16-year-old's confession).

Supporting cases include the following:

**Commonwealth v. Segovia**, 757 N.E.2d 752 (Mass. Ct. App. 2001).  Counsel ineffective

in vehicular hit and run causing death case for failing to move to suppress a videotaped statement.

Prior to the statement, the defendant, who was a Brazilian national, requested a translator and

paralegal and told the police officer he did not understand everything the police officer told him

regarding his Miranda rights.  Nonetheless, the police officer continued to question the defendant,

under the guise of asking "routine booking questions" after he requested legal assistance.  Prejudice

found because the defendant's statements were contradictory to his prior statements to police and

because, during the statement, the defendant had revealed the name of a witness that testified to

incriminating statements by the defendant.  This witness was viewed as "fruit of the poisonous tree"

by the court.

    **H.**      **Trial Counsel Failed to Challenge the Juvenile Confession which Contained Reference to Four Other Burglaries Which Could not be Corroborated. Corroboration is required for a Confession.**

    **I.**      **Trial Counsel Failed to Challenge the Uncorroborated Hearsay Testimony of Co-Conspirators Admitted Through Det. Heaton, In Violation of the Accomplice-Witness Rule.**

In *Long v. State*, the Texarkana Court of Appeals recently explained eloquently the law of

accomplice witness testimony. ___ S.W.3d ____, No. 06-98-179-CR (Tex. App.–Texarkana Nov.

2, 1999) (to be published).  "An accomplice witness is a witness at trial who participated with a

defendant before, during, or after the commission of a crime. *McFarland v. State,* 928 S.W.2d 482,

514 (Tex. Crim. App. 1996); *Kunkle v. State,* 771 S.W.2d 435, 439 (Tex. Crim. App. 1986); *Howard v. State,* 972 S.W.2d 121, 125 (Tex. App. - Austin 1998, no pet.).  A conviction cannot be had on the testimony of an accomplice witness unless corroborated by other evidence tending to connect the defendant with the offense committed. Corroboration is not sufficient if it merely shows the commission of the offense.  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); *Howard,* 972 S.W.2d at 125-26.  The so-called "accomplice witness rule" is not mandated by the United States Constitution or the common law.  Rather, it reflects a legislative determination that accomplice witness testimony implicating another person should be viewed cautiously due to the incentive to lie to avoid punishment or shift blame to another person.  *Blake v. State,* 971 S.W.2d 451, 454 (Tex. Crim. App. 1998).  The rule requires the jury to receive and act on such testimony with caution, considering the selfish interests and possibly corrupt motives of the witness.  *Howard,* 972 S.W.2d at 125."  *Long v. State*, slip op. at 3, ___ S.W.3d at ___; *accord Taylor v. State*, ___ S.W.3d ___, No. 14-97-01325-CR (Tex. App.-Houston [14th Dist.] Nov. 18, 1999) (to be published); *Fare v. State*, ___ S.W.3d ___, No. 09-98-122-CR, (Tex. App.--Beaumont [9th Dist.] Oct. 20, 1999) (to be published); *see also Villarreal v. State,* 576 S.W.2d 51, 56 (Tex. Crim. App. 1978); *Singletary v. State,* 509 S.W.2d 572, 576 (Tex. Crim. App. 1974); *accord McDuff v. State,* 943 S.W.2d 517, 520 (Tex. App. - Austin 1997, pet. ref'd); *see also Tran v. State,* 870 S.W.2d 654, 658 (Tex. App. - Houston 1994 pet. ref'd).

"To determine the sufficiency of corroboration, whether an objection was made or not, we eliminate the testimony of the accomplice witnesses and examine the testimony of the other witnesses." *Taylor v. State*, ___ S.W.3d ___, No. 14-97-01325-CR (Tex. App.-Houston [14th Dist.] Nov. 18, 1999) (to be published) (*citing Adams v. State,* 685 S.W.2d 661, 667-68 (Tex. Crim.

339

App. 1985); *Mitchell v. State,* 650 S.W.2d 801, 806 (Tex. Crim. App. 1983); *Mize v. State,* 915 S.W.2d 891, 896 (Tex. App.--Houston [1st Dist.] 1995, pet. ref'd)).  "From this testimony, we determine if evidence of incriminating character tends to connect the defendant with the commission of the offense.  *See Mitchell,* 650 S.W.2d at 806; *Mize,* 915 S.W.2d at 896.  The corroborative testimony does not need to directly link the appellant to the crime, nor does it have to independently establish his guilt.  *See Mize,* 915 S.W.2d at 896.  Normally, it is sufficient if the cumulative weight of the corroborative evidence tends to connect the appellant with the crime.  *Id.* In applying this test of sufficiency, the court must consider each case on its own facts and circumstances."  *Taylor v. State*, ___ S. W.3d at ___ (*citing Reed v. State,* 744 S.W.2d 112, 126 (Tex. Crim. App. 1988); *Ashford v. State,* 833 S.W.2d 660 (Tex. App.-Houston [1st Dist.] 1992, no pet.)).

   ***Cases Finding Insufficient Evidence.***  Courts often reverse for insufficient corroborating evidence.  For instance, in *Nolley v. State*, Nolley had been convicted of a brutal gang murder on the testimony of an accomplice.  ___ S.W.3d ___, No. 14-97-00439-CR (Tex. App.-Houston [14th Dist.] Oct. 21, 1999) (to be published).  The State's two corroborating witnesses could merely establish, at best, that Nolley had been in a car with one of the murderers three and one-half hours before the robbery, and that he had been seen walking down the street with one of the murderers the day before the robbery.  Holding this evidence insufficient, the Fourteenth Court of Appeals acquitted him.  *Nolley v. State*, slip op. at ___.  Evidence is insufficient if "does no more than point the finger of suspicion towards the accused, . . . ."  *Nolley v. State*, slip op. at 2 (*citing Paulus v. State,* 633 S.W.2d 827, 843 (Tex. Crim. App. 1981)).

The San Antonio Court of Appeals reversed a drug possession conviction in *Rios v. State*, because there was no testimony that Rios was more than a passenger in the car in which he and the accomplice were arrested.  982 S.W.2d 558 (Tex. App.--San Antonio 1998, pet. denied).

The San Antonio Court of Appeals reversed a murder conviction based upon testimony from three indicted accomplices.  *Badillo v. State,* 963 S.W.2d 854, 857 (Tex. App. - San Antonio 1998, pet. ref'd).  "The evidence corroborating the testimony of the women - the location of the register and the chip bags, the placement of Peña's body, the trajectory of the bullets - merely serves to link the accomplices to the crime.  It shows they had knowledge of what happened, but they would have had that same knowledge if one of them had done the shooting.  Their testimony does nothing to make it more probable that the defendant did the crime than themselves."  *Badillo*, 963 S.W.2d at 858.

In *Howard v. State,* the Austin Court of Appeals reversed a possession conviction.  972 S.W.2d 121, 128 (Tex. App. - Austin 1998, no pet.)  The only corroborating evidence linking Howard to the cocaine found in a ceiling light fixture was that  an officer had seen him leave that room, which created "only the weakest of inferences."  *Id.*

The First Court of Appeals reversed an aggravated robbery conviction in *Mize v. State,* 915 S.W.2d 891, 897 (Tex. App.--Houston [1st Dist.] 1995, pet. ref'd).  Identification of Mize was weak, and there was virtually no evidence connecting him to the scene.

*Moreno v. State,* 761 S.W.2d 407 (Tex. App. - Houston [14th Dist.] 1988, pet. ref'd), found insufficient corroborating evidence to support delivery of cocaine charge where testimony showed that Moreno, a passenger in the accomplice's vehicle, talked with accomplice before the attempted

drug transaction, stayed in the car while the accomplice attempted to complete the sale, and looked at the undercover police while they waited to arrest the parties.

*Navejar v. State,* 760 S.W.2d 786 (Tex. App. - Corpus Christi 1988, pet. ref'd), found insufficient corroborating evidence for a delivery of heroin conviction where testimony only showed that Navejar followed his accomplice in another car, parked next to the accomplice, and stayed in his car while accomplice attempted to sell drugs.

In *Hernandez v. State*, the Corpus Christi Court of Appeals reversed a murder conviction, finding no evidence to link Hernandez to the murder other than suggestions that he was around the victim and once owned a shotgun similar to the one used.  907 S.W.2d 654, 658 (Tex. App.–Corpus Christi 1995, _____).

Indeed, the Court of Criminal Appeals has reversed convictions for insufficient corroborating evidence, including a theft in *Moron v. State*, 779 S.W.2d 399 (Tex. Crim. App. 1985).  And in a remarkable decision in *Cruz v. State,* 690 S.W.2d 246 (Tex. Crim. App. 1985), the Court ordered the acquittal and release of a death row inmate because there was insufficient corroborating evidence linking him to the capital murder.

**J.      Trial Counsel Failed to Seek and Include a Jury Instruction on Corroboration of a Confession.**

"A person is an accomplice if there is sufficient evidence connecting him or her to the criminal offense as a blameworthy participant.  *Blake,* 971 S.W.2d at 455. The participation necessary to be considered an accomplice must involve an affirmative act or omission by the witness to promote the commission of the offense.  *Id.* at 454; *McFarland,* 928 S.W.2d at 514.  The test is whether there is sufficient evidence in the record to support a charge against the witness

alleged to be an accomplice. Whether the person is actually charged and prosecuted for his or her participation is irrelevant; what matters is the evidence in the record.  *Blake,* 971 S.W.2d at 455. Witnesses may be accomplices as a matter of law.  If there exists no doubt or the evidence clearly shows that a witness is an accomplice witness as a matter of law, the trial court is under a duty to so instruct the jury.  *Blake,* 971 S.W.2d at 455.  One who is or may be indicted for the same offense with which a defendant is charged, or for a lesser included offense based on alleged participation in the commission of the greater offense, is considered an accomplice as a matter of law.  *Ex parte Zepeda,* 819 S.W.2d 874, 876 (Tex. Crim. App. 1991). If evidence presented by the parties is conflicting, it is proper to leave the question of whether an inculpatory witness is an accomplice witness as a matter of fact to the jury, under instructions defining the term accomplice.  *Blake,* 971 S.W.2d at 455; *see Gamez v. State,* 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)."  *Long v. State*, slip op. at 3-4, ___ S.W.3d at ___ (footnote omitted); *see Harris v. State,* 645 S.W.2d 447, 454 (Tex. Crim. App. 1983) (holding that when the evidence clearly shows a witness is an accomplice as a matter of law, the trial court must so instruct the jury); *Chapman v. State,* 470 S.W.2d 656, 660 (Tex. Crim. App. 1971) (holding that one accomplice witness cannot corroborate the testimony of another accomplice witness).

"It is also clear who is not an accomplice witness: a person who is merely present at the scene of an offense is not an accomplice.  *Blake,* 971 S.W.2d at 454; one is not an accomplice for knowing about a crime and not disclosing it, or even concealing it. *Id.; Kunkle,* 771 S.W.2d at 439. If the evidence is clear that the witness is not an accomplice witness, no instruction need be given to the jury either that the witness is an accomplice as a matter of law, or in the form of a fact issue

343

whether the witness is an accomplice witness.  *Gamez*, 737 S.W.2d at 322."  *Long v. State*, slip op. at 3-4, ___ S.W.3d at ___.

The best analysis appears in *Mize*, 915 S.W.2d at 896-97.

*Analysis.*  Here, the trial judge erred by not instructing jurors that the juvenile and adult accomplices in Mr. Garcia's juvenile offenses were accomplices as a matter of law, or at least fact. At the very least, there was a disputed fact issue which should have been submitted in the form of an instruction allowing jurors to conclude that they were accomplices, and if so, then requiring jurors to find evidence to corroborate their testimony.  *See* McClung, Paul, Texas Criminal Jury Charges 365 (1999 ed.)  Courts reversing on this basis include *Long v. State*, ___ S.W.3d ____, No. 06-98-179-CR (Tex. App.–Texarkana Nov. 2, 1999) (to be published); *Howard v. State,* 972 S.W.2d 121, 128 (Tex.App. - Austin 1998, no pet.).

### K.      Trial Counsel Failed to Challenge Testimony of Mr. Heaton as Entirely Hearsay.

One of the witnesses called by the State was Joel Christopher Heaton, the director of the Texas Municipal Police Association.  (R.R. vol. 27 at 187-88.)  In 1988, Mr. Heaton was a Plano police officer.  He told jurors that Gustavo was responsible for several Plano home burglaries.  A juvenile named Rene Guajardo confessed to several burglaries and implicated Gustavo as an associate.  Mr. Heaton also interviewed other people and recovered some of the stolen property from a Plano apartment complex.  Some of the people who were found with the stolen property said that they had obtained it from Gustavo and other people.  Mr. Heaton assumed that the apartment complex residents with the stolen property were fencing the property from Gustavo and others. (R.R. vol. 27 at 188-96.)

Mr. Garcia's lawyer did not object to any of this hearsay testimony.

Mr. Heaton also told jurors that he interviewed a couple called the Jacksons. The Jacksons were two people he believed were fencing stolen property. He explained to jurors that he arranged for these co-conspirators to review a photographic lineup. The Jacksons, according to Mr. Heaton, looked at a lineup of photographs and identified Gus Garcia as one of the young men who sold stolen property to them. (R.R. vol. 27 at 205-06.) There was no objection to this hearsay by the defense counsel or effort to obtain the lineup photographs for review, or copies of the interview reports with the Jacksons.

Without objection by defense, Mr. Heaton also told jurors that he arrested Gustavo based on the evidence he obtained, and that Gustavo lied to him about his name. (R.R. vol. 27 at 207-08.) The defense did not object to these custodial interrogation oral statements. (R.R. vol. 27 at 207.)

Mr. Heaton's testimony violated the Confrontation Clause of the Sixth Amendment. There were also abundant *Bruton* violations. Mr. Heaton provided double hearsay of hearsay that other accomplices accused Gustavo of crimes.

In *Lilly v. Virginia*, the Court described the test used to determine whether hearsay violates the Confrontation Clause. 527 U.S. 116, 124-25, 119 S.Ct. 1887, 1894, 144 L.Ed.2d 117 (1999). To avoid a violation of the Confrontation Clause, hearsay evidence must fall within a "firmly rooted hearsay exception," *or* must contain "particularized guarantees of trustworthiness" such that cross-examination would probably add little, if anything, to the reliability of the evidence. *Id*. (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). Hearsay which falls into the "firmly rooted" category is that "whose conditions have proven over time `to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath' and cross-examination at a trial." *Id.,* 527 U.S. at 126, 119 S.Ct. at 1895 (citing *Mattox*

345

*v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed.2d 409 (1895)). *Lilly* relied upon *Bruton v. United States* for the idea that while a defendant's confession is one type of statement against penal interest and admissible against him, use of a confession as evidence against a co-defendant is not justified because such confessions are not within a firmly rooted exception to the hearsay rule for Confrontation Clause purposes. *Id.*, 527 U.S. at 128, 119 S.Ct. at 1896 (citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). The Court found that, consistent with the underlying principles in *Bruton*, a confession made to police by an accomplice which incriminates the defendant is inadmissible under general Confrontation Clause analysis. *Id.*, 527 U.S. at 131, 119 S.Ct. at 1897.

Supporting cases include the following:

***Dawkins v. State***, 346 S.C. 151, 551 S.E.2d 260 (2001). Counsel ineffective in criminal sexual conduct case for failing to object to the hearsay testimony of four witnesses that the alleged victim told them the identity of the perpetrator. While limited hearsay corroborative testimony is allowed in sexual assault cases, this corroboration is limited to the time and place of the assault and cannot include details or particulars, such as identification of the perpetrator. The defendant was prejudiced because improper corroboration that is merely cumulative to the victim's testimony cannot be harmless. Moreover, where the alleged victim's credibility was the central issue at trial, counsel's ineffectiveness could not be excused by a strategy to avoid upsetting or confusing the jury, especially since this issue could have been litigated outside the presence of the jury.

### L.  Trial Counsel Failed to Seek a Limiting Instruction Requiring Jurors to Disregard Uncorroborated Testimony of Accomplices.

The trial counsel failed to seek a limiting instruction for this testimony.

Supporting cases include the following:

*Mann v. State*, ___ S.E.2d ___, 2001 WL 1231461 (Ga. Ct. App. Oct. 17, 2001).  Counsel ineffective in sodomy case for failing to object to the testimony of a police investigator and a professional counselor that they believed the victim when he said he had been sexually abused. After the jury had already heard much of this testimony, the defense objected at a bench conference and the judge sustained.  The jury had already heard the testimony though and no instruction was given to the jury to disregard the testimony, and no other type of curative instruction was asked for or given.  Prejudice was found due to this improper testimony because the case was otherwise based only on the credibility of the alleged victim and the defendant when the victim refused to answer many of the questions during the trial and had only initially reported the abuse when he had himself been in trouble for committing sexual acts on another child.

**M.     Trial Counsel Failed to Obtain the Written Statements and Offense Reports from Mr. Heaton.**

The trial counsel failed to obtain the written statements and reports from Mr. Heaton. Counsel for Mr. Garcia asks the Court to compel the State to produce these statements and reports immediately.

**N.     The Trial Counsel Failed Seek a Pre-Trial *Franks* Hearing on the Admissibility of All of Mr. Heaton's Hearsay, Confession by Mr. Garcia, and Accusations by Co-Conspirators.**

**O.     Trial Counsel Elicited Extraneous Offense from Mr. Heaton.**

His questions led to testimony about Gustavo bringing a rifle to be fenced.

347

**P.** **Trial Counsel Failed to Challenge Photographic Lineup and Entirely Hearsay Testimony by a Police Officer That Co-Conspirators Picked out the Right Suspect.**

Mr. Heaton also told jurors that he interviewed a couple called the Jacksons.  The Jacksons were two people he believed were fencing stolen property.  He explained to jurors that he arranged for these co-conspirators to review a photographic lineup.  The Jacksons, according to Mr. Heaton, looked at a lineup of photographs and identified Gus Garcia as one of the young men who sold stolen property to them.  (R.R. vol. 27 at 205-06.)  There was no objection to this hearsay by the defense counsel or effort to obtain the lineup photographs for review, or copies of the interview reports with the Jacksons.

**Q.** **Trial Counsel Failed to Object to In-Custody Interrogation and Oral Statements of Mr. Garcia as a Juvenile.**

Without objection by defense, Mr. Heaton also told jurors that he arrested Gustavo based on the evidence he obtained, and that Gustavo lied to him about his name.  (R.R. vol. 27 at 207-08.)  The defense did not object to these custodial interrogation oral statements.  (R.R. vol. 27 at 207.)

**R.** **Trial Counsel Failed to Object to Hearsay of Owner of a Car Dealership Regarding Recovery of Cars Allegedly Stolen by Mr. Garcia as a Juvenile.**

One of the witnesses called by the State was Eddie W. Bradley, a manager at a Plano car dealership.  (R.R. vol. 28 at 14-15.)  He reported that in November 21, 1988, someone broke into the building, stole all of the car keys from the lock box, and took two cars from the lot.  The thieves drove through the cable barrier crossing the driveway.  The cars were found several weeks later driven by someone near the Plano High School.  (R.R. vol. 28 at 18.)  He had no personal knowledge at all of the recovery of these cars, but merely reported what was told to him.

348

**S.      Trial Counsel Failed to Object to the Hearsay Statements of Dep. Mehman, Dept. Blackburn, and Dept. Ponder.**

These were guards involved in responding to the attempted escape by inmates at the Ellis Unit.  They all described what they were told by other guards, rather than what they observed.

**T.      Trial Counsel Failed to Challenge the Signature on the Note Signed by Mr. Gustavo in the Dail Demanding a Match.**

The State introduced a note allegedly written by Mr. Garcia in jail.  There was no challenge to its authenticity.

One of the witnesses called by the State was Jerry Mehman, a deputy with the Collin County Sheriff's Department.  (R.R. vol. 28 at 74-75.)  In 1991, he was a jail officer.        Dep. Mehman testified that at one point in the jail, another inmate told guards that he and Mr. Garcia wanted a match so they could smoke.  The pair signed a note to guards stating that if they could not have a match then they would rather die.  (R.R. vol. 28 at 87; St. Exh. L.)  The other inmate began banging his head against the cell door.  Guards asked the two inmates to open the door but they refused.  The two inmates, one of whom was Mr. Garcia, had jammed a roll of toilet paper between the wall and the door and a ballpoint pen was stuck into the door track.  Consequently, the door would not open. Guards finally pried open the door and a shake down revealed cigarettes in one of the mattresses.

No one testified that it was Mr. Garcia's signature or handwriting.

**U.      Trial Counsel Failed to Challenge Royce Smithey's Qualifications in a 702 Hearing.**

A full discussion of the problems with Mr. Smithey's dicey qualifications appears above.

**V.      Trial Counsel Failed to Request Instruction of Definition in Charge of Key Term "Reasonable Doubt" or Make Proper Objections to its Omission.**

Supporting cases include:

349

*Stanford v. Stewart*, ___ S.E.2d ___, 2001 WL 1349202 (Ga. Nov. 5, 2001).  Trial counsel ineffective in arson case for failing to object to an erroneous instruction on the elements of the offense.  Appellate counsel ineffective for failing to raise ineffective assistance of trial counsel.  Defendant was indicted for arson for setting fire to a dwelling house.  The evidence at trial showed that he set fire to an apartment and that other residents of the apartment building were displaced.  At the conclusion of the trial, the court instructed on the elements of setting fire to a building under circumstances where "human life might be in danger."  Following these instructions, the prosecutor asked for an additional instruction on the indicted offense.  The defense counsel responded that either was sufficient.  The court brought the jury back in and instructed on the indicted offense and repeated the erroneous instruction.  Following these instructions, counsel did not object but stated that he reserved his right to object later.  Trial counsel was ineffective because a mistrial would have been granted if he had objected.  Appellate counsel was ineffective because he raised the substantive issue but did not raise ineffective assistance of trial counsel because he believed the issue was properly preserved.  The appellate court found error but found that the issue was not preserved because of trial counsel's acquiescence in the error.  "No reasonably effective appellate counsel would have failed to recognize that the charging error was not preserved for review."  *Id.* at ___.

*State v. Rogers,* 32 P.3d 724 (Mont. 2001).  Counsel ineffective in felony sexual assault case for failing to request a failure-to-agree instruction that would have allowed the jury to consider the lesser included offenses of misdemeanor sexual assault and misdemeanor assault if it were unable to reach a verdict on the greater offenses of attempted sexual intercourse without consent and felony sexual assault.  While the court had agreed to give lesser-included- offense instructions, counsel

failed to request this instruction and offered no strategic reason.  Prejudice found even though the jury convicted only of felony assault, apparently rejecting the sexual intent element, because hold-out jurors may have reached this verdict as a compromise rather than voting to acquit.  Counsel was also ineffective in refusing to file the notice of appeal, despite the defendant's repeated requests to do so, instead of filing the appeal and submitting an *Anders* brief.

> ***Dean v. State***, ___ S.W.3d ___, 2001 WL 1328491 (Tenn. Oct. 30, 2001).  Trial counsel ineffective in attempted second degree murder case for failing to object to erroneous instruction on range of punishment for attempted second-degree murder where the jury was instructed prior to deliberations on guilt-or-innocence, as then required under state law, that the punishment was 3-10 years when it was actually 8-30 years for this offense.  The jury was instructed on other offenses and ranges but convicted on this one.  Counsel's conduct was deficient because counsel was unaware of the pertinent sentencing range and unaware of a case finding this same instruction to be error four years before.  Prejudice found because the jury may well have relied on this instruction in finding the defendant guilty on this offense.  The court also rejected in this case that this issue was not cognizable because the sentencing range was a matter of state statutory law when post-conviction relief was limited to state and federal constitutional law.  The court made it clear that ineffective assistance of counsel, regardless of the underlying issue, is always a federal constitutional issue.

W. **Trial Counsel Failed to Object to Interview of Mr. Garcia by the State's Psychologist and Forced Waiver of his Fifth Amendment Right to Silence or to Challenge Constitutionality of *Lagrone v. State.***

The trial counsel allowed Gustavo to be interviewed by a state psychologist without objecting or preserving the issue.  (R.R. vol. 25 at 203.)

In this point, it may be impossible for anyone to overcome *Lagrone v. State*, but without an objection, the matter may be procedurally defaulted for federal review.

**X.      Trial Counsel Failed to Put Mr. Garcia on the Stand Outside the Jury's Presence to Create a Record of What He Would Have Explained Really Occurred During His Interview and Confession.**

With no risk, the trial counsel could have challenged the voluntariness of the confessions and built a record for higher courts by putting Garcia on the stand to explain what actually occurred. His testimony in such a hearing would likely have altered the analysis and decision of the trial court to permit the confessions, and would have provided a record for later federal rule.

For these reasons, counsel was ineffective.

## CONCLUSION

As this petition demonstrates, Garcia' rights under the federal constitution were violated, unremedied by Texas courts.

## RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, the Applicant GUSTAVO JULIAN GARCIA asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.   He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Garcia from custody, or alternatively, to reverse Garcia' conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Garcia also asks the Court to allow a reasonable time to amend this petition rather than to dismiss for failure to exhaust remedies.   He also requests reasonable time to respond to the State's

352

answer to this petition.  Finally, he asks for such other relief as the Court finds the Applicant justly entitled.

Respectfully submitted this 11 day of October 2009,

*James W. Volberding*

_____

**JAMES W. VOLBERDING**
**SBN: 00786313**

**Plaza Tower**
**110 North College Avenue**
**Suite 1850**
**Tyler, Texas 75702**

**(903) 597-6622 (Office)**
**(903) 597-5522 (fax)**
*e-mail: volberding@attglobal.net*

*John E. Wright*

_____

**JOHN E. WRIGHT**
**SBN: 20048500**

**Law Office of John E. Wright, P. C.**
**P. O. Box 6547**
**Huntsville, Texas 77342-6547**
**(936) 291-2211 Voice**
**(832) 201-0463  Fax**
*e-mail: wright49@swbell.net*

353

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this pleading has been delivered this 11 day of October 2009 to:

Ms. Fredericka Sargent
Office of the Attorney General                      *Counsel for the State*
Capital Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1600 (voice)
(512) 320-8132 (fax)

by the following means:

\_\_\_\_\_          By U.S. Postal Service Certified Mail, R.R.R.
\_\_\_\_\_          By First Class U.S. Mail
\_\_\_\_\_          By Special Courier _____
\_\_\_\_\_          By Hand Delivery
\_\_\_\_\_          By Fax before 5 p.m.,
\_\_\_\_\_          By Fax after 5 p.m.
\_X\_\_\_          By Email at Fredericka.Sargent@oag.state.tx.us

*James W. Volberding*

_____
JAMES W. VOLBERDING